**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| CODE REVISION COMMISSION and STATE OF GEORGIA, | : : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:15-CV-2594-RWS |
| | : | |
| PUBLIC.RESOURCE.ORG, INC., | : | |
| | : | |
| Defendant. | : | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 29] and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 30].

**I.      Factual Background**

Plaintiff Code Revision Commission ("Commission") is composed of the Lieutenant Governor, four members of the Senate, the Speaker of the House of Representatives, four additional members of the House of Representatives, and four members appointed by the State Bar of Georgia, one of whom is a judge or senior judge of the State Superior Courts and one of whom is a State district attorney.  O.C.G.A., Foreword at x.   The Commission assists the Georgia

legislature in publishing the laws it enacts in the Official Code of Georgia ("O.C.G.A.") [Doc. No. 29-1, ¶ 12, admitted; Doc. No. 17, ¶ 82].   The Commission was created by the General Assembly in 1977 and was tasked with selecting a publishing firm "possessing the necessary expertise and manpower to accomplish a complete remodification [of the state's laws] as quickly as possible." O.C.G.A., Foreword at ix-x.  From five law publishers, the Commission selected The Michie Company to prepare and publish what would become the O.C.G.A. and entered into a contract.  Id. at x.

The Commission itself developed the uniform numbering system and rules of style used in the new (1981) Code and adopted an arrangement into 53 Code titles.  Id. at xi.  Upon completion of the editorial process, a manuscript entitled the *Code of Georgia 1981 Legislative Edition* was prepared, presented to the General Assembly, and enacted at the 1981 extraordinary session of the General Assembly [Doc. No. 29-1, ¶ 19, admitted].  Annotations, indexes, editorial notes, and other materials have been added to that manuscript to produce the O.C.G.A., the first official Code to be published under authority of the State of Georgia since the Code of 1933 [Id.].

On October 3, 2006, the Commission issued a Request for Proposals, and

2

on December 27, 2006, the Commission entered a new Agreement for Publication

("Agreement") with Matthew Bender & Co. Inc. ("Lexis/Nexis") [Doc. No. 29-1,

¶ 20, admitted; Doc. No. 29-8].   The Agreement requires the official Code to

include not only the statutory provisions, but also "annotations, captions,

catchlines, headings, history lines, editorial notes, cross-references, indices, title

and chapter analyses, research references, amendment notes, Code Commission

notes, and other material related to or included in such Code at the direction of the

Commission" [Doc. No. 29-8, p. 2].   Each O.C.G.A. volume and supplement

therefore contains statutory text and non-statutory annotation text, including

judicial decision summaries, editor's notes, research references, notes on law

review articles, summaries of the opinions of the Attorney General of Georgia,

indexes, and title, chapter, article, part, and subpart captions, which are all

prepared by Lexis/Nexis under the requirements of the Agreement [Doc. No. 17,

¶¶ 1-3, 9, 18, and 26].

The Agreement provides that the Commission, not its hired publisher, has

"the ultimate right of editorial control" both over all material contained in the

O.C.G.A. and over what material is selected to become part of the O.C.G.A. [Doc.

No. 29-8, p. 2]. The Agreement requires Lexis/Nexis to follow the Commission's

detailed publication manual, which "reflect[s] those specific content, style and publishing standards of the Code as adopted, approved or amended from time to time by the Commission or its staff pursuant to Code Section 28-9-3 of the Official Code of Georgia Annotated" [Id.]. Additionally, the Agreement requires that Lexis/Nexis summarize "all published opinions of the Georgia Supreme Court and the Court of Appeals of Georgia, and all published opinions of the United States Supreme Court and other federal courts that arose in Georgia and construed Georgia general statutes, whether such decisions favor plaintiffs, defendants, or the prosecution" [Id., p. 4]. The Agreement similarly provides that research references and legislative history are included in the O.C.G.A. [Id., pp. 5-6].

The Agreement requires that Lexis/Nexis provide Georgia's statutes in an un-annotated form on a website that the public can access for free using the Internet [Doc. No. 29-8, pp. 12-13; Doc. No. 17, ¶¶ 73-75]. The free public website contains only the statutory text and numbering of the O.C.G.A. [Doc. No. 17, ¶¶ 73, 75]. The Agreement requires Lexis/Nexis to track usage of the un-annotated Code and to report annually to the Commission the amount of usage and the effect of subscriptions to the Code in print and on CD-ROM [Doc. No. 29-8, p. 13]. The Agreement requires Lexis/Nexis to provide appropriate copyright

4

AO 72A
(Rev.8/8
2)

notice on both the free public website and the online O.C.G.A. available as part of the Lexis/Nexis for-profit online services and to notify visitors that any reproduction of the O.C.G.A. other than the statutory text and numbering is prohibited [Doc. No. 29-8, p. 13].

In Georgia, Lexis/Nexis has the exclusive right to publish and sell the O.C.G.A. as a printed publication, on CD-ROM and in an online version, and Lexis/Nexis receives income from its sales of the O.C.G.A. [Doc. No. 17, ¶¶ 84-85]. The Commission, however, only receives royalties from the licensing fee for the CD-ROM and online versions of the O.C.G.A. [Doc. No. 29-1, ¶ 37, admitted]. In fiscal year 2014, the Commission received $85,747.91 in licensing fee royalties [Id., ¶ 38, admitted].

To make the O.C.G.A., including the annotations, available on the Internet, Public Resource purchased all 186 printed volumes and supplements of the O.C.G.A., scanned them all, and then posted those copies on its website: https://law.resource.org [Doc. No. 17, ¶¶ 34-36]. Public Resource also distributed copies of the entirety of the O.C.G.A. contained on USB thumb drives to the Speaker of the House, Georgia House of Representatives, Mr. Wayne Allen, Legislative Counsel, Office of Legislative Counsel, Georgia General Assembly,

AO 72A
(Rev.8/8
2)

and other members of the State of Georgia legislature [Id., ¶¶ 63-64]. Public Resource actively encourages all citizens to copy, use, and disseminate the O.C.G.A. volumes and to create works containing them [Doc. No. 29-1, ¶ 74, admitted].

This action was filed on July 21, 2015 [Doc. No. 1]. On October 8, 2015, Plaintiffs filed an Amended Complaint with claims for direct and indirect copyright infringement [Doc. No. 11]. Plaintiffs seek injunctive relief and removal of any infringing materials from the Internet [Id.]. Defendant filed a Counterclaim which seeks a judgment of non-infringement [Doc. No. 16].

After the Commission commenced this action, Public Resource purchased and copied the 2015 volumes and supplements of the O.C.G.A. and posted them on its website [Id., ¶ 46]. In addition, Public Resource posted the copies on the Internet archive website, www.archive.org [Id., ¶¶ 50-52, 54-56].

## II.   Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . .

6

AO 72A
(Rev.8/8
2)

court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But the court is bound only to draw those inferences that are reasonable.

7

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## III.   Analysis

Defendant has filed a Motion for Summary Judgment [Doc. No. 29]. Plaintiffs have filed a Motion for Partial Summary Judgment [Doc. No. 30] because Plaintiffs do not request judgment as to the 2015 works, which at the time of briefing were yet to be registered. In support of its motion, Defendant contends that the Court should grant summary judgment for two reasons: (1) the annotations to the O.C.G.A. are not copyrightable due to the unusual circumstances in Georgia in which the O.C.G.A., the only official Code of Georgia, includes the annotations; and (2) even if the annotations are copyrightable, Defendant's use

AO 72A
(Rev.8/8
2)

constitutes a non-infringing fair use of the copyrighted work.

### A.   Copyrightability of the O.C.G.A.

In order to establish a case of direct copyright infringement, Plaintiffs must demonstrate that: (1) they own a valid copyright in the allegedly infringing works, and (2) that Defendant copied the protected elements of the works. Peter Letterese & Assocs. v. World Inst. of Scientology Enters., Int'l, 533 F.3d 1287, 1300 (11th Cir. 2008) (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)). The parties have stipulated that, outside of the works published in 2015, each of the O.C.G.A. works is the subject of a copyright registration [Doc. No. 17, ¶ 17]. A certificate of copyright registration made within five years after first publication of the work constitutes "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1233 (11th Cir. 2010); 17 U.S.C. § 410(c). Production of these registrations shifts the burden to Defendant to establish that the registered works are not copyrightable. Latimer, 601 F.3d at 1233.

The Copyright Act extends protection to copyright owners "in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise

AO 72A
(Rev.8/8
2)

communicated, either directly or with the aid of a machine or device." 17 U.S.C.

§ 102(a). The Supreme Court instructs that the amount of originality required to

extend copyright protection to a work is exceedingly low, that only a "modicum

of creativity" is needed, and that copyright protection will be provided to the work

"no matter how crude, humble or obvious it might be." Feist, 499 U.S. at 345-46.

The Copyright Act itself specifically lists "annotations" in the works

entitled to copyright protection. 17 U.S.C. § 101. A long line of cases recognizes

copyright protection for annotated cases and statutes. See, e.g., W.H. Anderson

Co. v. Baldwin Law Pub. Co., 27 F.2d 82 (6th Cir. 1928); Lawrence v. Dana, 15

F. Cas. 26 (C.C.D. Mass. 1869). Moreover, the United States Copyright Office's

own treatise expressly recognizes the protectability of annotations. U.S.

COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES §§

313.6(C)(2), 717.1 (3d ed. 2014) (stating also that "[a] legal publication that

analyzes, annotates, summarizes, or comments upon a legislative enactment, a

judicial decision, an executive order, an administrative regulation, or other edicts

of government may be registered as a non-dramatic literary work"). In fact, the

Copyright Office has a long history of registering annotated statutes, such as

Copyright Reg. AA000020419 for Vernon's Annotated Statutes of the State of

10

Texas and Copyright Reg. TX0008001813 for Annotated Statutes of New Mexico 2015 Advance Code Service.  Defendant admits that annotations in an unofficial Code would be copyrightable [Doc. No. 17-4, p. 2].

Here, Defendant argues that these annotations to the O.C.G.A. are not copyrightable, but the Court disagrees.  The Court acknowledges that this is an unusual case because most official codes are not annotated and most annotated codes are not official.  The annotations here are nonetheless entitled to copyright protection.  The Court finds that Callaghan v. Myers, 128 U.S. 617 (1888), in which the Court found annotations in a legal reporter were copyrightable by the publisher, is instructive.  Defendant itself has admitted that annotations in an unofficial reporter would be copyrightable, and the Court finds that the Agreement does not transform copyrightable material into non-copyrightable material.

Furthermore, a transformation of an annotation into one uncopyrightable unit with the statutory text would be in direct contradiction to current Georgia law.  The U.S. Copyright Office has stated: "As a matter of longstanding public policy, the U.S. Copyright Office will not register a government edict that has been issued by any state." Compendium of U.S. Copyright Office Practices § 313.6(C)(2) (3d ed. 2014).  However, the Copyright Compendium makes clear that the Office may

11

register annotations that summarize or comment upon legal materials unless the

annotations have the force of law.  Only those government documents having the

force of law are uncopyrightable.  Id.

The entire O.C.G.A. is not enacted into law by the Georgia legislature and

does not have the force of law.  The Georgia General Assembly has passed not just

one but three different statutes to make clear that the O.C.G.A. contains both law

and commentary.  O.C.G.A. § 1-1-1 distinguishes the statutory and non-statutory

commentary portions of the O.C.G.A.:

> The statutory portion of the codification of Georgia laws prepared by
> the Code Revision Commission and the Michie Company pursuant
> to a contract entered into on June 19, 1978, is enacted and shall have
> the effect of statutes enacted by the General Assembly of Georgia.
> The statutory portion of such codification shall be merged with
> annotations, captions, catchlines, history lines, editorial notes, cross-
> references, indices, title and chapter analyses, and other materials
> pursuant to the contract and shall be published by authority of the
> state pursuant to such contract and when so published shall be known
> and may be cited as the "Official Code of Georgia Annotated."

O.C.G.A. § 1-1-7 first enacted as a session law in 1982 further states:

> Unless otherwise provided in this Code, the descriptive headings or
> catchlines immediately preceding or within the text of the individual
> Code sections of this Code, except the Code section numbers
> included in the headings or catchlines immediately preceding the text
> of the Code sections, and title and chapter analyses do not constitute
> part of the law and shall in no manner limit or expand the

12

AO 72A
(Rev.8/8
2)

> construction of any Code section. All historical citations, title and
> chapter analyses, and notes set out in this Code are given for the
> purpose of convenient reference and do not constitute part of the law.

Finally, the State of Georgia sessions laws include the following:

> Annotations; editorial notes; Code Revision Commission notes;
> research references; notes on law review articles; opinions of the
> Attorney General of Georgia; indexes; analyses; title, chapter, article,
> part, and subpart captions or headings, except as otherwise provided
> in the Code; catchlines of the Code sections or portions thereof,
> except as otherwise provided in the Code; and rules and regulations
> of state agencies, departments, boards, commissions, or other entities
> which are contained in the Official Code of Georgia Annotated are
> not enacted as statutes by the provisions of this Act.

2014 Ga. Laws 866, 2015 Ga. Laws 5, § 54.

Finally, Defendant has argued that the merger doctrine applies here and bars copyrightability. Under the merger doctrine, "expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." BUC Int'l Corp. v. Int'l Yacht Council Ltd., 489 F.3d 1129, 1142 (11th Cir. 2007) (internal quotation marks omitted). Such is not the case here. The mere fact that the judicial summaries in the O.C.G.A. are distinctly different from corresponding annotations in West's Code Annotated belies the applicability of the merger doctrine. There is no question that there are a multitude of ways to write a

AO 72A
(Rev.8/8
2)

paragraph summarizing a judicial decision, and further, a multitude of ways to compile the different annotations throughout the O.C.G.A. Therefore, the Court finds that the merger doctrine is inapplicable here.

For the reasons discussed above, the Court finds that the annotations of the O.C.G.A. are copyrightable.

### B.    Fair Use

Since the Court has found that the annotations of the O.C.G.A. are entitled to copyright protection, the Court will now address Defendant's arguments regarding fair use. A claim of fair use is an affirmative defense with the burden of proof on the putative infringer. See Harper & Row, Publishers v. Nation Enters., 471 U.S. 539, 562 (1985); Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1280 (11th Cir. 2014). In determining whether application of the fair use doctrine is appropriate, the Copyright Act mandates the review of four factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. These four

14

statutory factors are not to be treated in isolation from one another. <u>See</u> <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 578 (1994).  Rather, "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." <u>Id.</u> at 578.

### i.      Purpose and character of the use

The first factor that the Court must consider is the purpose and character of Defendant's use of the copyrighted work.  The Court must consider multiple factors, including (1) the extent to which the use is "transformative" rather than merely a superseding use of the original work, and (2) whether the use is for a nonprofit educational purpose, as opposed to a commercial purpose.  <u>Peter Letterese & Assocs. v. World Inst. of Scientology Enters.</u>, 533 F.3d 1287, 1309 (11th Cir. 2008).  The Eleventh Circuit instructs:

> A transformative work is one that adds something new, with a further purpose or different character, altering the first work with new expression, meaning or message.  On the other hand, a work that is not transformative, and that merely supersedes the objects of the original creation, is less likely to be entitled to the defense of fair use because of the greater likelihood that it will supplant the market for the copyrighted work, fulfilling demand for the original.

<u>Id.</u> at 1310 (internal citations and quotation marks omitted).

Defendant does not transform the annotations. It does not add, edit, modify,

15

AO 72A
(Rev.8/8
2)

comment on, criticize, or create any analysis or notes of its own. Defendant's justification in support of its verbatim copying and free distribution without authorization is that it purports to provide wider distribution of the annotations. Courts have routinely rejected arguments that this is transformative use. See, e.g., Author's Guild, Inc. v. HathiTrust, 755 F.3d 87, 101 (2d Cir. 2014) ("[T]he district court concluded that the 'use of digital copies to facilitate access for print-disabled persons is a transformative' use. This is a misapprehension; providing expanded access to the print disabled is not 'transformative'") (citation omitted)); Seltzer v. Green Day, Inc., 725 F.3d 1170, 1177 (9th Cir. 2013) ("In the typical 'non-transformative' case, the use is one which makes no alteration to the expressive content or message of the original work." (emphasis omitted)). Defendant's verbatim copying and posting of the annotations is expressly designed to supplant the O.C.G.A. as already distributed and made available online by Lexis/Nexis, which is not transformative.

The Court must also consider whether Defendant's use is for a nonprofit educational purpose, as opposed to a commercial purpose. That Defendant is a nonprofit does not end the inquiry pursuant to § 107(1). The Supreme Court has explained that "[t]he crux of the profit/nonprofit distinction is not whether the sole

16

motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471 U.S. at 562. Courts in several cases have found that educational use of copyrighted works by a nonprofit entity (or an individual associated with such an entity) was commercial even though the secondary user was not selling the items in question; "profit" may take the form of an indirect economic benefit or a non-monetary, professional benefit. See, e.g., Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 61 (1st Cir. 2012) (finding that the first factor weighed against fair use where an archbishop used copyrighted translations of a religious text on his website; although the use was educational, the archbishop profited from the use, in part, in the form of enhanced professional reputation; Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1118 (9th Cir. 2000) (finding the first factor weighed against fair use where a religious organization distributed copies of a copyrighted book for use in its religious observance; the use was nontransformative, and although the use was educational, the organization profited indirectly by using the work to attract new members who would tithe ten percent of their income); Weissmann v. Freeman, 868 F.2d 1313, 1324 (2d Cir. 1989) (finding that the first factor weighed

17

against fair use where a professor claimed an assistant's paper as his own work and copied it for use in his class, under the professor's name, because the professor profited from the use by enhancing his professional reputation and gaining a valuable authorship credit).

In this case, Defendant's business involves copying and providing what it deems to be "primary legal materials" on the Internet.  Defendant is paid in the form of grants and contributions to further its practice of copying and distributing copyrighted materials.  Defendant has also published documents that teach others how to take similar actions with respect to government documents.  Therefore, the Court finds that Defendant "profits" by the attention, recognition, and contributions it receives in association with its copying and distributing the copyrighted O.C.G.A. annotations, and its use was neither nonprofit nor educational.

### ii.    Nature of the copyrighted work

The second factor that the Court must consider is the nature of the copyrighted work.  The selection, writing, editing, statutory commentary, and creativity of the annotations requires skill and analysis in reviewing a wealth of materials and drafting original materials to inform and educate users about courts

18

and agencies applying the Georgia code and their citation in third party materials.

The creation of the annotations requires a tremendous amount of work from a team

of editors.  These efforts confirm that the annotations are original works entitled

to broad copyright protection.

The fact that the annotations contain fact and not fiction does not end the

inquiry for fair use purposes.  Indeed, the Eleventh Circuit admonished the district

court in Patton for exactly this approach:

> Here, the District Court held that "because all of the excerpts
> are informational and educational in nature and none are
> fictional, fair use factor two weights in favor of Defendants.
> Cambridge Univ. Press, 863 F.Supp.2d at 1242. We disagree.
> . . . Accordingly, we find that the District Court erred in
> holding that the second factor favored fair use in every
> instance.  Where the excerpts of Plaintiffs' works contained
> evaluative, analytical, or subjectively descriptive material that
> surpasses the bare facts necessary to communicate
> information, or derives from the author's experiences or
> opinions, the District Court should have held that the second
> factor was neutral, or even weighed against fair use in cases of
> excerpts that were dominated by such material.

Patton, 769 F.3d 1269-1270.  The annotations in this case contain exactly the

evaluative, analytical, or subjectively descriptive analysis and guidance that the

Eleventh Circuit addressed in Patton.  Thus, the second factor is, at best, neutral

as between these parties.

AO 72A
(Rev.8/8
2)

### iii.    Amount and substantiality of the portion used

The third factor that the Court must consider is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).  A court must ask whether the defendant has "helped [itself] overmuch to the copyrighted work in light of the purpose and character of the use." Peter Letterese, 533 F.3d at 1314 (quoting Campbell, 510 U.S. at 587).  This factor recognizes that the more of a copyrighted work that is taken in quantity and quality, the less likely the use is to be fair.  See Harper & Row, 471 U.S. at 565 (holding that the third factor disfavored fair use because the defendant copied a qualitatively substantial portion of the original work, even though the defendants copied only approximately 300 words out of the 200,000 words in the plaintiffs' work).  Indeed, where a defendant "uses virtually all of a copyrighted work, the fair use defense drifts even further out of its reach." Pac. & S. Co. v. Duncan, 744 F.2d 1490, 1497 (11th Cir. 1984).  In this case, Defendant has misappropriated every single word of every annotation using a bulk industrial electronic scanner.

### iv.    Effect on the potential market

The fourth factor that the Court must consider is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).

AO 72A
(Rev.8/8
2)

The "central question" is whether, assuming that everyone engaged in the defendant's conduct, the use "would cause substantial economic harm such that allowing [the conduct] would frustrate the purposes of copyright by materially impairing [the] incentive to publish the work." Patton, 769 F.3d at 1276. The Supreme Court has expressly stated that this factor forms the most central inquiry of the fair use doctrine. Harper & Row, 471 U.S. at 566 (stating "[t]his factor is undoubtedly the single most important element of fair use").

Plaintiffs have established the markets for the O.C.G.A. works: printed publications, CD-ROM, and subscription services. When considering Defendant's actions being performed by everyone, it is inevitable that Plaintiffs' markets would be substantially adversely impacted. A judicial decree that Defendant's wholesale copying of the copyrighted annotations constitutes a fair use would hinder the economic viability of creating and maintaining the O.C.G.A. because people would be less likely to pay for annotations when they are available for free online.

Additionally, Lexis/Nexis's sole revenue to recoup the costs of preparation of the annotations is through hard copy sales and licensing online access to the O.C.G.A. as permitted by the Agreement. Because Defendant has copied every

21

word of the annotations verbatim and posted them free of charge, Defendant's misappropriation destroys Lexis/Nexis's ability to recover these costs. See Patton, 769 F.3d at 1275 ("Because Defendants' use is nontransformative and fulfills the educational purposes that Plaintiffs, at least in part, market their works for, the threat of market substitution here is great and thus the fourth factor looms large in the overall fair use analysis."). The revenues from such licensing reinforce the value of the O.C.G.A. and the damage that would be inflicted if the entire O.C.G.A. were made available for free.

### v.    Conclusion

The Court has weighed all of the Campbell factors and finds that at least three of the four factors weigh in favor of Plaintiffs and against Defendant. As a result, the Court concludes that Defendant has not met its burden of proving fair use, and Plaintiffs are entitled to partial summary judgment.

## IV.   Conclusion

Defendant's Motion for Summary Judgment [Doc. No. 29] is DENIED. Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 30] is GRANTED. The parties are ORDERED to confer and to submit to the Court, within 14 days, a proposed briefing schedule to address the injunctive relief to which Plaintiffs are

AO 72A
(Rev.8/8
2)

entitled as a result of the foregoing decision.

**SO ORDERED**, this _23ʳᵈ_ day of March, 2017.

**RICHARD W. STORY**
United States District Judge

23