## DOCKET NO. 17-11589-HH

# United States Court of Appeals

*for the*

# Eleventh Circuit

---

CODE REVISION COMMISSION, ET AL.,

*Plaintiffs/Appellees,*

*v.*

PUBLIC.RESOURCE.ORG, INC.,

*Defendant/Appellant.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CASE NO: 1:15-cv-02594-RWS

(Hon. Richard W. Story)

## INITIAL BRIEF OF APPELLANT

ELIZABETH H. RADER
ALSTON & BIRD LLP
The Atlantic Building
950 F Street, N.W.
Washington, DC 20004
(202) 239-3008
elizabeth.rader@alston.com

SARAH P. LaFANTANO
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA 30309
(404) 881-7000
sarah.lafantano@alston.com

*Counsel for Defendant/Appellant*

*Public.Resource.Org., Inc. v. Code Revision Commission et al.*
No. 17-11589-HH

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellant Public.Resource.Org, Inc. provides the following Certificate of Interested Persons and Corporate Disclosure Statement:

- Alston & Bird, LLP (Counsel for Defendant-Appellant)

- Askew, Anthony B. (Counsel for Plaintiff-Appellees)

- Bowler, John M. (Counsel for Amicus Matthew Bender & Co., Inc.)

- Code Revision Commission (Plaintiff-Appellee, on behalf of and for the benefit of the General Assembly and the State of Georgia)

- Cohen, Hon. Mark H. (U.S. District Court Judge for the Northern District of Georgia (originally assigned))

- Durie Tangri, LLP (Counsel for Defendant-Appellant)

- Fastcase, Inc. (Legal publisher having an interest in offering its subscribers the Official Code of Georgia, Annotated without the need for a license)

- General Assembly of Georgia (Beneficiary of Plaintiffs-Appellees)

- Georgia Attorney General's Office (Counsel for State of Georgia)

- Gratz, Joseph C.  (Counsel for Defendant-Appellant)

- Halperin, David (Counsel for Defendant-Appellant)

*Public.Resource.Org., Inc. v. Code Revision Commission et al.*
No. 17-11589-HH

- Hirsch, Michelle J.  (Counsel for State of Georgia)

- Hobbs, Michael B. (Counsel for Amicus Matthew Bender & Co., Inc.)

- LaFantano, Sarah Parker (Counsel for Defendant-Appellant)

- Lexis/Nexis Group (Parent of Amicus Matthew Bender & Co., Inc.)

- Malamud, Carl (President and Founder of Defendant-Appellant)

- Matthew Bender & Co., Inc. (Amicus and licensee of Plaintiffs-Appellees)

- Meunier Carlin & Curfman LLC (Counsel for Plaintiffs-Appellees)

- Pavento, Lisa C. (Counsel for Plaintiffs-Appellees)

- Public.Resource.Org, Inc. (Defendant-Appellant)

- Rader, Elizabeth H. (Counsel for Defendant-Appellant)

- Rosenberg, Jason D. (Counsel for Defendant-Appellant)

- Schemmel, Lawrence A.  (Counsel for State of Mississippi)

- State of Georgia (Beneficiary of Plaintiffs-Appellees)

- State of Mississippi (State alleging Defendant-Appellant infringes copyright in its official code)

- Story, Hon. Richard W. (U.S. District Judge for the Northern District of Georgia )

- Thomas, Warren J. (Counsel for Plaintiffs-Appellees)

- Troutman Sanders LLP (Counsel for Amicus Matthew Bender & Co., Inc.)

*Public.Resource.Org., Inc. v. Code Revision Commission et al.*
No. 17-11589-HH

- Walters, Edward (Co-Founder and CEO of Fastcase, Inc.)

Appellant Public.Resource.Org, Inc. certifies that it is a California non-profit corporation, that it has no parent corporation, that there is nothing to declare with respect to stock ownership, and that there is no other entity related to, or affiliated with, Public.Resource.Org, Inc. that has a financial interest in the outcome of the claims asserted against it in this case.

## 11TH CIR. R. 28-1(C) STATEMENT ABOUT ORAL ARGUMENT

Appellant requests oral argument because it would aid the Court's decisional process in this multi-issue case involving the State of Georgia's assertion of copyright in portions of the Official Code of Georgia, Annotated.

# <u>TABLE OF CONTENTS</u>

Certificate of Interested Persons ............................................................. C-1

Statement Regarding Oral Argument ...................................................... i

Introduction ............................................................................................. 1

Statement of Jurisdiction ......................................................................... 2

Issues Presented ....................................................................................... 3

Statement of the Case .............................................................................. 4

    A.  Public.Resource.Org, Inc ............................................................. 4

    B.  The Official Code of Georgia, Annotated .................................... 5

    C.  Public Resource's scanning and posting ...................................... 8

Standard of Review .................................................................................. 13

Summary of the Argument ....................................................................... 13

Argument .................................................................................................. 16

    A. The district court erred in holding that annotations in the Official
       Code of Georgia, Annotated are copyrightable by the State of Georgia ...... 16

        1.  Federal Courts have held time and time again that a government
           cannot copyright its edicts ...................................................... 16

        2.  The trial court concluded that the annotations are copyrightable
           based on its erroneous interpretation of Georgia laws providing
           that the O.C.G.A's annotations are not statutes and are not enacted ...... 22

        3.  The trial court erred on considering only judicial summaries to find
           all the annotations copyrightable despite the idea/expression
           dichotomy and the merger doctrine ........................................ 23

B.  The district court's findings with respect to the fair use factors are clearly erroneous and, as a result, its holding that Public Resource's use of the O.C.G.A. was not a fair use is an error as a matter of law .......... 28

1.  The test for fair use ................................................................. 28

2.  The district court's findings that Public Resource's use was not transformative and neither non-profit nor educational are clearly erroneous ................................................................................. 29

   a.   The district court improperly ignored Public Resource's transformative purpose and actions to make the posted version more useful than the paper volumes or the redacted "free" website ................................................................................. 29

   b.  The Court's finding that Public Resource profits from its use of the O.C.G.A. was clearly erroneous and its reliance on outlying, non-binding cases to reach that conclusion was legal error .............. 34

3.  The district court's finding as to the second factor was based on a clearly erroneous finding that all the annotations are entitled to protection and on the court's failure to consider many kinds of annotations .............................................................................. 38

4.  The trial court erroneously concluded that the third factor weighed against fair use because failed to consider Public Resource's use of the entire O.C.G.A. was necessary to accomplish its purpose ................ 40

5.  The trial court's finding that use like Public Resource's would inevitably injure the market for the annotations ignored that there was no such injury because Public Resource's posting served different markets .................................................................................. 42

Conclusion .................................................................................. 47

Certificate of Compliance

Certificate of Service

iii

## <u>TABLE OF CITATIONS</u>

**Page(s)**

### Cases

*A.V. ex rel v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ......................................................... 30

*Allen v. Academic Games League of Am., Inc.*,
    89 F.3d 614 (9th Cir. 1996) ........................................................... 34

*American Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*,
    No. 12-528, 2013 WL 4666330 (D. Minn. Aug. 30, 2013) ......................... 30

*Authors' Guild v. Google, Inc.*,
    804 F.3d 202 (2d. Cir. 2015) (Leval, J), *cert. denied*,
    136 S. Ct. 1658 (2016) ..................................................... 30, 31, 45

*Banks v. Manchester*,
    128 U.S. 244 (1888) ...................................................... 16, 17

*BellSouth Advert & Publ'g Corp v. Donnelly Info. Publ'g. Inc.*,
    999 F.3d 1436 (11th Cir. 1993) ..................................................... 27

*Bellsouth Advert. & Publ'g Corp. v. Donnelly Info. Publ'g, Inc.*,
    999 F.2d 1436 (11th Cir. 1993) ................................................. 23, 39

*Building Officials & Code Adm. Int'l. Inc. v. Code Tech., Inc.*,
    628 F.2d 730 (1st Cir. 1980) ............................................... 17, 18, 22

*Callaghan v. Myers*,
    128 U.S. 617 (1988) ............................................................. 20

*Cambridge Univ. Press v. Patton*,
    769 F.3d 1232 (11th Cir. 2014) .................................................... 28

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ....................................................... passim

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
    97 F.3d 1504 (1st Cir. 1996).......................................................................... 24

*Consumers Union of United States, Inc. v. General Signal Corp.*,
    724 F.2d 1044 (2d Cir. 1983) ....................................................................... 38

*Davidson v. Wheelock*,
    27 F.61 (Minn. Cir. Ct. 1866)...................................................................... 17

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003)...................................................................................... 28

*Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)................................................................. 24, 28, 39, 40

*Golan v. Holder*,
    132 S. Ct. 873 (2012)................................................................................... 28

*Harper & Row Pubs., Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)...................................................................... 13, 34, 35

*Harrison Co. v. Code Revision Comm'n*,
    244 Ga. 325 (1979) ...................................................................................... 17

*Higgens v. Keuffel*,
    140 U.S. 428 (1891)...................................................................................... 25

*Hoehling v. Univ. Studios, Inc.*,
    618 F.2d 972 (2d Cir. 1980) ....................................................................... 45

*Home Design Servs. Inc. v. Turner Heritage Homes*,
    825 F.3d 1314 (11th Cir. June 17, 2016)................................................24-25

*Katz v. Google*,
    802 F.3d 1178 (11th Cir. 2015) ........................................................ 34, 36, 42

*Matthew Bender & Co., Inc. v. West Pub. Co.*,
158 F.3d 674 (2d Cir. 1998) ............................................................ 24, 27, 39

*Montgomery v. Noga*,
168 F.3d 1282 (11th Cir. 1999) ................................................................. 13

*Nash v. Lathrop*,
142 Mass. 29, 6 N.E. 559 (1886) ............................................................... 17

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ................................................................... 30

*Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*,
923 F. Supp. 1231 (N.D. Cal. 1995) ..................................................... 36, 37

*Righthaven, LLC v. Jama*,
2011 U.S. Dist. LEXIS 43952 (D. Nev. April 22, 2011) ............................ 36

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012) ....................................................................... 35

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ............................................................................ 40, 46

*Southco, Inc. v. Kanebridge Corp.*,
390 F.3d 276 (3d Cir. 2004) ...................................................................... 25

*Suntrust Bank v. Houghton Mifflin Co.*,
268 F.3d 1257 (11th Cir. 2001) ................................................................. 13

*Super Future Equities, Inc. v. Wells Fargo Bank Minnesota*,
553 F. Supp. 2d 680 (N.D. Tex. 2008) ....................................................... 36

*Swatch Grp. Mgm't. Serv. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d. Cir. 2014) ............................................................ 30, 36, 40

*United States v. Lanier*,
520 U.S. 259 (1997) .................................................................................. 18

*Veeck v. Southern Building Code Cong. Int'l*,
    293 F.3d 791 (5th Cir. 2002) ........................................................................ 17

*Warren Publ'g, Inc. v. Microdos Data Corp.*,
    115 F.3d 1509 (11th Cir. 1997) .............................................................. 23, 27

*Weissmann v. Freeman*,
    868 F.2d 868 F.2d 1313 (2d Cir. 1989) ............................................ 35, 36, 38

*Wheaton v. Peters*,
    33 U.S. 591 (1834) ................................................................................. 16, 21

*Worldwide Church of God v. Philadelphia Church of God., Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ................................................................ 35, 37

## Rules and Statutes

17 U.S.C. § 102(b) ...................................................................................... 23, 27

17 U.S.C. § 107 ............................................................................................ passim

17 U.S.C. § 107(1) ............................................................................................ 29

17 U.S.C. § 107(2) ............................................................................................ 38

17 U.S.C. § 107(3) ............................................................................................ 40

17 U.S.C. § 107(4) ............................................................................................ 42

28 U.S.C. § 1291 ................................................................................................. 2

28 U.S.C. § 1331 ................................................................................................. 2

28 U.S.C. § 1338(a) ............................................................................................ 2

O.C.G.A. § 1-1-1 ................................................................................... 5, 6, 19, 21

O.C.G.A. § 1-1-7 ............................................................................................... 22

## Constitution

U.S. Const. art 1 § 8 cl. 8 ................................................................. 28, 32


## Other Authorities

Pierre N. Leval, Nimmer Lecture:  Fair Use Rescued,
44 UCLA L. Rev. 1449 (1997) ............................................................ 35

## INTRODUCTION

The freedom to read, know and speak the law is essential to our democracy, and is a fundamental underpinning of the doctrines of the Rule of Law, equal protection, due process and access to justice. For this public minded reason, Public.Resource.Org scanned the Official Code of Georgia, Annotated ("O.G.C.A.") and posted an improved, digital version on its website. For the same reason, the nation's courts have long held that edicts of government cannot be protected by copyright. The modern scanner and the Internet are technological advances that can be wonderful tools to disseminate books—and law—to those who otherwise could not, or might not, read them.

But in this case, the district court held that Georgia's Code Revision Commission could use copyright to enjoin scanning and posting the O.C.G.A., the only authoritative source for the law of Georgia. Based on the district court's opinion, it appears that the reason that court would permit the Commission to assert this extraordinary and troubling power is that it hired a private for-profit publisher to prepare and maintain the annotations found throughout its volumes, and in return registered copyright in those annotations and made the publisher its exclusive licensee. The resulting loophole undermines the important constitutional concerns that led to the hallowed doctrine denying copyright protection to edicts of government.

1

The district court also rejected Public Resource's alternative argument, that even if the O.C.G.A.'s annotations could be copyrighted, Public Resource's nonprofit educational use, scanning the O.C.G.A. volumes and posting the digital version to improve access to the code, qualifies as a noninfringing fair use.

The district court went too far in favor of protecting private rights and not far enough in protecting the rights of the citizens of Georgia, and the public in general, to read and share the State's only official code. This Court can and should correct that legal error.

## STATEMENT OF JURISDICTION

The U.S. District Court for the Northern District of Georgia (Judge Story) had federal question jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a) because this is a civil action that arises under the Copyright Act. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's March 23, 2017 Order (Doc. 44) is a final decision granting Code Revision Commission's motion for partial summary judgment and denying Public.Resource.Org., Inc.'s motion for summary judgment, and the district court's April 7, 2017 Permanent Injunction Order (Doc. 46) is also a final decision. This appeal is timely, consistent with Rule 4(a) of the Federal Rules of Appellate Procedure, because Public Resource filed its Notice of Appeal within 30 days of the entry of the district court's March 23, 2017 order. (Doc. 49).

## ISSUES PRESENTED

1.      Courts have repeatedly held that a government cannot use copyright to limit who can copy its edicts, because the public's ability to read and speak the law is vital to protect due process rights and vindicate the Rule of Law.  The Official Code of Georgia, Annotated (O.C.G.A) is Georgia's only official code.  The General Assembly, through the Code Revision Commission, requires specific annotations and supervises their preparation.  Can the state assert copyright in the annotations, and thus in the entire official code of the state, because the Commission hired a publisher to prepare them?

2.      The Copyright Act provides that a copyright only protects expression, not facts, and not short phrases or titles.  Can the state of Georgia hold a valid, enforceable copyright in annotations such as indexes and cross-references or summaries of public judicial opinions?

3.      Public Resource, a non-profit organization dedicated to improving the public's access to public legal materials, purchased and scanned the O.C.G.A.  It also added features to the digitized text to facilitate searching, copying and overall usability, and posted the digital version on its website.  Does Public Interest's use of the O.C.G.A, constitute a fair use of the annotations under 17 U.S.C. § 107?

## STATEMENT OF THE CASE

### A.  Public.Resource.Org, Inc.

Carl Malamud founded Defendant-Appellant Public.Resource.Org, Inc. ("Public Resource") in 2007, with the mission to improve public access to government records and the law.  Doc. 29-3 at ¶¶ 14, 19.  Mr. Malamud felt that the public suffered from the absence on the Internet of primary legal materials, the raw materials of our democracy.  These include judicial opinions, statutes, their codifications and regulations of the executive branch and underlying materials.  *Id.* at ¶ 19.  In 2008, Public Resource posted on the Internet 1.8 million pages of case law, including all U.S. Courts of Appeals opinions from 1950 on, and all U.S. Supreme Court opinions.  *Id.* at ¶ 20.  In the years since, Public Resource has gone on to post millions of pages of the Federal Reporter and to scan three million pages of briefs filed in the Ninth Circuit.  *Id.* at ¶ 21.

Public Resource also looked at the availability of primary legal materials published by states and municipalities.  *Id.* at ¶¶ 31-32.  Most states' statutes and regulations, and their codifications, were available, in some form, on the Internet. *Id.* at ¶ 33.  In many cases, however, the technology employed did not make the information available in a very useful fashion, or take advantage of the Internet and its potential.  *Id.*

4

In May, 2013, Public Resource purchased paper copies of a number of

official state codes and had them scanned. *Id.* at ¶ 45. It then posted the scans of

the official codes, including the Official Code of Georgia, Annotated

("O.C.G.A."), on its website, and uploaded them to the Internet Archive website.

Doc. 11 at ¶¶ 15-17. It did so with the firm conviction that "the freedom to read,

know, and speak the law is essential to our democracy, and is a fundamental

underpinning of the doctrines of the rule of law, equal protection, due process and

access to justice." Doc. 11-3 at 3.

### B.  The Official Code of Georgia, Annotated

The O.C.G.A. is the only official code of Georgia. Ga. Code Ann. § 1-1-1

(West 2017). The State of Georgia enacts and promulgates the laws of the state

through its legislature, the Georgia General Assembly (the "Legislature"). Doc. 17

at ¶ 44. The state laws are provided in Code sections. Doc. 29-16 at 3. The

Legislature is assisted by Plaintiff-Appellee Code Revision Commission in

publishing the Georgia state laws. Ga. Code. Ann. § 1-1-1 (West 2017); Doc. 17 at

¶ 82. Periodically, the Legislature revises, modifies and amends its laws through

supplemental laws and amendments. Doc. 11 at ¶ 9. Every bill introduced in the

Georgia Legislature begins with an incantation in the form: "An Act … To amend

Article . . . of Chapter . . . of Title  . . . of the Official Code of Georgia Annotated."

Doc.17 at ¶ 81.

5

Georgia's General Assembly passes Georgia's statutes and years ago
determined that the official Code should contain specific kinds of annotations.
Doc. 29-6 at 4; Doc. 29-7 at 2-3.   The General Assembly established the
Commission to ensure, among other things, that the O.C.G.A., the State's only
official Code, will contain the annotations. Doc. 29-6 at 3.  Most of the
commissioners are Georgia's elected officials and the Commission's work is
supervised by elected legislators.  *Id.*  The General Assembly, through the
Commission, supervises preparing and maintaining the annotations.  *Id.* at 3-4.

The Commission does not assert copyright in the O.C.G.A. statutory text.
Doc. 11 at ¶ 14.  The Commission asserts, however, that it holds a valid copyright
in the O.C.G.A.'s annotations.  *Id.* at ¶ 13.  Public Resource disagrees and contends
that the O.C.G.A. is one edict of Georgia's general assembly and includes its
annotations:  therefore the entire O.C.G.A. is in the public domain.  Doc. 16 at ¶
13.

One summary warns that "[a]ttorneys who cite unofficial publications of
1981 code do so at their peril" and that "Official Code publication controls over
unofficial compilation."  Ga. Code Ann. § 1-1-1 (West 2017), note (judicial
decisions).  A marketing page for the print version of the O.C.G.A. stresses that the
print version is the only official version of the Official Code of Georgia Annotated.
Doc. 16-7.  The word "Official" is emphasized throughout this marketing page,

including boldface and underlining.  In short, one cannot read the official law of Georgia without reading the O.C.G.A.  *Id.*

Georgia's Legislative Counsel publishes the *User's Guide to the Official Code of Georgia Annotated.*  Doc. 29-16.  The *Guide* underscores the annotations' importance for understanding and using the official law of Georgia.  Those who write about the Code should cite the O.C.G.A. rather than an unofficial code.  *Id.* at 2.  The Guide also explains that some annotations are indexes, tables and research references pointing the reader to materials relevant to understanding the nuances and interpretations of the statutory text itself.  *Id.* at 6-7.  Importantly, it explains that the manuscript of fifty-three Code titles enacted in 1981 was not the official Code *until* the Annotations were added.  *Id.*

In 2006, the Commission entered into an agreement for publication of the O.C.G.A. with Matthew Bender & Co., Inc. ("Lexis/Nexis").  Doc. 29-8.  The Commission, however, retained oversight and ultimate control over publishing the O.C.G.A.  *Id.* at 3.  The agreement specifies the Commission's and Lexis/Nexis's respective roles in codifying, publishing, and maintaining the O.C.G.A.  *Id.*  It also specifies what the annotations Lexis/Nexis prepares, under the Commission's direct supervision, must contain.  *Id.* at 2, 4-5.  In return, the State gives Lexis/Nexis exclusive rights to publish the printed O.C.G.A., sell it on CD-ROMs, and provide paid subscribers access to it online.  *Id.* at 23-26.  No other legal

service can obtain a license to provide the O.C.G.A. online.  Doc. 29-14 at ¶ 11.

The Commission does not receive royalties on the sale of printed, bound volumes

of the O.C.G.A. but receives royalties from the sale of Lexis/Nexis's CD-ROM

and customers' subscriptions to online access to the O.C.G.A.  Doc. 29-17 at 15.

The publishing agreement also requires that Lexis/Nexis provide Georgia's

statutes, stripped of their annotations, on a website that the public can access for

free, if they first agree to accept Lexis/Nexis's terms of use.  Doc. 29-8 at 11-12;

Doc. 17 at ¶¶ 73-75, 86-87; Doc. 17-10; Doc. 17-9.  These terms of use enforce a

state monopoly on who can read the law.  Importantly, the publishing agreement

requires Lexis/Nexis to track use of the unannotated code on that website and, after

each publishing year, provide reports to the Commission including "the effect, if

any, on subscriptions to the Code in print and on CD-ROM."  Doc. 29-8 at 12.  The

Commission produced a one-page summary of monthly accesses to the

unannotated code in this action, but it does not address the effect, if any, of the

availability of the unannotated code on paid subscriptions to the online O.C.G.A.

Doc. 29-10.

### C.  Public Resource's scanning and posting

Public Resource's purpose in scanning and posting the O.C.G.A. was to

facilitate scholarship, criticism and analysis of the official Code, to inform and

educate the public about the laws that govern it, and to encourage public

engagement with the law. Doc. 29-3 at ¶ 45. But it also had a more ambitious

goal: the bulk code for the O.C.G.A. should be free for download so that people

will be able to use the Internet and programming skills to create other websites that

make the O.C.G.A. even more useful to Georgia's citizens and the general public.

*Id.* at ¶¶ 34-39. By purchasing, scanning, and posting the O.C.G.A. volumes,

Public Resource strives to provide a significantly more useful version. *Id.* at ¶ 45.

The process of scanning and posting transforms the text in several ways. For

example, each scanned volume has Optical Character Recognition, which makes it

significantly more accessible to visually impaired people. *Id.* at ¶ 46. The process

of posting each volume includes significant metadata, such as the names of the

titles included in each volume, making them more easily discovered using search

engines. *Id.* The process also creates a version that is compatible with e-Book

readers, smart phones, and tablets. *Id.*

Public Resource also provides all the volumes in bulk on its servers,

allowing users to quickly access the entire Code or a specific volume, and copy

and paste relevant sections into their own documents. *Id.* at ¶¶ 36, 39-41, 44; Doc.

29-4 at ¶ 7. Public Resource believes from experience that making an official code

available in bulk enables volunteers in the community to create a better web. Doc.

29-4 at ¶ 7; Doc. 29-3 at 36, 39-41, 44. Additionally, the Internet Archive's user

interface allows readers to search a volume of the O.C.G.A., displaying "pins" for

9

each page that contain the search term, allowing a reader to quickly look for key phrases in different locations.  Doc. 29-3 at ¶¶ 39-41, 44.  It also allows the reader to bookmark a particular page and send a link via email or social media.

After scanning, Public Resource copied the files to thumb drives and sent them to the state officials charged with codification and promulgation of state law. Doc. 17 at ¶ 63.  For Georgia, they were sent to Georgia Speaker of the House, David Ralston, and Georgia Legislative Counsel Wayne R. Allen.  *Id.* at ¶¶ 63-65. Public Resource brought its scanning, posting and distribution of the O.C.G.A. to the attention of Georgia's legislature to invite a dialogue.  Its letter to Georgia's speaker and legislative counsel explained: "Our purpose in making these statutes available is to promote access to the law by citizens and to promote innovation in ways the statutes are made available so that public servants, members of the bar, citizens, and members of the business community have ready access to the laws that govern them." Doc. 17-3.  The letter continues: "Access to the law is a fundamental aspect of our system of democracy, an essential element of due process, equal protection, and access to justice."  *Id.*

Josh McKoon, the Chairman of Georgia's Code Revision Commission, responded with a letter asserting copyright in "all copyrightable aspects of the Official Code of Georgia, Annotated," and demanded that Public Resource cease and desist from copying and posting the O.C.G.A.  Doc. 17-5.  Since then, the

10

Commission has stated that it even claims copyright in "catchlines of code sections; names of Titles, Chapters, Articles, Parts and Subparts; history lines; editor's notes; annotations; research references; cross-references; indexes; and other such materials." Doc. 17-8. Carl Malamud responded promptly with a three page letter carefully articulating why Public Resource rejects the distinction between the statutory text and the additional materials. Doc. 17-4. The same letter explained why Public Resource has concluded that the entire O.C.G.A. is in the public domain. *Id.* Finally, it set out the Constitutional objectives behind the doctrine that copyright cannot be used to prevent copying and distribution of edicts of government. *Id.* The Commission's lawsuit followed. Doc. 1.

The Commission filed this action on July 21, 2015, bringing claims for direct and indirect copyright infringement. Doc. 1. Public Resource filed its answer and counterclaim for declaratory judgment that the Commission's copyrights are invalid and, in the alternative, that its use of the O.C.G.A. is noninfringing. The Commission later amended its complaint to add allegations that Public Resource posted 2015 O.C.G.A. volumes after it filed its original complaint and that the Commission had filed applications with the Copyright Office to register copyright in those volumes. Public Resources amended its pleading accordingly. Doc. 16. After minimal discovery, the parties stipulated to numerous facts. Doc. 17. They cross-motions and filed their respective dispositive motions

11

and supporting papers on May 17, 2015.  Docs. 29 and 30.  The Commission

moved only for partial summary judgment because the Copyright Office had not

issued registrations for the 2015 works.  Doc. 30.

On April 23, 2017, the district court issued its order denying Public

Resource's motion and granting the Commission's motion.  Doc. 44.  Relying on

the Compendium of U.S. Copyright Office Practices, the district court concluded

that only annotations having the force of law are uncopyrightable and therefore

held that the non-statutory portions of the O.C.G.A. are copyrighted.  *Id.* at 12.

The district court also rejected Public Resource's argument that the merger

doctrine bars copyrighting factual or brief annotations that can only be expressed

in a few ways.  *Id.* at 13-14.

The district court also rejected Public Resource's argument that its use of the

entire O.C.G.A. was noninfringing because of the fair use doctrine, codified at 17

U.S.C. § 107.  *Id.* at 22.  As to the first fair use factor, the district court found that

Public Resource's use was neither nonprofit nor educational.  *Id.* at 18.  It found that

the second factor was, at best, neutral because the annotations contain "evaluative,

analytical, or subjectively descriptive analysis and guidance."  Considering the

substantiality of the portion of the copyrighted work used, the district court found

that Public Resource's use of all the annotations weighed against fair use.  *Id.* at 20.

Finally, the district court found that if everyone performed Public Resource's

12

actions, "it is inevitable that Plaintiffs' markets would be substantially adversely impacted" and therefore the fourth factor also weighed against fair use. *Id.* at 21.

The court also ordered the parties to confer and submit a proposed briefing schedule to address injunctive relief. Instead, the parties conferred and jointly moved the district court to enter a proposed injunction. Doc. No. 45. The court did so and judgment was entered on April 7, 2017. Doc. 52. This appeal follows.

## STANDARD OF REVIEW

This Court reviews a district court's conclusions of law *de novo* and findings of fact for clear error. *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1260 (11th Cir. 2001). Originality of elements in a copyrighted work is a question of fact reviewed under the clearly erroneous standard. *Montgomery v. Noga*, 168 F.3d 1282, 1291 n.14 (11th Cir. 1999). Fair use involves both questions of law and questions of fact. *Harper & Row Pubs., Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985).

## SUMMARY OF THE ARGUMENT

The district court committed reversible error in at least three different ways:

1.    The district court erred by applying a general rule that a private publisher can copyright its annotations in federal and state codes to hold that a state can copyright annotations in its official code. In so doing, the district court failed to consider a long line of cases holding that governments cannot use

13

copyright to prevent copying and distribution of their edicts because the law belongs to the people, who must be able to read and speak the law in the interests of due process and the Rule of Law.

2.     The district court's findings that *all* the O.C.G.A.'s annotations contain sufficient originality and creativity to be eligible for copyright are clearly erroneous because the district court treated the annotations that are summaries of judicial decisions as representative of all the annotations.  The finding that these summaries meet the standard for authorship is clearly erroneous because there only so many ways to describe a case's facts, reasoning and holding, which are not original but distilled from the public domain opinions themselves.  Additionally, by focusing on the summaries and not analyzing the other annotations, each claimed as copyrighted works, the district court clearly erred in implicitly finding that pure compilations of facts such as indexes, history lines and cross-references are copyrightable.  Similarly, its implicit findings that short phrases such as catchlines, names, titles and subtitles are copyright-eligible are clearly erroneous in light of cases holding the opposite.

3.     The district court also erred in balancing 17 U.S.C. § 107's fair use factors to hold that Public Resource's use of the O.C.G.A., including its annotations, was not a fair use.  First, the district court's finding that Public Resource's purpose in posting the O.C.G.A. weighed against fair use is clearly

14

erroneous.  The court applied the surprising reasoning—rejected by an Eleventh Circuit case—that nonprofit uses that confer intangible benefits, such as public recognition, are considered commercial use and weigh against fair use.  Second, the finding that the nature of the annotations is merely neutral is clearly erroneous because the O.C.G.A. is primarily a work that conveys facts about Georgia's law, and the annotations are almost purely compilations or descriptive words and phrases.  Third, the district court erroneously concluded that posting the O.C.G.A., and thus using 100% of the annotations.  The court failed to ask the right question for the third fair use factor:  whether the quantity and value of the material used was reasonable *in relation to the purpose* of the copying.  A number of courts have held that the use of 100% of a copyrighted work can be fair use if the answer to that question is "yes" and the factors taken together compel a holding of fair use.  Finally, the district court's finding that if everyone did what Public Resource did, it would destroy the market for the O.C.G.A. is clearly erroneous because there was no evidence in the record for this finding.  It was entirely based on hypothetical harm and there are many reasons that Public Resource's use serves a different market, or markets, than those for a set of printed volumes, CD-ROM, or subscriptions for online access to the O.C.G.A.  Thus, the district court's entire fair use analysis was fatally flawed and its decision should be overruled.

15

## ARGUMENT

**A. The district court erred in holding that annotations in the Official Code of Georgia, Annotated are copyrightable by the State of Georgia.**

    1. <u>Federal Courts have held time and time again that a government cannot copyright its edicts.</u>

It is well established that edicts of government are in the public domain and not subject to copyright claims. The U.S. Supreme Court announced this rule in its first copyright case, *Wheaton v. Peters*, 33 U.S. 591, 668 (1834), a dispute between two publishers of Supreme Court reports. The Court observed that "[no reporter has or can have any copyright in the written opinions delivered by this Court; and that the judges thereof cannot confer on any reporter any such right." Subsequent cases explained and expanded the rule. "[T]he whole work done by judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or statute." *Banks v. Manchester*, 128 U.S. 244, 253 (1888) (invalidating a state law that authorized an official reporter to copyright court opinions). The Massachusetts Supreme Judicial Court articulated the policies underlying the rule:

> Every citizen is presumed to know the law thus declared, and it needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the statutes or the decisions and opinions of the justices.

*Nash v. Lathrop*, 142 Mass. 29, 35, 6 N.E. 559 (1886). The doctrine is codified, with respect to works of the federal government, at 17 U.S.C. § 107.

Similarly, courts have agreed that there can be no copyright in a state's constitution and statutes and states cannot confer private copyrights to publishers by contract. *Davidson v. Wheelock*, 27 F.61 (Minn. Cir. Ct. 1866). "States' laws are public records open to inspection, digesting and compiling by anyone." *Harrison Co. v. Code Revision Comm'n*, 244 Ga. 325, 329 (1979). Laws are created by legislators who are government employees, so there is no justification for the copyright monopoly. *Banks*, 128 U.S. at 244. And the public—not a state government—owns the law because "the citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process." *Building Officials & Code Adm. Int'l. Inc. v. Code Tech., Inc.*, 628 F.2d 730, 734 (1st Cir. 1980). The Fifth Circuit has held that a standard-drafting association could not enforce its copyright in a model building code against an individual who published the code online as part of a compilation of local laws. *Veeck v. Southern Building Code Cong. Int'l*, 293 F.3d 791, 802 (5th Cir. 2002 ) (en banc.).

There are constitutional reasons for the doctrine. Copyright aside, due process requires that official publications of the law must be public and may not be

copyrighted.  Citizens must have free access to the laws that govern them to satisfy the notice requirement of the due process clause.  *Building Officials & Code Adm. Int'l, Inc.,* 628 F.2d at 734; *see also United States v. Lanier*, 520 U.S. 259, 265 (1997).

The O.C.G.A. is a single edict of government with one author, Georgia's General Assembly, acting on behalf of the people of Georgia.  Through the Commission, the General Assembly supervises preparing and maintaining the annotations.  Annotations are not an editorial enhancement of the O.C.G.A.  The Commission creates them for the benefit of the State and its citizens.  That the Commission has contracted the work to a third-party publisher, acting as the State's agent, does not make the O.C.G.A. or any part of it a private or copyrightable work.

The *User's Guide to the Official Code of Georgia Annotated* underscores that the annotations are an integral, state-issued component of the official law of Georgia.  Doc. 29-16.  The Legislature passes acts "to amend….the Official Code of Georgia Annotated."  Doc. 17 at ¶ 81.  The General Assembly established the Commission to ensure, among other things, that the O.C.G.A., the State's only official Code, will contain the annotations.  Doc. 29-6 at 3.  Therefore, the publication agreement between the Commission and Lexis/Nexis requires the O.C.G.A to include the annotations.  Doc. 29-8 at 2, 4-5.  This shows that the

18

General Assembly decided that a citizen, reading a statute to understand the law that governs her conduct, should be able to read in the O.C.G.A. how judges, Georgia's Attorney General and the State Bar have interpreted and applied that statute. Indeed, the very first annotation in the O.C.G.A. warns that attorneys who cite unofficial publications of 1981 code do so at their peril. The O.G.C.A. controls over unofficial compilations. Ga. Code Ann. § 1-1-1, note. For all these reasons, the O.C.G.A., including the annotations, must be treated as one unified edict of government by the General Assembly and the Commission. Thus, the line of cases holding that states cannot copyright statements of their laws warrants holding that Public Resource had every right to scan, transform, and publish the O.C.G.A. and to encourage the public to distribute and use it as they see fit. This serves the Copyright Act's purpose.

The district court erred in accepting the Commission's claim that the O.C.G.A. constitutes multiple works, including the public domain statutes and multiple copyrighted annotations, each of which is a separate "work." Treating the annotations as separate works led the district court to its second error:  analyzing whether annotated codes are copyrightable at all, instead of whether a state's official annotated code like the O.C.G.A. should be treated differently than any other state's edicts of government containing the official laws of that state. Thus, instead of starting from the undisputed premise that a State's statutes are not

19

subject to copyright by the State or anyone else, the district court failed to even acknowledge that hallowed doctrine. It relied instead on two cases "recognizing that copyright protects annotated cases and statutes." *Id.* But those cases involved unofficial law books created by private parties, not the official code of a state. Recognizing copyright for private annotations in unofficial codes does not compel the holding that a state can hold a valid copyright in its official annotated code.

Next, the district court observed that "the Copyright Office's own treatise expressly recognizes the protectability of annotations." *Id.* The district court also found *Callaghan v. Myers*, 128 U.S. 617 (1988), instructive, because it held that annotations in a legal reporter were copyrightable by the publisher. *Id.* at 11. Public Resource agrees that such annotations in *unofficial* codes are copyrightable by their private publishers. The issue is whether the State of Georgia can register and assert copyright in its own annotations to its only official code to prevent Public Resource from scanning and posting the O.C.G.A. Furthermore, the Compendium is supposed to reflect the Copyright's interpretation of the Copyright Act in light of federal common law. It is not binding on a district court or this Court, which is charged with interpreting and applying federal statutes like the Copyright Act. Nevertheless, the district court went on to cite the Compendium— and nothing else— for the premise that "[o]nly those government documents having the force of law are uncopyrightable." Doc. No. 44 at 12. This was legal

20

error.  No one disputes that the General Assembly does not individually enact the

annotations as laws.  But the rule that edicts of government are not subject to

copyright does not mean that only the parts of an edict that have the force of law

are uncopyrightable.   *Wheaton v. Peters*, for example, states that no reporter can

have copyright in written opinions delivered by the Supreme Court.  33 U.S. at

668.  But written judicial opinions contain sentences and paragraphs that do not

have the force of law, in addition to the court's reasoning and holdings that do

have the force of law.  For example, an opinion typically recounts facts that put the

legal issues in their context, and often summarizes the parties' competing

arguments.  And just as those sentences and paragraphs are not treated as separate

works for copyright purposes, neither should courts treat the annotations in an

official code as entitled to copyright by contrasting them with the statutes.

Therefore, the Court's analysis should instead focus on the Georgia Assembly's

decisions to include specific annotations in the State's only official Code—

regardless of who prepares them.  O.C.G.A. § 1-1-1 provides that the statutory text,

*combined* with the non-statutory portions created under the Commission's contract

with the original publisher, constitute the O.C.G.A.:

> The statutory portion of the codification of Georgia laws prepared by
> the Code Revision Commission and the Michie Company pursuant to
> a contract entered into on June 19, 1978, is enacted and shall have the
> effect of statutes enacted by the General Assembly of Georgia.  The
> statutory portion of such codification shall be merged with
> annotations, captions, catchlines, history lines, editorial notes, cross-

references, indices, title and chapter analyses, and other material
pursuant to the contract and when so published shall be known and
may be cited as the "Official Code of Georgia Annotated."

That makes the O.C.G.A. different from unofficial annotated codes that
private publishers prepare on their own initiatives and copyright in their own
names. And the public owns the O.C.G.A. regardless of who actually drafts the
annotations because the O.C.G.A derives its authority from the consent of
Georgia's citizens, who elect the members of the General Assembly. *See Building
Officials & Code Adm.*, 628 F.2d at 734. To allow a state to circumvent federal
copyright law and hold copyright in its only official code merely by hiring a
private company to author portions of that code would undermine the sound policy
reasons for the doctrine that edicts of government are not copyrightable. Indeed,
the exception would threaten to swallow the rule, to the people's detriment.

2.  The district court concluded that the annotations are copyrightable based
    on its erroneous interpretation of Georgia laws providing that the
    O.C.G.A's annotations are not statutes and are not enacted.

Georgia did not carve the nonstatutory materials out of the O.C.G.A., and
out of the public domain, by passing session laws providing that they are not part
of the law or are not enacted as statutes. Descriptive headings or catchlines,
historical citations, title and chapter analyses, history lines and indexes in the
O.C.G.A. are not copyrightable in the first place. The significance of O.C.G.A.
§ 1-1-7, relied on by the district court, is to clarify that heading, catchlines and

references do not constitute part of the law and cannot be used to limit or expand

the construction of any Code section.  This is simply a caveat for statutory

interpretation.  Similar disclaimers can be found in numerous private contracts.

The laws recognizes that the annotations are intended to be part of the O.C.G.A.

even though they are not part of the statutes.  But because whether the annotations

are enacted as statutes does not determine whether the entire O.C.G.A. is in the

public domain as an edict of government, it was error to rely on the three sessions

laws to exclude those portions from the O.C.G.A. for purposes of copyrightability.

> 3. <u>The district court erred on considering only judicial summaries to find all the annotations copyrightable despite the idea/expression dichotomy and the merger doctrine.</u>

Section 102(b) of the Copyright Act, 17 U.S.C. § 102(b), precludes

copyright for "any idea, procedure, process, system, method of operation, principle

or discovery, regardless of the form in which it is described, explained, illustrated,

or embodied in such work."  Under the merger doctrine, copyright does not protect

expression when there is only one way to express an idea, or so few ways that

protecting the expression would effectively protect—and remove from the public

domain—the idea itself.  *Bellsouth Advert. & Publ'g Corp. v. Donnelly Info.*

*Publ'g, Inc.*, 999 F.2d 1436, 1442 (11th Cir. 1993) (en banc); *Warren Publ'g, Inc.*

*v. Microdos Data Corp.*, 115 F.3d 1509, 1518 n. 27 (11th Cir. 1997) (en banc).

Expression in a compilation lack sufficient creativity or originality for copyright when the selections or editorial decisions were conventional and dictated by the need the compilation serves. For example, the Second Circuit held that West Publishing's case reports lacked enough originality or creativity for copyright because "industry conventions or other external factors so dictate selection that any person composing a compilation of the type at issue would necessarily select the same categories of information." *Matthew Bender & Co., Inc. v. West Pub. Co.*, 158 F.3d 674, 681-82 (2d Cir. 1998). The *Matthew Bender* court recognized that "West's editorial work entails considerable scholarly labor and care, and is of distinct usefulness to legal practitioners" but reasoned that, for any editor of judicial opinions "faithfulness to the public domain original is the dominant editorial value, so that the creative is the enemy of the true." *Id.* at 688. Whether expression contains enough originality to be copyrightable is an issue of law. *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) (holding white pages listings in a telephone directory lacked the requisite originality for copyright; *see also CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504 (1st Cir. 1996) (affirming summary judgment that aspects the defendant copied from the plaintiff's work were uncopyrightable ideas, concepts, unoriginal metaphors, words and short phrases); *Home Design Servs. Inc. v. Turner Heritage Homes*, 825

F.3d 1314, 1329 (11th Cir. June 17, 2016) (originality is a question of law for the court to decide).

Words and short phrases such as catchlines, names, titles and subtitles are not copyrightable because they contain a de minimus amount of authorship, if any. *Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 286 (3d Cir. 2004) (en banc) (Alito, J.)  To be copyright eligible, written expression must have some value as a composition, and not be a mere subject designation or label.  *Higgens v. Keuffel*, 140 U.S. 428 (1891).

The district court, rejecting Public Resource's merger argument, only considered the annotations that are judicial summaries.  Doc. 44 at 13.  It reasoned that "[t]he mere fact that the judicial summaries in the O.C.G.A. are directly different from corresponding annotations in West's Code Annotated belies the applicability of the merger doctrine."  *Id.* at 13.  Public Resource recognizes that the annotations that are summaries of opinions present a closer question than the annotations that are names, titles or collections of facts.  But the Court can still conclude, as a matter of law, that they lack the requisite originality to be copyrightable.  Although they are different, their many similarities flow directly from the public domain opinions.  Every fact or idea in each summary can be traced to the judicial opinion itself, and in many cases to the briefs and supporting papers underlying the opinion.  It is not surprising, therefore, that the O.C.G.A.'s

25

case summaries home in on the same facts, language and holdings as the case summaries in West's Code of Georgia, Annotated, an unofficial compilation. Moreover, the editors at Lexis/Nexis must follow the Commission's instructions for distilling opinions into summaries, so, as discussed above, the Commission is authoring the annotations with help from its agent.  Doc. 29-7 at 104.  For all these reasons, the annotations in the O.C.G.A. should not be protected by copyright.

The Commission asserts copyright in numerous annotations of the O.C.G.A., not just summaries of judicial opinions.  Doc. 29-10.  They also include research references; notes on law review article; indexes; title, chapter, article, part and subpart captions or headings; and catchlines.  Doc. 17 at ¶¶ 1, 3, 9, 18, 26; Doc. 17-8 at 1.  The Commission contends that each of these is a "work" protected by copyright.  Doc. 11 at ¶ 13.  Therefore, the district court should have analyzed these annotations as well as the judicial summaries.  But the district court failed to analyze whether the idea/expression dichotomy, the merger doctrine or lack of originality render these annotations are uncopyrightable.  They do.

Editor's notes, indexes, lists of law review articles and other reference materials are meant to be accurate compilations of uncopyrightable facts about the statutes.  They are organized, as provided in the Commission's publication agreement, so as to be most useful for legal research.  Doc. 29-8. History lines simply show where a new Code section appeared in earlier official codes to trace

26

that Code section back to its origin.  Doc. 29-7.  No creativity is required to trace

history lines.  All they require is reading and note-taking.  Likewise, code citations,

research references, cross-references, indexes and a case's subsequent history are

facts discovered by Lexis/Nexis's editors, not creative or original expression.  *See*

*BellSouth Advert & Publ'g Corp v. Donnelly Info. Publ'g. Inc.*, 999 F.3d 1436

(11th Cir. 1993) (en banc) (distinguishing techniques for discovering facts from

acts of authorship); *Warren Pub'g., Inc. v. Microdos Data Corp.*, 115 F.3d 1509

(11th Cir. 1997) (same).  Therefore, 17 U.S.C. § 102(b) bars their copyrightability.

Lexis/Nexis's editorial work in discovering and organizing facts, like West's in the

*Matthew Bender* case, no matter how scholarly, laborious and useful, cannot make

these annotations creative or original so as to be protectable by copyright.

Similarly, the merger doctrine makes some of the O.C.G.A.'s annotations

not subject to copyright.  For example, the idea of an index is to provide a list of

topics and the places at which the O.C.G.A. addresses each one.  That idea can

only be expressed accurately in so many ways.  Likewise, the idea of identifying

all the cases in which a court applied a given statute can only be expressed

accurately in so many ways.  Copyright for these kinds of annotations would

preclude others' expressing the same ideas.  Accordingly, the merger doctrine

should prevent the Commission from asserting copyright in the kinds of

annotations that simply organize facts for convenience.  The district court's

27

cursory findings that merger is inapplicable to all the various annotations are clearly erroneous and the decision that the annotations are copyrightable should be reversed.

**B. The district court's findings with respect to the fair use factors are clearly erroneous and, as a result, its holding that Public Resource's use of the O.C.G.A. was not a fair use is an error as a matter of law.**

    1.  <u>The test for fair use.</u>

The primary objective of copyright is not to reward the labor of particular authors, but to "promote the Progress of Science and the useful Arts…" *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (quoting U.S. Const., art. I, § 8, cl. 8); *see also Campbell v. Acuff-Rose Music, Inc.* 510 U.S. 569, 574 (1994). In other words, "copyright's purpose is to promote the creation and publication of free expression." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). The fair use doctrine exists to serve that purpose by providing for some lawful use of copyrighted materials without the copyright holder's authorization. *Campbell*, 510 U.S. at 574. Applying the fair use doctrine in a way that promotes the dissemination of knowledge, not simply its creation, is consistent with copyright's goals. *Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) (citing *Golan v. Holder*, 132 S. Ct. 873 (2012)). Section 107 of the Copyright Act, which codifies the fair use doctrine, states:

        Notwithstanding the provisions of section 106 and 106A,
the fair use of a copyrighted work, including such use by

reproduction in copies… or by any other means specified in
that section, for purposes such as criticism, comment, news
reporting, teaching (including multiple copies for classroom
use), scholarship or research, is not an infringement of
copyright.  In determining whether the use made of a work in
any particular case is a fair use the factors to be considered shall
include-

(1) the purpose and character of the use, including
whether such use is of a commercial nature or is for nonprofit
education purposes; (2) the nature of the copyrighted work; (3)
the amount and substantiality of the portion used in relation to
the copyrighted work as a whole; and (4) the effect of the use
upon the potential market for or value of the copyrighted work.

Because these factors are nonexclusive, and fair use is an equitable

doctrine, courts must consider every case on its own facts.  *Campbell*, 510 U.S. at

577-78.  Courts determine whether fair use applies on a work-by-work basis,

applying the four factors to each work at issue.  *Cambridge*, 769 F.2d at 1259-60.

2.  <u>The district court's findings that Public Resource's use was not
transformative and neither non-profit nor educational are clearly
erroneous.</u>

a.  *The district court improperly ignored Public Resource's
transformative purpose and actions to make the posted version more
useful than the paper volumes or the redacted "free" website.*

The first fair use factor is "the purpose and character of the use, including

whether such use is of a commercial nature or is for nonprofit educational

purposes."  17 U.S.C. § 107(1).  Beyond that, the critical inquiry is "whether the

work merely supersedes the objects of the original or instead adds something new,

with a further purpose or different character." *Campbell*, 510 U.S. at 579.  Thus, an

29

important focus is whether the use is "transformative." *Id.* For example, a Ninth Circuit panel found that a search engine's copying of website images in order to create an Internet search index was transformative because it transformed the image into a pointer directing a user to a source of information. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007). And a Second Circuit panel held that digitizing entire copyrighted books for Google's Library Project and Google Books project is fair use. *Authors' Guild v. Google, Inc.*, 804 F.3d 202, 225 (2d. Cir. 2015) (Leval, J), *cert. denied*, 136 S. Ct. 1658 (2016). "Reproduction of an original without any change can still qualify as fair use when the use's purpose and character differs from the original, such as photocopying for use in a classroom." *American Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*, No. 12-528, 2013 WL 4666330, at *11 (D. Minn. Aug. 30, 2013). For example, making an exact digital copy of a student's thesis for the purpose of detecting plagiarism is a fair use. *A.V. ex rel v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009). Likewise, a financial reporting service's copying and dissemination of an entire sound recording of a public company's conference call, to tell a wider audience what the company had represented to investment analysts, was found to be fair use. *Swatch Grp. Mgm't. Serv. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 85 (2d. Cir. 2014). Libraries' creation of digital copies of entire copyrighted books by scanning them to create a "digital library" and allow the

30

public to search that library to locate where specific words or phrases appear in the digitized book has also been held to be a fair use.  *Authors' Guild, Inc. v. Hathitrust*, 755 F.3d 87, 97 (2d. Cir. 2014).  These cases illustrate that the *purpose* of using an entire work informs whether that use is transformative and whether it qualifies as fair use.

Public Resource's mission is to improve public access to government records and the law.  Doc. 29-3 at ¶¶ 14, 19, 45.  Public Resource's purpose in scanning and posting the O.C.G.A. was to facilitate scholarship, criticism and analysis of the official Code, to inform and educate the public about the laws that govern it, and to encourage public engagement with the law.  *Id.* at ¶ 45.  Public Resource wants the public to have free, unfettered access to the official Code, including the annotations that make it official and authoritative, on a better website.  *Id.*  But Public Resource does not just want to save Georgia citizens a trip to the library or the cost of a Lexis/Nexis product.  It also wants the O.C.G.A. to be free for download so that people will be able to use the Internet and programming skills to create *other* websites that make the O.C.G.A. even more useful to Georgia's citizens and the general public.  Making an official code available in bulk enables volunteers in the community to enhance citizens' access to, and interaction with, their laws.  *Id.*

31

By purchasing, scanning, and posting the O.C.G.A. volumes, Public Resource strived to provide a significantly more useful version. Malamud Decl., Ex. A at ¶ 45. Each scanned volume was significantly more accessible to visually impaired people. *Id.* at ¶46. Each had significant metadata, making titles more easily discovered using search engines. *Id.* Each was compatible with e-Book readers, smart phones, and tablets. *Id*. Thus, the public could read the O.C.G.A. wherever they wanted to. On Public Resource's website, users could quickly access the entire Code or a specific volume, and copy and paste relevant sections into their own documents. *Id.* On the Internet Archive's site, its user interface allowed readers to search the entire text of a volume of the O.C.G.A., allowing a reader to quickly look for key phrases in different locations, bookmark a page and send links via email or social media. *Id.* Public Resource's purpose in scanning and posting of the O.C.G.A., and certainly the purposes of the third party uses that Public Resource seeks to enable, are therefore transformative in a way that "promotes the Progress of Science and the useful Arts," U.S. Const. art 1 § 8 cl. 8.

The district court described Public Resource's purpose as "to provide wider distribution of the annotations." This trivialized Public Resource's much more expansive and transformative purpose. It also erroneously focuses on the annotations. Public Resource aspires to greatly improve usability of the *whole* O.C.G.A., most importantly the statutes. Public Resource's motivation for posting

32

the annotations along with the statutory text was that the O.C.G.A. contains them and is not the official code without them. Indeed, the Commission calls them "valuable analysis and guidance regarding …state laws." Doc. 11 at ¶ 2. Also, as a practical matter, scanning the paper volumes is the only efficient way to digitize the volumes, and scanning necessarily copies the annotations along with the statutory text and numbering.

The district court also completely ignored the efforts Public Resource went to, when it scanned the O.C.G.A. volumes, to make the digital code more useable and useful, as discussed above. The district court should have considered these undisputed facts before concluding that Public Resource's use was not transformative.

To be candid, the jurisprudence on what is and is not "transformative" for fair use analysis continues to develop and not all courts have analyzed similar uses the same way. This case presents the court with a rare opportunity to add its reasoning about why Public Resource's creation of its digital version of the O.C.G.A., for the purpose of publication of an edict of government, is or is not transformative to the growing numbers of fair use cases tackling such issues. The Court can do so based on the undisputed facts in the record and conclude that Public Resource's digital version is transformative.

   *b. The Court's finding that Public Resource profits from its use of the*
      *O.C.G.A. was clearly erroneous and its reliance on outlying, non-*
      *binding cases to reach that conclusion was legal error.*

Even if this Court finds that Public Resource's use is not transformative, its

nonprofit, educational nature should have weighed in favor of fair use.  The parties

stipulated that that Public Resource's use is for nonprofit, educational use.  Doc. 17

at ¶ 57.  Cases analyzing fair use almost always find that a party's nonprofit status

weighs in favor of fair use.  *See, e.g.*, *Allen v. Academic Games League of Am.,*

*Inc.*, 89 F.3d 614, 617 (9th Cir. 1996); *Katz v. Google*, 802 F.3d 1178, 1183 (11th

Cir. 2015).  The Supreme Court has explained, however, that "[t]he crux of the

profit/nonprofit distinction is not whether the sole motive of the use is monetary

gain but whether the user stands to profit from using the O.C.G.A. without paying

the customary price."  Applying that test, Public Resource's use is not for profit.

First, there is no "customary price" for posting O.C.G.A. volumes on a website,

because the Commission refuses to license anyone but Lexis/Nexis to provide

online access.  Doc. 29-8 at 23-26; Doc. 29-14 at ¶ 11.  Public Resource paid

Lexis/Nexis's price for the print volumes it scanned and posted.  Doc. 29-3 at ¶ 45.

Therefore, the first factor favors a finding of fair use and not infringement.

The district court initially asked the right question:  whether Public Resource

stands to profit from exploitation of the O.C.G.A., complete with its annotations,

without paying the customary price.  Doc. No. 44 at 17, citing *Harper & Row*, 471

U.S. at 742.   But then the district court's reliance on three unusual fair use cases

caused it to make the clearly erroneous finding that Public Resource profited from

its use of the O.C.G.A.   Doc. No. 44 at 17, citing *Society of Holy Transfiguration*

*Monastery, Inc. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012); *Worldwide Church of*

*God v. Philadelphia Church of God., Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000);

*Weissmann v. Freeman*, 868 F.2d 868 F.2d 1313, 1324 (2d Cir. 1989).   In these

cases, the courts found that "profit" in the fair use context can include non-

monetary, intangible benefits to nonprofit users.   But the *Cambridge* Eleventh

Circuit court considered these same three cases and rejected their reasoning, as

well as distinguishing them on their facts.   *Cambridge*, 769 F.2d at 1265 (using the

bluebook signal *Contra* with *Holy Transfiguration Monastery* and *Weissmann* to

indicate contrary authority).   That court also observed, with respect to the line of

reasoning in the cited cases, "this reasoning is somewhat circular, and hence of

limited usefulness to our fair use inquiry.   Of course, any unlicensed use of

copyrighted material profits the user in the sense that the user does not pay a

licensing fee."   *Id.* at 1266 and n. 22, citing Pierre N. Leval, Nimmer Lecture:  Fair

Use Rescued, 44 UCLA L. Rev. 1449, 1460 (1997).   The court concluded, "thus,

the concern with profit in this sense is better dealt with under the third factor… See

17 U.S.C. § 107."   Curiously, the district court used the same parenthetical

descriptions of *Holy Transfiguration Monastery*, *Worldwide Church of God*, and

*Weissmann* as appear in the *Cambridge* opinion, but did not even mention Cambridge's negative discussion of these cases. *Cambridge*, 769 F.3d at 1265. Another Eleventh Circuit court rejected a similar argument in *Katz v. Google*, 802 F.3d at 1182 (rejecting the argument that a blogger's use of a copyrighted photograph in her blog was commercial use because she used the blog to "advertise" a planned book about the photo's subject), citing *Swatch Group*, 756 F.3d at 83. In *Swatch*, the court discounted a magazine's commercial use of an entire work because the link between that use and the gain from the commercial use was too attenuated. 756 F.3d at 83. Other courts have also rejected *Weissmann*'s reasoning and holding. *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 923 F. Supp. 1231, 1244 (N.D. Cal. 1995); *Super Future Equities, Inc. v. Wells Fargo Bank Minnesota*, 553 F. Supp. 2d 680, 698 (N.D. Tex. 2008). Similarly, at least one district court has found use by a nonprofit corporation with an educational mission to be noncommercial use despite its solicitation of donations on its website. *Righthaven, LLC v. Jama*, 2011 U.S. Dist. LEXIS 43952, *7 (D. Nev. April 22, 2011). Public Resource is aware of no Supreme Court or Eleventh Circuit case that holds that non-monetary, intangible benefits weigh against finding a nonprofit educational use to be fair use. Indeed, if more courts accepted and applied the intangible benefit theory, it could eliminate the fair use defense for many nonprofit uses otherwise at the core of fair use, such

36

as quoting a poem in a political speech.  "If mere recognition by one's peers constituted 'personal profit' to defeat a finding of noncommercial use, courts would seldom find any criticism fair use and much valuable criticism would be discouraged." *Religious Technology*, 923 F. Supp. at 1244.  It would effectively, and improperly, read half of the first fair use factor out of Section 107 of the Copyright Act.

Even if the outlier cases holding that a non-monetary benefit to the secondary user weighs against fair use were controlling authorities, they are readily distinguishable.  In *Holy Transfiguration Monastery*, the court found that an archbishop profited from using copyrighted religious text on its website in the form of enhanced professional reputation.  689 F.3d at 61.  Here, Public Resource provides access to all kinds of government documents and edicts on its website. The Commission offered no evidence that Public Resource or its founder enjoyed an enhanced reputation specifically as a result of posting the O.C.G.A.  In *Worldwide Church*, the court found that a church profited, indirectly, from distributing copies of a copyrighted book to attract new members who would tithe ten percent of their income.  227 F.3d at 1118.  No one tithes to Public Resource, though it does apply for grants from foundations and accept donations.  The Commission offered no evidence that Public Resource receives grants specifically for distributing *copyrighted* material.  After receiving the Commission's first cease

and desist letter, Public Resource did solicit donations to *defray* its costs to continue to scan and post the O.C.G.A., it did so expressly stating its good faith belief that it is in the public domain.  And contributions made specifically to defray those costs were only about $3,000.  Doc. 17 at ¶ 78.  This is not profit.  Finally, *Weissmann* involved a professor who passed his assistant's academic paper off as his own, and profited to the extent that he enhanced his professional reputation. 868 F.2d at 1324.  Here, there has been no allegation that Public Resource claimed to be the author or the publisher of the O.C.G.A.  For these reasons, the district court's finding that Public Resource profits from posting the O.C.G.A. is clearly erroneous and its reliance on the intangible benefit cases was error as a matter of law.

3. The district court's finding as to the second factor was based on a clearly erroneous finding that all the annotations are entitled to protection and on the court's failure to consider many kinds of annotations.

The second factor requires courts to consider "the nature of the copyrighted work."  17 U.S.C. § 107(2).  "[S]ome works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Campbell*, 510 U.S. at 586.  The scope of fair use is greater when informational—as opposed to more creative—works are involved.  *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983).  The scope of fair use should

38

also be greater where a most of a work constitutes a state's laws.  Copyright in a

factual compilation is "thin" and does not extend to the facts themselves.  *Feist,*

499 U.S. at 349-51; *Bellsouth*, 999 F.3d at 1445.

As discussed above, the O.C.G.A. is a compilation and primarily a factual

work.  Assuming that the annotations contain sufficient original expression to be

copyrightable—if they were not part of the State's only official Code—the

O.C.G.A.'s purpose is still to impart facts.  The O.C.G.A's purpose is not to

showcase the law drafters' form of expression, or the editors' skills in summarizing

cases or preparing accurate indexes.

Moreover, most of the annotations—such as indexes, tables, and research

references—are even less expressive and more factual than the summaries of

judicial decisions and attorney general and state bar opinions.  Doc. 29-16 at xxi-

xxii.  In *Matthew Bender,* the court affirmed the district court's decision that

West's selection and arrangement of preexisting facts in its case reports displayed

insufficient creativity to be protectable.  *Matthew Bender*, 158 F.3d at 688.  For

similar reasons, the second statutory factor favors holding that Public Resource's

posting of the O.C.G.A. is a fair use.

Fair use analysis must be performed on a case-by-case/work-by-work basis.

As discussed above, however, the district court's analysis appeared to focus on the

judicial summaries and not address the annotations that are most factual, such as

39

titles, indexes, history lines and research references.  The district court also may have to some extent applied the rejected sweat-of-the-brow doctrine.  *See Feist*, 499 U.S. at 353-54.  The district court reasoned:  "The creation of the annotations requires a tremendous amount of work from a team of editors.  These efforts confirm that the annotations are original works entitled to broad copyright protection."  Doc. No. 44 at 19.  If the district court literally relied on the editors' efforts with respect to gathering facts about the statutes in analyzing factor two, that is another reason that it found that the second factor was, at best, neutral.  The Court can properly find that the district court erred and that the informational (and official) nature of the O.C.G.A. and its annotations dictate a wide scope of fair use.

4.  <u>The district court erroneously concluded that the third factor weighed against fair use because failed to consider Public Resource's use of the entire O.C.G.A. was necessary to accomplish its purpose.</u>

The third fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  This factor asks whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586.  Verbatim copying may sometimes be necessary to adequately convey the facts.  *Swatch*, 756 F.3d at 85.  Likewise, home videotaping of entire movies and television shows for certain noncommercial purposes qualifies as fair use.  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-450 (1984).

40

Here, Public Resource posted the entire O.C.G.A. because posting only the statutory text would not serve the same purpose. Scholarship, analysis and other public engagement with the law is undermined without access to the complete official Code, including summaries of judicial opinions and attorney generals' opinions. Not every citizen can find and read the original judicial and attorney generals' opinions to learn how a code section has been interpreted. Therefore, Public Resource posts as much of the O.C.G.A. as is necessary to fulfill its purpose.

After explaining the third factor considerations, the district court characterized the facts in one sentence: "In this case, Defendant has misappropriated every single word of every annotation using a bulk industrial electronic scanner." Doc. No. 44 at 20. But the Copyright Act's purpose, drawn from the Constitution's Copyright clause, is to promote creation *and dissemination* of ideas. *Cambridge*, 769 F.3d at 1256. Scanning books can serve this vital public interest purpose as well as it can infringe copyrights, depending on the nature of the book and how the scans are used.

While the court did not spell out that it was weighing this factor heavily against fair use, it clearly did so and wrote in its conclusion that "at least three of the four factors weigh in favor of Plaintiffs and against Defendant." The court's

failure to acknowledge and consider Public Resource's purpose, or make the

correct inquiry, was error as a matter of law.

5. <u>The district court's finding that use like Public Resource's would inevitably injure the market for the annotations ignored that there was no such injury because Public Resource's posting served different markets.</u>

The fourth fair use factor is "the effect of the use upon the potential market

for, or value of the copyrighted work."  17 U.S.C. § 107(4); *Campbell*, 510 U.S. at

590.  Specifically, courts consider whether the secondary use brings to the market a

competing substitute for the original, or its derivative, "so as to deprive the rights

holder of significant revenues because of the likelihood that potential purchasers

may opt to acquire the copy in preference to the original."  *Authors Guild v.*

*Google*, 804 F.3d at 223.  In the *Google* case, the court considered whether snippet

views of digitized books were a significantly competing substitute for the

plaintiffs' copyrighted books and concluded that they were not.  *Id.* at 224.  Even if

Google's use could cause some loss of sales, because sometimes a snippet view

will satisfy a searcher's need for access to a text, the Second Circuit still found fair

use.  The court also reasoned that the sales lost because of a snippet view occur in

relation to interests not protected by copyright, such as historical facts.  *Id.*

Here, there is no evidence that Public Resource's posting of the O.C.G.A

brings to the market a competing substitute for the original so as to deprive the

State of significant revenues.  First, because of the publishing agreement's unusual

nature, the State does not receive revenue from royalties on the sale of printed, bound volumes of the O.C.G.A. in the first place.  Doc. 29-17 at 14-15.  If Lexis/Nexis loses any sales of the printed, bound volumes because citizens can read the O.C.G.A. online for free, only Lexis/Nexis is deprived of revenues, and it is not the copyright holder.  Second, while the Commission does receive royalties from the licensing fees for the CD-ROM and on-line versions of the O.C.G.A., it offered no evidence that Public Resource's posting of the O.C.G.A. has lessened those royalties or is likely to do so.  Instead, the Commission alleged that if Lexis/Nexis cannot recoup its costs to develop the annotations, "the State of Georgia will be required to either stop publishing the annotations altogether or pay for development of the annotations using tax dollars." Doc. 11 at ¶ 2.  Assuming this were true, it is not harm to the market for the O.C.G.A.  It is a different kind of harm not relevant to fair use.

Importantly, the publishing agreement requires Lexis/Nexis to track use of the unannotated code on the free Lexis/Nexis website and, after each publishing year, provide reports to the Commission including "the effect, if any, on subscriptions to the Code in print and on CD-ROM."  Doc. 29-8 at 12.  If Lexis/Nexis ever provided such reports, the Commission did not offer them in the district court as evidence of harm to the market for the O.C.G.A. and they are not in the record.  The Commission produced a one-page summary of monthly

43

accesses of the Lexis/Nexis website.  Doc. 29-10.  Public Resource submitted it to the district court to argue that the Commission has no evidence of the effect of Public Resource's use on the potential market.  *Id.*  The summary, to the extent it might constitute Lexis/Nexis's reports under the publishing agreement, does not address the Lexis/Nexis website's effect, if any, on paid subscriptions to the Code. Public Resource posted the O.C.G.A. over four years ago.  *Id.*  If Public Resource's use destroyed the market for the O.C.G.A., and no one is still paying for the annotations, the Commission should have been able to show *some* evidence of this impact.  But it could not show the loss of one single sale or subscription, let alone significant damage to its income or the value of the work.

The Court can thus conclude that Public Resource's posting has little or no effect on the actual market for the paper O.C.G.A. or the C.D.-ROM.  Many public domain works, such as religious texts, Shakespeare's plays and *The Federalist Papers*, can now be found on the Internet, yet many individuals still purchase new, printed copies.  Most libraries and law firms within Georgia will prefer to continue purchasing the printed, bound volumes for their patrons' use, as they have done since the O.C.G.A. was first published.  Many other official state codes are available, in their entirety, on the Internet, but the printed editions still sell well. And a citizen merely seeking to consult the only official Code of Georgia on a particular issue would be unlikely to purchase the whole O.C.G.A. from

44

Lexis/Nexis in the first place, so no sale is lost when that citizen consults the O.C.G.A., including annotations, using Public Resource's website. Likewise, if a legislator from another state, or her staff, wants to compare proposed legislation to the analogous Georgia statute, she is unlikely to purchase the O.C.G.A from Lexis/Nexis, so no sale is lost when she consults it using Public Resource's website instead.

And, as in the *Google Books* case, the ability of Public Resource's copy to satisfy a citizen's need to otherwise consult an authorized copy of the O.C.G.A. bound or on CD-ROM will generally occur in relation to interests not protected by copyright, namely finding specific facts as part of broader research. For legal research, for example, a student or lawyer might refer to the annotations to find the year a statute was last revised, or which cases cite a specific statutory provision of interest. These are facts, and the State's copyright (if any) does not extend to facts in a book, only certain expression. *See Authors Guild v. Google*, 804 F.3d at 224 (quoting *Hoehling v. Univ. Studios, Inc.*, 618 F.2d 972, 974 (2d Cir. 1980)). Therefore, the Court may conclude that Public Resource's scanning and posting does not offer a competing substitute for the printed O.C.G.A. that deprives the State of significant revenues. For the same reasons, Public Resource does not contribute to third parties' infringement because the scanned O.C.G.A. on the Internet has substantial noninfringing fair uses that also do not deprive the State of

45

significant revenue.  *See Sony*, 464 U.S. at 456 (finding no contributory infringement where video recorders had substantial noninfringing uses and studios failed to show any likelihood of substantial harm).  Therefore, the fourth factor is at best, neutral, or favors fair use.

The district court disregarded the Commission's inability to show an effect on demand for the copyrighted works because it accepted the Commission's argument that injury would be "inevitable."  Doc. 44 at 21.  Relying on that argument, absent evidence of injury in the record, was clearly erroneous.  The district court did not even discuss Public Resource's arguments set out above but apparently rejected them out of hand.  The district court also reasoned that Public Resource's use destroys Lexis/Nexis's ability to recover its costs to prepare the annotations in the O.C.G.A.  *Id.* at 22.  But if Lexis/Nexis had any evidence of lost subscriptions or sales, why did it not report this to the Commission as provided in the publication agreement, or put it in the declaration in support of its amicus brief?  In *Cambridge*, the Eleventh Circuit reasoned that, although the burden of proving fair use falls on the defendant, where the plaintiffs could reasonably be expected to have certain relevant evidence, it was reasonable to put the burden of going forward with that evidence on the plaintiffs, while keeping the overall burden of persuasion for the fourth factor on the defendants.  769 F.3d at 1279 and n.34 (discussing evidence that certain licenses for the works were available).  Here,

because of the publishing agreement, there is good reason to believe that the Commission had evidence relevant to whether uses like Public Resources actually significantly injure the market for the works. It chose, however, to argue inevitability instead of coming forward with that evidence. For all these reasons, the district court's finding that factor four weighs against fair use is clearly erroneous. When the fair use factors are analyzed correctly and weighed together, they show that Public Resource's use of the O.C.G.A. was a non-infringing fair use.

## **CONCLUSION**

The Constitution requires that the Copyright Act, and thus the courts that apply United States copyright law, balance its primary goal of improving the spread of knowledge with the secondary goal of giving authors adequate incentive to create new works. Edicts of government are not subject to copyright. Private publishers are thus free to use those edicts to create their own unofficial annotated codes and obtain copyright in their annotations. But the O.C.G.A. is different. Georgia's General Assembly decided years ago, before the growth of the Internet and before the practicality of scanning documents, that the State's only official code, the only authoritative statement of Georgia law, should be annotated. That it hired a private publisher to prepare and maintain the annotations on the Commission's behalf should not make any difference. Applying Supreme Court

47

precedent, this Court can and should rule that the O.C.G.A. is one unitary edict of

government and that Public Resource and anyone else is free to read, scan, post,

speak, and distribute it as they see fit.

This 17th day of May, 2017.

Respectfully submitted,

/s/ Elizabeth H. Rader
Elizabeth H. Rader
ALSTON & BIRD LLP
The Atlantic Building
950 F. Street N.W.
Washington DC  20004
Telephone:  202-239-3008
Facsimile: 201-239-3333

Sarah P. Lafantano
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
sarah.laFantano@alston.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(B), I certify that this Appellants' Brief uses Times New Roman 14-point font and contains 11,590 words.

This 17th day of May, 2017.

/s/ Sarah P. LaFantano
Sarah LaFantano
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
sarah.lafantano@alston.com

*Counsel for Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on May 17, 2017, I electronically filed the foregoing APPELLANTS' BRIEF with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter.

/s/ Sarah P. LaFantano
Sarah P. LaFantano
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Sarah.lafantano@alston.com

*Counsel for Appellant*

# ADDENDUM

**U.S. Const., art. I, § 8, cl. 8.  Patents and copyrights.**
To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

**17 U.S.C. § 102.  Subject matter of copyright: In general**
(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  Works of authorship include the following categories:
>  (1) literary works;
>  (2) musical works, including any accompanying words;
>  (3) dramatic works, including any accompanying music;
>  (4) pantomimes and choreographic works;
>  (5) pictorial, graphic, and sculptural works;
>  (6) motion pictures and other audiovisual works;
>  (7) sound recordings; and
>  (8) architectural works.

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

**17 U.S.C. § 107.  Limitations on exclusive rights: Fair use**
Notwithstanding the provisions of sections 106 and 106A [17 USCS §§ 106 and 106A], the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>  (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>  (2) the nature of the copyrighted work;
>  (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>  (4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

**Ga. Code Ann. § 1-1-1.  Enactment of Code**
The statutory portion of the codification of Georgia laws prepared by the Code Revision Commission and the Michie Company pursuant to a contract entered into on June 19, 1978, is enacted and shall have the effect of statutes enacted by the General Assembly of Georgia.  The statutory portion of such codification shall be merged with annotations, captions, catchlines, history lines, editorial notes, cross-references, indices, title and chapter analyses, and other materials pursuant to the contract and shall be published by authority of the state pursuant to

such contract and when so published shall be known and may be cited as the "Official Code of Georgia Annotated."

**Ga. Code Ann. § 1-1-7.  Notes and catchlines of Code sections not part of law**
Unless otherwise provided in this Code, the descriptive headings or catchlines immediately preceding or within the text of the individual Code sections of this Code, except the Code section numbers included in the headings or catchlines immediately preceding the text of the Code sections, and title and chapter analyses do not constitute part of the law and shall in no manner limit or expand the construction of any Code section.  All historical citations, title and chapter analyses, and notes set out in this Code are given for the purpose of convenient reference and do not constitute part of the law.