## DOCKET NO. 17-11589-HH

# United States Court of Appeals

*for the*

# Eleventh Circuit

---

CODE REVISION COMMISSION, ET AL.,

*Plaintiffs/Appellees,*

*v.*

PUBLIC.RESOURCE.ORG, INC.,

*Defendant/Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CASE NO: 1:15-cv-02594-RWS

(Hon. Richard W. Story)

## APPELLANT'S APPENDIX – VOLUME TWO

ELIZABETH H. RADER
ALSTON & BIRD LLP
The Atlantic Building
950 F Street, N.W.
Washington, DC 20004
(202) 239-3008
elizabeth.rader@alston.com

SARAH P. LAFANTANO
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA 30309
(404) 881-7000
sarah.lafantano@alston.com

*Counsel for Defendant/Appellant*

# TABLE OF CONTENTS

**VOLUME ONE**

**TAB DS –** District Court Docket Sheets ......................................................... 1

**TAB 1 –** Complaint for Injunctive Relief
Filed July 21, 2015 ..................................................................... 10

    **TAB 1-1 –** Code §1-1-6 ............................................................... 29

    **TAB 1-2 –** Columbia Journalism Review .......................................... 31

    **TAB 1-3 –** YES WE SCAN Project Promotion .................................. 37

    **TAB 1-4 –** July 25, 2013 Cease and Desist Letter to Carl Malamud ................. 41

    **TAB 1-5 –** Letter from Public.Resource.Org dated 7/30/13 ........................... 44

    **TAB 1-6 –** O.C.G.A. Works Copied by Defendant ............................ 48

**TAB 6 –** Answer and Counterclaim
Filed September 14, 2015 .......................................................... 53

    **TAB 6-1 –** Letter from Lee Rosenthal dated 7/16/08 ....................... 84

    **TAB 6-2 –** Letter from Darrell Issa dated 1/5/11 ............................ 86

    **TAB 6-3 –** Code §1-1-1 .............................................................. 88

    **TAB 6-4 –** Code §1-1-10 .......................................................... 91

    **TAB 6-5 –** LexisNexis Terms and Conditions .................................. 93

    **TAB 6-6 –** Georgia Code Website Terms and Conditions ............................. 100

**TAB 11 –** Amended Complaint for Injunctive Relief
Filed October 8, 2015 ............................................................. 104

    **TAB 11-1 –** Code §1-1-6 (FOUND AT TAB 1-1)

i

**TAB 11-2 –** Columbia Journalism Review (FOUND AT TAB 1-2)

**TAB 11-3 –** YES WE SCAN Project Promotion (FOUND AT TAB 1-3)

**TAB 11-4 –** July 25, 2013 Cease and Desist Letter to Carl Malamud (FOUND AT TAB 1-4)

**TAB 11-5 –** Letter from Public.Resource.Org dated 7/30/13 (FOUND AT TAB 1-5)

**TAB 11-6 –** O.C.G.A. Works Copied by Defendant (FOUND AT TAB 1-6)

**TAB 10 –** Answer to Affirmative Defenses and Counterclaim
Filed October 10, 2015 .......................................................................................... 125

**TAB 16 –** Answer to Amended Complaint and Counterclaim of Defendant
Public.Resource.Org, Inc.
Filed October 22, 2015 .......................................................................................... 141

**TAB 16-1 –** Letter from Lee Rosenthal dated 7/16/08 (FOUND AT 6-1)

**TAB 16-2 –** Letter from Darrell Issa dated 1/5/11 (FOUND AT 6-2)

**TAB 16-3 –** Code §1-1-1 (FOUND AT 6-3)

**TAB 16-4 –** Code §1-1-10 (FOUND AT 6-4)

**TAB 16-5 –** LexisNexis Terms and Conditions (FOUND AT 6-5)

**TAB 16-6 –** Georgia Code Website Terms and Conditions (FOUND AT 6-6)

**TAB 16-7 –** LexisNexis Official Code of Georgia Annotated ........................ 172

**VOLUME TWO**

**TAB 17 –** Stipulation of Facts
Filed January 15, 2016 ........................................................................................ 175

**TAB 17-1 –** O.C.G.A. Works Copied and Distributed by Defendant ............ 197

**TAB 17-2 –** Cover of Georgia Code 2013 Edition ............................................ 209

**TAB 17-3 –** Letter from Carl Malamud dated 5/30/13 ................................... 211

**TAB 17-4 –** Letter from Public.Resource.Org dated 7/30/13 (FOUND AT TAB 1-5)

**TAB 17-5 –** July 25, 2013 Cease and Desist Letter to Carl Malamud (FOUND AT 1-4)

**TAB 17-6 –** Letter from Josh McKoon dated 8/15/13 ................................... 213

**TAB 17-7 –** Letter from Josh McKoon dated 4/2/14 ..................................... 215

**TAB 17-8 –** Emails between Wayne Allen and Brendan Keefe ...................... 220

**TAB 17-9 –** LexisNexis Terms and Conditions (FOUND AT 6-5)

**TAB 17-10 –** Georgia Code Website Terms and Conditions .......................... 223

**TAB 17-11 –** LexisNexis Online Georgia Statutes Terms and Conditions ..... 225

**TAB 17-12 –** Georgia Code Website Terms and Conditions (FOUND AT TAB 6-6)

**TAB 17-13 –** LexisNexis Official Code of Georgia Annotated (FOUND AT TAB 16-7)

Exhibits to Motion for Summary Judgment with Brief in Support
Filed May 17, 2016

**TAB 29-3 –** Declaration of Carl Malamud .......................................... 230

**TAB 29-4 –** IRS Information for Public.Resource.Org ................................... 251

**TAB 29-6 –** Foreword from History of Codification ...................................... 255

**TAB 29-7 –** Article from Georgia State Bar Journal ......................... 263

**TAB 29-8 –** Agreement for Publication ............................................... 268

**TAB 29-10 –** Lexis Report on hits on GA Code ................................. 301

**TAB 29-14 –** Declaration of Edward Walters ..................................................... 303

**TAB 29-16 –** User's Guide to the OCGA.......................................................... 308

**TAB 29-17 –** Plaintiff Commission's Response to Defendant
Public.Resource.Org, Inc.'s First Set of Interrogatories............ 316

**TAB 44 –** Order on Motion for Summary Judgment
Entered March 23, 2017.................................................................... 343

**TAB 45 –** Joint Motion for Entry of Proposed Permanent Injunction Order
Filed April 6, 2017 ........................................................................... 366

**TAB 45-1 –** Proposed Order .............................................................. 370

**TAB 52 –** Order on Joint Motion for Permanent Injunction
Entered April 7, 2017 ....................................................................... 372

**TAB CS –** Certificate of Service

# TAB 17

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION on behalf of and for the benefit of THE GENERAL ASSEMBLY OF GEORGIA, and THE STATE OF GEORGIA, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:15-CV-02594-MHC |
| PUBLIC.RESOURCE.ORG, INC. | |
| Defendant. | |

## STIPULATION OF FACTS

Plaintiff and Counterclaim-Defendant the Code Revision Commission, on

behalf of and for the benefit of the General Assembly of Georgia, and the State of

Georgia ("Commission"), and Defendant and Counterclaim-Plaintiff

Public.Resource.Org, Inc. ("Public Resource") stipulate to the following facts:

1.      Each Official Code of Georgia Annotated ("O.C.G.A.") volume and

supplement in Exhibit A contains statutory text and non-statutory annotation text.

2.      The 2014 and 2015 State of Georgia session laws each state in part:

> Annotations; editorial notes; Code Revision Commission
> notes; research references; notes on law review articles;
> opinions of the Attorney General of Georgia; indexes;
> analyses; title, chapter, article, part, and subpart captions or

175

> headings, except as otherwise provided in the Code;
> catchlines of Code sections or portions thereof, except as
> otherwise provided in the Code; and rules and regulations
> of state agencies, departments, boards, commissions, or
> other entities which are contained in the Official Code of
> Georgia Annotated are not enacted as statutes by the
> provisions of this Act.

2014 Ga. Laws 866, § 54; 2015 Ga. Laws 5, § 54.

3.      The non-statutory annotation text of each O.C.G.A. volume and

supplement in Exhibit A includes summaries of judicial decisions.

4.      The summaries of judicial decisions in the non-statutory annotations

of each O.C.G.A. volume and supplement in Exhibit A are prepared by Matthew

Bender and Company, a member of the LexisNexis Group, a division of Reed

Elsevier Properties, Inc. ("LexisNexis") under contract for the State of Georgia,

and are finalized under the direct supervision of and subject to the approval of the

Code Revision Commission.

5.      The judicial decisions summarized in the judicial decision summaries

in each O.C.G.A. volume and supplement in Exhibit A have been selected by

LexisNexis to be summarized for inclusion in the O.C.G.A, under the direct

supervision and subject to the approval of the Code Revision Commission.

2

6.      The content of the summaries of judicial decisions in each O.C.G.A. volume and supplement in Exhibit A has been selected for inclusion in the O.C.G.A.

7.      The summaries of judicial decisions in each O.C.G.A. volume and supplement in Exhibit A have been coordinated with an O.C.G.A. statute (statutory text).

8.      The summaries of judicial decisions in each O.C.G.A. volume and supplement in Exhibit A are arranged under the heading "Judicial Decisions" prior to or following an O.C.G.A. statute (statutory text).

9.      The summaries of judicial decisions are selected, coordinated and arranged in each O.C.G.A. volume and supplement listed in Exhibit A.

10.     The non-statutory annotation text of each O.C.G.A. volume and supplement in Exhibit A includes editor's notes.

11.     Editor's notes in each O.C.G.A. volume and supplement in Exhibit A are prepared by LexisNexis under contract for the State of Georgia, and under the direct supervision and subject to the approval of the Code Revision Commission.

12.     The editor's notes in each O.C.G.A. volume and supplement in Exhibit A have been coordinated with an O.C.G.A. statute (statutory text).

177

13.    The editor's notes in each O.C.G.A. volume and supplement in Exhibit A are arranged after the heading "Editor's notes" prior to or following an O.C.G.A. statute (statutory text).

14.    The editor's notes are coordinated and arranged in each O.C.G.A. volume and supplement listed in Exhibit A.

15.    The preface in each O.C.G.A. volume and supplement in Exhibit A is prepared under contract by LexisNexis for the State of Georgia and under the direct supervision and subject to the approval of the Code Revision Commission.

16.    Each O.C.G.A. volume and supplement in Exhibit A contains a copyright notice in the form of "Copyright © [Year] By State of Georgia All rights reserved."

17.    Each O.C.G.A. volume and supplement in Exhibit A is the subject of a U.S. Copyright Registration as shown in Exhibit A.

18.    The non-statutory annotation text of each O.C.G.A. volume and supplement listed in Exhibit A includes summaries of opinions of the Attorney General of Georgia.

19.    The summaries of opinions of the Attorney General of Georgia in the non-statutory annotations of each O.C.G.A. volume and supplement listed in Exhibit A are prepared by LexisNexis under contract for the State of Georgia, and

4

178

under the direct supervision of and subject to the approval of the Code Revision Commission.

20.    The opinions of the attorney general of Georgia referenced in each O.C.G.A. volume and supplement listed in Exhibit A have been selected for inclusion in the O.C.G.A.

21.    The opinions of the Attorney General of Georgia referenced in the opinion of the attorney general summaries are selected in each O.C.G.A. volume and supplement listed in Exhibit A.

22.    The content of the summaries of opinions of the Attorney General of Georgia in each O.C.G.A. volume and supplement listed in Exhibit A has been selected for inclusion in the O.C.G.A.

23.    The summaries of opinions of the Attorney General of Georgia in each O.C.G.A. volume and supplement listed in Exhibit A have been coordinated with an O.C.G.A. statute (statutory text).

24.    The summaries of opinions of the Attorney General of Georgia in each O.C.G.A. volume and supplement listed in Exhibit A are arranged under the heading "Opinions of the Attorney General" prior to or following an O.C.G.A. statute (statutory text).

5

25.    The summaries of the opinions of the Attorney General of Georgia are selected, coordinated and arranged in each O.C.G.A. volume and supplement listed in Exhibit A.

26.    The non-statutory text of each O.C.G.A. volume and supplement listed in Exhibit A includes summaries of research references.

27.    The summaries of research references in the non-statutory annotations of each O.C.G.A. volume and supplement in Exhibit A are prepared by LexisNexis under contract for the State of Georgia, and under the direct supervision and subject to the approval of the Code Revision Commission.

28.    The research references referenced in each O.C.G.A. volume and supplement in Exhibit A have been selected for inclusion in the O.C.G.A.

29.    The research references are selected in each O.C.G.A. volume and supplement listed in Exhibit A.

30.    The content of the summaries of the research references in each O.C.G.A. volume and supplement listed in Exhibit A has been selected for inclusion in the O.C.G.A.

31.    The summaries of research references in each O.C.G.A. volume and supplement listed in Exhibit A have been coordinated with an O.C.G.A. statute (statutory text).

32.     The summaries of research references in each O.C.G.A. volume and supplement listed in Exhibit A are arranged under the heading "Research References" prior to or following an O.C.G.A. statute (statutory text).

33.     The summaries of research references are selected, coordinated and arranged in each O.C.G.A. volume and supplement listed in Exhibit A.

34.     Public Resource purchased from LexisNexis and copied the entirety of 186 volumes and supplements of the O.C.G.A, including front and back covers, which 186 volumes include the volumes and supplements of the O.C.G.A. listed in Exhibit A.

35.     Although at least some of the O.C.G.A. volumes and supplements purchased by Public Resource were available for purchase on compact disc (CD), Public Resource purchased these volumes and supplements in paper form.

36.     Public Resource posted on its website https//law.resource.org the copies it made of the O.C.G.A. including the volumes and supplements of the O.C.G.A. listed in Exhibit A.

37.     At least one copy of each O.C.G.A. volume and supplement that Public Resource posted on its https//law.resource.org website is in an electronic format that displays an image of the printed publication as copied by Public Resource, which image allows for electronic page turning of the printed

7

publication. Exhibit B is a true and correct copy of the front cover of one such image.

38.    Public Resource has facilitated, enabled, encouraged and induced others to view, download, print, copy and distribute each O.C.G.A. volume and supplement listed in Exhibit A without limitation or compensation to the State of Georgia.

39.    Public Resource created works containing each O.C.G.A volume and supplement listed in Exhibit A.

40.    The annotations to each O.C.G.A. volume and supplement listed in Exhibit A include summaries of cases that relate to the O.C.G.A., summaries of Opinions of the Attorney General of Georgia and summaries of research references related to the O.C.G.A.

41.    Public Resource actively encourages all citizens to copy, use, and disseminate to others in Georgia and elsewhere and to create works containing the O.C.G.A volumes and supplements listed in Exhibit A.

42.    Public Resource solicited funds on a crowd funding website (www.indiegogo.com/projects/the-laws-of-georgia) to help it scan and post entire volumes and supplements of the O.C.G.A, including each O.C.G.A. volume and supplement listed in Exhibit A.  This funding campaign ended on July 11, 2014.

182

43.    Public Resources continues to solicit funds on its website

(https://yeswescan.org) to support its general mission of making federal, state and

local laws easily available to the public free of charge.

44.    The State of Georgia enacts and promulgates the laws of the state

through its legislature. The state laws are provided in Code sections.

45.    The Commission does not assert copyright in the O.C.G.A. statutory

text itself because the laws of Georgia are and should be free to the public.

46.    Subsequent to July 22, 2015 and with full knowledge of the

Commission's Complaint (Dkt. No. 1), Public Resource copied the entirety of the

volumes and supplements of the 2015 O.C.G.A. shown in Exhibit A and

distributed those copies via posting them on its website https://law.resource.org.

47.    Public Resource continues to post the entirety of the 114 volumes and

supplements of the O.C.G.A. shown in Exhibit A, including front and back covers,

on its website https//law.resource.org.

48.    Public Resource's posting of the entirety of the 114 volumes and

supplements of the O.C.G.A. listed in Exhibit A on its website

https://law.resource.org was for the purpose of facilitating, enabling, encouraging

and inducing others to view, download, print, copy and distribute those volumes

and supplements of the O.C.G.A.

49.    Public Resource's posting of the entirety of the 114 volumes and supplements of the O.C.G.A. listed in Exhibit A on its website https://law.resource.org resulted in the copying (downloading) of those volumes and supplements from that website by members of the public.

50.    Public Resource posted on a website, www.archive.org, copies of the entirety of the volumes and supplements of the O.C.G.A. listed in Exhibit A.

51.    At least one copy of each O.C.G.A. volume and supplement that Public Resource posted on the www.archive.org website is in an electronic format that mimics a printed publication.

52.    Subsequent to July 22, 2015 and with full knowledge of the Commission's Complaint (Dkt. No. 1), Public Resource copied the entirety of the volumes and supplements of the 2015 O.C.G.A. listed in Exhibit A and posted them on the website www.archive.org.

53.    Public Resource, despite having the right to remove the entirety of the volumes and supplements of the O.C.G.A. that it posted on the website www.archive.org, including those volumes and supplements listed in Exhibit A, has not removed such copies.

54.    Public Resource's posting of the entirety of the volumes/supplements of the O.C.G.A. on the website www.archive.org, including those

10

184

volumes/supplements listed in Exhibit A, was for the purpose of facilitating,

enabling, encouraging and inducing others to view, download, print, copy and

distribute those volumes and supplements of the O.C.G.A.

55. Public Resource's posting of the entirety of volumes and supplements

of the O.C.G.A. on the website www.archive.org, resulted in the copying

(downloading) of each of those volumes/supplements of the O.C.G.A. from the

website by members of the public as listed in Exhibit A.

56. Public Resource labeled each of the volumes and supplements of the

O.C.G.A. it posted on the website www.archive.org as listed in Exhibit A with the

"CCO 1.0 Universal license" which states that members of the public may copy,

modify and distribute those O.C.G.A. volumes and supplements.

57. Public Resource labeled each of the volumes and supplements of the

O.C.G.A. it posted on the website www.archive.org as listed in Exhibit A with the

following statement:

> *All citizens and residents are hereby advised that this is a legally binding document duly promulgated and enacted and that failure to comply with such requirements as hereby detailed within may subject you to criminal or civil penalties under the law. Ignorance of the law shall not excuse noncompliance and it is the responsibility of the citizens to inform themselves as to the laws that are enacted in the United States of America and in the State of Georgia and all cities and territories contained therein.*

11

185

58.    Public Resource's copying and posting of the entire volumes and supplements of the O.C.G.A. on the websites https://law.resource.org and www.archive.org as shown in Exhibit A, and in particular the electronic nature of these documents and their availability on the Internet, magnifies the ease and speed with which they may be copied and distributed to others.

59.    Carl Malamud, the founder and president of Public.Resource.Org, testified before the U.S. House of Representatives, House Judiciary Committee, to advance an amendment to the U.S. Copyright Act making state and local official legal documents uncopyrightable for reasons of public policy. No such amendment has been adopted by Congress.

60.    Carl Malamud has tried to become the U.S. Public Printer but has not been nominated for the office of United States Public Printer.

61.    Public Resource posted on its https://yeswescan.org website and delivered to the Commission a Proclamation of Promulgation stating that its deliberate copying and distribution of the O.C.G.A. would be greatly expanded in 2014.

62.    Public Resource instituted a public funding campaign on the website www.indiegogo.com to support its continued copying and distribution of the O.C.G.A. and raised approximately $3,000.00.

63.    Public Resource distributed USB thumb drives containing scanned copies of the O.C.G.A. to members of the State of Georgia Legislature.

64.    Public Resource distributed copies of the entirety of 90 volumes and supplements of the O.C.G.A. to at least eight institutions in and around the state of Georgia, Honorable David Ralston, Speaker of the House, Georgia House of Representatives and Mr. Wayne Allen, Legislative Counsel, Office of Legislative Counsel, Georgia General Assembly, including those shown in Exhibit A, by placing those copies on USB thumb drives and mailing them.

65.    Public Resource's distribution of the entirety of 90 volumes and supplements of the O.C.G.A. to at least eight institutions in and around the state of Georgia, including those volumes and supplements shown in Exhibit A, was for the purpose of facilitating, enabling, encouraging and inducing others to view, download, print, copy and distribute those volumes and supplements of the O.C.G.A.

66.    The Commission has not authorized Public Resource to copy, distribute or make derivative works of any entire volume or supplement of the

O.C.G.A., including those shown in Exhibit A, and upon receiving cease and desist letters from the Commission, Public Resource refused to remove any and all copies of the O.C.G.A. that it had posted on any website.

67.    The correspondence shown in Exhibit C is a true and exact copy of a letter written by Mr. Malamud and sent to David Ralston and Wayne Allen on May 30, 2013.

68.    The correspondence shown in Exhibit D is a true and exact copy of a letter written by Mr. Malamud and sent to Joshua McKoon, David Ralston and David Shafer on July 30, 2013.

69.    The correspondence shown in Exhibit E is a true and exact copy of a letter written by Joshua McKoon and sent to Mr. Malamud on July 25, 2013.

70.    The correspondence shown in Exhibit F is a true and exact copy of a letter written by Joshua McKoon and sent to Mr. Malamud on August 15, 2013.

71.    The correspondence shown in Exhibit G is a true and exact copy of a letter written by Joshua McKoon and sent to Mr. Malamud on April 2, 2014.

72.    The correspondence shown in Exhibit H consists of true copies of an email written by Brendan Keefe and sent to Wayne R Allen, on September 18, 2015 and Mr. Allen's email responding to Mr. Keefe the same day.

73.    The statutory text and numbering of the O.C.G.A. is accessible by the public through the Georgia General Assembly website at www.legis.ga.gov and the Georgia Senate website at www.senate.ga.gov by clicking on the "Georgia Code" link on each of those websites which will direct the user to the LexisNexis website operated for the State of Georgia.

74.    The "Georgia Code" links on the websites www.legis.ga.gov and www.senate.ga.gov link to the LexisNexis website http://www.lexisnexis.com/hottopics/gacode/Default.asp ("LexisNexis GA Code website"), which is operated for the State of Georgia, and the LexisNexis GA Code website contains the statutory text and numbering of the O.C.G.A.

75.    There is no fee to access the statutory text and numbering of the O.C.G.A. through the LexisNexis GA Code website.

76.    The statutory text and numbering of the O.C.G.A. can be electronically copied and/or printed from the LexisNexis GA Code website.

77.    The statutory text of the O.C.G.A. is searchable by term on the LexisNexis GA Code website.

78.    The market for the O.C.G.A. includes markets for the sale of the printed publication, the CD-ROM, and on-line versions of the O.C.G.A.

79.    Public Resource operates the websites public.resource.org, law.resource.org, house.resource.org, bulk.resource.org and others.

80.    Public Resource reformats at least some of the documents containing laws it posts. As a matter of course, Public Resource transforms codes and standards into HTML. The O.C.G.A. had not been so transformed, but this was the intention.

81.    It is typical for bills introduced in the Georgia General Assembly ("Legislature") to begin, "An Act . . . To amend Article . . . Chapter . . . of Title . . . of the Official Code of Georgia Annotated."

82.    The Georgia Legislature is assisted by the Code Revision Commission in publishing the laws enacted by the Legislature.

83.    The Code Commission Notes added to the Georgia Statutory Text are prepared by the Code Revision Commission.

84.    LexisNexis publishes and sells the O.C.G.A. as a printed publication, on CD-ROM, and in an on-line version.

85.    LexisNexis receives income from its sales of the O.C.G.A.

86.    To access the statutory text and numbering in the O.C.G.A. via the website link found on the State of Georgia website, www.legis.ga.gov, one must

190

accept the terms and conditions of use generally applicable to the LexisNexis websites ("LexisNexis Website Use Terms and Conditions").  A true and correct copy of the LexisNexis Website Use Terms and Conditions is attached as Exhibit I. The access page that allows users to access the online publication by accepting the LexisNexis Website Use Terms and Conditions explicitly states that the LexisNexis Website Use Terms and Conditions do not apply to the O.C.G.A. statutory text and numbering.  A true and correct copy of this access page is attached as Exhibit J.

87.    The LexisNexis Website Use Terms and Conditions are governed by New York state law and require the user to submit to the personal jurisdiction of New York state courts for the purpose of litigating any action arising out of or relating to the LexisNexis Website Use Terms and Conditions.

88.    After navigating through the access page, and once within the LexisNexis site hosting the statutory text and numbering of the O.C.G.A. ("LexisNexis GA Code website"), one  notice on the LexisNexis GA Code website is a hyperlink to Terms and Conditions specific to the Georgia Code materials ("LexisNexis Georgia Materials Terms and Conditions"), which is available for download at

https://www.lexisnexis.com/hottopics/gacode/GA_Statutes_Website_Terms3.doc

or by clicking on the "Terms and Conditions" hyperlink at the bottom of the page. A true and accurate copy of the Second LexisNexis Terms and Conditions is attached as Exhibit K.

89.    The LexisNexis Website Use Terms and Conditions incorporate by reference any notices contained on the LexisNexis GA Code website. *See* Sec. 25 of the Website Use Terms and Conditions.

90.    The LexisNexis Georgia Materials Terms and Conditions state that "Georgia Code section text and numbering may be copied from this website at the user's expense and effort."

91.    The O.C.G.A statutory text and numbering that is available for free on the LexisNexis site does not contain the Annotations, such as the Judicial Summaries, summaries of Code Revision Commission Notes, summaries of Attorney General Opinions, and compilations thereof.

92.    Until at least May 28, 2014, the notice displayed before users could access the "free" online publication included a banner page that the user had to acknowledge before access was granted. That banner page noted clearly that only the "latest print version of the O.C.G.A. is the authoritative version." A true and correct copy of this banner page is attached as Exhibit L to this pleading.

93.     This 2014 banner page did not explicitly state that the LexisNexis Website Use Terms and Conditions do not apply to the Georgia Code statutory text and numbering.

94.     The Annotations include a summary of a vacated Northern District of Georgia case, which states: "[a]ttorneys who cite unofficial publications of 1981 Code do so at their peril," and the heading of the summary reads "Official Code publication controls over unofficial compilation."  O.C.G.A. § 1-1-1, note (Judicial Decisions).

95.     A LexisNexis marketing page for the print version of the O.C.G.A. states: "The Official Code of Georgia Annotated (O.C.G.A.) provides users with the official Georgia statutes, fully annotated" (emphasis in original).  A true and correct copy of this marketing page is attached as Exhibit M to this pleading.

96.     Public.Resource.org will not rely on the affirmative defenses of failure to state a claim on which relief can be granted or copyright misuse as pleaded in its Answer.  To the extent that there are factual disputes that relate to irreparable harm, those do not render summary adjudication of the parties' respective claims and counterclaims inappropriate.


Respectfully submitted, this 15th day of January, 2016.

193

_____

Anthony B. Askew (G.A. Bar: 025300)
Lisa C. Pavento (G.A. Bar: 246698)
Warren Thomas (G.A. Bar: 164714)
Meunier Carlin & Curfman LLC
999 Peachtree Street, NE, Suite 1300
Atlanta, Georgia 30309
Phone: 404-645-7700
Fax: 404-645-7707
taskew@mcciplaw.com
lpavento@mcciplaw.com
wthomas@mcciplaw.com

*Counsel for the Plaintiff, Code Revision
Commission on behalf of and for the
benefit of the General Assembly of
Georgia, and the State of Georgia*

_____

Elizabeth H. Rader (pro hac vice)
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Telephone: 202-239-3008
Fax: (202) 239-3333
elizabeth.rader@alston.com

Jason D. Rosenberg
Georgia Bar No. 510855
Sarah Parker LaFantano
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone 404-881-7461
Fax (404) 253-8861
jason.rosenberg@alston.com
sarah.lafantano@alston.com

*Counsel for the Defendant,
Public.Resource.Org*

194

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that, pursuant to L.R. 5.1C and 7.1D of the Northern District of Georgia, the foregoing **Stipulation of Facts** complies with the font and point selections approved by the Court in L.R. 5.1C. The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

_____

Anthony B. Askew (G.A. Bar: 025300)
Meunier Carlin & Curfman LLC
999 Peachtree Street NE, Suite 1300
Atlanta, Georgia 30309
Telephone: 404-645-7700
Email: taskew@mcciplaw.com

21

## CERTIFICATE OF SERVICE

I, the undersigned counsel, hereby certify that on January 15, 2016, a true and correct copy of the foregoing Stipulation of Facts was electronically filed with Clerk of Court using the CM/ECF system which will automatically send notification of such filing to all attorneys of record.

_____
Anthony B. Askew (G.A. Bar: 025300)
Meunier Carlin & Curfman LLC
999 Peachtree Street NE, Suite 1300
Atlanta, Georgia 30309
Telephone: 404-645-7700
Email: taskew@mcciplaw.com

# TAB 17-1

# EXHIBIT A

Case 1:15-cv-02594-RWS    Document 17-1    Filed 01/15/16    Page 2 of 12

Exhibit A

O.C.G.A. Works Copied and Distributed by Defendant

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https//law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 1 | 1 | | | 2007 | 1, 2, 3 | 902 | TX 6-913-180 TX 5-954-373 |
| 2 | 2 | | | 2007 | 1, 2, 3 | 944 | TX 6-913-180 TX 6-830-237 TX 5-954-373 TX 5-594-374 |
| 3 | 3 | 1-3 | | 2000 | 1, 2, 3 | 365 | TX 5-297-038 TX 5-954-378 |
| 4 | 5 | 7, 8 | | 2004 | 1, 2, 3 | 459 | TX 6-075-716 TX 5-954-375 |
| 5 | 6 | 9 | 1-10 | 2007 | 1, 2, 3 | 1,405 | TX 6-913-180 TX 5-954-373 |
| 6 | 7 | 9 | 11-15 | 2014 | 1, 2 | 255 | TX 7-898-935 TX 5-954-371 |
| 7 | 7A | 9 | 12-16 | 2015 | 1, 2 | 18 | Applied for |
| 8 | 9 | 11 | | 2002 | 1, 2, 3 | 621 | TX 5-626-881 TX 5-594-377 |
| 9 | 12 | 14 | | 2003 | 1, 2, 3 | 971 | TX 5-866-857 TX 5-880-238 TX 5-954-376 |

1

198

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 10 | 13 | 15 | | 2014 | 1, 2 | 96 | TX 7-898-935 TX 5-954-371 |
| 11 | 13A | 15 | 12-24 | 2015 | 1, 2 | 17 | Applied for |
| 12 | 14 | 16 | 1-6 | 2011 | 1, 2, 3 | 1,054 | TX 7-413-966 TX 5-954-370 |
| 13 | 14A | 16 | 7-11 | 2011 | 1, 2, 3 | 207 | TX 7-413-966 TX 5-954-370 |
| 14 | 14B | 16 | 12-17 | 2011 | 1, 2, 3 | 1,010 | TX 7-413-966 TX 5-954-370 |
| 15 | 15 | 17 | | 2013 | 1, 2 | 979 | TX 7-948-091 |
| 16 | 16 | 18, 19 | | 2015 | 1, 2 | 17 | Applied for |
| 17 | 17 | 20 | | 2012 | 1, 2, 3 | 782 | TX 7-564-165 TX 5-954-380 |
| 18 | 21 | 25, 26 | | 2014 | 1, 2 | 41 | TX 7-898-935 TX 5-954-371 |
| 19 | 22 | 27-30 | | 2007 | 1, 2, 3 | 842 | TX 6-913-180 TX 6-830-237 TX 5-954-373 TX 5-954-374 |
| 20 | 23 | 31, 32 | | 2012 | 1, 2, 3 | 911 | TX 7-564-165 TX 5-954-380 |
| 21 | 24 | 33 | 1-22 | 2014 | 1, 2 | 452 | TX 7-898-935 TX 5-954-371 |

2

199

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 22 | 27 | 35, 36 | | 2012 | 1, 2, 3 | 693 | TX 7-564-165 TX 5-954-380 |
| 23 | 28 | 37-39 | | 2012 | 1, 2, 3 | 644 | TX 7-564-165 TX 5-954-380 |
| 24 | 29 | 40 | | 2014 | 1, 2 | 52 | TX 7-898-935 TX 5-954-371 |
| 25 | 29A | 41, 42 | | 2014 | 1, 2 | 75 | TX 7-898-935 TX 5-954-371 |
| 26 | 30 | 43 | | 2011 | 1, 2, 3 | 1,079 | TX 7-413-966 TX 5-954-370 |
| 27 | 32 | 44 | 8-15 | 2002 | 1, 2, 3 | 863 | TX 5-626-881 TX 5-594-377 |
| 28 | 33 | 45 | | 2002 | 1, 2, 3 | 281 | TX 5-626-881 TX 5-594-377 |
| 29 | 34 | 46 | | 2004 | 1, 2, 3 | 410 | TX 6-030-866 TX 6-075-716 TX 5-954-375 |
| 30 | 37 | 48 | 7-18 | 2013 | 1, 2 | 579 | TX 7-948-091 TX 5-594-372 |
| 31 | 38 | 49, 50 | 1-12 | 2013 | 1 | n/a | TX 7-948-091 TX 5-594-372 |
| 32 | 39 | 51 | | 2000 | 1, 2, 3 | 886 | TX 5-297-038 TX 5-954-378 |

3

200

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 33 | 40 | 52, 53 | | 2011 | 1, 2, 3 | 1,259 | TX 7-413-966 TX 5-954-370 |
| 34 | 1 (Supp) | | | 2007/2014 | 1, 2 | 57 | TX 7-898-935 TX 5-954-371 |
| 35 | 2 (Supp) | | | 2007/2014 | 1, 2 | 76 | TX 7-898-935 TX 5-954-371 |
| 36 | 3 (Supp) | 1-3 | | 2000/2014 | 1, 2 | 63 | TX 7-898-935 TX 5-954-371 |
| 37 | 4 (Supp) | 4-6 | | 2013/2014 | 1, 2 | 51 | TX 7-898-935 TX 5-954-371 |
| 38 | 5 (Supp) | 7, 8 | | 2004/2014 | 1, 2 | 55 | TX 7-898-935 TX 5-954-371 |
| 39 | 6 (Supp) | 9 | | 2007/2014 | 1, 2 | 90 | TX 7-898-935 TX 5-954-371 |
| 40 | 8 (Supp) | 10 | | 2009/2014 | 1, 2 | 59 | TX 7-898-935 TX 5-954-371 |
| 41 | 9 (Supp) | 11 | | 2002/2014 | 1, 2 | 54 | TX 7-898-935 TX 5-954-371 |
| 42 | 10 (Supp) | 12 | | 2012/2014 | 1, 2 | 40 | TX 7-898-935 TX 5-954-371 |
| 43 | 11 (Supp) | 13 | | 2010/2014 | 1, 2 | 47 | TX 7-898-935 TX 5-954-371 |

4

201

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 44 | 12 (Supp) | 14 | | 2003/2014 | 1, 2 | 43 | TX 7-898-935 TX 5-954-371 |
| 45 | 14 (Supp) | 16 | 1-6 | 2011/2014 | 1, 2 | 68 | TX 7-898-935 TX 5-954-371 |
| 46 | 14A (Supp) | 16 | 7-11 | 2011/2014 | 1, 2 | 58 | TX 7-898-935 TX 5-954-371 |
| 47 | 14B (Supp) | 16 | 12-17 | 2011/2014 | 1, 2 | 57 | TX 7-898-935 TX 5-954-371 |
| 48 | 15 (Supp) | 17 | | 2013/2014 | 1, 2 | 77 | TX 7-898-935 TX 5-954-371 |
| 49 | 16 (Supp) | 18, 19 | | 2010/2014 | 1, 2 | 79 | TX 7-898-935 TX 5-954-371 |
| 50 | 17 (Supp) | 20 | | 2012/2014 | 1, 2 | 39 | TX 7-898-935 TX 5-954-371 |
| 51 | 18 (Supp) | 21 | | 2008/2014 | 1, 2 | 34 | TX 7-898-935 TX 5-954-371 |
| 52 | 19 (Supp) | 22, 23 | | 2014 | 1, 2 | 53 | TX 7-898-935 TX 5-954-371 |
| 53 | 20 (Supp) | 24 | | 2013/2014 | 1, 2 | 159 | TX 7-898-935 TX 5-954-371 |
| 54 | 22 (Supp) | 27-30 | | 2007/2014 | 1, 2 | 75 | TX 7-898-935 TX 5-954-371 |

5

202

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 55 | 23 (Supp) | 31, 32 | | 2012/2014 | 1, 2 | 66 | TX 7-898-935 TX 5-954-371 |
| 56 | 25 (Supp) | 33 | 23-64 | 2013/2014 | 1, 2 | 61 | TX 7-898-935 TX 5-954-371 |
| 57 | 26 (Supp) | 34 | | 2008/2014 | 1, 2 | 99 | TX 7-898-935 TX 5-954-371 |
| 58 | 27 (Supp) | 35, 36 | | 2012/2014 | 1, 2 | 53 | TX 7-898-935 TX 5-954-371 |
| 59 | 28 (Supp) | 37-39 | | 2012/2014 | 1, 2 | 54 | TX 7-898-935 TX 5-954-371 |
| 60 | 30 (Supp) | 43 | | 2011/2014 | 1, 2 | 47 | TX 7-898-935 TX 5-954-371 |
| 61 | 31 (Supp) | 44 | 1-7 | 2010/2014 | 1, 2 | 149 | TX 7-898-935 TX 5-954-371 |
| 62 | 32 (Supp) | 44 | 8-15 | 2002/2014 | 1, 2 | 77 | TX 7-898-935 TX 5-954-371 |
| 63 | 33 (Supp) | 45 | | 2002/2014 | 1, 2 | 60 | TX 7-898-935 TX 5-954-371 |
| 64 | 34 (Supp) | 46 | | 2004/2014 | 1, 2 | 39 | TX 7-898-935 TX 5-954-371 |
| 65 | 35 (Supp) | 47 | | 2010/2014 | 1, 2 | 30 | TX 7-898-935 TX 5-954-371 |

6

203

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 66 | 36 (Supp) Reprint | 48 | 1-6 | 2010/2014 | 1, 2 | 63 | TX 7-898-935 TX 5-954-371 |
| 67 | 37 (Supp) | 48 | 7-18 | 2013/2014 | 1, 2 | 49 | TX 7-898-935 TX 5-954-371 |
| 68 | 38 (Supp) | 49, 50 | 1-12 (50) | 2013/2014 | 1, 2 | 37 | TX 7-898-935 TX 5-954-371 |
| 69 | 38A (Supp) | 50 | 13-38 | 2013/2014 | 1, 2 | 49 | TX 7-898-935 TX 5-954-371 |
| 70 | 39 (Supp) | 51 | | 2000/2014 | 1, 2 | 89 | TX 7-898-935 TX 5-954-371 |
| 71 | 40 (Supp) | 52, 53 | | 2011/2014 | 1, 2 | 57 | TX 7-898-935 TX 5-954-371 |
| 72 | 1 (Supp) | | | 2007/2015 | 1, 2 | 20 | Applied for |
| 73 | 2 (Supp) | | | 2007/2015 | 1, 2 | 15 | Applied for |
| 74 | 3 (Supp) | 1-3 | | 2000/2015 | 1, 2 | 25 | Applied for |
| 75 | 4 (Supp) | 4-6 | | 2013/2015 | 1, 2 | 17 | Applied for |
| 76 | 5 | 7, 8 | | 2015 | 1, 2 | 14 | Applied for |

7

204

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 77 | 6 (Supp) | 9 | 1-10 | 2007/2015 | 1, 2 | 20 | Applied for |
| 78 | 7 | 9 | 11 | 2015 | 1, 2 | 23 | Applied for |
| 79 | 8 (Supp) | 10 | | 2009/2015 | 1, 2 | 40 | Applied for |
| 80 | 9 (Supp) | 11 | | 2002/2015 | 1, 2 | 16 | Applied for |
| 81 | 10 (Supp) | 12 | | 2012/2015 | 1, 2 | 9 | Applied for |
| 82 | 11 (Supp) | 13 | | 2010/2015 | 1, 2 | 14 | Applied for |
| 83 | 12 (Supp) | 14 | | 2003/2015 | 1, 2 | 12 | Applied for |
| 84 | 13 | 15 | 1-11A | 2015 | 1, 2 | 21 | Applied for |
| 85 | 14 (Supp) | 16 | 1-6 | 2011/2015 | 1, 2 | 17 | Applied for |
| 86 | 14A (Supp) | 16 | 7-11 | 2011/2015 | 1, 2 | 18 | Applied for |
| 87 | 14B (Supp) | 16 | 12-17 | 2011/2015 | 1, 2 | 17 | Applied for |
| 88 | 15 (Supp) | 17 | | 2013/2015 | 1, 2 | 32 | Applied for |

8

205

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 89 | 17 (Supp) | 20 | | 2012/2015 | 1, 2 | 15 | Applied for |
| 90 | 18 (Supp) | 21 | | 2008/2015 | 1, 2 | 21 | Applied for |
| 91 | 19 (Supp) | 22, 23 | | 2014/2015 | 1, 2 | 11 | Applied for |
| 92 | 20 (Supp) | 24 | | 2013/2015 | 1, 2 | 14 | Applied for |
| 93 | 21 (Supp) | 25, 26 | | 2014/2015 | 1, 2 | 10 | Applied for |
| 94 | 22 (Supp) | 27-30 | | 2007/2015 | 1, 2 | 13 | Applied for |
| 95 | 23 (Supp) | 31, 32 | | 2012/2015 | 1, 2 | 20 | Applied for |
| 96 | 24 (Supp) | 33 | 1-22 | 2014/2015 | 1, 2 | 12 | Applied for |
| 97 | 25 (Supp) | 33 | 23-64 | 2013/2015 | 1, 2 | 12 | Applied for |
| 98 | 26 (Supp) | 34 | | 2008/2015 | 1, 2 | 11 | Applied for |
| 99 | 27 (Supp) | 35, 36 | | 2012/2015 | 1, 2 | 11 | Applied for |

9

206

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|---|---|---|---|---|---|---|---|
| 100 | 28 (Supp) | 37-39 | | 2012/2015 | 1, 2 | 18 | Applied for |
| 101 | 29 (Supp) | 40 | | 2014/2015 | 1, 2 | 11 | Applied for |
| 102 | 29A (Supp) | 41, 42 | | 2014/2015 | 1, 2 | 13 | Applied for |
| 103 | 30 (Supp) | 43 | | 2011/2015 | 1, 2 | 14 | Applied for |
| 104 | 31 (Supp) | 44 | 1-7 | 2010/2015 | 1, 2 | 14 | Applied for |
| 105 | 32 (Supp) | 44 | 8-16 | 2002/2015 | 1, 2 | 12 | Applied for |
| 106 | 33 (Supp) | 45 | | 2002/2015 | 1, 2 | 13 | Applied for |
| 107 | 34 (Supp) | 46 | | 2004/2015 | 1, 2 | 10 | Applied for |
| 108 | 35 (Supp) | 47 | | 2010/2015 | 1, 2 | 9 | Applied for |
| 109 | 36 (Supp) | 48 | 1-6 | 2010/2015 | 1, 2 | 10 | Applied for |
| 110 | 37 (Supp) | 48 | 7-18 | 2013/2015 | 1, 2 | 21 | Applied for |

10

207

| No. | Volume | Titles | Chapters | Edition/ Supp. | Distributed on https://law.resource.org (1), www.archive.org (2), and/or thumb drive (3) | Number of downloads on www.archive.org at least as early as 10/29/2015 | Copyright Registration |
|-----|--------|--------|----------|----------------|------------------------------------------------------------------------------------------|-----------------------------------------------------------------------|------------------------|
| 111 | 38 (Supp) | 49, 50 | 1-12 (50) | 2013/2015 | 1, 2 | 19 | Applied for |
| 112 | 38A (Supp) | 50 | 13-38 | 2013/2015 | 1, 2 | 13 | Applied for |
| 113 | 39 (Supp) | 51 | | 2000/2015 | 1, 2 | 18 | Applied for |
| 114 | 40 (Supp) | 52, 53 | | 2011/2015 | 1, 2 | 11 | Applied for |

11

208

# TAB 17-2

# EXHIBIT B



# TAB 17-3

# EXHIBIT C

**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

**Public Works for a Better Government**

May 30, 2013

Hon. David Ralston
Speaker of the House
Georgia House of Representatives
332 State Capitol
Atlanta, GA 30334

Mr. Wayne R. Allen, Legislative Counsel
Office of Legislative Counsel
Georgia General Assembly
3021 State Capitol
Atlanta, GA 30334

Dear Speaker Ralston and Mr. Allen:

I am pleased to enclose for your consideration a George Washington USB Thumb Drive
containing a scanned version of the Official Code of Georgia Annotated as well as XML–
encoded versions of the code. Our purpose in making these statutes available is to
promote access to the law by citizens and to promote innovation in ways the statutes
are made available so that public servants, members of the bar, citizens, and members
of the business community have ready access to the laws that govern them.

Access to the law is a fundamental aspect of our system of democracy, an essential
element of due process, equal protection, and access to justice. The Supreme Court of
the United States has repeatedly reaffirmed this principle, stating for example in Banks
v. Manchester (128 U.S. 244, 1888) that "the authentic exposition and interpretation of
the law, which, binding every citizen, is free for publication to all, whether it is a
declaration of unwritten law, or an interpretation of a constitution or a statute."

The fact that there is no copyright in the law has been affirmed as a statement of
policy by the United States Copyright Office which stated "Edicts of government, such
as judicial opinions, administrative rulings, legislative enactments, public ordinances,
and similar official legal documents are not copyrightable for reasons of public policy.
This applies to such works whether they are Federal, State, or local as well as to those
of foreign governments."

I would be pleased to answer any questions you may have and look forward to better
access to the law by the citizens of Georgia.

Sincerely yours,

Carl Malamud
Public.Resource.Org

212

# TAB 17-6

# EXHIBIT F



## The General Assembly

Atlanta, Georgia 30334

August 15, 2013

Carl Malamud
Public.Resource.Org
1005 Gravenstein Highway North
Sebastopol, California 95472

VIA CERTIFIED MAIL

Dear Mr. Malamud:

We have received your response dated July 30, 2013, refusing to comply with the cease and desist letter sent on behalf of the Georgia Code Revision Commission on July 25, 2013, regarding your unlawful copying of the Official Code of Georgia Annotated.  The response received was unacceptable.

Your response includes a misstatement or misunderstanding of federal copyright law.  As indicated in the prior letter, the State of Georgia already makes the entire body of statutory law in Georgia available to the public at no charge at www.legis.ga.gov. This is wholly different from the product produced by Lexis, the state's publisher, which includes additional value-added material which is subject to copyright protection.

Therefore, we again demand that you immediately: (a) cease and desist your unlawful copying of the Official Code of Georgia Annotated; (b) remove any and all files containing the Official Code of Georgia Annotated from the internet; (c) destroy any and all files containing the Official Code of Georgia Annotated from the internet; and (d) provide us with prompt written assurance within 5 days of receiving this letter that all such steps have been taken and that you will cease and desist from any further infringement of the copyrighted Official Code of Georgia Annotated.

If you fail to comply with this letter, the Georgia Code Revision Commission intends to pursue all available remedies, including but not limited to, preliminary and permanent injunctions, damages, and costs and attorney's fees associated with defending the state's rights for copyright violation under the Copyright Act of 1976.

Sincerely,

Chairman Josh McKoon
Georgia Code Revision Commission

cc:    Code Commission members

214

# TAB 17-7

# EXHIBIT G



## The General Assembly

Atlanta, Georgia 30334

April 2, 2014

Carl Malamud
Public.Resource.Org
1005 Gravenstein Highway North
Sebastopol, California 95472

Dear Mr. Malamud:

We have received your package entitled "Proclamation of Promulgation". Please see our correspondence of July 25, 2013, and August 15, 2013 (copies attached) to Public.Resource.Org asserting our rights in the copyrightable portions of the Official Code of Georgia Annotated. Per such previous notice, we continue to assert such copyright ownership and direct Public.Resource.Org to immediately cease and desist all activities which entail infringement of such copyright.

Sincerely,

Chairman Josh McKoon
Georgia Code Revision Commission

cc:    Code Commission members

216



## The General Assembly

Atlanta, Georgia 30334

July 25, 2013

Carl Malamud
Public.Resource.Org
1005 Gravenstein Highway North
Sebastopol, California 95472

VIA CERTIFIED MAIL

Dear Mr. Malamud:

On behalf of the Georgia Code Revision Commission, we are writing to notify you that your unlawful copying of the Official Code of Georgia Annotated infringes upon the exclusive copyright of the State of Georgia. Accordingly, you are hereby directed to

## CEASE AND DESIST ALL COPYRIGHT INFRINGEMENT.

The State of Georgia, acting through the Georgia Code Revision Commission, is the owner of a copyright in various aspects of the Official Code of Georgia Annotated. Under United States copyright law, the State of Georgia's copyright has been in effect since the original date of creation of such official Code in 1983. All copyrightable aspects of the Official Code of Georgia Annotated are copyrighted under United States copyright law. The state asserts no copyright in the statutory text itself or in the numbering of the Code sections.

We received your letter dated May 30, 2013, to Honorable David Ralston, Speaker of the House of Representatives of Georgia, and Mr. Wayne Allen, Legislative Counsel for the Georgia General Assembly, containing notice that you have scanned the Official Code of Georgia Annotated, as evidenced by the USB Thumb Drive which was enclosed with the letter. It has also come to our attention that such files can be freely accessed from the internet (https://law.resource.org/pub/us/code/ga/georgia.scan.2012/) with no restrictions to its access.

Therefore, we demand that you immediately: (a) cease and desist your unlawful copying of the Official Code of Georgia Annotated; (b) remove any and all files containing the Official Code of Georgia Annotated from the internet; (c) destroy any and all files containing the Official Code of Georgia Annotated from the internet; and (d) provide us with prompt written assurance within 10 days of receiving this letter that all such steps have been taken and that you will cease and desist from any further infringement of the copyrighted Official Code of Georgia Annotated.

217

Mr. Carl Malamud
July 25, 2013
Page 2

If you do not comply with this cease and desist demand within this time period, the State of Georgia, through the Georgia Code Revision Commission, is entitled to use your failure to comply as evidence of willful infringement and seek monetary damages and equitable relief for your copyright infringement.

For your information, the unannotated Georgia Code, including Code section designations and headings, is available to the public at no charge at www.legis.ga.gov.

If you are represented by legal counsel, please direct this letter to your attorney immediately and have your attorney notify us of such representation.

Sincerely,

Chairman Josh McKoon
Georgia Code Revision Commission

cc:    Code Commission members



## The General Assembly

Atlanta, Georgia 30334

August 15, 2013

Carl Malamud
Public.Resource.Org
1005 Gravenstein Highway North
Sebastopol, California 95472

VIA CERTIFIED MAIL

Dear Mr. Malamud:

We have received your response dated July 30, 2013, refusing to comply with the cease and desist letter sent on behalf of the Georgia Code Revision Commission on July 25, 2013, regarding your unlawful copying of the Official Code of Georgia Annotated. The response received was unacceptable.

Your response includes a misstatement or misunderstanding of federal copyright law. As indicated in the prior letter, the State of Georgia already makes the entire body of statutory law in Georgia available to the public at no charge at www.legis.ga.gov. This is wholly different from the product produced by Lexis, the state's publisher, which includes additional value-added material which is subject to copyright protection.

Therefore, we again demand that you immediately: (a) cease and desist your unlawful copying of the Official Code of Georgia Annotated; (b) remove any and all files containing the Official Code of Georgia Annotated from the internet; (c) destroy any and all files containing the Official Code of Georgia Annotated from the internet; and (d) provide us with prompt written assurance within 5 days of receiving this letter that all such steps have been taken and that you will cease and desist from any further infringement of the copyrighted Official Code of Georgia Annotated.

If you fail to comply with this letter, the Georgia Code Revision Commission intends to pursue all available remedies, including but not limited to, preliminary and permanent injunctions, damages, and costs and attorney's fees associated with defending the state's rights for copyright violation under the Copyright Act of 1976.

Sincerely,

Chairman Josh McKoon
Georgia Code Revision Commission

cc:    Code Commission members

219

# TAB 17-8

# EXHIBIT H

220

**From:** "Allen, Wayne" <Wayne.Allen@legis.ga.gov>
**Date:** Friday, September 18, 2015 at 3:45 PM
**To:** Brendan Keefe <bkeefe@11alive.com>
**Subject:** RE: Georgia Code Revision Commission -- Open Records Request

Mr. Brendan Keefe
Chief Investigative Reporter
WXIA 11 Alive (NBC/TEGNA Atlanta)

Mr. Keefe,

This is in response to your request below for inspection and reproduction of the Official Code of Georgia Annotated (O.C.G.A.).

To inspect the content of the Official Code of Georgia Annotated, there is no need to resort to an open records request such as you have made. The O.C.G.A. is available at many libraries, such as at the Georgia State University Law School and general public libraries. You are free to peruse it there for research purposes. If you wish to obtain your own copies of the volumes of the O.C.G.A., you may purchase it from LexisNexis, the official publisher, like anyone else.

For your information, the Georgia General Assembly and its agencies are not subject to the Georgia "open records" law. See Coggin v. Davey, 233 Ga. 407, 410-411 (1975) (General Assembly is not an "agency" within the meaning of the "Open Meetings" law); O.C.G.A. Sec. 50-18-70(b) (the term "agency" under Open Records law has same meaning as under Open Meetings law).

As to your intention to electronically reproduce the O.C.G.A. and republish it "on WXIA-TV 11 and 11alive.com", be aware that the O.C.G.A. is copyrighted by the State of Georgia, and the copyright is controlled by the Code Revision Commission of the State of Georgia. Those portions of the O.C.G.A. that are enacted by the General Assembly (i.e., statute text of Code sections and numbers of Titles, Chapters, Articles, Parts, Subparts, and Code sections) are in the public domain and may be used without any need for obtaining permission. Indeed, the statutory portion of the O.C.G.A. is available to the general public at no charge at http://www.lexisnexis.com/hottopics/gacode/Default.asp Please see the note to users on that webpage.

The remaining, nonstatutory material in the O.C.G.A. (i.e., catchlines of Code sections; names of Titles, Chapters, Articles, Parts, and Subparts; history lines; editor's notes; Code Commission notes; annotations; research references; cross-references; indexes; and other such materials) is copyrighted by the State of Georgia and shall not be republished without permission. No such permission is granted here.

For further information regarding the publication and copyright of the O.C.G.A., I refer you to an informative news release regarding the same as posted at http://www.house-press.com/?p=5088

W. R. Allen
Legislative Counsel
Georgia General Assembly

PRO_00001



316 State Capitol, SW
Atlanta, GA 30334
404.656.5000
http://www.legis.ga.gov/Joint/en-US/LegCounsel.aspx

### Notice of Confidentiality

This message and any attachments thereto are intended for use by the named addressee(s) only and may contain confidential, privileged attorney-client communication, attorney work product, or other matter that is protected against disclosure under Georgia law, O.C.G.A. Sections 24-5-501 and 50-18-75.  Unauthorized use, copying, distribution, or retention of or reliance upon this message and any attachments thereto is prohibited.

**From:** Keefe, Brendan [mailto:bkeefe@11alive.com]
**Sent:** Friday, 18 September, 2015 14:54
**To:** Allen, Wayne
**Cc:** Keefe, Brendan
**Subject:** Georgia Code Revision Commission -- Open Records Request

Wayne,

We are requesting inspection of the current **Official Code of Georgia Annotated**. At time of inspection, we will bring our own photographic device for electronic reproduction of this open record, as provided by OCGA 50-18-71(b)(1)(B), for publication on WXIA-TV 11 and 11alive.com

Please let us know when such inspection and photographic reproduction is convenient for your office.

If you or anyone else at the Georgia Code Revision Commission are not the custodians of these records, please forward this ORR to the custodians or reply with their contact information. If you are claiming an exemption or exception to the Open Records Act to deny this request in whole or in part, please cite the particular exemption/exception and any relevant case law. In that case, if there is a state agency that holds these records that may not be exempt or excepted from the Open Records Act, please reply with the name and contact information for that agency.

Thank you in advance for this consideration, and for prompt inspection of the people's records.

**BRENDAN KEEFE**
*Chief Investigative Reporter*
WXIA 11 Alive (NBC/TEGNA Atlanta)
bkeefe@11alive.com
m (404) 291-2691
@brendankeefe
facebook.com/BrendanKeefe11Alive
TIPS: theinvestigators@11alive.com

2

# TAB 17-10

# EXHIBIT J

Case 1:15-cv-02594-RWS Document 17-10 Filed 01/15/16 Page 2 of 2

This website is maintained by LexisNexis®, the publisher of the Official Code of Georgia Annotated, to provide free public access to the law. It is not intended to replace professional legal consultation or advanced legal research tools. To report errors regarding this website, please complete the Feedback Form.

Legislative staff of the Georgia General Assembly cannot respond to requests for legal advice or the application of the law to specific facts from anyone except members of the Georgia General Assembly. Therefore, to understand and protect your legal rights, you should consult your own private lawyer. Please refer legal questions elsewhere.

**Terms & Conditions**

Your use of this service is subject to Terms and Conditions. These Terms and Conditions do not apply to the Statutory Text and Numbering contained in the Content of the site. However, the State of Georgia reserves the right to claim and defend the copyright in any copyrightable portions of the site. Please indicate your agreement to the Terms and Conditions by clicking "I Agree" below."

I Agree

224

# TAB 17-11

# EXHIBIT K

# WEBSITE TERMS AND CONDITIONS

Your use of this Website or any of the Georgia Materials available on the Website ("Research Service") is subject to these Website terms and conditions (the "Agreement").  You understand and acknowledge that by using the Website or any of the Materials you hereby consent to abide by all of the terms and conditions of this Agreement.  Capitalized terms used in this Agreement are defined in Section 8.0 below.

## 1.0  LICENSE TO USE THE RESEARCH SERVICE.

**1.1  General Rights Granted; Restrictions.**  You are hereby granted a non-exclusive, non-transferable limited license to access and use the Research Service for your own internal use.  In addition, this license includes the rights to use the Research Service on one single-user personal computer.

**1.2  Permitted Uses of Materials.** Georgia Code section text and numbering may be copied from this website at the user's expense and effort.  In addition, you may create printouts and electronic copies of an insubstantial portion of Materials retrieved from the Research Service solely for use in the performance of your professional services or research, and you may incorporate those Materials into your work product, which you may then provide to your client, the courts, opposing counsel, and others as required for you to perform your professional services or research.  You may not redistribute Materials in newsletters, articles, or other documents for commercial value.

**1.3  Research Service – Restrictions on Use.** Except as expressly provided in this Agreement or with our express written permission, you may not, nor may you permit others to:

1.3.1  copy all or any portion of the Research Service; or

1.3.2  create compilations or derivative works of all or any portion of the Research Service; or

1.3.3  use the Research Service in any manner that violates any federal, state or local laws, statutes or regulations.

**1.4  Research Service – Prohibited Uses.** You may not, nor may you permit others to:

1.4.1  use the Research Service in any fashion that may infringe any copyright, intellectual property right, or proprietary or property right or interest of us or our Suppliers; or

1.4.2  store in a retrieval system, transfer, publish, distribute, display to others, broadcast, sell, or sublicense all or any portion of the Research Service, except as expressly provided in Section 1.2; or

1.4.3  use the Research Service to develop a database, infobase, online or similar database service, or other information resource in any media (print, electronic or otherwise, now existing or developed in the future) for sale to or use by others; or

« 1 »

**ACT:\USCPM\...\GA Statutes Website Terms3.doc**

226

1.4.4  make any portion of the Research Service available to third parties through any timesharing system, service bureau, the Internet, or any other similar technology now existing or developed in the future; or

1.4.5  remove or obscure any copyright notice or other notice or terms of use contained in the Research Service; or

1.4.6  remove, disable, or defeat any functionality on the Website or in the Research Service designed to limit or control access to or use of the Website or Research Service.

## 2.0  OWNERSHIP RIGHTS AND PROTECTION OF INTELLECTUAL PROPERTY.

**2.1  Ownership.**  The Research Service and any copyrights, trademarks, patents, trade secrets, intellectual property rights, and other proprietary rights in and to the Research Service are owned by us and our Suppliers, and you obtain no right, title, or interest therein.

You hereby assign to us all copyrights, intellectual property rights, and any other proprietary or property rights or interests in and to any work created in violation of this Agreement.

**2.2  Trade Secrets.**  The technology used in any Licensed Program included in the Website or Materials is a trade secret, and you will maintain any information learned about that technology as a trade secret and will not disclose that information or permit that information to be disclosed to any person or entity.

You will not copy, reverse engineer, decompile, disassemble, derive source code from, modify, or prepare derivative works of the Licensed Program, nor will you permit others to do so.

## 3.0  LIMITED WARRANTY; DISCLAIMER.

**3.1  Limited Warranty Regarding the Research Service.**  We represent and warrant to you that we have the right and authority to make the Research Service available to you under the terms of this Agreement.

**3.2  Limited Warranty Regarding Use of the Research Service Media.**  You hereby represent and warrant that all use of the Research Service will comply with this Agreement and all federal, state and local laws, statutes, rules and regulations.

**3.3  General Disclaimer.**  WE MAKE NO WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE RESEARCH SERVICE, THE ACCURACY OR THE COMPLETENESS OF THE MATERIALS; THE RESEARCH SERVICE AND MATERIALS ARE FURNISHED ON AN "AS IS", AS-AVAILABLE BASIS.  ALL WARRANTIES OF ANY TYPE NOT EXPRESSLY STATED IN THIS AGREEMENT, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED.

ACT:\USCPM\...\GA Statutes Website Terms3.doc

**3.4  Warranty Limitation.** We will have no responsibility to you under this Section 3.0 with respect to:

3.4.1  any use of the Research Service in a manner not authorized by this Agreement; or

3.4.2  abuse or modification of the Research Service by you.

**4.0  LIABILITY LIMITATIONS.**

**4.1  DAMAGES DISCLAIMER.**  UNDER NO CIRCUMSTANCES WILL WE OR ANY SUPPLIER BE LIABLE FOR DIRECT, INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR FOR LOSS OF PROFITS, REVENUE, OR DATA, WHETHER IN AN ACTION IN CONTRACT, TORT, PRODUCT LIABILITY, STRICT LIABILITY, STATUTE OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF THOSE DAMAGES.

**4.2  LIABILITY DISCLAIMER.**  Neither we nor any Supplier will be liable for any loss, injury, claim, liability, or damage of any kind resulting in any way from:  (a) any errors in or omissions from the Research Service or any Materials available or not included therein, (b) the unavailability or interruption of the Research Service, (c) your use of the Research Service, (d) your use of any equipment in connection with the Research Service, or (e) the content of any Materials.

**5.0  CHANGES TO THE AGREEMENT.**  We may immediately amend the Agreement from time to time by posting changes on the Website.  Your continued use of the Research Service after notice of any change is posted to the Website will constitute your acceptance of the change.

**6.0  PROFESSIONAL RESPONSIBILITY.**  The Research Service does not constitute or contain legal advice and is not intended to be a substitute for the exercise of professional judgment.  The Research Service is provided for convenience purposes only.

**7.0  MISCELLANEOUS.**

**7.1  Termination.**  We may suspend or discontinue providing the Website and Research Service at any time and without notice to you.

**7.2  Notices.**  All notices and other communications under the Agreement will be deemed given on the date posted to the Website.

**7.3  Failure to Enforce.**  If we fail to enforce any provision of the Agreement it will not constitute or be construed as a waiver of such provision or of the right to enforce it at a later time.

**7.4 Governing Law.** The Agreement will be governed by and construed in accordance with the laws of the State of Georgia, regardless of the law that might otherwise apply under applicable principles of conflicts of law.

« 3 »

**ACT:\USCPM\...\GA Statutes Website Terms3.doc**

**7.5 Survival.** Sections 1.0, 2.0, 3.0 and 4.0 will survive after the Website is no longer available and this Agreement is considered terminated.

**8.0 DEFINITIONS.**

**8.1 "Agreement"** means the terms and conditions provided in this Agreement.

**8.2 "Licensed Program"** means, if applicable, any computer programs, control information and related software that provide access to the Materials.

**8.3 "Materials"** means the information contained in the Research Service.

**8.4 "Research Service"** means, any Licensed Program and Materials available on the Website.

**8.5 "Supplier"** means LexisNexis, a division of Reed Elsevier Inc., and any other third party supplier of Materials and Licensed Programs, or any such party who provides or operates the Website.

**8.6 "us"** or **"we"** means the State of Georgia acting through the Code Revision Commission and the Office of Legislative Counsel.

**8.7 "you"** or **"your"** means any person or entity that accesses or uses the Website or Research Service.

**8.8 "Website"** means any website owned by or operated for the State of Georgia containing the Research Service.

# TAB 29-3

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION<br>on Behalf of and For the Benefit of the<br>GENERAL ASSEMBLY OF GEORGIA,<br>and the STATE OF GEORGIA,<br><br>       Plaintiff,<br><br>v.<br><br>PUBLIC.RESOURCE.ORG, INC.,<br><br>       Defendant. | ) <br>) <br>)   CIVIL ACTION<br>)   NO.  1:15-cv-2594-MHC<br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) |

---

**DECLARATION OF CARL MALAMUD IN SUPPORT OF
PUBLIC.RESOURCE.ORG'S MOTION FOR SUMMARY JUDGMENT**

I, Carl Malamud, declare as follows:

1.      I am the founder of Public.Resource.Org ("Public Resource").  I have

personal knowledge of the facts stated in this declaration and know them to

be true and correct.  I could competently testify to them if called as a

witness.

231

2.      I wish to explain why I purchased, scanned, and posted on the Internet the Official Code of Georgia Annotated.

3.      As plaintiffs have mentioned that my name was considered for appointment as Public Printer of the United States and that President Obama did not appoint me to that position, I will explain the  circumstances.

4.      From 2005-2006, I served as Chief Technology Officer to John D. Podesta, the President and CEO of the non-profit research organization, the Center for American Progress ("CAP"). Although my main job was to help the institution and its people use technology effectively, John encouraged me to undertake initiatives around national technology policy.

5.      My approach has always been hands-on, focused on building systems that provide solutions to real problems.

6.      I am a self-taught computer expert, which affects my approach to technology policy. In the 1980s, I consulted for a number of federal agencies, such as the Department of Defense and the Board of Governors of the Federal Reserve System, on the use of databases and networks. I wrote eight advanced professional reference books and taught many engineers how these technologies work in practice. I have since placed all my books in the

public domain and they are available at http://catalog.hathitrust.org/Search/Home?adv=1&type[]=author&lookfor[]=Carl+Malamud

7.      In 1993, I created the first radio station on the Internet, under the auspices of a 501(c)(3) nonprofit I founded called the Internet Multicasting Service. I was inspired to make the radio station non-profit by the examples of National Public Radio and of Brian Lamb, who created C-SPAN. The New York Times described this effort in an article entitled "Turning the Desktop PC Into a Talk Radio Medium" which may be viewed at http://www.nytimes.com/1993/03/04/us/turning-the-desktop-pc-into-a-talk-radio-medium.html

8.      As part of our programming, we did live streaming of speeches held at National Press Club luncheons, and also joined the Public Radio Satellite system, produced original programming such as my talk show "Geek of the Week," and received rights from Harper Audio to post audio of authors such as T.S. Elliot and Robert Frost reading their own work. The archives of our programming are still available on the net and may be viewed at http://museum.media.org/radio/

9.      In 1993, I applied for and was granted membership in the Radio TV Gallery of the U.S. House of Representatives and connected a feeds of the floors of the House and Senate to the Internet by installing dedicated lines from the basement of the U.S. Capitol to our offices. The Washington Post described this project in an article entitled "Superhighway Routed Through Capitol Hill" which may be viewed at https://www.washingtonpost.com/ archive/politics/1994/09/19/superhighway-routed-through-capitol-hill/ 0aba8ac6-e154-4bd5-8cb3-0a3b30b0e762/

10.     Being located in Washington, D.C. was fortuitous. Internet Service Providers UUNET and MFS Datanet donated a free 10 million bit per second link into the core of the Internet, one of the fastest links in Washington at the time. When President Clinton's staff wanted to do an Internet demonstration but had not yet been able to get their own link installed, we ran an infrared link down to the White House lawn so the President could give his demonstration.

11.     I always considered the Internet to be a new medium, and "radio" was only a metaphor. We did not hesitate to explore other ways of using the Internet. In 1993, Congressman Edward J. Markey asked me why the Securities and Exchange Commission's EDGAR database was not available on the Internet. I told him I didn't see any reason why it wasn't. I proceeded

to get a grant from the National Science Foundation and put that database on the Internet. Dr. Eric Schmidt, then at Sun Microsystems, gave us equipment so we could run the service.  The New York Times described the project in an article entitled "Plan Opens More Data To Public" which may be found at http://www.nytimes.com/1993/10/22/business/plan-opens-more-data-to-public.html

12.    We also put the full U.S. Patent database on the Internet with full text capabilities.  Not only the public, but also many patent examiners used this service extensively., Two years later, I loaned the SEC hardware and donated all our software so that they were able to take over the service. Our loaner agreement with the SEC and a letter of thanks from them is available at https://public.resource.org/sec.gov/

13.    With this background in mind,2006, when I moved back to D.C. to work for John Podesta, I set out looking for a new policy initiative that would further open government proceedings to the public. I decided to focus on the proposition that video from all congressional hearings should be streamed live on the Internet as high resolution video with closed captions and other modern features. As part of my investigation, I met with numerous congressional staff, and with Mr. Bruce James, the Public Printer of the United States, and became familiar with the working of the Government

235

Printing Office and their publication of the Official Journals of Government, including the Federal Register and the Code of Federal Regulations.

14.    In 2007, I had moved the Center for American Progress from having no technical staff,being dependent on high-priced outside consultants and having only rudimentary capabilities to a full department working with modern technologies, such as the Python programming language and a properly hosted web system. I told John that my work was done, and moved back to California where I founded my current non-profit, Public.Resource.Org ("Public Resource"), where I have worked exclusively since then.

15.    At Public Resource, I continued my interest in better access throughout the country to the proceedings of Congress. After C-SPAN issued a DMCA takedown notice to Speaker Nancy Pelosi for posting video of herself testifying in front of the House of Representatives, I was able to convince C-SPAN to allow far more liberal use of records of government proceedings. James Fallows described this incident in the Atlantic, a copy of which may be read at http://www.theatlantic.com/technology/archive/2007/03/another-win-for-carl-malamud-or-news-you-won-apos-t-see-in-the-may-2007-issue-of-the-atlantic/7543/

16.    I continued my efforts from 2007-2010 to get Congress to make more video available. I began posting video of congressional hearings obtained from the few committees that were online and from C-SPAN, and wrote an unsolicited report to Speaker Pelosi. Those efforts are documented on the Public Resource web site at https://public.resource.org/house.gov/

17.    In 2011, one of the first acts of Speaker Boehner on taking office was to ask me to work with Chairman Darrell Issa and his staff on congressional video. As part of that effort, we worked with the Committee on Oversight and Government Reform to post a full archive of their proceedings and to develop techniques to use official transcripts to create closed-captions, the first time Congressional video was accessible in this manner. We copied over 14,000 hours of video from all committees, an archive spanning the 100th to the 112th Congress and furnished that data to C-SPAN and the Internet Archive, as well as maintaining an extensive YouTube presence. A copy of the letter from Speaker Boehner may be viewed at https://law.resource.org/rfcs/gov.house.20110105.pdf

18.    During this same period, from 2007-2011, we worked with David Ferriero, the Archivist of the United States. Public Resource donated equipment to the National Archives, and we sent in volunteers to duplicate approximately 6,000 government videos and post them to YouTube and the

Internet Archive, where they have received over 50 million views. The New York Times described this program in "Duplicating Federal Videos for an Online Archive" which can be viewed at http://www.nytimes.com/ 2010/03/15/technology/15fedflix.html

19.    While online video and other government databases were important initiatives, when I started Public Resource, I felt the public suffered from the the absence on the Internet of primary legal materials, the raw materials of our democracy. These materials include judicial opinions (and the underlying dockets leading to those opinions), statutes and the codifications of those statutes (and the underlying hearings that led to those public laws) of the legislature, and regulations (and the underlying notices and comments that led to those regulations) of the executive branch.

20.    In 2008, working with Professor Lawrence Lessig and Creative Commons, Public Resource posted on the Internet 1.8 million pages of case law, including all U.S. Court of Appeals opinions from 1950 on, as well as all U.S. Supreme Court opinions. This was the first time these judicial opinions were freely available on the Internet. A copy of that announcement may be viewed at https://bulk.resource.org/courts.gov/ 0_Press_20080211.pdf

21.     Public Resource went on to post all the text of the First Series of the Federal Reporter, all of the Federal Cases, and to scan three million pages of briefs from the Ninth Circuit of the U.S. Court of Appeals dating from the beginning of the court to 1970. All of these materials are available for use without restriction. In addition, all of the Federal Cases and the first forty volumes of the Federal Reporter were retyped into HTML files so they can be viewed as web pages in the same format we used for other court opinions. An example is *Banks v. Manchester*, 128 U.S. 244, 9 S.Ct. 36, 32 L.Ed. 425 (1988) which may be viewed at https://law.resource.org/pub/us/case/reporter/US/128/128.US.244.html

22.     In 2008, as part of posting the U.S. Court of Appeals opinions on the Internet, a member of the public alerted me that numerous Social Security Numbers appeared in court opinions. I redacted those privacy violations and sent a copy of my audit to the Committee on Rules and Practice of the Judicial Conference and to the Chief Judges of the Circuits. This effort received a letter of thanks form the Judicial Conference is available at https://public.resource.org/scribd/7512576.pdf

23.     In 2008, I discovered Social Security Numbers (SSNs) of 232,000 military officers in the Congressional Record. I alerted the Government Printing Office, the Defense Department, and the Federal Trade Commission. The government redacted those Social Security Numbers from their computer systems and, after I contacted them, both West and Lexis redacted this information from their commercial services. The privacy breach was the subject of a front-page article in Stars and Stripes entitled "Military lags in safeguarding officers' identities" which may be found at http://www.stripes.com/news/military-lags-in-safeguarding-officers-identities-1.96079

24.     In 2008, an audit of the PACER system unveiled a large number of privacy violations in District Court dockets. A comprehensive audit of 20 million pages of filings from 32 District Courts was sent to the Chief Judges and the Judicial Conference. This effort led to changes in the privacy procedures for the PACER system as a whole and in specific District Courts. A copy of the letter of acknowledgement from the Honorable Royce C. Lamberth of the District Court for the District of Columbia may be found at https://public.resource.org/scribd/11851306.pdf

25.     In 2010, Public Resource led a national effort entitled "Law.Gov," which consisted of a series of fifteen workshops examining the availability

of primary legal materials in the United States. Major law schools, such as Harvard, Stanford, Duke, Cornell, and Colorado hosted these workshops. Over 600 people attended them, and speakers included government officials such as the Law Librarian of Congress, the Archivist of the United States, the Director of the Office of the Federal Register, several White House officials, and Professor Laurence Tribe from the Department of Justice. At the conclusion of the workshops, we posted a set of consensus principles with recommendations for access to legal materials. Details may be viewed at https://law.resource.org/index.law.gov.html

26.     During this period, I continued to visit Washington and met on numerous occasions with officials responsible for the Official Journals of Government, including Mr. Ray Mosley of the Office of the Federal Register, and Robert C. Tapella, the Public Printer of the United States, and his Chief Technology Officer, Mr. Michael Wash. I came to appreciate the important role that the Government Printing Office plays and saw great potential in transforming the office to meet the needs of the Internet era.

27.     When Barack Obama was elected President, I spent considerable time developing those ideas into a series of concrete actions the Government Printing Office could take, and published those ideas in a series of papers. I announced that I would be delighted to be considered as a possible candidate

for Public Printer, and posted a web site called "Yes We Scan." A number of prominent individuals agreed to lend their name as supporters. A copy of that web page may be found at https://yeswescan.org/index.gpo.html

28.     Advancing one's name publicly for an appointed office is somewhat unusual, but one of my goals was to raise public awareness of the important role the Government Printing Office played since its founding in 1861.  My campaign did so:  a large number of people read the position papers and expressed their "tweets of support." A "flip book" with 1,017 of those tweets may be found at at https://yeswescan.org/tweets_for_net.pdf

29.     I had several interviews at the Office of Presidential Personnel and was informed that I was on the short list. While I was not named to the position, I was asked by the Obama-Biden Transition effort to serve as a consultant and expand my thoughts on how the Federal Register could be transformed. A copy of the paper I submitted in January, 2009 may be viewed at https://public.resource.org/change.gov/reboot.register.pdf

30.     That effort led to far-reaching changes in the publication of the Federal Register. I was pleased to help support Mr. Raymond Mosley of the Office of the Federal Register (OFR) in those efforts and to serve as the nominator for OFR as the winner of the first Walter Gellhorn Award for

innovation in government services from the Administrative Conference of the United States. A copy of the statement from the Office of the Federal Register may be viewed at https://www.federalregister.gov/blog/2011/12/federalregister-gov-wins-award-for-innovation-best-practices

31.    Although availability of Federal information has been my primary focus since 1993, at Public Resource I also looked at the availability of primary legal materials published by states and municipalities. In 2008, Public Resource posted a copy of the California Code of Regulations, which previously was not available on the Internet. We also posted a copy of Title 24 of the California Code of Regulations, which consists of the building, electrical, fire, plumbing, and other public safety codes.

32.    Since 2008, we have continued our efforts to post the public safety codes incorporated into law by state governments. In 2012, that effort was expanded to include technical public safety codes that are incorporated by reference into the Code of Federal Regulations. Neither of these actions was undertaken lightly, and I read deeply into the issue of promulgation of the law through history.

33.     In most states, I found that state statutes and regulations, as well as the codification of the statutes and regulations, were available in some form on the Internet. In many cases, however, the technology employed did not make the information in a very useful fashionor take advantage of the Internet and its potential.

34.     In 2008, the State of Oregon tried to prevent Internet sites, including the one run by Public Resource, from posting the Oregon Revised Statutes, and initially threatened to sue them. I was pleased to be invited, however, along with citizens of Oregon, to testify before a joint session of the Legislative Counsel Committee on June 19, 2008. At the conclusion of that hearing, the Legislative Counsel Committee resolved unanimously not to assert copyright over the Oregon Revised Statutes. Copies of my testimony, and press reports about the Oregon situation may be viewed at https://public.resource.org/oregon.gov/

35.     A lecture I gave at Lewis & Clark Law School and the University of Oregon entitled "Three Revolutions In American Law" about the Oregon situation and the principle that the law has no copyright in the United States may be viewed at  https://public.resource.org/oregon.gov/3revolutions_pamphlet.pdf

36.    After Oregon ceased asserting copyright in its laws, a student at Lewis & Clark Law School who had majored in computer science as an undergraduate, was able to create a vastly better web presence for the Oregon Revised Statutes. Public Resource was pleased to provide some financial support and technical advice for this effort.  The web site  may be viewed at http://www.oregonlaws.org/

37.    A similar situation occurred in April 2013 in the District of Columbia, where the D.C. Code was unavailable to download and had restrictions on use asserting copyright. I spent $803 and purchased the Official DC Code, scanned the documents, and sent them on a USB Drive to V. David Zvenyach, the General Counsel of the DC Council, with a letter detailing the reasons D.C.'s copyright assertions were unfounded.

38.    Mr. Zvenyach looked into the situation and in a September 13, 2013 letter to me acknowledged the importance to an informed citizenry of promulgation of the law. But, he went further. A few days later, the DC Council issued an unofficial version of the code that could be downloaded in bulk, and then Mr. Zvenyach and local volunteer programmers created a far better version of the Code on a public web site. A July 8, 2014 article in Government Executive described the project and may be viewed at http://www.govexec.com/state-local/2014/07/ultimate-open-government-

unlocking-laws/87997/.  The DC Code site they created may be viewed at

http://dccode.org/

39.    I have repeatedly seen that making an official code available in bulk

enables volunteers in the community to create a better web. In Chicago, for

example, I worked with American Legal Publishing, the official codification

contractor for the Chicago City Council, to make a copy of the Chicago

Code available for download, with the active support of the City Clerk of

Chicago, the Honorable Susana Mendoza. In August, 2013, Todd Meyers,

the Vice President for Client Services of American Legal Publishing, worked

with me to provide a custom version of the Chicago Code in bulk as a series

of RTF files, making it easy for me to transform the entire code into other

formats, such as HTML. We posted quarterly snapshots of the Chicago

Building, Municipal and Zoning Codes from 2007-2013 on our site at

https://law.resource.org/pub/us/code/city/il/Chicago/

40.    After the data was made available, a nonprofit organization in

Washington, D.C., the OpenGov Foundation, took that raw data and put

together a  beautiful web site which may be found at http://chicagocode.org/

41.     I was pleased to be a speaker, along with Clerk Mendoza, when this
new site was unveiled on November 25, 2013. Her press release about the
event may be viewed at http://www.chicityclerk.com/news/clerk-mendoza-
joins-open-government-movement-leaders-tonight-help-crack-chicago-
municipal-code

42.     In 2013, purchased paper copies of the official state codes of a number
of states, including Arkansas, Colorado, Idaho, Mississippi, and Arkansas. I
had those documents scanned. Then I put the files on a George Washington
USB "thumb drive," and sent them to the state officials charged with
codification and promulgation of state law. On May 30, 2015, I sent such a
letter to the Honorable David Ralston, Speaker of the House of the Georgia
House of Representatives and Mr. Wayne R. Allen, the Legislative Counsel.
That letter may be viewed at https://law.resource.org/pub/us/code/ga/ga.gov.
20130530.pdf

43.     I have encountered assertions, like the State of Georgia's, that the
State owns copyright in its Official Code, before. For example, in 2007, I
created a mirror of the U.S. Copyright records, data used in services such as
Google Book Search and the Internet Archive's Open Library. The Library
of Congress asserted copyright over that database.  It was only after the
Register of Copyrights, Marybeth Peters, stepped in and disclaimed

copyright protection for works of government that the Library of Congress dropped its assertions. The letter from Ms. Peters may be viewed at https:// public.resource.org/scribd/3319365.pdf

44.    During a break in the 2008 hearing before the Legislative Counsel Committee of Oregon, I was approached by Senate President Peter Courtney, who served seven terms in the Oregon House of Representatives before serving five terms in the Oregon Senate. Senator Courtney asked me why it was not enough  that the State had a web site already for the Oregon Revised Statutes.  He seemed unimpressed when I explained some of the technical flaws in the state-run site. I explained then that many of us that had a dream of being able to post the state laws of all states and allow people to compare them;if each state had special license agreements and restrictions, that could never be possible. Senator Courtney's eyes lit up.  He told me that when he goes to write a law, the first thing he does is looks at similar laws in neighboring states, and that the service I described would be immensely useful.

45.    By purchasing, scanning, and posting the O.C.G.A. volumes, we are striving to provide a significantly more useful version of the Official Code for people to read and share. Public Resource's purpose in scanning and posting the O.C.G.A. was to facilitate scholarship, criticism and analysis of

the official Code, to inform the public about the laws that govern it, for educational purposes and to encourage public engagement with the law.

46.    A significant transformation in the O.C.G.A. is performed during this process, increasing the usability and accessibility of the Official Code.  Each volume that is scanned also has Optical Character Recognition (OCR), which means it becomes significantly more accessible to people who are visually impaired. The process of posting each volume includes significant metadata, such as the names of the titles included in each volume, making them more easily discovered using search engines. In the process of posting the each volume, a version is created that is compatible with e-Book readers, smart phones, and tablets. In addition, the user interface provided on the Internet Archive allows users to search a volume, with "pins" being displayed for each page that contains the search term, allowing a reader to quickly look for key phrases in different locations. The user interface also allows a user to "bookmark" a particular page and send that link via email or social media, allowing other readers to quickly pull up that location. In addition, Public Resource provides on our own servers all the volumes in bulk, allowing a user to quickly access the entire code or a specific volume, then copy and paste relevant sections into their own documents.

47.     I would like to do many more things with the Official Code of
Georgia Annotated to make it more useful for citizens. There are numerous
references in the O.C.G.A. to the U.S. Code. Section 1-2-5, for example,
references 8 U.S.C. 1448, and it would be very help to link directly to that
provision of the U.S. Code. Likewise, references to the Georgia
Constitution, to acts of the legislature on the government's web site, and to
judicial opinions can all be provided with links.

I declare under penalty of perjury under the laws of the United States that
the foregoing is true and correct.

Executed on May /4, 2016 in Sebastopol, CA,

/s/ _____
CARL MALAMUD

250

**TAB 29-4**

# EXHIBIT B

INTERNAL REVENUE SERVICE                    DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201

Date:    SEP 2 5 2007          Employer Identification Number:
                                   20-8842127
                               DLN:
                                   17053213057007
PUBLIC.RESOURCE.ORG, INC.      Contact Person:
C/O CARL MALAMUD                   ELIZABETH MARQUEZ        ID# 95117
1005 GRAVENSTEIN HWY N          Contact Telephone Number:
SEBASTOPOL, CA  95472              (877) 829-5500
                               Accounting Period Ending:
                                   December 31
                               Public Charity Status:
                                   170(b)(1)(A)(vi)
                               Form 990 Required:
                                   Yes
                               Effective Date of Exemption:
                                   April 13, 2007
                               Contribution Deductibility:
                                   Yes
                               Advance Ruling Ending Date:
                                   December 31, 2011
                               Addendum Applies:
                                   No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code.  Contributions to you are
deductible under section 170 of the Code.  You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code.  Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations.  During your advance ruling
period, you will be treated as a public charity.  Your advance ruling period
begins with the effective date of your exemption and ends with advance ruling
ending date shown in the heading of the letter.

Shortly before the end of your advance ruling period, we will send you Form
8734, Support Schedule for Advance Ruling Period.  You will have 90 days after
the end of your advance ruling period to return the completed form.  We will
then notify you, in writing, about your public charity status.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public
Charities, for some helpful information about your responsibilities as an
exempt organization.

If you distribute funds to other organizations, your records must show whether
they are exempt under section 501(c)(3).  In cases where the recipient

                                              Letter 1045 (DO/CG)

PRO-000561

252

-2-

PUBLIC.RESOURCE.ORG, INC.

organization is not exempt under section 501(c)(3), you must have evidence the
funds will be used for section 501(c)(3) purposes.

If you distribute funds to individuals, you should keep case histories showing
the recipient's name and address; the purpose of the award; the manner of
selection; and the relationship of the recipient to any of your officers,
directors, trustees, members, or major contributors.

                          Sincerely,

                          Robert Choi

                          Robert Choi
                          Director, Exempt Organizations
                          Rulings and Agreements

Enclosures: Publication 4221-PC
            Statute Extension

                                              Letter 1045 (DO/CG)

PRO-000562

253

Form 1023 (Rev. 6-2006)    Name: **Public.Resource.Org, Inc.**    EIN: 20 – 8842127    Page **11**

**Part X    Public Charity Status** (Continued)

e  509(a)(4)—an organization organized and operated exclusively for testing for public safety. ☐

f  509(a)(1) and 170(b)(1)(A)(iv)—an organization operated for the benefit of a college or university that is owned or operated by a governmental unit. ☐

g  509(a)(1) and 170(b)(1)(A)(vi)—an organization that receives a substantial part of its financial support in the form of contributions from publicly supported organizations, from a governmental unit, or from the general public. ☐

h  509(a)(2)—an organization that normally receives not more than one-third of its financial support from gross **investment income** and receives more than one-third of its financial support from contributions, membership fees, and gross receipts from activities related to its exempt functions (subject to certain exceptions). ☐

i  A publicly supported organization, but unsure if it is described in 5g or 5h. The organization would like the IRS to decide the correct status. ☑

6  If you checked box g, h, or i in question 5 above, you must request either an **advance** or a **definitive ruling** by selecting one of the boxes below. Refer to the instructions to determine which type of ruling you are eligible to receive.

a  **Request for Advance Ruling:** By checking this box and signing the consent, pursuant to section 6501(c)(4) of the Code you request an advance ruling and agree to extend the statute of limitations on the assessment of excise tax under section 4940 of the Code. The tax will apply only if you do not establish public support status at the end of the 5-year advance ruling period. The assessment period will be extended for the 5 advance ruling years to 8 years, 4 months, and 15 days beyond the end of the first year. You have the right to refuse or limit the extension to a mutually agreed-upon period of time or issue(s). Publication 1035, *Extending the Tax Assessment Period*, provides a more detailed explanation of your rights and the consequences of the choices you make. You may obtain Publication 1035 free of charge from the IRS web site at *www.irs.gov* or by calling toll-free 1-800-829-3676. Signing this consent will not deprive you of any appeal rights to which you would otherwise be entitled. If you decide not to extend the statute of limitations, you are not eligible for an advance ruling. ☑

**Consent Fixing Period of Limitations Upon Assessment of Tax Under Section 4940 of the Internal Revenue Code**

For Organization

| | | |
|---|---|---|
| *(Signature of Officer, Director, Trustee, or other authorized official)* | **Carl Malamud** | July 30, 2007 |
| | (Type or print name of signer) | (Date) |
| | **President & CEO** | |
| | (Type or print title or authority of signer) | |

For IRS Use Only

| | |
|---|---|
| IRS Director, Exempt Organizations | SEP 2 5 2007 |
| | (Date) |

b  **Request for Definitive Ruling:** Check this box if you have completed one tax year of at least 8 full months and you are requesting a definitive ruling. To confirm your public support status, answer line 6b(i) if you checked box g in line 5 above. Answer line 6b(ii) if you checked box h in line 5 above. If you checked box i in line 5 above, answer both lines 6b(i) and (ii). ☐

(i) (a) Enter 2% of line 8, column (e) on Part IX-A. Statement of Revenues and Expenses. _____

(b) Attach a list showing the name and amount contributed by each person, company, or organization whose gifts totaled more than the 2% amount. If the answer is "None," check this box. ☐

(ii) (a) For each year amounts are included on lines 1, 2, and 9 of Part IX-A. Statement of Revenues and Expenses, attach a list showing the name of and amount received from each **disqualified person.** If the answer is "None," check this box. ☐

(b) For each year amounts are included on line 9 of Part IX-A. Statement of Revenues and Expenses, attach a list showing the name of and amount received from each payer, other than a disqualified person, whose payments were more than the larger of (1) 1% of line 10, Part IX-A. Statement of Revenues and Expenses, or (2) $5,000. If the answer is "None," check this box. ☐

7  Did you receive any unusual grants during any of the years shown on Part IX-A. Statement of Revenues and Expenses? If "Yes," attach a list including the name of the contributor, the date and amount of the grant, a brief description of the grant, and explain why it is unusual.    ☐ Yes  ☑ No

Form **1023** (Rev. 6-2006)

PRO-000563

# TAB 29-6

# EXHIBIT D

## FOREWORD

At the 1981 extraordinary session, the General Assembly of Georgia enacted the statutory portion of the Official Code of Georgia Annotated, the first complete and official recodification of the laws of Georgia since the Code of 1933. Since the adoption of the Code of 1933, there has been a significant increase in both the number and complexity of the laws of Georgia. State government has grown in size and has undergone several significant reorganizations. State government is operating under its fourth state constitution since 1933.

In recognition of the many changes in the laws and the government of the State of Georgia, the General Assembly created the Code Revision Study Committee in 1976. The committee was composed of the following members:

Honorable Wayne Snow, Jr., Chairman
Honorable Howard T. Overby, Vice Chairman
Honorable Hugh Brown McNatt, Secretary
Honorable Peter L. Banks
Honorable Roy Barnes
Honorable Robert W. Crenshaw, Jr.
Honorable Roger Johnson
Honorable Randolph C. Karrh
Honorable J. Beverly Langford
Honorable Preston B. Lewis, Jr.
Honorable Lewis R. Slaton
Honorable Hugh D. Sosebee
Honorable J. Douglas Stewart
Honorable Albert W. Thompson
Honorable Larry Walker

The committee was directed to conduct a thorough study of the subject of code revision, including the need therefor, the time involved, the cost thereof, and all other matters relative thereto. In December, 1976, the committee submitted its report to the General Assembly. In its findings the committee stated: ''The time for a complete, bulk revision and recodification of this state's statutory law is long overdue and must be accomplished as quickly as possible. Any attempt to accomplish code revision on a title-by-title basis is not a practicable or feasible solution to the problem. The most economical and satisfactory method to accomplish code revision within the State of Georgia is through a negotiated contract with a publishing firm possessing the necessary expertise and manpower to accomplish a complete recodification as quickly as possible.''

The committee then recommended that the General Assembly create a Code Revision Commission and vest in the commission the responsibility of

ix

FOREWORD

selecting an appropriate firm to accomplish the code revision project and to resolve the myriad of details connected with the code revision project.

To carry out the recommendations of the Code Revision Study Committee, the General Assembly created the Code Revision Commission at the 1977 session and gave the commission the powers necessary to carry out the code revision project. The commission is composed of the Lieutenant Governor and four members of the Senate, the Speaker of the House of Representatives and four additional members of the House of Representatives, and five members appointed by the president of the State Bar of Georgia, one of whom is a judge or senior judge of the superior courts and one of whom is a district attorney. The members of the commission as of the date of enactment of the Official Code of Georgia Annotated were:

> Honorable Wayne Snow, Jr., Chairman
> Honorable Thomas B. Murphy
> Honorable Larry Walker
> Honorable Randolph C. Karrh
> Honorable J. C. Daugherty
> Honorable Zell Miller
> Honorable Roy Barnes
> Honorable J. Nathan Deal
> Honorable Bill Littlefield
> Honorable Charles Wessels
> Honorable R. W. Crenshaw, Jr.
> Honorable Hugh Brown McNatt
> Honorable Lewis R. Slaton
> Honorable Hugh D. Sosebee
> Honorable J. Douglas Stewart

In addition to the members listed above, Honorable Peter L. Banks, Honorable Howard T. Overby, Honorable J. Beverly Langford, and Honorable Albert W. Thompson served as members of the commission during the recodification process.

The Office of Legislative Council of the General Assembly provided staff for the commission. Terry A. McKenzie, Betty J. Clements, Martin Moody Wilson, G. Joseph Scheuer, Dolores McDonald, and Patterson Harp served as members of the Code Revision Division of the Office of Legislative Counsel and as the staff of the commission. In addition, Frank H. Edwards, Legislative Counsel, Gloria Anderson, and the other employees of the Office of Legislative Counsel provided valuable assistance in the preparation of the Official Code of Georgia Annotated.

Following presentations by five law publishers, the commission selected The Michie Company to prepare and publish the Official Code of Georgia Annotated on behalf of the State of Georgia. Following the execution of a contract between the commission and The Michie Company, the commis-

x

FOREWORD

sion and staff developed the uniform numbering system and rules of style which are used in the new Code. The commission adopted an arrangement of laws consisting of 53 Code titles. A statute copy consisting of the Code of 1933, all Georgia laws enacted since 1933, and those laws which were inadvertently omitted from the Code of 1933 but which are still in effect was prepared and arranged into the 53 titles. The editorial staff of The Michie Company, under the direction of David P. Harriman, Stephen C. Willard, James J. Watson, and J. Gerald Kail, performed a title-by-title examination of the statute copy. Numerous memoranda were prepared and sent to the commission for each title. The questions and proposals for changes contained in the memoranda were examined by the staff of the commission, proposed responses were developed, and the questions and proposals were then considered and resolved by the commission. Over 100,000 questions were resolved in this manner. In addition to the questions contained in the memoranda, grammatical changes, the correction of typograhical errors, the renumbering of 1933 Code sections and portions thereof, the correction of cross-references within text, and changes necessitated by rules of style were marked directly onto the statute copy by the editors and were examined and approved by the commission and its staff. Upon completion of this process, each title was typeset in a page-proof format and was again examined completely by the editors and the commission's staff. The page proofs were proofread several times and every memoranda question and response was compared with the page proofs to ensure that the editorial work was correct. Throughout this process, every effort was made to avoid changes in the substance of the law. In those instances in which the commission felt that a substantive change had to be made, a separate bill was introduced in the General Assembly to accomplish the change. These bills were enacted in the 1980 and 1981 regular sessions of the General Assembly. Upon completion of the editorial process, a manuscript entitled the *Code of Georgia 1981 Legislative Edition* was prepared, presented to the General Assembly, and enacted at the 1981 extraordinary session of the General Assembly. Annotations, indexes, editorial notes, and other materials have been added to that manuscript to produce the Official Code of Georgia Annotated, the first official Code to be published under authority of the State of Georgia since the Code of 1933.

In reviewing the memoranda and page proofs, the commission and its staff received the assistance of several hundred people. The Code Revision Overview Committee of the State Bar of Georgia and a number of committees, sections, and individual members of the bar reviewed memoranda or page proofs and provided valuable assistance to the commission. In addition, each department of state government and a number of organizations assigned people to work with the commission in the recodification project. This project could not have been completed without the expertise provided by these individuals and the Code Revision Commission wishes to express its gratitude for their assistance.

xi

FOREWORD

The adoption and publication of the Official Code of Georgia Annotated represents years of painstaking effort by the General Assembly of Georgia, the Code Revision Commission, the Office of Legislative Counsel, the State Bar of Georgia, and The Michie Company. It has been the goal of all who have contributed their time, labor, and expertise to this project to produce a complete, thorough, accurate, and usable Code for the State of Georgia and its citizens. We sincerely hope and believe that this goal has been accomplished.

Code Revision Commission
Honorable Wayne Snow, Jr.
Chairman, 1981
Honorable Larry Walker
Chairman, 1990

xii

## HISTORY OF THE CODIFICATION OF THE LAWS OF GEORGIA

The development of the codification of the laws of Georgia has been divided by one commentator into three separate stages — compilation, digest, and code.

The compilation stage began with the provisions of the Constitution of 1798 that the body of laws of the state should be "revised, digested and arranged under proper heads." Pursuant to this provision, a compilation of laws was published by Robert Watkins in 1801, followed the next year by a compilation prepared by Horatio Marbury and William H. Crawford. Both compilations covered much the same field, specifically, the years 1755 to 1800. Later, pursuant to an Act of 1809 providing for decennial compilations, three separate compilations were prepared. The first, covering the years 1800 to 1810, was prepared by Augustin Smith Clayton. The second, covering the years 1810 to 1819, was prepared by Lucius Q. C. Lamar. The third, covering the years 1819 to 1829, was prepared by William H. Dawson. These volumes encompassed all laws and resolutions passed during the periods in question, regardless of the public and general or private and local nature of the laws and resolutions included and regardless of whether they were in force.

The next stage of development, the digest period, began with an Act of 1819 directing the preparation of a digest of laws of the state. The digest was to embrace all Acts and resolutions passed prior to the 1819 Session as well as those Acts and resolutions passed during that session. The Act directing the preparation of the digest contemplated a condensed volume which would exclude repealed laws and laws of a private and local nature. Pursuant to this legislative authorization, Oliver H. Prince prepared a digest volume which was approved by the Governor in January 1822 and which was revised in 1837. The 1837 revision of Prince's Digest contained an index of local laws. Pursuant to a resolution of the General Assembly passed December 23, 1843, William A. Hotchkiss prepared a digest of the statutory law of Georgia. This work was the subject of a state subscription upon its completion in 1845. In 1851, Thomas R. R. Cobb published another legislatively authorized digest which was based on the arrangement and plan developed by Prince. Both Prince's Digest and Cobb's Digest contained an alphabetical listing of titles and a chronological arrangement of legislative Acts and resolutions. Next, Howell Cobb prepared "A Compilation of the General and Public Statutes of the State of Georgia." This work was subscribed to by the state in 1859.

The next and most innovative step in the evolution of Georgia codified law was the Georgia Code of 1863. In 1858, a bill was introduced in the General Assembly proposing the codification of Georgia law. The resulting enactment provided for the formation of a three-man commission to

xiii

HISTORY OF CODIFICATION

prepare for the people of Georgia a code "which should, as near as practicable, embrace, in a condensed form, the laws of Georgia, whether derived from the common law, the constitutions, the statutes of the state, the decisions of the supreme court, or the statutes of England in force in the State." This was to be the first code in the United States giving statutory effect to common law and equitable principles.

The commissioners, David Irwin, Thomas R. R. Cobb, and Richard H. Clark, took it upon themselves to add and delete laws in a manner consistent with the existing system of law, with an eye toward meeting existing needs and in anticipation of future needs. In doing so, the commissioners adopted and incorporated suggestions, alterations, modifications, enlargements, and restrictions in the laws of the state. However, the taking of such liberties was ratified when the Code was adopted by the General Assembly.

Because the commissioners omitted historical annotations, the sources of some of the laws contained in the Code of 1863, particularly the part dealing with "Political and Public Organization of the State," written by Clark, remain undisclosed. Other parts of the Code are clearly traceable to two prior sources, the Judiciary Act of 1799 and the Penal Code of 1833, which were carried almost wholly intact into Parts 3 and 4 of the Code.

Although a number of codes have followed the Code of 1863, few alterations in its form have been made. Some changes have been made for purposes of clarity, but the substance of the original Code has generally been preserved. The succeeding revisions have continued the process initiated by the Code of 1863 of codifying common law principles as they have developed.

Subsequent official Codes of Georgia were commissioned and adopted as follows:

Code of 1868: Committee appointed to examine revised Code, Ga. L. 1865-66, p. 315. Governor authorized to subscribe for copies for use by state, Ga. L. 1866, p. 223. Code ratified by Constitution of 1868, Art. XI, Sec. III.

Code of 1873: Governor authorized to subscribe for copies of revised Code upon favorable report by Attorney General, Ga. L. 1872, p. 524.

Code of 1882: Governor authorized to direct Attorney General to examine revised Code, Ga. L. 1880-81, p. 676. Publication of Code authorized by General Assembly, Ga. L. 1880-81, p. 140.

Code of 1895: Authorization given for appointment of Code commissioners, Ga. L. 1893, p. 119. Code adopted, Ga. L. 1895, p. 98.

Code of 1910: Code commission created, Ga. L. 1909, p. 111. Code adopted, Ga. L. 1910, p. 48.

HISTORY OF CODIFICATION

**Code** of 1933: Code commission created, Ga. L. 1929, p. 1487. Code **adopted**, Ga. L. 1933, p. 31; Ga. L. 1935, p. 84.

xv

# TAB 29-7

# EXHIBIT E

Reprinted with permission from the Georgia State Bar Journal, Volume 18, Number 3, February 1982. Copyright State Bar of Georgia.
Statements expressed within this article should not be considered endorsements of products or procedures by the State Bar of Georgia.

Case 1:15-cv-02594-RWS   Document 29-1   Filed 05/17/18   Page 8 of 16

# THE MAKING
# OF A NEW CODE

## The Official Code of Georgia Annotated: Recodification in Georgia



### By Terry A. McKenzie

ON NOVEMBER 1, 1982, the first Official Code of Georgia in almost 50 years will become effective.[1] The adoption of this Code represents years of effort by the General Assembly, the Code Revision Commission, the Office of Legislative Counsel, the State Bar of Georgia, and the Michie Company. This article reviews the recodification process in Georgia and describes the features of the new Code in an effort to provide information that will be helpful in using the new Code.

## History of Recodification

Official codes were enacted by the General Assembly or became effective following their enactment in 1863, 1868, 1873, 1882, 1889, 1910, and 1933. In addition to these official codes, several private individuals and companies have published unofficial codes in Georgia. These unofficial codes were not enacted by the General Assembly.

Recognizing the length of time that had elapsed since the adoption of the Code of 1933 and the changes that have occurred in the law and in state government since that time, the General Assembly created the Code Revision Study Committee in 1976.[2] This committee recommended that the recodification process be undertaken. To carry out this recommendation, the General Assembly in 1977 created the Code Revision Commission (the "Commission").[3] The Commission is composed of the Lieutenant Governor and four members of the Senate, the Speaker and four additional members of the House of Representatives, and five members appointed by the president of the State Bar of Georgia, one of whom is a senior judge of the superior courts and one of whom is a district attorney. The Office of Legislative Counsel provides staff services to the Commission. Following presentations by five law publishers, the Commission entered into a contract on June 19, 1978 with the Michie Company for the preparation and publication of the Official Code of Georgia Annotated.

## The Recodification Process

Immediately following the execution of the contract with the Michie Company, the Commission and its staff began developing the rules of style that are used in the new Code. A three unit numbering system was adopted for Code section numbers.[4] Uniform designations were developed for subsections, paragraphs, subparagraphs, divisions, and subdivisions of Code sections.[5] The Code was divided into titles, titles into chapters, chapters into articles, articles into parts, and parts into subparts. Rules for capitaliza-

264

tion and punctuation were adopted and a dictionary* was selected as a standard reference work. Standard headings were developed for those types of sections that are repetitive in nature, such as definition sections.[7]

Following the adoption of the rules of style, the editorial staff of the Michie Company arranged the statutes into 53 titles selected by the Commission. This was done by actually cutting and pasting copies of the Code of 1933 and all Georgia laws enacted since 1933. In addition, statutes enacted prior to 1933 that were inadvertently omitted from the Code of 1933 were included. The statute copy that resulted from this process thus contained the text of the laws as they were actually enacted by the General Assembly.

The editors then began a title-by-title examination of this material. A main memorandum and one or more supplemental memoranda were sent to the Commission for each title. The questions and proposals for changes contained in the memoranda were examined by the staff, proposed responses were developed, and the questions and proposals were then considered and resolved by the Commission itself. More than 100,000 questions were resolved in this manner. In addition to making the changes resulting from resolving the questions contained in the memoranda, the editors also made grammatical changes, corrected typographical errors, renumbered Code sections and portions thereof, corrected cross-references within the text, and made changes necessitated by rules of style. All of these changes were examined and approved by the Commission and its staff.

Upon completion of this process, each title was typeset in a page proof format and was again examined completely by the editors and the Commission's staff. The page proofs were proofread several times and every memoranda question and response was compared with the page proofs to ensure that the editorial work was correct. Throughout this process, every effort was made to avoid changes in the substance of the

law. In those instances in which the Commission felt that a substantive change had to be made, a separate bill was introduced in the General Assembly to accomplish the change. these bills were enacted in the 1980 and 1981 regular sessions of the General Assembly.

In reviewing the memoranda and page proofs, the Commission and its staff received the assistance of several hundred people in the state. The Code Revision Overview Committee of the State Bar and a number of committees, sections, and individual members of the Bar reviewed memoranda or page proofs and provided valuable assistance to the Commission. In addition, each department of state government and a number of organizations assigned people to work with the Commission in the recodification project.

Upon completion of the review of the page proofs, the Michie Company printed 500 sets of the statutory portion of the Code. This manuscript version is entitled the *Code of Georgia 1981 Legislative Edition*. It is this document that was enacted by the General Assembly. Copies of the legislative edition have been placed in the office of the clerk of the superior court or the county law library in each county so that members of the Bar may examine them. The text of the statutes contained in the legislative edition is currently being merged with annotations, notes, and other material and will be published in the early summer of 1982 as the Official Code of Georgia Annotated. This new Code will become effective on November 1, 1982 and will repeal the Code of 1933 and most general laws of the state as of the effective date.

## Types of Changes

As noted earlier, in the preparation of the new code typographical errors were corrected, grammatical corrections were made, and the laws were converted into the style adopted by the Commission. While these changes are important from an aesthetic point of view and constitute a major portion of the changes made in the

statutory law, they are not the most important changes made.

In the past when an Act of the General Assembly was declared unconstitutional, there was no established procedure to ensure that such Act was specifically repealed by the General Assembly. These Acts are not included in the new Code and are repealed by its adoption.

There are also many laws that are still in effect in a technical sense but that are obsolete either from the mere passage of time, through the advancement of technology or society in general, or as a result of changes in the law itself. As an example, under Chapter 78-2 of the Code of 1933, the state provided pensions for ex-Confederate soldiers and their widows. In 1912, there were 19,972 soldiers and widows receiving pensions, but they are all now deceased. Thus, Chapter 78-2 has become obsolete through the passage of time. As another example, under an 1826 Act, now codified as Code Section 40-1403, the Comptroller General is required to reside in the state capitol building. This provision may have served a purpose at a time when communications were slow, but it is hardly necessary today and it has been many years since this



*Terry A. McKenzie is a Deputy Legislative Counsel and is in charge of the Code Revision Division of the Office of Legislative Counsel of the General Assembly of Georgia. He received his B.B.A. degree in 1966 and his J.D. degree in 1969 from the University of Georgia.*

# NEW CODE

provision was observed. Such obsolete laws have been omitted from the new code.

Since the last official code was adopted in 1933, there have been several major reorganizations in state government. A number of the changes in the structure of state government were accomplished through broadly worded statutes. The Executive Reorganization Act of 1972[8] is an example of this method of reorganization. Using fairly broad language, this Act transferred functions or assigned powers and duties without specifically amending the text of the statutes directly affected. Thus, the Ocean Science Center of the Atlantic Commission was abolished and its functions were divided between the Department of Natural Resources, the Board of Regents of the University System of Georgia, and the Department of Industry and Trade and this division of functions was accomplished without a specific amendment to the law creating the commission.[9] The Code revision process has corrected the language of the statutes to carry out the various reorganization Acts.

In addition to reorganization Acts, there have been a number of statutes and constitutional amendments that have changed the titles of public officials. These have been given effect in the new Code. For example, the term "ordinary" has been changed to "judge of the probate court."[10]

Of major significance has been the resolution of conflicts in the law and the deletion of material that had previously been repealed by implication. In performing this part of the recodification process, very careful attention was given to the rules of statutory construction, always keeping in mind the intention of the General Assembly in enacting a particular statute. Conflicts, of necessity, must be resolved if all general statutes are being enacted at one time in a new code because there will not be a latest expression of the General Assembly once everything is reenacted in one Act. As an example, Code Section 5-104 provides that the Commissioner of Agriculture shall be allowed one clerk to assist in the duties of his office. Later appropriations Acts and the laws dealing with the State Merit System of Personnel Administration allow the employment of more than one employee. In preparing the new Code, such conflicts in the law have been resolved and statutes have been repealed in the revision process to avoid unintended results from the adoption of the new Code.

## Contents of the Code

The Official Code of Georgia Annotated will contain 53 titles. In addition to these titles, a separate volume will contain the United States Constitution and the Constitution of Georgia. The constitutions will not be assigned Code title numbers but will retain their original internal designations.

Until all annotations, editorial notes, and other materials are completed, it is impossible to determine the number of volumes that the new Code will contain. Each volume will contain between 700 and 850 pages, will be stub bound to allow for substantial pocket parts before a volume will need replacement, and will be bound so that the book will lie open at any page. The Michie Company will sell individual volumes of the Code in addition to complete sets.

A new index is being prepared for the Code. The general index will contain no double jump or blind references. Each provision in the Code will be adequately indexed and, under the provisions of the code revision contract, each provision of the Code must be cited in at least two index entries. Each volume of the code will also contain an individual volume index. Both of these indexes will contain popular names of Acts where they are ascertainable. In addition to the general index, a new local and special laws index has been prepared. This index contains all local laws enacted since 1730. This has been compiled after a complete reading of each Act and represents a significant historical resource.

Following each Code section is a history line that will trace that Code section back to its origin. If a Code section originated in a prior code, rather than in a separate Act, such fact will be noted with the abbreviation "Orig." The section number of the Act in which the Code section or amendment thereto actually appears will be given in each citation in addition to the volume and page number of the Georgia laws at which the Act may be found. Also, each official code and the section number thereof will be given in the history line for a Code section to show where that new Code section appeared in prior official codes. While a Code section's history can easily be traced backwards through the history lines, conversion tables will also be included in the new Code so that a researcher can easily trace Code sections from their origin forward to the new Code. The Code will also contain a note detailing the history of prior codes in Georgia.

Where appropriate, Code sections will be followed by cross-references to related provisions of the Code as well as by appropriate references to the United States Code. Code sections that have been cited in articles or notes in law reviews published in Georgia, including the *Georgia State Bar Journal*, will be followed by a reference to such articles or notes. Editorial notes will also be included where the editors or the Commission feel that such notes would be helpful.

The editorial staff of the Michie Company has read and annotated all appropriate Georgia cases and federal cases construing Georgia law. The annotations contain direct quotations from the reported decisions where possible. Annotations contain the full name of the case, the full *Georgia Reports* and *Georgia Appeals Reports* citations, the full *Southeastern Reporter* citation, and the year of decision. Annotations will generally be arranged by subject matter with cases involving the constitutional-

# NEW CODE

ity of the statute appearing first.

In addition to judicial decisions, the annotations will also include summaries of the *Opinions of the Attorney General*. Following the *Opinions of the Attorney General* will be research references that will cite the user of the Code to appropriate articles or notes in *American Jurisprudence*, *Corpus Juris Secundum*, *American Law Reports*, and *Uniform Laws Annotated*.

## Points to Ponder

The adoption of the Official Code of Georgia Annotated marks a departure from prior codes in several respects. Unlike a number of prior codes, the new Code contains a specific repealer that repeals all prior codes and most prior general laws of the state. If a law was omitted from the Code of 1933, it was not necessarily repealed as a result of the omission. Code Section 1-1-10 of the new Code repeals all prior laws except for those excepted from repeal. In addition to specific Code sections or Acts that are listed, Code Section 1-1-10 exempts 15 classes of Acts and resolutions from repeal. These classes include laws that are not normally contained in a code because they are of limited duration or of limited interest to researchers. Examples of these types of laws include appropriations Acts, resolutions authorizing leases of state property, local Acts, resolutions creating study committees of the General Assembly, and Acts or resolutions directing that a bridge be named in honor of someone. Although not codified, citations to these Acts and resolutions will be carried in the index.

The important point to remember is that the Official Code of Georgia Annotated will be the official publication of the general laws of this state that are contained therein. Future general Acts of the General Assembly will be drafted as amendments to this Code and it is this Code that will be cited in state publications.

Code revision is an ongoing effort. The Commission will continue in existence and can make recommendations and introduce legislation, through its members, to maintain the Official Code of Georgia Annotated. The Commission will also provide members of the Bar with a conduit for comments and suggestions for improvements in the Code.

The State of Georgia holds a copyright for the Official Code of Georgia Annotated. Under the provisions of the contract with the Michie Company, the Commission will control the price of the Code to subscribers, the price of pocket parts, and the replacement of individual volumes of the Code. The Commission intends to allow the replacement of volumes only when that becomes absolutely necessary. While the final price to subscribers will not be fixed until later, the Michie Company is offering a prepublication price of $600 per set to subscribers until March 1, 1982.

The Commission and the Michie Company have designed the new Code to make it as easy to use as possible. Every attempt has been made to make the arrangement of the laws within the Code as logical as possible and to allow for orderly future growth. A user's guide will be provided with the Code to explain its usage.

In addition to the user's guide, subscribers are encouraged to read the foreword and Title 1. Title 1, "General Provisions," contains the rules of statutory construction, definitions of terms that are used throughout the Code, a statement of legislative intent, statements relating to the effect of the new Code, and repealers and exceptions thereto.

A card will be placed in each set of the new Code containing a toll-free telephone number for the Michie Company. Anyone having a question or comment concerning the new Code is encouraged to call the publisher or the Commission.

The index for the new Code will also contain postage-paid cards that can be used if there is any question or comment concerning index entries. The prepa-

ration of an index is one of the most difficult aspects of publishing. Every effort is being made to ensure that the index for the new Code will be of the highest quality and will be easy to use. Anyone who feels that additional index entries would be helpful or who has difficulty finding a Code section in the new Code is encouraged to fill out and mail one of the postage-paid cards or to use the toll-free telephone number. Since the index has not been completed, members of the Bar are also encouraged to provide the Commission with their suggestions for particular index entries now so that such suggestions can be incorporated into the index prior to publication. Correspondence can be addressed to the Commission at 316 State Capitol, Atlanta, Georgia 30334.

## Conclusion

On November 1, 1982, the State of Georgia, the General Assembly, and the legal profession will enter a new era in Georgia. The Code Revision Commission, the Office of Legislative Counsel, the Michie Company, and the hundreds of people who have participated in the recodification process believe that it will be a positive step forward.

FOOTNOTES

1. Ga. L. 1981, Ex. Sess., p. 8.
2. Ga. L. 1976, p. 739.
3. Ga. L. 1977, p. 922, amended by Ga. L. 1978, p. 230.
4. The three unit numbering system is used in a number of state codes. Under this system the Code section number is a combination of the title, chapter, and section numbers, separated by dashes. Thus, Code Section 25-2-3 is Code Section 3 of Chapter 2 of Title 25. While articles, parts, and subparts of the Code are numbered, they are not reflected in Code section numbers.
5. Subsections are designated (a), (b), etc.; paragraphs are designated (1), (2), etc.; subparagraphs are designated (A), (B), etc.; divisions are designated (i), (ii), etc.; and subdivisions are designated (I), (II), etc.
6. *Funk & Wagnalls Standard College Dictionary*, copyright 1977 by Harper & Row, Publishers, Inc.
7. In connection with definitions sections, users of the Code should note Code Section 1-3-2 of the Official Code of Georgia Annotated.
8. Ga. L. 1972, p. 1015, as amended.
9. Ga. L. 1972, p. 1015, Sections 705, 1818, and 2203.
10. Article VI, Section VI, Paragraph IV of the Constitution of Georgia of 1976.

# TAB 29-8

# EXHIBIT F

## AGREEMENT FOR PUBLICATION

THIS AGREEMENT ("Agreement"), is made this 27 day of December, 2006, by and between the Code Revision Commission of the State of Georgia ("Commission" or "State") and Matthew Bender & Company, Inc., a member of the LexisNexis Group ("Publisher").

### WITNESSETH:

This Agreement is entered into between the Code Revision Commission of the State of Georgia, as established pursuant to Official Code of Georgia Annotated § 28-9-2, and the Publisher pursuant to a Request for Proposals ("RFP") issued on October 3, 2006 by the Commission for the purpose of providing for the publication, maintenance, and distribution of the Official Code of Georgia Annotated ("Code") and other related services and products as provided in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the Commission and the Publisher agree as follows:

## 1. EDITORIAL DUTIES OF THE PUBLISHER

### 1.1 General.

(a) The Publisher shall be responsible for the ongoing publication and maintenance of the Code, and shall perform and provide all services necessary for the preparation, editorial revision, publication and maintenance of the Code, in printed, electronic and any other form. Duties of the Publisher shall extend to all Code publications in whatever form or medium covered by this Agreement. The editorial and quality standards provided in this Section 1 shall apply to all supplements and replacement volumes prepared by the Publisher and to each updated general index prepared by the Publisher.

(b) The Publisher shall bear all editorial, publication and distribution costs associated with the production and maintenance of the Code, without any contribution, subsidy or expense by the Commission, or any consideration from the Commission other than the consideration provided for in this Agreement.

(c) Upon request of the Commission, the Publisher's editors or other representatives, as determined by the Commission, shall confer with the Commission or its staff, either in Atlanta, Georgia, or at the offices of the Publisher.

–1–

COMM000001

269

(d)  Consultations between and decisions by the editorial staffs of the Commission and the Publisher shall be amply documented in memoranda prepared by each party, so as to provide documentation of and accountability for editorial decisions.

(e)  The ultimate right of editorial control over all material contained in the Code shall be in the Commission, and in the event of any disagreement between the Commission and the Publisher over the material to be included, the decision of the Commission shall control.

(f)   The Publisher shall be required to publish the Code in conformity with the Commission's *Publication Manual for the Official Code of Georgia Annotated* as provided by staff of the Commission to the Publisher, which manual shall reflect those specific content, style, and publishing standards of the Code as adopted, approved, or amended from time to time by the Commission or its staff pursuant to Code Section 28-9-3 of the Official Code of Georgia Annotated.  Such manual is hereby incorporated into this Agreement by reference.  The Publisher agrees that the contents and specifications of such manual are controlled by the Commission and that the information contained in the manual is neither confidential nor proprietary to any publisher nor does it constitute a trade secret of any publisher.

(g)  The provisions contained in this Section 1 may be varied by mutual written consent of the Publisher and the Commission.

### 1.2  Name of Publication.

The name of the publication produced and maintained pursuant to this Agreement shall be the "Official Code of Georgia Annotated".

### 1.3  Content of Publication.

The material comprising the Code shall include:

(a)  All statutory provisions, annotations, captions, catchlines, headings, history lines, editorial notes, cross-references, indices, title and chapter analyses, research references, amendment notes, Code Commission notes, and other material related to or included in such Code at the direction of the Commission;

(b)  The United States Constitution and the Georgia Constitution, as amended;

(c)  General index, indices related to local and special laws, and conversion tables; and

(d)  Other material as provided in this Agreement.

–2–

COMM000002

The Code shall include the codification of Georgia laws prepared by the Code Revision Commission and The Michie Company and enacted by the General Assembly of Georgia by an Act approved September 3, 1981 (Ga. L. 1981, Ex. Sess., p. 8), and subsequent current legislative enactments of the General Assembly of Georgia.

### 1.4 Organization, Arrangement and Numbering.

The Publisher shall maintain the organization and arrangement of the current Code in all supplements and replacement volumes published under this Agreement. In addition, the Publisher shall continue the section numbering system currently in use in the Code. The United States Constitution and the Constitution of Georgia, in place of the regular numbering system should carry, at the top of the page as well as at the beginning of each article, section, paragraph, or amendment, the appropriate article, section, paragraph, and amendment numbers. The Publisher shall provide for descriptive headings known as catchlines to denote the contents of a Code section. Such catchlines shall be printed in boldface type to the right of a Code section number. The Publisher shall also include any catchlines at the subsection, paragraph, subparagraph, division, or subdivision level of any Code section as contained in legislation enacted by the General Assembly and such catchlines shall be printed in italics or large and small capitals within the text of a Code section. The Publisher shall also provide for descriptive headings known as captions to denote the contents of a title, chapter, article, part, subpart, or other subdivision of the Code. The form and style of the organization, arrangement, catchlines, and captions shall be subject to the approval of the Commission.

### 1.5 User's Guide.

The Publisher shall provide a User's Guide in the bound Volume 1 of the Code containing instructions for the use of the Code, which shall be usable and easily understood by both lay and legal professional persons. A reference to such User's Guide shall be included in each other bound volume of the Code. A guide for users shall be set out in other parts of the Code or other publications under this Agreement, as requested by the Commission.

### 1.6 Case Annotations.

(a) The Publisher shall compile a complete set of annotations to each statute appearing in the Code from all court cases that are available up to the date of adjournment *sine die* of the regular session of the General Assembly. Case annotations shall include all published opinions of the Georgia Supreme Court and the Court of Appeals of Georgia, and all published opinions of the United States Supreme Court and other federal courts that arose in Georgia and construed Georgia general statutes, whether such decisions favor plaintiffs, defendants, or the prosecution. Additional annotations to those required by this Paragraph may be included where determined useful as determined or approved by the Commission. References to the annotations shall include both the official publication and the national reporter system reference where available.

–3–

**COMM000003**

The official state or U.S. citation shall be given first followed by the unofficial citation. The form of the annotations shall be subject to the approval of the Commission.

(b) Every case decided by the courts mentioned in subparagraph (a) of this Paragraph shall be read by the Publisher's editors for the purpose of preparing annotations for the Code and the Publisher's editors shall extract from such cases all direct constructions and applications. Annotation material shall be extracted from the cases showing reference to all pertinent amendments, additions, and deletions in statutory and constitutional provisions subsequent to the date of the decision being annotated. In reading cases and extracting material therefrom, the Publisher's editors shall avoid the inclusion of long factual annotations where they do not bear directly upon the statute involved. The Publisher's editors shall take from the cases constructions concerning constitutionality, purpose, intent, and meaning of words and phrases as well as illustrations as to what a particular provision applies and to what a particular provision does not apply.

(c) After the annotations have been extracted from the cases, they shall be completely edited and arranged under appropriate headings. Unless otherwise appropriate, constitutional constructions shall be arranged first, followed by annotations concerning purpose, meaning, and application of the particular provision. Larger annotations shall be given appropriate analysis lines which shall be selected to cover the content of the material. Where headings are supplied for annotations, such headings shall be carried so as to present a scheme at the beginning of the annotated material. After a logical arrangement of annotation material has been made, the individual annotation or paragraph shall be appropriately catchlined, the catchline stating in a few words the general content of the annotation.

(d) The Publisher shall verify each completed annotation, including the name and citation of the case and its arrangement and catchline.

**1.7 Research References.**

(a) The Publisher shall include the following research references in the Code:

(1) Collateral references to American Law Reports, American Jurisprudence 2nd, American Jurisprudence Trials, American Jurisprudence Pleading and Practice, American Jurisprudence Proof of Facts, Corpus Juris Secundum, Uniform Laws Annotated, related legislation from the federal government, law reviews and other research aids currently included in the Code;

(2) Annotations to opinions of the Georgia Attorney General;

(3) Cross-references to related Code sections and provisions; and

--4--

COMM000004

(4) Any new annotations as determined by the Publisher's editorial staff and approved by the Commission, or as required by the Commission.

(b) The Publisher shall update all existing research references and historical data, and check for continuing validity of any existing references, annotations and editor's notes before publication of the annual supplements and replacement volumes.

(c) The form, arrangement, and content of research references shall be subject to the approval of the Commission.

### 1.8 Legislative History.

The Publisher shall insert immediately after each Code section the source and history of that section, including the volume, page number, and section number of the Georgia Laws for the original Act and all amendatory Acts relative to such section, the 1933 Code or any prior officially enacted Code, or the court decision citation or other source of such section, including an indication of the English common law as a source. Historical notes shall be added when the source of the section cannot be simply or adequately expressed by using the volume, page number, and section number of the Georgia Laws. In addition, a note shall be included at an appropriate location within the Code which relates the history of Georgia's Codes and which specifically refers to the incorporation of principles from Georgia case law and from English statutes in the Georgia Code of 1863. The Publisher also shall insert the bill number or bill numbers constituting the source of the section and the amendments or modifications to the section for all Acts enacted in 2005 or later. The form of the history lines shall be subject to the approval of the Commission.

### 1.9 Notes.

The Publisher shall provide for editor's notes, amendment notes, Code Commission notes, effective date notes, and such other notes as may be required by the Commission. Unless otherwise directed by the Commission, such notes shall be placed at the end of Code sections for purposes of explanation of unusual situations, description of changes, correction of errors, reference to uncodified provisions of Acts, delayed effectiveness, and other purposes. Such notes shall be organized and styled in accordance with the Publication Manual for the Official Code of Georgia Annotated and as approved by the Commission.

### 1.10 Volume Index.

Each volume of the Code containing statutory titles shall contain an individual volume index covering the material contained in such volume. Each volume index shall be prepared in accordance with the specifications for the general index. Individual volume indexes shall not be revised in the annual supplements to the volumes but shall be revised and updated when a volume is recompiled and republished.

–5–

**COMM000005**

**1.11 General Index.**

(a) The general index shall be updated and published annually. The general index shall be published in two (2) softcover volumes in a format similar to the current Index, unless otherwise specified by the Commission. Repealed laws shall be deleted from the general index and references to new laws or new subjects in amended laws shall be integrated annually. General index volumes will be bound with flexible, perfect bound covers. The general index shall be prepared in accordance with the following general specifications:

(1) Lines will be produced by an actual reading of the body of the statutes and other material, not merely from headings or catchlines;

(2) All sections of the Code, appropriate statutes, and other appropriate material will be separately indexed, although blanket references may also be used where a group of sections includes the same general subject matter or where separate indexing of each section will serve no useful purpose;

(3) The headings used in the index shall not be a mere alphabetical arrangement of those used in the body of the statutes and other material. In choosing index headings, the indexers shall, whenever practical, break down the large divisions employed by the compilers of the statutes and arrange index lines under such group headings as the user may reasonably be expected to look for in an index prepared on an alphabetical or catchword plan. All major terms used in the statutory portion of the Code shall be represented in the index. All short titles used in the statutory portion of the Code shall be represented as main headings in the index and shall also be compiled in a separate table index preceding the general index entries;

(4) Headings, subheadings, and the lines and sublines under the headings and subheadings shall be arranged alphabetically throughout;

(5) Where matter may be reasonably indexed under more than one descriptive word, it shall be indexed under each of such descriptive words either by a direct reference or a cross-reference, and no section shall be indexed in less than two entries;

(6) Under each heading the lines will begin with some descriptive word, so as to be readily located without the necessity of scanning everything under such heading;

(7) The index shall include popular names of Acts;

(8) All cross-references shall be made:

(A) Wherever a heading consists of an expression for which there is a common synonym;

--6--

COMM000006

274

(B)  Whenever there is a group of lines (one flush line and two or more indented lines) which, having been put under a chosen heading, might also properly be put under other headings; the object being to gather all related matter together in one place, with cross-references in all the other places, rather than scattering the lines around, with some under one heading and others under different headings; but this will not apply to single lines, which shall be duplicated in all appropriate places;

(C)  Where matter under a heading might reasonably be expected to be found under some other heading; and

(D)  In all other instances, where, in the judgment of the indexers or the Commission, cross-references would be helpful to the user.

(b)  Adequate precautions shall be taken to see that all cross-references correctly refer to the place intended and are not of the "blind" or "double jump" type, leading either to nothing or to another cross-reference.

(c)  The Publisher shall annually provide the updated general index upon its completion to the Commission in an electronic format acceptable to the Commission as readily usable for the purposes of research and generating a display and printout of how any one or more sections are indexed.

**1.12 Local and Special Law Index.**

(a)  A complete index to all local and special laws and general laws of local application shall be published as a part of the Code. The local and special laws index shall contain references to the volume and page of the Georgia Laws at which all local and special laws may be found.

(b)  Entries relating to each municipality, county, authority, court, or other topic shall be divided into two sections. The first section shall contain all currently effective local and special laws pertaining to such topic and each amendment to such laws, even though any such amendments may have been superseded by a later amendment. The second section under each topic shall contain references to all local and special laws pertaining to such topic which have been repealed and which are no longer in effect. In the event that the name of any municipality, county, authority, court, or other topic for which index entries are made in the local and special laws index has been changed, index entries shall be made under the current name and cross-references shall be made to former names.

(c)  Care shall be taken to ensure consistency in the manner in which Acts of similar subject matter pertaining to the same topic are indexed.

–7–

COMM000007

(d) The local and special laws index shall also include an index of general laws of local application, arranged according to the census under which they were originally enacted. Such local and special laws index shall also include a table showing the population of Georgia counties according to each census beginning with the United States Decennial Census of 1920 and shall likewise include a list of the population of each county in order according to the population of each county according to the most recent census available.

(e) As used in this Paragraph or elsewhere in this Agreement, the term "local and special laws" shall include laws enacted by the General Assembly of Georgia which, by their terms, are of less than state-wide application and shall also include ordinances and resolutions adopted by municipalities and counties under their home rule powers and which are published in the Georgia Laws, local amendments to the Constitutions of Georgia, miscellaneous resolutions adopted by the General Assembly which are not codified but which appear in the Georgia Laws, and other laws and resolutions which appear in the Georgia Laws but which are not included in the general index.

### 1.13 Tables.

The Publisher shall publish as a part of the Code parallel reference tables between the Code, the Code of Georgia Annotated (published by the Harrison Company), the 1933 Code, and all previous Codes, and between previous Constitutions of Georgia. In addition, the Publisher shall include such additional reference tables as the Publisher determines to be appropriate with the approval of the Commission, or as requested by the Commission.

### 1.14 Constitutions of the United States and the State of Georgia.

(a) The Publisher shall include in the Code the Constitution of the United States and the Constitution of the State of Georgia, with appropriate annotations and references to those Constitutions in all respects conforming to the statutory annotations set forth in Paragraphs 1.6 and 1.7 of this Agreement; however, annotations to the United States Constitution for federal court cases need only refer to those cases that arose in the State of Georgia and construed general Georgia statutes or Georgia constitutional provisions. The Publisher shall prepare separate indices for each Constitution.

(b) As a part of preparing the supplements and replacement volumes for the 2007 general session of the Georgia General Assembly, the Publisher shall provide for the replacement of the volume containing the Georgia Constitution which shall be revised to include a history line for each Constitutional provision containing its origin with ratification of the 1983 Constitution and any subsequent amendments. Such history line shall be annually updated as appropriate by the Publisher in subsequent years. The form of the history line shall be subject to the approval of the Commission.

–8–

**COMM000008**

### 1.15 Limitations of Editorial Changes.

(a) In performing editorial services, the Publisher shall copy the exact language of the text of those statutes as it appears in the enrolled acts sent to the Publisher by the Commission staff, except as otherwise specifically instructed by Commission staff, including, but not limited to, changes to the statutory text under the authority of Code Section 28-9-5.

(b) The Publisher shall call to the attention of the Commission staff any Code sections or provisions that it believes may have been repealed by implication either by judicial action or by enactment of subsequent legislation or that the Publisher believes may keep the laws from being accurate, clear, and harmonious, as for example statutes that are obsolete; that are inconsistent, duplicating, or overlapping with others; that contain grammatical or typographical errors; or that are otherwise defective in form, substance, or relation to other statutes affecting the same subject. The Publisher shall take only such action as the Commission staff may approve, if any.

(c) The Commission, from time to time, shall confer with the Publisher's editors and shall instruct the editors as to the manner of handling the individual suggestions and specify whether to incorporate suggested changes and additions into the Code or whether such suggestions and changes must be effected by the General Assembly of Georgia.

### 1.16 Editor's Qualifications.

All editors and indexers involved in the preparations of upkeep materials for the Code, other than copy editors and index technicians, shall be lawyers. As used in this Paragraph, "lawyer" means a graduate of an accredited law school admitted to the practice of law in one or more jurisdictions. All copy editors and index technicians must have been appropriately trained and must be supervised by lawyer editors. The Publisher shall designate one (1) lawyer editor for primary editorial responsibility of the Code. The Publisher shall notify the Commission of any staffing changes in editors, indexers, and other key staff involved in producing the materials for the Code within ten (10) days of such change.

### 1.17 Prepublication Review.

With respect to supplements, replacement volumes, and updates of the general index, the Publisher shall afford the Commission an opportunity for prepublication review and correction of errors therein. Such prepublication review process shall meet the following standards:

(1) The Publisher shall be responsible for proofreading and other quality control procedures sufficient to ensure that such materials accurately incorporate the enactments of the General Assembly and meet the requirements of this Section 1;

--9--

**COMM000009**

277

(2)  The purpose of prepublication review by the Commission shall not be to serve as a primary proofreading or quality control function but to ensure to the Commission's satisfaction that the Publisher has properly carried out its proofreading and quality control procedures;

(3)  Submission of material to the Commission for prepublication review shall be according to a schedule approved in advance by the Commission so as to allow the Commission ample time for review; and

(4)  Any errors or deficiencies noted by the Commission during prepublication review shall be corrected by the Publisher prior to publication at no charge to the Commission.

## 2.  PUBLICATION DUTIES OF THE PUBLISHER.

### 2.1  General.

The Publisher shall provide all printing and distribution services necessary to publish and distribute the Code and all other publications described in this Agreement, in printed, electronic and any other form.  The Publisher shall secure all materials needed to compile the Code, except copies of legislative acts in printed, electronic, or both printed and electronic format furnished by the Commission.  The Publisher agrees to maintain at all times an adequate staff and adequate publishing and distribution facilities necessary to carry out its duties under this Agreement.

### 2.2  Supplements.

Supplements shall, as directed by the Commission, contain legislation of a general and permanent nature enacted and approved at the preceding regular session of the Georgia General Assembly, as well as legislation of a general and permanent nature enacted and approved at any preceding special session, and not yet included in the bound volumes of the Code.  For the benefit of Code users requiring supplemental information more frequently than annually, material and data for ad-interim update between publications of supplements may be prepared and sold separately by the Publisher; provided, however, the Commission retains the right to require the Publisher to publish interim updates within a reasonable period containing general legislation enacted at a special session of the General Assembly.

### 2.3  Replacement Volumes.

(a)  When supplements become inconveniently large or when major legislation affects the contents of bound volumes, the Publisher may recompile and replace the affected bound

–10–

**COMM000010**

volumes with the prior consent and approval of the Commission. The Commission staff shall make an annual recommendation to the Commission regarding a schedule of replacement volumes for the following general session updates. Prior to this, the Publisher may make recommendations to Commission staff regarding such schedule. The Publisher shall schedule for publication replacement volumes as approved by the Commission.

(b) If the content or arrangement of a volume proposed as a replacement volume is different from the content or arrangement of the volume to be replaced, the changes shall be specified by the Publisher and subject to approval by the Commission. The present style of numbering volumes shall be continued, unless a change is authorized by the Commission. The Commission also reserves the right to change volumes to be replaced if circumstances, such as legislative actions, make those changes desirable.

(c) The Publisher, through an experienced editorial staff, shall review material in each volume before its replacement and refer to the Commission or its staff any laws in such volume that it considers to be archaic, obsolete or unconstitutional. Any archaic or obsolete research references or annotations shall be removed before replacement, with the approval of the Commission.

(d) The Publisher shall possess sufficient production capacity to provide replacement volumes in a timely manner as directed by the Commission. Those volumes shall match the current publication in materials and form as closely as possible. The publication of all replacement volumes and their retail prices shall require the prior approval of the Commission.

### 2.4 Inventory of Additional Code Sets or Volumes.

At all times during the period of this Agreement the Publisher shall keep available a reasonable supply of complete sets of the Code and supplements and individual volumes of the Code and supplements, to meet the needs or requests of users for purchase or replacement, or shall have the ability to produce and distribute a complete set or any individual volume that is requested for purchase or replacement within two (2) weeks from the date of the request. The Publisher shall be required to provide an accounting of available inventory at any time, upon request of the Commission.

### 2.5 Internet Access to Georgia Code.

(a) The Publisher shall provide access to the Code on the Internet as follows:

(1) The Publisher shall publish and maintain an unannotated Code on the Publisher's Internet site, at no charge to the Commission or the State. The Commission and the State Bar of Georgia shall be authorized to provide for a weblink from the website of the Georgia General Assembly and the State Bar of Georgia to such unannotated Code at no charge.

—11—

**COMM000011**

There shall be no charge to users for accessing the unannotated Code on the Publisher's Internet site. The Publisher shall track usage of the Code on its Internet site, and after each year of publication, the Publisher shall provide usage reports to the Commission with usage and the effect, if any, on subscriptions to the Code in print and on CD-ROM.

(2)  The online unannotated Code shall be accessible to the public 24 hours per day, 7 days per week. In no event shall a user be required to register, log-in, or establish a username or password in order to access the unannotated Code. The online unannotated Code shall include the text and numbering of all Code sections; numbers of titles, chapters, articles, parts, and subparts; catchlines, captions, and headings; and history lines. The online unannotated Code shall be fully searchable, including text in the catchlines, captions, and headings and shall also be accessible by links from the table of contents.

(3)  For any publication on the Internet of the unannotated Georgia Code or the Code, the Publisher shall provide appropriate notices of the State's copyright interest. All visitors to the Internet site shall be notified that reproduction of any portion of the unannotated Georgia Code or the Code, other than Code section text and numbering, is prohibited unless permission has been granted by the State. The copyright notice shall appear at the outset of each "session" with the unannotated Code, and each screen shall display the copyright. The form and content of the notice shall be as approved by the Commission.

(b)  The Publisher shall provide the Commission with the data for an unannotated Georgia Code to be used on an Internet site maintained by the State, if requested by the Commission.

**2.6 Electronic Version.**

(a) The Publisher shall provide to the Commission in electronic format the current Code. Such electronic format shall be approved annually as to format, content, and coding by the Commission prior to its production by the Publisher so as to ensure that it is usable for the purposes desired by the Commission. Without limiting the generality of the foregoing, it is contemplated that these purposes shall include computerized bill drafting, computerized search and retrieval and printing of all materials in the Code, and computerized legal research. It is contemplated that the electronic format furnished will completely eliminate the state's need for the separate statutory computer data base heretofore maintained by the state.

(b)  The electronic format of the Code furnished pursuant to subparagraph (a) of this Paragraph may be used by the State in any manner in which it deems fit, provided that such electronic format shall not be used in any manner to generate printed volumes or sets of the Code which would compete with the printed volumes or sets produced by the Publisher except as specifically authorized by Paragraph 8.2 or by subparagraph (c) of this Paragraph.

–12–

**COMM000012**

(c) Upon and after the termination of the Publisher's right to sell and distribute the Code under this Agreement, or upon and after the state's award of a successor agreement for publication of the Code and within the final twelve (12) months of the Publisher's right to sell and distribute the Code under this Agreement, the Commission may furnish another successor publisher with whom it contracts originals or copies of the electronic format Code furnished pursuant to subparagraph (a) of this Paragraph for the successor publisher's use in the performance of its Agreement.

### 2.7 Database Compare.

The Publisher shall provide for the electronic comparison of its Code database with the database of statutory text of the State. The comparison shall include all of the statutory text and Code section numbering. The comparison shall result in a document containing discrepancies between the databases including all material that is in the Publisher's Code database but not in the State Code database and material that is in the State's Code database but not in the Publisher's Code database.

### 2.8 CD-ROM.

(a) The Publisher shall:

(1) Publish, license and distribute a CD-ROM Edition of the Code. The Publisher shall render and perform all services necessary for the preparation and publication of the CD-ROM, and shall bear all editorial, publication and distribution costs, without any contribution, subsidy or expense by the State. General requirements for the contents and the publication of the CD-ROM are as stated in Exhibit C, which is incorporated into and made a part of this Agreement.

(2) Bear sole responsibility to assure that the statutory text and other materials on the CD-ROM are accurate and are in compliance with this Agreement.

(3) Provide the Commission with a list of the subscribers to the CD-ROM Edition in the same manner as required for the Code under Paragraph 2.10.

(b) There shall be no charge for subscriptions to the CD-ROM Edition for State Government Subscribers. State Government Subscribers may use subscriptions to the CD-ROM Edition on stand-alone computers or on local area networks or intranets without incurring any charges therefor, including concurrent user charges, regardless of the number of concurrent users. Any department or agency of the state which desires to reproduce and distribute or sell copyrighted materials from the Code in printed book format as authorized by Paragraph 8.2 and which is a State Government Subscriber may download and prepare for printing a copy of such material from the CD-ROM which the department or agency receives as a State Government Subscriber.

–13–

COMM000013

281

(c) For purposes of this Agreement, the term:

(1) "CD-ROM" means compact disc-read only memory format, and shall also mean and include DVDs (Digital Versatile Discs).

(2) "CD-ROM Edition" means the CD-ROM or DVD version of the Official Code of Georgia Annotated together with other data bases and retrieval software contained on a CD-ROM or DVD, or both, as published by the Publisher pursuant to this Agreement.

(3) "General Subscribers" means all Subscribers who are not State Government Subscribers.

(4) "Hypertext linking" means the ability to directly access referenced material contained on the CD-ROM Edition from a referencing citation on the CD-ROM Edition.

(5) "State Government Subscribers" means subscribers which are departments, agencies, divisions, authorities, entities, or officials of the state government of the State of Georgia, and shall include the Office of Legislative Counsel and other offices, officials, and employees of the General Assembly of Georgia and each house thereof, members of the General Assembly of Georgia, Justices of the Supreme Court of Georgia, Judges of the Court of Appeals of Georgia, judges of the superior courts, judges of the state courts, judges of the probate courts, judges of the juvenile courts, chief magistrates of the magistrate courts, district attorneys, the Attorney General and the Department of Law, the state law library, county law libraries, libraries of law schools, colleges, and universities which are units of the University System of Georgia, and any other entities, including nonprofit organizations, or groups of officials or employees of the State of Georgia or of any counties, municipalities, boards of education, authorities, or political subdivisions which have been designated by the Code Revision Commission as State Government Subscribers.

(6) "Subscriber" means any individual or any private, government, or other entity which has executed a Subscription Agreement with the Publisher for the license and use of the CD-ROM Edition, and includes General Subscribers and State Government Subscribers.

(7) "Subscription Agreement" means an Agreement between the Publisher and any private, governmental, or other entity or person for the license and use of the CD-ROM Edition.

--14--

COMM000014

282

**2.9  Errata Notices.**

Whenever the Commission or Publisher discovers any errors or omissions in the published materials comprising the Code, the Commission may direct the Publisher to correct such errors and omissions, at the Publisher's expense, through the distribution of errata notices, paste-in correction sheets, or such other corrective matter as may be directed by the Commission.  The Publisher shall notify the Commission staff immediately upon discovery of any errors or omissions that may warrant an errata notice.

**2.10  Subscriber Information.**

The Publisher shall furnish the Commission on an annual basis and upon request by the Commission the number of subscribers to the Code.  The Publisher also shall furnish the Commission with a listing of persons or entities subscribing to the Code, upon request of the Commission or its staff.  The subscriber list shall be furnished in both printed form and in a data processing medium reasonably designed to facilitate use by the Commission.  The Publisher agrees that the Commission may furnish the subscriber list to any successor publisher to facilitate a transition between publishers and waives any rights in the subscriber list to the contrary.  The Commission agrees not to use the subscriber list for purposes of marketing any product competing with the Code or any Code product.

**2.11  Subscriber Assistance.**

(a)  The Publisher shall maintain a toll-free telephone number and fax number and an e-mail address at which Code subscribers and other purchasers may consult the Publisher concerning billing, editorial, or index questions.  The Publisher also shall provide postage paid response and suggestion cards similar to those currently in use for the convenience of subscribers and other purchasers.

(b)  The Publisher shall annually provide the Commission with a summary of problems reported to it concerning the Code.

**2.12  Online Access for Legislators.**

The Publisher shall arrange for its affiliate LexisNexis to provide members of the Georgia General Assembly with access through Lexis.com to fully searchable Georgia primary law materials and federal statutory and case law materials for use by the legislators only in their official duties directly related to their elected office.  Such access shall be provided at no charge to the members.  The materials included are as listed on Exhibit E, attached hereto and incorporated herein, and are subject to change as LexisNexis adds or deletes material in this menu for distribution to its customers at large.  An authorized agent of the Commission shall sign on behalf thereof LexisNexis's regular terms and conditions for use of Lexis.com for

--15--

COMM000015

283

purposes of this paragraph and shall certify to LexisNexis the names of those members to whom such access is provided. The online service shall be available annually November 1 through the end of each year's legislative session and will be accessible through a customized webpage created specifically for the Georgia General Assembly members.

### 3. SPECIFICATIONS.

(a) The Publisher shall publish the Code in the number of volumes approved in writing by the Commission. The volumes shall continue to be similar to the volumes of the present Code in style, format, appearance and quality. The final decision as to contents of each volume shall rest with the Commission as communicated by the Commission staff. The Code shall be divided so as to equalize the number of pages for the volumes as closely as possible. No volume shall have less than 700 pages or more than 1,400 pages except upon approval of the Commission. The Publisher shall attempt to effect a uniform thickness for individual volumes. Different weights and bulk of paper may be used to accomplish this, but the Commission shall approve all paper differing from the standard specified prior to actual printing. The printing specifications shall be the same as the printing specifications for the Code in effect on the day before the effective date of this Agreement. Larger or smaller volumes in particular instances may be published with the written approval of the Commission through the Commission staff.

(b) All sets of the Code, replacement volumes and supplements shall be made to conform in all respects to existing volumes of the Code. Materials shall be equal or superior quality to existing volumes. Books shall be Smyth sewn in sheets folded, where possible, in thirty-two page signatures and on three, seven-sixteenths tapes, or sewn by a process to produce a volume as strong as that commonly known as "Library Editions." Each signature shall be collation marked.

(c) End sheets shall be 80-lb. offset with a grain running parallel with the binding edge, and the first and last signatures shall be tipped and reinforced using one inch gummed Cambric, gathered, sewn using textbook thread, smashed, glued off, resmashed, three sides trimmed, rounded and backed with the backing not to exceed 1/4 inch; and, also, lined up using legal super which extends at least 1/4 inch beyond the reinforced area, covered with heavy Kraft paper glued affording proper adhesion to allow loose-back casing in. Mercerized headbands shall be applied and the book shall be cased in using suitable adhesive to prevent warpage and to penetrate Pyroxylin cloth.

(d) All of the material used in binding or printing that has a grain shall have the grain running parallel to the binding edge of the book.

(e) The binders shall be so designed that when the volume is opened for use, it will remain open without further physical support and will afford a full view of the page to the reader.

–16–

COMM000016

284

(f)  The back cover shall have a reinforced pocket to accommodate pocket part supplements.  A stub is to be left in the binding of each volume to accommodate pocket part supplements of no less than 1/4 the size of that volume or 300 pages, whichever is greater, so that the binding of the volumes will not be strained; provided, however, that the requirements of this subparagraph may be amended by mutual consent of the Publisher and the Commission.

(g)  The case shall consist of such material as shall be approved by the Commission, with the advice of the Publisher, but in no event shall the case be of a quality less than Pyroxylin coated Buckram equal to "F" grade Legal (or equal) over No. 18 binders board with the grain running parallel to the binding edge.

(h)  All words and numbers on bindings shall be stamped in imitation gold foil of permanent nature.  The corners of the case are to be square with a minimum of 1/2 inch in-turning on all four edges and the case lining strip is to be of suitable material for loose-back binding.

(i)  The paper, including the weight, finish, and color thereof, to be used in printing shall be specified by the Commission with the advice of the Publisher.  The Publisher shall furnish paper samples to the Commission.

(j)  The color and texture of the binding cloth shall be selected by the Commission after consultation with the Publisher.  The Commission shall approve the design, materials, stamping, etc., after receiving samples submitted by the Publisher.  Each bound volume shall be individually shrink wrapped or boxed in such a manner as to protect the volume from dust and damage during storage and shipment.

(k)  Unless otherwise directed by the Commission, all supplements shall be in all respects of equal quality with the bound volumes of the Code except that a different weight or thickness of paper may be used, if approved by the Commission.

(l)  The specifications contained in this Section 3 may be varied by mutual written consent of the Publisher and the Commission.

## 4. SCHEDULES AND DELIVERY.

### 4.1 Annual Updates.

Supplements, replacement volumes, an updated general index, and any other applicable update materials shall be prepared and shipped by the Publisher no later than 75 days following the receipt by the Publisher of the text of all enrolled acts enacted at each regular session of the

–17–

**COMM000017**

General Assembly (exclusive of approval dates, page numbers, or other material added after adoption by the General Assembly) in an electronic format specified by the Commission, beginning after the 2007 regular session of the General Assembly and annually thereafter during the term of this Agreement.

### 4.2 Internet Access to Georgia Code.

The online unannotated version of the Code, as provided for in Paragraph 2.5, shall be made available no later than January 15, 2007.  Such online version shall be updated no later than  thirty (30) days following the date of publication of the annual supplements and other update materials.

### 4.3 Electronic Version.

The Publisher shall deliver the electronic version of the Code, as provided for in Paragraph 2.6, no later than  thirty (30) days following the date of publication of the annual supplements and other update materials, or at such earlier time as the electronic version may otherwise be distributed to search service companies.  The electronic version shall be delivered to the Commission as directed by the Commission staff.  The Publisher agrees to provide such assistance as may be necessary to enable the Commission to make full use of the electronic version.

### 4.4 Database Comparison.

The Publisher shall complete the database comparison provided for in Paragraph 2.7, including a list of any errors which may warrant any errata notices, and provide the same to the Commission no later than thirty (30) days following the date of publication of the annual supplements and other update materials.

### 4.5 CD-ROM.

The Publisher shall make available an updated version of the CD-ROM required in Paragraph 2.8 no later than thirty (30) days following the date of publication of the annual supplements and other update materials, or the beginning of the next calendar quarter following such publication, whichever is later.

–18–

COMM000018

286

**4.6 Errata Notices.**

Any corrections as provided for in Paragraph 2.9 shall be made to the Publisher's database and published and shipped no later than thirty (30) days after the date the Commission directs the Publisher to make such corrections.

## 5.  PRICES.

**5.1  Setting of Prices.**

(a)  Except as otherwise provided in subparagraph (b) of this Paragraph, on and after July 1, 2007, and for the remainder of the term of this Agreement, unless otherwise adjusted pursuant to Paragraph 5.2, the prices charged by the Publisher shall not exceed the prices specified in Exhibit D, which is incorporated into and made a part of this Agreement.  From December 1, 2006 through June 30, 2007 the Publisher may sell any inventory of the Code at the prices approved by the Commission in July 2006 pursuant to the Agreement dated December 2, 1998 between the State of Georgia and LEXIS Law Publishing.

(b)  From December 1, 2006 through June 30, 2007, the Publisher may sell any inventory of the Code that the Publisher purchases from the preceding publisher pursuant to Section 2-6-7 of the Agreement dated December 2, 1998 between the State of Georgia, acting through its Code Revision Commission, and LEXIS Law Publishing at the prices approved by the Commission in July 2006 pursuant to such 1998 Agreement; provided, however, that this provision shall be inapplicable in the event that the Publisher is the same as, or a successor-in-interest to, the preceding publisher.

(c)  The Publisher shall provide annual updates at no charge to those State entities having subscriptions on November 15, 2006.  For purposes of this subparagraph, "State entity" is defined to include only:

(1) Departments, agencies, divisions, authorities, entities, or officials of the state government of the State of Georgia, and includes the Office of Legislative Counsel and other offices, officials, and members and employees of the General Assembly of Georgia;

(2) The Justices of the Supreme Court of Georgia, Judges of the Court of Appeals of Georgia, and the judicial circuits, state courts and superior courts;

(3) The state's district attorneys and solicitors, and the state's public defenders; and

(4) The law schools, colleges, and universities which are units of the University System of Georgia.

Such annual updates will be provided for the duration of this Agreement.

–19–

**COMM000019**

**5.2 Price Changes.**

(a)  In the absolute and sole discretion of the Commission, the prices fixed in Paragraph 5.1 may be adjusted once a year by the Publisher effective on or after the date of publication of annual supplements or other update materials of each year beginning in 2008, in light of all relevant factors.  Relevant factors shall include but not be limited to: (1) quality of work performance, including but not limited to accuracy and editorial quality of page proofs submitted for prepublication review, quality of the final published product, and number and severity of errata sheets required after publication; (2) number of days that the previous year's annual supplements and update materials were shipped earlier than the 75 days required in Paragraph 4.1, if any; (3) rate of inflation; (4) cost of labor and materials; (5) quantity of printed pages; (6) rates of local, state, and federal taxes; (7) energy costs; and (8) extra or extraordinary functions required by the Commission to be performed by the Publisher for the benefit of the general public, the state, or both.  The Commission may, in its absolute and sole discretion, approve a price change initiated by either party.  The Publisher shall provide the Commission with all relevant information relating to a proposed price change.

(b)  Both parties to this Agreement recognize that the provisions herein governing time of availability and accuracy of published materials are of the essence.  Both parties recognize that failure of the Publisher to comply with such provisions may decrease the value of the Code to subscribers.  Accordingly, in the event of material failure of the Publisher to comply with such provisions, the Commission is authorized in its sole discretion (after notice to and consultation with the Publisher) to decrease any or all of the maximum prices otherwise chargeable by the Publisher, so as to compensate subscribers reasonably and proportionately for any such decrease in value. However, such a decrease shall not apply if the failure to comply is due to the Commission's acts or omissions or is due to any matter beyond the control of the Publisher.

**5.3 Discounts.**

The failure of the Publisher to have the supplements, replacement volumes, and other update materials shipped not later than seventy-five (75) days as required by Paragraph 4.1, shall give rise to a discount on purchases of the Code, supplements, individual volumes, replacement volumes, and index volumes.  Unless waived by the Commission, the amount of the discount shall be equal to one percent (1%) of the price for each of those Code products for each period of three (3) working days or less by which shipment is late.  The additional discount shall be in effect through the end of the calendar year in which the failure to meet the deadline occurs.

COMM000020

## 6. COPYRIGHT.

**6.1 General.**

(a) The work of the Publisher on the Code, the CD-ROM Edition, and other publications covered under this Agreement is work made for hire for the purposes of the copyright laws of the United States, and shall be and remain the sole and exclusive property of the State of Georgia, acting through the Commission.

(b) All the contents of the Code, including all supplements and replacement volumes, the CD-ROM Edition, and those parts of any other publications required by this Agreement or authorized by the Commission that incorporate Code copyrightable materials, to the extent of such incorporation, shall be copyrighted in the name of the State of Georgia, acting through the Commission, and all copyrights thereto shall be vested, held, and renewed in the name of the State of Georgia, acting through the Commission. The copyrights shall cover all copyrightable parts of the Code in all relevant media, including print and electronic forms.

(c) The Publisher, on behalf of the Commission and in the name of the State of Georgia as copyright owner, shall take all necessary actions to obtain and register a copyright on any new or additional materials prepared for the Code and other publications. In addition, the Publisher shall take all necessary actions to renew any existing copyrights on the Code, the CD-ROM Edition, and Code materials in the name of the State of Georgia, acting through the Commission. The Publisher shall annually provide evidence of the registration or renewal of all copyrights to the Commission staff.

(d) The Publisher shall cooperate with and assist in the defense or initiation of any actions relating to the copyright rights referenced in this Agreement.

(e) The Commission shall be the sole entity of the State that may exercise control over the State's copyright on the Code, the CD-ROM Edition, and Code materials.

**6.2 Notice of Copyright.**

(a) Any publication of the Code or portions of the Code shall identify it as the "Official Code of Georgia Annotated" or a selected portion thereof without any additional qualifier or name that would indicate to a user that the Code is not a State copyrighted publication, and shall include notice of the State's copyright.

(b) The Publisher shall label the CD-ROM Edition, both in documentation and on an initial screen which is displayed before a user obtains access to the Code, with the following statement:

"The Code Revision Commission of the State of Georgia, as holder of the copyright to the Official Code of Georgia Annotated, has licensed the use of the Code by

–21–

COMM000021

_____ on this CD-ROM (or DVD) version. This CD-ROM (or DVD) version contains a merged version of the Code in which the material in the supplements has been merged with the material in the case bound, printed volumes of the Code to form a single data base. In the event of any discrepancy or difference between the Code contained on the CD-ROM (or DVD) version and the Code contained in the printed volumes and supplements, the printed volumes and supplements shall control."

## 7. SUPERVISION.

If there is any disagreement as to material to be included in the Code or as to any codification, annotation or other matter of editorial content, the Publisher shall abide by and follow the decision of the Commission as communicated by the Commission staff. If there is any other dispute between the Publisher and the Commission concerning publication of the Code or the Publisher's duties or performance under this Agreement, the decision of the Commission shall prevail.

## 8. RIGHTS TO PUBLISH AND SELL.

### 8.1 Publisher's Right to Publish and Sell.

(a)    Except as otherwise provided in this Agreement, the Publisher is granted the exclusive right to distribute and sell in printed, bound book format sets and volumes of the Code as well as the exclusive right to publish, distribute, and sell printed annual supplements and periodic printed replacement volumes to the Code from March 2, 2007 through the term of this Agreement. Notwithstanding any rights granted pursuant to this Agreement, the Commission retains all rights to grant to others the right to use captions, catchlines, history lines, and other components of the Code, CD-ROM Edition, and on-line version.

(b) From December 1, 2006 through March 1, 2007, the Publisher is granted non-exclusive rights to distribute and sell any inventory of the Code that the Publisher purchases from the preceding publisher pursuant to Section 2-6-7 of the Agreement dated December 2, 1998 between the State of Georgia, acting through its Code Revision Commission, and LEXIS Law Publishing, provided, however, that this provision shall be inapplicable in the event that the Publisher is the same as, or a successor-in-interest to, the preceding Publisher.

(c) Ninety days prior to the termination of the Publisher's right to sell and distribute the Code under this Agreement, a successor publisher shall have non-exclusive rights to distribute and sell any inventory of the Code that the successor publisher purchases pursuant to subparagraph (c) of Paragraph 9.6. During this same period, the Publisher shall have non-exclusive rights to distribute and sell any existing inventory of the Code that the successor publisher does not purchase.

–22–

**COMM000022**

**8.2 State Agencies.**

(a) Notwithstanding the provisions of Paragraph 8.1, any department or agency of the state shall have the right to reproduce and distribute or sell any one or more titles or parts of titles of the Code (including annotations, indexes, editorial notes, and other material referred to in Paragraph 1.3 of this Agreement) which are administered by, or substantially related to the administration of, that department or agency. Any such use of copyrighted material by a department or agency of the state shall contain the appropriate copyright notices showing the state's copyright in the selected portions of the Code.

(b) Subparagraph (a) of this Paragraph does not impose any burdens or responsibilities on the Publisher nor does it preclude the Publisher from entering into a separate agreement, or agreements, with any department or agency of the state to reproduce and distribute or sell on behalf of such department or agency any one or more titles or parts of titles of the Code, including any editorial material in which the state owns the copyright. Any such use of copyrighted material by the Publisher or by a department or agency of the state shall contain the appropriate copyright notices showing the state's copyright in the selected portions of the Code.

**8.3 Reprint of Selected Portions.**

The Publisher is granted the right to reprint selected portions of copyrighted material from the Code in other publications it might publish for use by the bench and bar of Georgia; e.g., a practice manual which includes selected statutes annotated from the Code, which right shall survive the expiration of this Agreement. Any such use of copyrighted material by the Publisher shall contain the appropriate copyright notices showing the state's copyright in the selected portions of the Code.

**8.4 CD-ROM.**

(a) The State of Georgia grants the Publisher the exclusive right to publish, distribute, market, sell, and sublicense for publication, distribution, marketing, and sale, CD-ROM Editions of the Code.

(b) The State of Georgia grants the Publisher the right to license, distribute, and market the CD-ROM Edition and services described herein to all interested parties.

(c) The Publisher is granted the right to republish selected portions of copyrighted material from the Code in other electronic publications it might publish for use by the bench and bar of Georgia; e.g., a practice manual which includes selected statutes and annotations from the Code.

(d) The Commission grants the Publisher the right to grant sublicenses to publish,

--23--

COMM000023

291

distribute, market, and sell CD-ROM and DVD versions of either the Code, a limited portion of the Code consisting of the text of Code sections plus the captions, catchlines, and history lines, or selected portions of the Code, in accordance with the provisions of this Section 8. The Publisher shall, subject to the terms and conditions of a License Agreement provided by or approved by the Commission, grant such sublicenses to any entities desiring to obtain them. The Publisher shall furnish each such sublicensee a current edition of the Code, or portion thereof, as appropriate, in electronic data base format, in accordance with the terms and conditions of the applicable License Agreement. A License Agreement shall be executed by and between the Publisher and any such sublicensee, and the Publisher shall file a copy of any such executed License Agreement with the Commission no later than 10 days after execution by all the parties thereto. The Publisher shall not grant any sublicense to any entity for publication, distribution, marketing, and sale of CD-ROM versions of either the Code or portions thereof other than by execution of a License Agreement provided by or approved by the Commission.

(e) After the end of each quarter, the Publisher shall make payment to the State of Georgia in an amount equivalent to the percentage specified in Exhibit D of the sum of all licensing fees received by the Publisher during the quarter just ended under any and all License Agreements executed pursuant to subparagraph (d) of this Paragraph. Such payments shall be made no later than thirty (30) days after the end of each quarter.

(f) Concurrent with any payment made pursuant to subparagraph (e) of this Paragraph, the Publisher, by and through a knowledgeable officer of the company having responsibility for accurate reporting of all revenues received by the Publisher, shall make an affidavit under penalty of false swearing and misappropriation of state funds, and submitting to the jurisdiction of the Superior Court of Fulton County, Georgia, stating that the amount of the payment made to the State of Georgia is equivalent to the percentage specified in Exhibit D of the sum of all fees received by the Publisher during the quarter just ended under any and all License Agreements executed pursuant to subparagraph (d) of this Paragraph.

(g) Neither the Commission, the State of Georgia, or any official, officer, employee, or agent thereof shall be responsible or liable in any way for the accuracy of material contained in any electronic data base version furnished by the Publisher pursuant to this Paragraph, and no warranty therefor, express or implied, shall be created as a result of this Agreement. Any License Agreement entered into by the Publisher shall be subject to this subparagraph.

**8.5 Online Licensees.**

(a) The Commission grants the Publisher the right to create electronic data bases containing the Code and to license the use of the Official Code of Georgia Annotated by on-line licensees, as approved by the Commission. The Publisher is authorized to contract with on-line licensees for the use of such materials in the creation and operation of computer data bases of the Official Code of Georgia Annotated, provided that such use shall be subject to the provisions of this Paragraph.

–24–

**COMM000024**

(b) The Publisher agrees to furnish to each on-line licensee the Code in electronic data base format compiled and updated at the Publisher's expense and with no cost to the State of Georgia.

(c) The Publisher agrees to pay to the State of Georgia an annual license fee of the amount specified in Exhibit D for each on-line licensee using the Official Code of Georgia Annotated pursuant to this Paragraph plus a variable royalty in an amount equal to the percentage specified in Exhibit D of the gross receipts the on-line licensee receives from its use of the Official Code of Georgia Annotated on such on-line service.

(d) The Publisher agrees to make the Official Code of Georgia Annotated and revisions and updates thereto available in electronic format to all on-line licensees simultaneously.

(e) The rights granted to the Publisher to furnish electronic data base versions to all on-line licensees by this Section 8 shall expire upon the expiration or termination of this Agreement.

(f) All sums due the State of Georgia pursuant to this Paragraph shall be payable no later than thirty (30) days after the end of each quarter of each year for the duration of this Agreement. The Commission shall have the right to an accounting for all funds due under this Agreement.

(g) Concurrent with any payment made pursuant to subparagraph (f) of this Paragraph, the Publisher, by and through a knowledgeable officer of the company having responsibility for accurate reporting of all revenues received by the Publisher, shall make an affidavit under penalty of false swearing and misappropriation of state funds, and submitting to the jurisdiction of the Superior Court of Fulton County, Georgia, stating that the amount of the payment made to the State of Georgia is equivalent to any annual license fees received as specified in Exhibit D for each on-line licensee plus a variable royalty in an amount equal to the percentage specified in Exhibit D of the gross receipts the on-line licensee receives from its use of the Official Code of Georgia Annotated on such on-line service received by the Publisher during the quarter just ended under any and all licensing contracts entered into pursuant to this Paragraph.

(h) There shall be no automatic renewal of the agreement contained in this Paragraph.

(i) Neither the Commission, the State of Georgia, nor any official, officer, employee, or agent thereof shall be responsible or liable in any way for the accuracy of material furnished by the Publisher pursuant to this Paragraph, and no warranty, express or implied, shall be created as a result of this Paragraph.

(j) Any contract between the Publisher and any on-line licensee shall be subject to this Paragraph and other terms of this Agreement. All contracts between the Publisher and an on-line licensee shall be in a form approved by the Commission prior to entering into the contract.

–25–

COMM000025

**8.6  Reservation of Rights.**

(a)  Other than those rights expressly granted the Publisher in this Agreement, all right, title, and interest in and to the Code and all materials comprising the Code, including without limitation those materials prepared and created by the Publisher for inclusion in the Code, shall remain with the State of Georgia and the Publisher is granted no rights with respect to the Code other than as expressly set forth in this Agreement.  Any and all rights granted to the Publisher in this Agreement with respect to the Code are to be construed as a license and such license shall not limit the ability of the State of Georgia to grant or enter into other licenses or Agreements not in conflict with the licenses granted in this Agreement.

(b)  Except as otherwise provided in this Agreement, the Commission shall have the exclusive right to sell, license, or otherwise permit the Publisher or third parties to use the Code in any electronic, microfilm, microform, or other format.  Except as otherwise provided in this Agreement, the Publisher shall not have any right to distribute the Code in electronic or other format or to sell, license, or otherwise permit third parties to use the Code in electronic or other format, except to the extent that such rights may be granted to the Publisher by the Commission upon such terms as may be approved by the Commission.

## 9.  TERM AND TERMINATION.

**9.1  Term.**

This Agreement shall take effect December 1, 2006, and shall remain in effect until March 1, 2012, unless terminated earlier pursuant to this Section 9.  The Commission retains an option to renew this Agreement for a five-year term or on a year-to-year basis on or after March 1, 2012.

**9.2  Termination for Cause.**

(a)  The Commission may terminate this Agreement for cause whenever the Commission determines that the Publisher has failed to perform one (1) or more of its contracted duties and responsibilities in a timely and proper manner or in a manner satisfactory to the Commission, or if the Publisher fails to adhere to any of the terms of this Agreement, and the Publisher is unable to cure the failure within a reasonable period of time as specified by the Commission.  This termination shall be known as "termination for cause."

(b)  If there is termination for cause as provided by this Paragraph, the Commission may procure, upon such terms and in such manner as the Commission deems appropriate, services

–26–

COMM000026

294

similar to those terminated, and the Publisher shall be liable to the Commission for any excess costs for those similar services. In addition, the Publisher shall be liable to the Commission for administrative costs or other damages incurred by the Commission in procuring those similar services. The Commission agrees to negotiate in good faith to procure those similar services at a reasonable cost.

(c) The rights and remedies of the Commission provided in this Paragraph shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Agreement. Notwithstanding the above, the Publisher shall not be relieved of its liability to the Commission for damages sustained by virtue of breach of this Agreement by the Publisher.

### 9.3 Termination for Convenience.

(a) The Commission may terminate this Agreement for convenience without cause by giving written notice to the Publisher at least ninety (90) days before the effective date of the termination, if for any reason the Commission determines, in its sole discretion, that the termination is in the best interest of the State.

(b) If the Commission terminates this Agreement for convenience, it shall allow the Publisher to complete and sell publications previously authorized and begun as of the date of notice of termination. In addition, the Commission agrees to license Code material to the Publisher for electronic publication until such time as a successor publisher begins providing electronic publication of the Code.

### 9.4 Force Majeure.

Performance of any duty on the part of the Publisher may be excused by the Commission in its sole discretion if it determines in writing that the performance of the specified duty was prevented by fire, strike, flood, war, act of God or other circumstances beyond the control of the Publisher.

### 9.5 Termination of Rights.

Upon expiration or termination of this Agreement, all rights granted to the Publisher under this Agreement will cease and terminate. Further, upon termination of this Agreement the Publisher will cease all publication and sale of the Code, CD-ROM Edition, and on-line licensing except as otherwise provided in this Section 9. The Publisher will have the right to sell its remaining inventory of the Code in accordance with the terms and conditions of subparagraph (c) of Paragraph 9.6 and will have the right to license, market, and sell its remaining inventory of the CD-ROM Edition for a period of 120 days following expiration or termination of this Agreement. Neither party hereto will be liable to the other party hereto for damages, losses,

–27–

**COMM000027**

costs, or expenses of any kind or character whatsoever arising from the termination or expiration of this Agreement whether such damages, losses, costs, or expenses arise from the loss of prospective sales or expenses incurred or investments made in connection with the establishment, development, or maintenance of the Publisher's business or any other reason whatsoever; provided, however, that such termination or expiration will not affect any claim, demand, liability, or right of either party hereto arising pursuant to this Agreement prior to such termination or expiration or after such termination or expiration in connection with the sale by the Publisher of its remaining inventory of the Code and CD-ROM Edition.

**9.6 Transition.**

(a) If this Agreement expires or is terminated pursuant to this Section 9, the Publisher shall cooperate in any transition to a successor publisher.

(b) Ninety days prior to the termination of the Publisher's right to sell and distribute the Code under this Agreement, the Publisher shall provide to the Commission for use by the Commission and the successor publisher a complete, then current list of the Publisher's subscribers to the Code.

(c) Ninety days prior to the termination of the Publisher's right to sell and distribute the Code under this Agreement, the Publisher agrees to sell its existing inventory of the Code or such portion of its existing inventory of the Code as the successor publisher wishes to purchase to the successor publisher at the Publisher's cost, including all manufacturing and editorial costs, not to exceed 80 percent of the retail prices. Any dispute as to the Publisher's inventory cost shall be resolved through good faith negotiations between the Publisher and the successor publisher.

**10. MISCELLANEOUS.**

**10.1 Documents Incorporated.**

The Publisher agrees to perform the duties and obligations described in the RFP, as amended if applicable, and the Publisher's Technical Proposal ("Proposal"), which are hereby incorporated into this Agreement by reference and attached as Exhibits A and B; however, the Commission is not bound by any provision of the Proposal. If there is any actual conflict, the documents shall govern in the following descending order of superiority:

(a) This agreement;

(b) RFP amendments and addenda (Answers to questions submitted pursuant to Sections 1.2 and 1.3 of the RFP);

–28–

COMM000028

(c) The RFP;

(d) The Proposal.

**10.2  Amendments.**

This Agreement may be amended from time to time upon mutual agreement of the Commission and the Publisher.  All amendments shall be made in writing, and fully executed by duly authorized representatives of both parties.

**10.3  Contract Cannot be Assigned.**

The Publisher shall not assign, delegate or subcontract this Agreement or any part of this Agreement without the prior written consent of the Commission.  The Commission's consent to the performance of such obligations by third parties shall in no way release the Publisher from responsibility for the performance of any obligations under this Agreement.  In no event shall any publications under this Agreement, including but not limited to Code sets, annual update sets, volumes, supplements, or other materials, be printed, bound, or produced outside of the continental United States.

**10.4 Entire Agreement.**

This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior oral and written agreements.  This Agreement may not be amended or modified, except by a further written agreement signed by the parties hereto.

**10.5  Counterparts.**

This Agreement may be executed in two (2) counterparts, each of which shall constitute an original, but both of which taken together shall constitute only one (1) instrument.

**10.6  Headings.**

Section and paragraph headings in this Agreement are for convenience only and shall not affect the interpretation or construction of this Agreement.

–29–

**COMM000029**

**10.7  Financial Responsibility.**

The Publisher shall submit satisfactory evidence to the Commission staff of its compliance with the requirement to obtain a One Million Dollar ($1,000,000.00) performance bond, and of the approval of the bond by the Commission.

**10.8   Additional Remedies.**

The Publisher agrees that its obligations set forth in this Agreement and the restrictions on its use, publication, sale, and distribution of the Code, CD-ROM Edition, and on-line version are reasonable and necessary to protect and preserve the interests and properties of the State of Georgia; and that irreparable loss and damage will be suffered by the State of Georgia should the Publisher breach any of its obligations or restrictions with respect to the Code, CD-ROM Edition, and on-line version.  Therefore, the Publisher agrees and consents that, in addition to all the remedies provided at law or in equity, the State of Georgia will be entitled to a temporary restraining order and temporary and permanent injunctions to prevent a breach or contemplated breach of any of the covenants.  The existence of any claim, demand, action, or cause of action of the Publisher against the State of Georgia shall not constitute a defense to the enforcement by the State of Georgia of any of the covenants or agreements herein.

**10.9  Indemnification.**

(a)  The Publisher agrees to protect, indemnify, save and hold harmless the Commission, the State, all State agencies, departments, boards, commissions and institutions, and all officers, agents, servants and employees of the State, from any and all claims, demands, damages, judgments, and liability arising directly or indirectly out of this Agreement, and from any and all costs, expenses and attorneys' fees (including costs of work done by the Georgia Attorney General or his designees) incurred as a result of any claim, demand, lawsuit or cause of action; however, the Publisher shall not be responsible for any claim, demand, damage, judgment or liability arising from the negligent or willful conduct of the Commission or the State.

(b)  The Commission or the State or any official, officer, employee, or agent thereof shall not be liable to any third party who is licensed to use any on-line version, electronic version, or CD-ROM of the Code.  The Publisher shall save and hold the Commission and the State harmless from any and all claims, demands, damages, judgments, and liability arising directly or indirectly out of the use of any on-line version, electronic version, or CD-ROM of the Code, including the use of any data that the Publisher has provided to the Commission; however, the Publisher shall not be responsible for any claim, demand, damage, judgment or liability arising from the negligent or willful conduct of the Commission or the State.

COMM000030

(c)  The Commission shall give the Publisher written notice of any such claim, demand or lawsuit, if the Commission is notified first, and full right and opportunity to conduct the Publisher's defense of the claim, demand or lawsuit.  However, the Commission does not accord to the Publisher, through its attorneys, any rights to represent the Commission, the State, any State agency, department, board, commission or institution, or any officer, agent, servant or employee of the State, in any legal matter.

### 10.10  Non-Discrimination.

No person shall be excluded from participation in, or be denied benefits of, or be otherwise subjected to discrimination in the performance of the Publisher under this Agreement or in the employment practices of the Publisher on the grounds of disability, age, race, color, religion, sex, national origin or any other classification protected by federal or Georgia constitutional or statutory law.   The Publisher, upon request, shall show proof of such non-discrimination and shall post in conspicuous places, available to all employees and applicants, notices on non-discrimination.

### 10.11  Interpretation and Venue.

This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.  Any controversy arising under, or in relation to, this Agreement shall be resolved in accordance with the laws of Georgia and the Publisher hereby consents to the jurisdiction of the Superior Court of Fulton County, Georgia.   The Publisher further consents that any process or notice of motion or other application to the court or any judge thereof may be served upon the Publisher by service upon the Secretary of State of Georgia, with a copy of such being forwarded to the Publisher by the Secretary of State via registered mail.

### 10.12  Prohibited Payments.

The Publisher warrants that no part of the total Agreement amount shall be paid directly or indirectly to an employee or an official of the State as wages, compensation, or gifts in exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Publisher in connection with any work contemplated or performed under this Agreement.

### 10.13  Financial Responsibility.

Notwithstanding any provision in this Agreement to the contrary, in no event is the State or the Commission financially responsible to the Publisher under this Agreement.

–31–

**COMM000031**

299

# TAB 29-10

# EXHIBIT H

301

http://www.lexis-nexis.com/hottopics/GACode/    # of hits by calendar month

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 Total | 1,040,159 | 987,573 | 1,456,059 | 1,244,079 | 1,109,258 | 1,017,254 | 1,203,969 | 1,241,271 | 889,275 | 692,737 | 660,657 | 498,342 | 12,040,633 |
| 2008 Total | 513,132 | 415,979 | 780,044 | 654,011 | 677,887 | 214,514 | 331,711 | 219,525 | 866,005 | 516,266 | 199,764 | 75,838 | 5,464,676 |
| 2009 Total | 1,158,911 | 1,013,204 | 1,140,196 | 1,009,692 | 594,827 | 747,102 | 782,623 | 961,173 | 818,432 | 928,300 | 658,521 | 811,783 | 10,524,764 |
| 2010 Total | 692,446 | 817,637 | 571,882 | 855,139 | 702,132 | 661,946 | 740,491 | 730,105 | 671,126 | 625,934 | 491,377 | 509,377 | 8,269,591 |
| 2011 Total | 304,397 | 524,998 | 747,034 | 605,831 | 637,787 | 647,646 | 631,589 | 603,881 | 555,969 | 649,497 | 491,047 | 501,584 | 6,901,260 |
| 2012 Total | 572,582 | 667,748 | 628,923 | 590,835 | 575,833 | 580,278 | 551,285 | 535,537 | 738,099 | 835,361 | 702,745 | 592,614 | 7,571,840 |
| 2013 Total | 631,915 | 680,530 | 651,304 | 718,192 | 719,006 | 545,081 | 631,680 | 756,129 | 725,419 | 773,252 | 663,616 | 601,788 | 8,147,912 |
| 2014 Total | 703,515 | 690,993 | 721,643 | 768,204 | 979,283 | 972,489 | 1,035,929 | 915,720 | 1,024,738 | 995,438 | 893,599 | 619,058 | 10,320,609 |
| 2015 Total | 1,035,418 | 1,010,817 | 803,766 | 892,257 | 803,799 | 868,394 | 1,294,226 | 623,952 | 813,603 | 672,246 | 570,991 | 206,211 | 9,595,680 |
| **Total All Years:** | | | | | | | | | | | | | 78,836,965 |

COMM000228

302

# TAB 29-14

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION ) | |
| on Behalf of and For the Benefit of the ) | CIVIL ACTION |
| GENERAL ASSEMBLY OF GEORGIA, ) | NO. 1:15-cv-2594-MHC |
| and the STATE OF GEORGIA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| PUBLIC.RESOURCE.ORG, INC., ) | |
| ) | |
| Defendant. ) | |

**DECLARATION OF EDWARD WALTERS IN SUPPORT OF**

**PUBLIC.RESOURCE.ORG's MOTION FOR SUMMARY JUDGMENT**

I, Edward Walters, declare and state as follows:

1.    I have personal knowledge of the facts stated in this Declaration and know them to be true and correct except as otherwise stated. I could competently testify to them if called as a witness.

2.    I am trained as a lawyer and received a J.D. from the University of Chicago Law School, where I was an Editor of the University of Chicago Law Review. I am a member of the Virginia State Bar and the D.C. Bar, and I am

304

admitted to practice before the U.S. Supreme Court, the U.S. Court of Appeals for

the Fourth Circuit, and the U.S. Court of Appeals for the Fifth Circuit.

3.      From May 1991 to January 1993, I served in The White House Office

of Media Affairs, then the Office of Presidential Speechwriting, where I conducted

research and wrote speeches for President George H.W. Bush.

4.      From November 1997 to November 1999, I was an attorney at the

firm of Covington & Burling.

5.      From November 1999 until the present, I have been the co-Founder

and CEO of Fastcase, a legal publishing company.

6.      Since May 2014, I have served as an Adjunct Professor at the

Georgetown University Law Center where I teach a class on the Law of Robots.

7.      Since August 2013, I have served on the Board of Directors of

Public.Resource.Org.  I also serve as the Vice Chair of the Board of Directors of

ProBono.Net.

8.      My company, Fastcase, provides subscribers a comprehensive legal

research service, including cases, statutes, regulations, court rules, and

constitutions for all 50 states. We also provide access to a comprehensive library

law journals and other materials in partnership with HeinOnline, a joint service

which won the New Product of the Year award in 2014 from the American

Association of Law Libraries.

9.      The Fastcase service is often offered to end users as part of an arrangement with state and local bar associations, who contract with us so they may offer this as a free benefit to their members.

10.      In January 2011, Fastcase and the State Bar of Georgia announced a partnership which made the Fastcase service available to the 42,000 members of the State Bar of Georgia.

11.      We have attempted, on numerous occasions to license the Official Code of Georgia from the State of Georgia and LexisNexis, however we have been informed that no license would be granted, at any price.

12.      As part of our service to all of our subscribers, we offer a version of the Code of Georgia, but it is what OCGA 1-1-1 terms an "unofficial compilation." In particular, we write our own section titles and catchlines. Members of the State Bar of Georgia thus access this unofficial compilation instead of the Official Code of Georgia Annotated when they access our service.

//

306

13.    Fastcase would prefer to offer the Official Code of Georgia Annotated, instead of an unofficial compilation, to our subscribers as that is the version of these edicts of government that is promulgated by the State of Georgia.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on February __10__, 2016, in Washington, District of Columbia

EDWARD WALTERS

307

# TAB 29-16

# EXHIBIT N

## USER'S GUIDE

CONTENTS

CITATION FORM
ARRANGEMENT AND NUMBERING SYSTEM
ARRANGEMENT OF SPECIFIC TYPES OF MATERIAL WITHIN THE CODE
TITLE AND CHAPTER ANALYSES
HISTORY LINES
REPEAL LINES
CROSS REFERENCES
CASE ANNOTATIONS
EDITOR'S NOTES AND CODE COMMISSION NOTES
LAW REVIEWS
OPINIONS OF THE ATTORNEY GENERAL OF GEORGIA
ADVISORY OPINIONS OF THE STATE BAR
DECISIONS AND OPINIONS UNDER PRIOR LAW
RESEARCH REFERENCES
INDEXES
—GENERAL INDEX
—VOLUME INDEXES
—INDEX OF LOCAL AND SPECIAL LAWS AND GENERAL LAWS OF LOCAL APPLICATION
CONVERSION TABLES
DICTIONARY
SECRETARY OF STATE'S CERTIFICATES

*Citation Form*

The Official Code of Georgia Annotated may be cited as "O.C.G.A." See Code Section 1-1-8 as to citation of the Official Code of Georgia Annotated.

*Arrangement and Numbering System*

The Official Code of Georgia Annotated is arranged into 53 Code titles. In addition to the 53 titles, the Constitution of the United States and the Constitution of Georgia are included in separate volumes with their original internal numbering systems retained. No Code title numbers have been assigned to the Constitutions.

With the exception of Title 1, "General Provisions," titles within the Code are arranged in alphabetical order. A list of the Code title numbers and names appears in the front of each volume of the Code.

Where appropriate, titles within the Code are divided into chapters, chapters are divided into articles, articles are divided into parts, and parts are divided into subparts. An exception to this arrangement occurs in Title 11, "Commercial Code." Because of the importance of maintaining the numbering scheme of the Uniform Commercial Code throughout the United States, Title 11 does not follow the numbering scheme used in the remaining titles of the Code.

Titles, chapters, articles, parts, and subparts of the Code are designated with Arabic numerals. If a new title, chapter, article, part, or subpart is

xvii

USER'S GUIDE

added between two existing titles, chapters, articles, parts, or subparts, it will be designated by the preceding numeral plus a capital letter. Thus, if two new chapters are to be added between Chapters 4 and 5 of a title, they will be designated as Chapters 4A and 4B.

A three-unit numbering system is used to designate Code sections. Thus, Code Section 2-5-1 is the first Code section of Chapter 5 of Title 2. Code section numbers are not consecutive in the Code. At the end of each article, part, and subpart, gaps are left in Code section numbers to allow for future legislation. If a new Code section is added between two existing Code sections, the new Code section will be designated with the preceding Code section number followed by a period and one or more numerals. Thus, if two new Code sections are added between Code Sections 2-5-38 and 2-5-39, the new Code sections will be designated as Code Sections 2-5-38.1 and 2-5-38.2.

Where appropriate, Code sections are divided into subsections, subsections are divided into paragraphs, paragraphs are divided into subparagraphs, subparagraphs are divided into divisions, and divisions are divided into subdivisions. These units are designated as follows:

Subsections—(a), (b), (c), (d), etc.

Paragraphs—(1), (2), (3), (4), etc.

Subparagraphs—(A), (B), (C), (D), etc.

Divisions—(i), (ii), (iii), (iv), etc.

Subdivisions—(I), (II), (III), (IV), etc.

If it becomes necessary to add new subsections, paragraphs, subparagraphs, divisions, or subdivisions between existing subsections, paragraphs, subparagraphs, divisions, or subdivisions, the new material will be designated as follows:

Subsection—(a), (a.1), (a.2), (b)

Paragraph—(1), (1.1), (1.2), (2)

Subparagraph—(A), (A.1), (A.2), (B)

Division—(i), (i.1), (i.2), (ii)

Subdivision—(I), (I.1), (I.2), (II)

If a Code section has introductory language followed by a list, subsection designations are not used to designate the items in the list, but each item is given a paragraph designation. This helps to maintain the flexibility of the numbering system. Definitions sections are examples of this system of numbering items in a list.

xviii

310

USER'S GUIDE

*Arrangement of Specific Types of Material Within the Code*

Title 1 of the Official Code of Georgia Annotated relates to general provisions applicable either to the adoption of the Code itself or to the enactment of laws generally. Title 1 contains an expression of legislative intent in the enactment of the Code, provides for severability for the Code and future laws as well, preserves certain types of Acts which are not codified, provides for the specific repeal of prior codes and laws, describes classes and categories of persons, provides for rights of persons, provides for rules of statutory construction, and provides for definitions of terms used throughout the Code. All persons are urged to read Title 1 prior to using the Code.

In the same manner that Title 1 contains material which is applicable to the entire Code, most titles within the Code contain a general provisions chapter as Chapter 1 of the title. This chapter contains definitions and other material of general application throughout the particular title.

Within each chapter, article, part, and subpart, certain types of material generally will be arranged in a uniform manner throughout the Code. The short title of a law, if any, will be the first Code section, followed by the Code section stating the purpose or legislative findings, followed by Code section defining certain words and phrases used in that law. Within the body of the chapter, article, part, or subpart, related Code sections will be grouped together. Penalty Code sections are generally at the end of the material to which they relate.

*Title and Chapter Analyses*

Preceding each title in the Code is a title analysis which lists the numbers and captions of each chapter within the title.

Preceding each chapter in the Code is a chapter analysis which lists each article, part, and subpart within the chapter and each Code section and its catchline.

*History Lines*

Generally, each Code section is followed by a history line which includes citations to the Georgia Laws and prior official compilations of the laws of the state, pertaining to substantially the same subject matter as the present Code section. Unofficial codes are not cited in the history lines. No history line is included for those Code sections which are enacted by the Official Code of Georgia Annotated itself. Examples of these types of Code sections include those Code sections in Title 1 dealing with the enactment of the Official Code of Georgia Annotated and Code sections in other titles which provide new title-wide definitions not previously included in the law.

Quite often the history lines not only will reflect the most recent specific enactment of a Code section but also will trace similar provisions of law

xix

311

USER'S GUIDE

existing prior to the most recent specific enactment, even though that enactment may not have expressly amended any of the prior similar provisions and may in fact have repealed them. For example, Ga. L. 1977, p. 396 enacted a new game and fish code (now codified primarily at Title 27) which repealed most of the then-existing provisions of law relating to game and fish. However, rather than beginning each history line in Title 27 with the most recent specific enactment (Ga. L. 1977, p. 396), the editors have examined the pre-1977 game and fish Acts, compared the subject matter of those Acts with the subject matter of each section of Ga. L. 1977, p. 396, and added history where appropriate. This tracing procedure serves the purpose of providing more complete historical information and recognizes the fact that many repeals by the General Assembly have the practical effect of amending or renumbering existing provisions of law.

In some cases the history lines may provide a quick method of translating sections of the Code to sections of prior codes. However, since the history lines do not cite unofficial codifications of provisions of Georgia law, reference generally should be made to the conversion tables in Volume 41 whenever a translation of a new Code section to a prior provision of law is desired.

Bill numbers are included in history lines for Acts enacted in 2005 and later.

History lines are provided for those numbered paragraphs of the 1983 Georgia Constitution that have been amended or added since that Constitution was ratified in 1982.

*Repeal Lines*

When a Code section is repealed, its Code section number and catchline are set out, followed by a notation that the particular section has been repealed. An Editor's note under the repeal line lists citations to the Georgia Laws on which the repealed Code section was based, and refers the user to the Code provisions, if any, now covering the subject of the repealed Code section.

*Cross References*

Appropriate cross references between related provisions of the Code are included at the beginning of the annotations for a particular title, chapter, article, part, subpart, or Code section.

*Case Annotations*

LexisNexis® has prepared and included in the Official Code of Georgia Annotated a complete set of case annotations. All decisions of the Supreme Court of Georgia and the Court of Appeals of Georgia and all decisions of the federal courts in cases which arose in Georgia construing any portion of the general statutory law of the state, the Constitution of the United States,

xx

312

USER'S GUIDE

and the Constitution of Georgia have been examined and appropriate annotations have been prepared and included under a "Judicial Decisions" heading following the title, chapter, article, part, subpart, or Code section designation of the Official Code of Georgia Annotated to which they relate. Annotations contain the name of the case, the complete official and unofficial citations, and the year of the decision. Normally, constructions of statutes relating to constitutionality thereof appear first in the annotations for a particular provision of the Code.

### Editor's Notes and Code Commission Notes

If the editorial staff of LexisNexis®, the Code Revision Commission, or the commission's staff felt that an explanatory note would be helpful to users of the Code, such notes were added as editor's notes or Code Commission notes.

### Law Reviews

Appropriate articles and notes from each law review which is published in the State of Georgia are noted following the title, Code section, or other designation to which they relate.

### Opinions of the Attorney General of Georgia

Where appropriate, annotations are included concerning relevant opinions of the Attorney General of Georgia, and citations to those opinions are given. These annotations are included under the heading "Opinions of the Attorney General" following the particular title, Code section, or other designation to which they relate.

### Advisory Opinions of the State Bar

Where appropriate, annotations are included concerning relevant advisory opinions of the State Bar of Georgia, and citations to those opinions are given. These annotations are included under the heading "Advisory Opinions of the State Bar" following the particular title, Code section, or other designation to which they relate.

### Decisions and Opinions Under Prior Law

Editor's notes or the subheadings "Decisions Under Prior Law" and "Opinions Under Prior Law" appear in the case annotations and the annotations to Attorney General opinions. These editor's notes and subheadings are utilized to indicate a judicial decision or an Attorney General opinion under a provision of law which was specifically repealed subsequent to the decision or opinion but which was succeeded by a provision similar to the repealed provision, so that the decision or opinion has continued relevance to an effective provision of law.

### Research References

To aid in legal research, collateral references have been included to appropriate material in American Jurisprudence, Corpus Juris Secundum,

xxi

313

USER'S GUIDE

American Law Reports, and Uniform Laws Annotated. These annotations are included under the heading "Research References" following the particular title, Code section, or other designation to which they relate.

*Indexes*

*—General Index*

The Official Code of Georgia Annotated contains a completely new general index prepared by LexisNexis®. Index entries have been produced by an actual reading of the body of the statutes and other material and not merely from headings or catchlines. All major headings in the Code are represented in the index.

*—Volume Indexes*

In addition to the general index, each volume of the Code contains an individual volume index covering the material contained in that volume. Individual volume indexes will not be revised in the annual supplements to the volumes but will be revised and updated when a volume is recompiled and republished.

*—Index of Local and Special Laws and General Laws of Local Application*

In addition to the general index, a complete, new index to local and special laws and general laws of local application has been compiled and published as a part of the Code. This index contains citations to the Georgia Laws from 1730 to the present. Entries are divided into current and noncurrent laws in order to eliminate the necessity of having to examine repealed laws when attempting to locate currently effective laws. Index entries were prepared after a complete reading of each statute. After the index was prepared, each entry was compared with the Georgia Laws to ensure the accuracy of the index entries.

For further information regarding the index to local and special laws and general laws of local application, see the foreword to that index and the user's guide preceding the portion of that index dealing specifically with general laws of local application.

*Conversion Tables*

Conversion tables have been included in Volume 41 to assist the user of the Code in converting citations between the Official Code of Georgia Annotated and the Georgia Code Annotated, the Code of Georgia of 1933, and all previous codes of the State of Georgia. Also included are a table showing the location of each section of the Georgia Laws which has been codified in the Official Code of Georgia Annotated and tables which indicate corresponding provisions of the 1877 Constitution of Georgia, the 1945 Constitution of Georgia, the 1976 Constitution of Georgia, and the 1983 Constitution of Georgia. Conversion tables for the present and prior Constitutions of Georgia are also contained in Volume 2.

xxii

USER'S GUIDE

*Dictionary*

In the preparation of this Code, the Code Revision Commission and The Michie Company utilized Funk & Wagnalls Standard College Dictionary, copyright 1977 by Harper & Row, Publishers, Inc., as a standard reference work.

*Secretary of State's Certificates*

In each statutory volume as well as in the volume containing the Constitution of Georgia, there is included in the front matter a certification by the Secretary of State of Georgia that the statutes or constitutional provisions contained in that volume are true and correct copies of such material as enacted by the General Assembly of Georgia, all as the same appear of file and record in the office of the Secretary of State.

xxiii

# TAB 29-17

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION on behalf of and for the benefit of THE GENERAL ASSEMBLY OF GEORGIA, and THE STATE OF GEORGIA, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:15-CV-02594-MHC |
| PUBLIC.RESOURCE.ORG, INC. | |
| Defendant. | |

**PLAINTIFF COMMISSION'S RESPONSE TO DEFENDANT PUBLIC.RESOURCE.ORG, INC.'S FIRST SET OF <u>INTERROGATORIES</u>**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of Georgia, Plaintiff Code Revision Commission on Behalf of and For the Benefit of the General Assembly of Georgia, and the State of Georgia ("Commission"), by and through its attorneys, hereby objects and responds to Defendant Public.Resource.Org, Inc. ("Public Resource")'s First Set of Interrogatories to Plaintiff Code Revision Commission as follows.

317

## INTRODUCTION

The Commission objects to Public Resource's interrogatories to the extent they request identification of documents subject to attorney-client privilege or work product doctrine. The Commission is not producing documents and does not expect Public Resource to produce documents concerning correspondence between the parties and their counsel based on claims of privilege or work product.


**INTERROGATORY NO. 1:** *Identify the portions of the O.C.G.A. in which you claim a valid copyright, including, but not limited to, the statutory text; annotations; editorial notes; Commission notes; research references; notes on law review articles; opinions of the Attorney General of Georgia; indexes; analyses; title, chapter, article, part, and subpart captions or headings; and catchlines of Code sections.*

**RESPONSE**: Commission objects to Public Resource's definition of the term "you" as overly broad and unduly burdensome. Commission's responses will be made only on behalf of the Code Revision Commission on behalf of and for the benefit of the General Assembly of Georgia, and the State of Georgia. Commission also objects to Public Resource's definition of "O.C.G.A." as unclear and misleading because Public Resource separately lists "annotations" and certain portions of the O.C.G.A. that are encompassed by the term "annotations," but not

other portions of the O.C.G.A. encompassed by the term.  Specifically, notes on

law review articles, editorial notes, Commission notes, summaries of opinions of

the Attorney General, indexes, analyses, title, chapter, article, part, and subpart

captions or headings, and catchlines of Code sections are all annotations of the

Official Code of Georgia, but listed as separate from "annotations."  Judicial

summaries and summaries of research references are not listed despite also being

Official Code of Georgia annotations.  Accordingly, in its responses, Commission

defines "O.C.G.A." as "a publication containing the Official Code of Georgia and

annotations to the Official Code," wherein "annotations" refers to all non-statutory

elements of the publication. Commission further objects to this interrogatory on the

grounds that it seeks information that is not relevant to the claims or defenses of

the parties because it seeks information regarding copyrights in works that are not

being asserted in this litigation.

Subject to and without waiving these objections, Commission states that it

claims copyright in this litigation in those portions of the O.C.G.A. that are

asserted, which excludes the O.C.G.A. statutory text and numbers of Titles,

Chapters, Articles, Parts, Subparts, and Code Sections.  In this case, Commission

asserts its copyrights in the following elements of the O.C.G.A. volumes and

supplements listed in Exhibit A of the Amended Complaint (Dkt. No. 011)

("Amended Complaint"):

1) judicial summaries found under the heading "JUDICIAL DECISIONS" as creative and original text;

2) editor's notes found after the heading "Editor's notes" as creative and original text;

3) summaries of cross references found after the heading "Cross references" as compilations;

4) summaries of research references found below the heading "RESEARCH REFERENCES" as compilations;

5) summaries of law reviews found after the heading "Law reviews" as compilations;

6) summaries of the opinions of the Attorney General of Georgia found below the heading "OPINIONS OF THE ATTORNEY GENERAL" as compilations; and

7) compilations of the judicial summaries, editor's notes, summaries of cross references, summaries of research references, summaries of law reviews, and summaries of the opinions of the Attorney General of Georgia.

All identified hereafter as "Asserted Works."

**INTERROGATORY NO. 2:** *Identify the portions of the O.C.G.A. in which you do not claim copyright, including, but not limited to, the statutory text, the annotations; editorial notes; Commission notes; research references; notes on law review articles; opinions of the Attorney General of Georgia; indexes; analyses; title, chapter, article, part, and subpart captions or headings; and catchlines of Code sections.*

**RESPONSE**:  Commission objects to Public Resource's definition of the term "you" as overly broad and unduly burdensome.  Commission's responses will be made only on behalf of the Code Revision Commission on behalf of and for the benefit of the General Assembly of Georgia, and the State of Georgia. Commission also objects to Public Resource's definition of "O.C.G.A." as unclear and misleading because Public Resource separately lists "annotations" and certain items that are encompassed by the term "annotations," but not other items encompassed by the term.  Specifically, notes on law review articles, editorial notes, Commission notes, summaries of opinions of the Attorney General, indexes, analyses, title, chapter, article, part, and subpart captions or headings, and catchlines of Code sections are all annotations of the Official Code of Georgia, but listed as separate from "annotations."  Judicial summaries and summaries of research references are not listed despite also being Official Code of Georgia annotations.  Accordingly, in its responses, Commission defines "O.C.G.A." as "a

321

publication containing the Official Code of Georgia and annotations to the Official Code," wherein "annotations" refers to all non-statutory elements of the publication. Commission further objects to this interrogatory on the grounds that it seeks information that is not relevant to the claims or defenses of the parties because it seeks information regarding copyrights in works that are not being asserted in this litigation.

Subject to and without waiving these objections, Commission states that it does not claim copyright in the O.C.G.A. statutory text and numbers of Titles, Chapters, Articles, Parts, Subparts, and Code Sections. In this litigation, Commission asserts its copyrights in the Asserted Works.


**INTERROGATORY NO. 3:** *Describe in detail the process by which the Commission creates the Commission notes of the O.C.G.A. and the extent to which Matthew Bender and Company, a member of the LexisNexis Group, a division of Reed Elsevier Properties, Inc., is involved in their creation.*

**RESPONSE:** Commission objects to Public Resource's definition of the term "Commission" as overly broad and unduly burdensome. Commission's responses will be made only on behalf of the Code Revision Commission on behalf of and for the benefit of the General Assembly of Georgia, and the State of Georgia. Commission also objects to Public Resource's definition of "O.C.G.A." as unclear

322

and misleading because Public Resource separately lists "annotations" and certain items that are encompassed by the term "annotations," but not other items encompassed by the term.  Specifically, notes on law review articles, editorial notes, Commission notes, summaries of opinions of the Attorney General, indexes, analyses, title, chapter, article, part, and subpart captions or headings, and catchlines of Code sections are all annotations of the Official Code of Georgia, but listed as separate from "annotations."  Judicial summaries and summaries of research references are not listed despite also being Official Code of Georgia annotations.  Accordingly, in its responses, Commission defines "O.C.G.A." as "a publication containing the Official Code of Georgia and annotations to the Official Code," wherein "annotations" refers to all non-statutory elements of the publication. Commission also objects to this interrogatory on the grounds that it seeks information that is not relevant to the claims or defenses of the parties because it seeks information regarding the Code Commission notes, which are not included in the Asserted Works.  No information is being provided in response to this interrogatory.

**INTERROGATORY NO. 4:** *Identify those state- and county-operated facilities at which a member of the public could access the complete, annotated O.C.G.A.*

323

*for free, including, but not limited to, state and county libraries, state universities, high and junior high schools, state prisons, etc.*

**RESPONSE:** Commission objects to Public Resource's definition of "identify" and its requirement for "the present or last known address of each established place of business, and the officers and/or partners of each entity" as being overly burdensome with respect to the state and county facilities identified. Commission provides the name, city, state and zip code of each facility, which is the information in the possession of the Commission. Commission objects to Public Resource's definition of "O.C.G.A." as unclear and misleading. Specifically, Public Resource separately lists "annotations" and multiple items that are encompassed by the term "annotations," making it unclear to what "annotations" refers. Specifically, notes on law review articles, editorial notes, Commission notes, summaries of opinions of the Attorney General, indexes, analyses, title, chapter, article, part, and subpart captions or headings; and catchlines of Code sections are all annotations of the Official Code of Georgia, but listed as separate from "annotations." Judicial summaries and summaries of research references are not listed despite also being Official Code of Georgia annotations. Accordingly, in its responses, Commission defines "O.C.G.A." as "a publication containing the Official Code of Georgia and annotations to the Official Code," wherein "annotations" refers to all non-statutory elements of the publication.

324

Commission further objects to this interrogatory on the grounds that the term "complete, annotated O.C.G.A." as used in this interrogatory is vague, ambiguous and misleading. The term O.C.G.A. is an acronym for the Official Code of Georgia Annotated, and accordingly, Commission cannot discern to what an annotated form of the already annotated Official Code of Georgia would refer. Commission further objects to this interrogatory as being overly burdensome and seeking information that is not relevant to the claims or defense of the parties and not proportional to the needs of the case. More specifically, "state- and county-operated facilities" are not limited to facilities within Georgia. It would be extremely burdensome, if not impossible, for Commission to identify any and all state- and county-operated facilities anywhere in the U.S. at which a member of the public could access the O.C.G.A. for free. It is also impossible for the Commission to determine the onsite-O.C.G.A. accessibility conditions within a state- or county-operated facility within the State of Georgia.

Subject to and without waiving these objections, Commission states that a CD-ROM Edition of the O.C.G.A. is provided by LexisNexis for free on a yearly basis to state- and county-operated facilities such as state and county libraries, state universities, and county law enforcement offices within the State of Georgia as follows.

1. Dekalb County Law Library, Decatur, Georgia 30030

2.  Carroll County Law Library, Carrollton, Georgia 30117

3.  Douglas County Law Library, Douglasville, Georgia 30134

4.  Hall County Law Library, Gainesville, Georgia 30501

5.  Turner County Law Library, Ashburn, Georgia 31714

6.  Thomas County Law Library, Thomasville, Georgia 31799

7.  Grady County Law Library, Cairo, Georgia 39827

8.  Bulloch County Law Library, Statesboro, Georgia 30460

9.  Cook County Law Library, Adel, Georgia 31620

10. Tattnall County Law Library, Reidsville, Georgia 30453

11. Laurens County Law Library, Dublin, Georgia 31040

12. Toombs County Law Library, Lyons, Georgia 30436

13. Tift County Law Library, Tifton, Georgia 31794

14. Douglas County Law Library, Douglasville, Georgia 30134

15. Wilkes County Law Library, Washington, Georgia 30673

16. Muscogee County Law Library, Columbus, Georgia 31901

17. Chattooga County Law Library, Summerville, Georgia 30747

18. Barrow County Law Library, Winder, Georgia 30680

19. Baldwin County Law Library, Milledgeville, Georgia 31061

20. Oconee County Law Library, Watkinsville, Georgia 30677

21. Jefferson County Law Library, Louisville, Georgia 30434

22. Richmond County Law Library, Augusta, Georgia 30901

23. Wilkinson County Law Library, Irwinton, Georgia 31042

24. Clayton County Law Library, Jonesboro, Georgia 30236

25. Lincoln County Law Library, Lincolnton, Georgia 30817

26. Chatham County Law Library, Savannah, Georgia 31401

27. Appling County Law Library, Baxley, Georgia 31513

28. White County Law Library, Cleveland, Georgia 30528

29. Lowndes County Law Library, Valdosta, Georgia 31603

30. Coffee County Law Library, Douglas, Georgia 31533

31. Cherokee County Law Library, Canton, Georgia 30114

32. Cobb County Law Library, Marietta, Georgia 30090

33. Catoosa County Law Library, Ringgold, Georgia 30736

34. Jasper County Law Library, Monticello, Georgia 31064

35. Dade County Law Library, Trenton, Georgia 30752

36. Heard County Law Library, Franklin, Georgia 30217

37. Gwinnett County Law Library, Lawrenceville, Georgia 30046

38. Columbia County Law Library, Evans, Georgia 30809

39. Putnam County Law Library, Eatonton, Georgia 31024

40. Hall County Law Library, Gainesville, Georgia 30501

41. Irwin County Law Library, Ocilla, Georgia 31774

42. Mercer University School of Law, Macon, Georgia 31207

43. Georgia State University, Atlanta, Georgia 30303

44. University of Georgia School of Law, Athens, Georgia 30602

45. University of Georgia Institute of Continuing Legal Education, Athens, Georgia 30603

46. University of Georgia, Vinson Institute of Government, Athens, Georgia 30602

47. Institute of Community and Area Development, Athens, Georgia 30602

48. Abraham Baldwin Agricultural College, Tifton, Georgia 31794

49. Coastal Georgia Community College, Brunswick, Georgia 31520

50. Dekalb College Library, Clarkston, Georgia 30021

51. Roberts Memorial Library, Cochran, Georgia 31014

52. North Metro Tech, Acworth, Georgia 30102

53. Armstrong State College, Savannah, Georgia 31419

54. Georgia Southwestern State University, Americus, Georgia 31709

55. Augusta State University, Augusta, Georgia 30904

56. Gordon College, Barnesville, Georgia 30204

57. East Georgia College Library, Swainsboro, Georgia 30401

58. Dekalb County Police Department, Lithonia, Georgia 30058

59. Gwinnett County Police Department, Lawrenceville, Georgia 30043

60. Georgia Department of Corrections, Forsyth, Georgia 31029

61. Georgia Board of Pardons and Paroles, Atlanta, Georgia 30334

62. Henry County Sheriff's Department, McDonough, Georgia 30253

63. Cherokee County Sheriff's Office, Canton, Georgia 30115

64. Ware County Sherriff's Office, Waycross, Georgia 31503

**INTERROGATORY NO. 5:** *Identify the total revenue the Commission received in 2014 from the following sources: (1) royalties from sales of the printed bound volumes of the O.C.G.A.; (2) royalties from the licensing fees of the CD-ROM of the O.C.G.A.; and (3) royalties from the licensing of the on-line version of the O.C.G.A.*

**RESPONSE:** Commission objects to Public Resource's definition of the term "Commission" as overly broad and unduly burdensome. Commission's responses will be made only on behalf of the Code Revision Commission on behalf of and for the benefit of the General Assembly of Georgia, and the State of Georgia. Commission objects to Public Resource's definition of "O.C.G.A." as unclear and misleading. Specifically, Public Resource separately lists "annotations" and multiple items that are encompassed by the term "annotations," making it unclear to what "annotations" refers. Specifically, notes on law review articles, editorial notes, Commission notes, summaries of opinions of the Attorney General, indexes,

329

analyses, title, chapter, article, part, and subpart captions or headings; and catchlines of Code sections are all annotations of the Official Code of Georgia, but listed as separate from "annotations." Judicial summaries and summaries of research references are not listed despite also being Official Code of Georgia annotations.  Accordingly, in its responses, Commission defines "O.C.G.A." as "a publication containing the Official Code of Georgia and annotations to the Official Code," wherein "annotations" refers to all non-statutory elements of the publication.

Subject to and without waiving these objections, Commission states that it does not receive revenue from royalties from the sales of printed bound volumes of the O.C.G.A. Commission will provide information regarding the royalties it received in 2014 from the licensing fees of the CD-ROM of the O.C.G.A. and the licensing of the on-line version of the O.C.G.A. within six weeks of the date specified by Public Resource in its First Set of Interrogatories.  This time period is reasonable as it gives Commission one week from the end of the current legislative session to provide the information.

**INTERROGATORY NO. 6:** *Identify all facts, documents, or other information on which you rely to support the assertion in Paragraphs 29 and 35 of the Amended Complaint that "there is no adequate remedy at law" for Plaintiff.*

**RESPONSE:** Commission objects to Public Resource's definition of the term "you" as overly broad and unduly burdensome. Commission's responses will be made only on behalf of the Code Revision Commission on behalf of and for the benefit of the General Assembly of Georgia, and the State of Georgia. Commission also objects to Public Resource's definition of the term "documents" to the extent that it encompasses e-mail correspondence. Public Resource has not propounded specific discovery requests for e-mails as required by and stipulated to in the Joint Preliminary Report and Discovery Plan. (Dkt. No. 012, Item No. 11(b)(1)) Commission further objects to this interrogatory since it improperly calls for legal conclusions.

Subject to and without waiving these objections, Commission states the following: Commission owns copyrights in the Asserted Works, which are found in seventy seven (77) O.C.G.A. volumes and supplements. The Asserted Works were published and sold for a fee as parts of the O.C.G.A., a serial publication. The owner of a copyright has the exclusive right to reproduce the copyrighted work in copies, to prepare derivative works based upon the copyrighted work, and to distribute copies of the copyrighted work pursuant to 17 U.S.C. § 106. In contravention of Commission's exclusive rights, Public Resource has on multiple occasions copied, made derivative works of, and distributed via the internet, on multiple websites, the entirety of all 77 O.C.G.A. volumes and supplements that

331

contain the Asserted Works, including front and back covers.  Public Resource has

facilitated, enabled, encouraged and induced others to view, download, print, copy,

further distribute and produce derivative works of each and every Asserted Work

without compensation to the Commission. The uncontrollable nature and the extent

of this past infringement by Public Resource could never be compensated or

redressed by damages.  Any attempt by the Commission to obtain compensation

for the damages caused by this past infringement would require multiple lawsuits

against multiple parties in multiple jurisdictions.  Furthermore, Public Resource

has demonstrated its intention to continue to infringe, and to continue to induce

others to infringe, the copyrights in the Asserted Works and future editions of the

O.C.G.A. by copying and distributing additional editions of the O.C.G.A. after the

filing of the present lawsuit.  This continued infringement falls squarely within

Public Resource's established history of taking steps to cause policy change and

force entities, including copyright owners, to yield to its demands.  Public

Resource itself praises the act of deliberate, continued and extremely wide

distributions of documents via the internet in order to ensure that the documents

are "copied thousands of times." *See* Dkt. No. 001-02.  Public Resource further

indicates that there is "power" in putting such "large document archives online.

Aggressively."  *Id*.  Public Resource simply will not stop seeking its desired policy

changes, and will not stop infringing Commission's copyrights in the O.C.G.A.,

until it is forced to do so by a court of law via the issuance of a permanent

injunction. Consequently any available legal remedy would not be adequate.

Commission further identifies the following documents: Amended

Complaint and Exhibits (Dkt. Nos. 011 and 011-1 through 011-6); Stipulation of

Facts and Exhibits (Dkt. Nos. 017 and 017-1 through 017-13); COMM000001,

COMM000042; COMM000044; and PRO-000564.


**INTERROGATORY NO. 7:** *Identify all facts, documents, or other information*

*on which you rely to support the assertion in Paragraphs 29 and 35 of the*

*Amended Complaint that "Defendant's conduct will continue to cause severe and*

*irreparable harm to Plaintiff."*

**RESPONSE:** Commission objects to Public Resource's definition of the term

"you" as overly broad and unduly burdensome.  Commission's responses will be

made only on behalf of the Code Revision Commission on behalf of and for the

benefit of the General Assembly of Georgia, and the State of Georgia.

Commission also objects to Public Resource's definition of the term "documents"

to the extent that it encompasses e-mail correspondence.  Public Resource has not

propounded specific discovery requests for e-mails as required by and stipulated to

in the Joint Preliminary Report and Discovery Plan. (Dkt. No. 012, Item No.

11(b)(1)) Commission further objects to this interrogatory since it improperly calls for legal conclusions.

Subject to these objections, Commission states the following: Commission owns copyrights in the Asserted Works.  The Asserted Works were published and sold for a fee as parts of the O.C.G.A., a serial publication.  The owner of a copyright has the exclusive right to reproduce the copyrighted work in copies, to prepare derivative works based upon the copyrighted work, and to distribute copies of the copyrighted work pursuant to 17 U.S.C. § 106. In contravention of Commission's exclusive rights, Public Resource has on multiple occasions copied, made derivative works of, and distributed via the internet the Asserted Works. Public Resource has facilitated, enabled, encouraged and induced others to view, download, print, copy and distribute each Asserted Work without charging a fee for the Asserted Works and without compensation to the Commission.  Public Resource will continue its infringing activity, unless enjoined by this Court. The Commission has experienced and will experience irreparable harm because there is no adequate remedy at law for the widespread infringement caused by Public Resource as indicated in Commission's response to Interrogatory No. 6, which is hereby incorporated by reference.

Commission further identifies the following documents: Amended Complaint and Exhibits (Dkt. Nos. 011 and 011-1 through 011-6); Stipulation of

Facts and Exhibits (Dkt. Nos. 017 and 017-1 through 017-13); COMM000001,
COMM000042; COMM000044; and PRO-000564.


**INTERROGATORY NO. 8:** *Identify all facts, documents, or other information*
*on which you rely to support the assertion in Paragraph 2 of the Amended*
*Complaint that "[w]ithout providing the publisher the ability to recoup its costs*
*for the development of these copyrighted annotations, the State of Georgia will be*
*required to either stop publishing the annotations altogether or pay for*
*development of the annotations using state tax dollars."*

**RESPONSE**: Commission objects to Public Resource's definition of the term
"you" as overly broad and unduly burdensome.  Commission's responses will be
made only on behalf of the Code Revision Commission on behalf of and for the
benefit of the General Assembly of Georgia, and the State of Georgia.
Commission also objects to Public Resource's definition of the term "documents"
to the extent that it encompasses e-mail correspondence.  Public Resource has not
propounded specific discovery requests for e-mails as required by and stipulated to
in the Joint Preliminary Report and Discovery Plan. (Dkt. No. 012, Item No.
11(b)(1))

Subject to and without waiving these objections, Commission states the
following: Commission owns copyrights in the Asserted Works that were

335

developed pursuant to a work for hire agreement with the publisher, LexisNexis. The Asserted Works were published and sold for a fee as parts of the O.C.G.A., a serial publication.  LexisNexis bears its own costs for development of the Asserted Works in the O.C.G.A. and bears the O.C.G.A. publication costs.  LexisNexis receives revenue from the sales of the O.C.G.A. that contain the Asserted Works. LexisNexis is a for-profit company. The Commission's operations are funded by state tax dollars. An increase in the Commission's operations in order to develop its own Asserted Works (or works similar to the Asserted Works) in the O.C.G.A. would require increased funding or would cause the Commission to stop creating the Asserted Works.

Commission further identifies at least the following documents: Amended Complaint and Exhibits (Dkt. Nos. 011 and 011-1 through 011-6); Stipulation of Facts and Exhibits (Dkt. Nos. 017 and 017-1 through 017-13); COMM000001, COMM000042; and COMM000044.


**INTERROGATORY NO. 9:** *Identify all facts, documents, or other information on which you rely to support the assertion in Paragraph 2 of the Amended Complaint that "[u]nless Defendant's infringing activities are enjoined, Plaintiff and the citizens of the State of Georgia, will face losing valuable analysis and guidance regarding their state laws."*

**<u>RESPONSE</u>:** Commission objects to Public Resource's definition of the term "you" as overly broad and unduly burdensome.  Commission's responses will be made only on behalf of the Code Revision Commission on behalf of and for the benefit of the General Assembly of Georgia, and the State of Georgia. Commission also objects to Public Resource's definition of the term "documents" to the extent that it encompasses e-mail correspondence.  Public Resource has not propounded specific discovery requests for e-mails as required by and stipulated to in the Joint Preliminary Report and Discovery Plan. (Dkt. No. 012, Item No. 11(b)(1))

Subject to and without waiving these objections, Commission states the following: Commission owns copyrights in the Asserted Works that were developed pursuant to a work for hire agreement with the publisher, LexisNexis. The Asserted Works were published and sold for a fee as parts of the O.C.G.A., a serial publication.  The owner of a copyright has the exclusive right to reproduce the copyrighted work in copies, to prepare derivative works based upon the copyrighted work, and to distribute copies of the copyrighted work pursuant to 17 U.S.C. § 106. In contravention of Commission's exclusive rights, Public Resource has on multiple occasions copied, made derivative works of, and distributed via the internet the Asserted Works.  Public Resource has facilitated, enabled, encouraged and induced others to view, download, print, copy and distribute each Asserted

337

Work without compensation to the Commission.  LexisNexis bears its own costs for development of the Asserted Works in the O.C.G.A. and bears the O.C.G.A. publication costs.  LexisNexis receives monies from the sales of the O.C.G.A. that contain the Asserted Works.  LexisNexis is a for-profit company. If Lexis Nexis is not compensated for the creation and publication of the Asserted Works and/or works similar to the Asserted Works ("Annotations"), it is unlikely that they will continue to create and publish the Annotations.  The Commission's operations are funded by state tax dollars. An increase in the Commission's operations due to its own development of Official Code of Georgia Annotations would require increased funding.  Such increase funding may not be available.  Thus the Commission may not be able to create and publish the Annotations.  If Lexis Nexis does not create and publish the Annotations and the Commission is unable to obtain additional funding, the public will lose the benefit of reviewing those Annotations.

Commission further identifies at least the following documents: Amended Complaint and Exhibits (Dkt. Nos. 011 and 011-1 through 011-6); Stipulation of Facts and Exhibits (Dkt. Nos. 017 and 017-1 through 017-13); COMM000001, COMM000042; and COMM000044.

**INTERROGATORY NO. 10:** *Identify all facts, documents, or other information on which you rely to support any contention regarding the effect of Public Resource's use of the O.C.G.A. upon the potential market for, or value of, the copyrighted works.*

**RESPONSE:** Commission objects to Public Resource's definition of the term "you" as overly broad and unduly burdensome.  Commission's responses will be made only on behalf of the Code Revision Commission on behalf of and for the benefit of the General Assembly of Georgia, and the State of Georgia.  Commission also objects to Public Resource's definition of the term "documents" to the extent that it encompasses e-mail correspondence.  Public Resource has not propounded specific discovery requests for e-mails as required by and stipulated to in the Joint Preliminary Report and Discovery Plan. (Dkt. No. 012, Item No. 11(b)(1)) Commission further objects to this interrogatory since it improperly calls for legal conclusions.

Subject to and without waiving these objections, Commission states the following: Commission owns copyrights in the Asserted Works.  The Asserted Works were published and sold for a fee as parts of the O.C.G.A., a serial publication.  The owner of a copyright has the exclusive right to reproduce the copyrighted work in copies, to prepare derivative works based upon the copyrighted work, and to distribute copies of the copyrighted work pursuant to 17

U.S.C. § 106. In contravention of Commission's exclusive rights, Public Resource has on multiple occasions copied, made derivative works of, and distributed via the internet the Asserted Works.  Public Resource has facilitated, enabled, encouraged and induced others to view, download, print, copy and distribute each Asserted Work without charging a fee for the Asserted Works and without compensation to the Commission.  As a result of Public Resource making the copyrighted Asserted Works available to the public for free, the ability of Lexis Nexis to market the Asserted Works and/or works similar to the Asserted Works ("Annotations") for a fee will be effected and its sales of the Annotations as part of the O.C.G.A. will be reduced.

Commission further identifies at least the following documents: Amended Complaint and Exhibits (Dkt. Nos. 011 and 011-1 through 011-6); Stipulation of Facts and Exhibits (Dkt. Nos. 017 and 017-1 through 017-13); COMM000001, COMM000042; and COMM000044.


February 18, 2016                    *s/Anthony B. Askew/*
                                     Anthony B. Askew (G.A. Bar: 025300)
                                     Lisa C. Pavento (G.A. Bar: 246698)
                                     Warren Thomas (G.A. Bar: 164714)
                                     Meunier Carlin & Curfman LLC
                                     999 Peachtree Street, NE, Suite 1300
                                     Atlanta, Georgia 30309
                                     Phone: 404-645-7700
                                     Fax: 404-645-7707
                                     taskew@mcciplaw.com

lpavento@mcciplaw.com
wthomas@mcciplaw.com

*Counsel for the Plaintiff, Code Revision
Commission on behalf of and for the
benefit of the General Assembly of
Georgia, and the State of Georgia*

## CERTIFICATE OF SERVICE

I certify that on Thursday, February 18, 2016, the foregoing PLAINTIFF

COMMISSION'S RESPONSE TO DEFENDANT

PUBLIC.RESOURCE.ORG, INC.'S FIRST SET OF INTERROGATORIES

was sent to counsel for Defendant Public.Resource.Org by electronic mail at the

addresses listed below.

> Elizabeth H. Rader
> ALSTON & BIRD LLP
> 950 F Street, NW
> Washington, DC 20004
> elizabeth.rader@alston.com
>
> Jason D. Rosenberg
> Sarah Parker LaFantano
> ALSTON & BIRD LLP
> One Atlantic Center
> 1201 West Peachtree Street
> Atlanta, GA 30309-3424
> jason.rosenberg@alston.com
> sarah.lafantano@alston.com

> By:    *s/Anthony B. Askew/*
>        Anthony B. Askew
>        Meunier Carlin & Curfman LLC
>        999 Peachtree Street, NE, Suite 1300
>        Atlanta, Georgia 30309
>        Phone: 404-645-7700
>        Fax: 404-645-7707
>        taskew@mcciplaw.com

342

# TAB 44

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

CODE REVISION COMMISSION                    :
and STATE OF GEORGIA,                             :
                                    :
    Plaintiffs,                                      :
                                      :    CIVIL ACTION NO.
    v.                                                    :    1:15-CV-2594-RWS
                                      :
PUBLIC.RESOURCE.ORG, INC.,                  :
                                      :
    Defendant.                                      :

**<u>ORDER</u>**

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 29] and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 30].

**I.    Factual Background**

Plaintiff Code Revision Commission ("Commission") is composed of the Lieutenant Governor, four members of the Senate, the Speaker of the House of Representatives, four additional members of the House of Representatives, and four members appointed by the State Bar of Georgia, one of whom is a judge or senior judge of the State Superior Courts and one of whom is a State district attorney.  O.C.G.A., Foreword at x.  The Commission assists the Georgia

AO 72A
(Rev.8/8
2)

legislature in publishing the laws it enacts in the Official Code of Georgia ("O.C.G.A.") [Doc. No. 29-1, ¶ 12, admitted; Doc. No. 17, ¶ 82]. The Commission was created by the General Assembly in 1977 and was tasked with selecting a publishing firm "possessing the necessary expertise and manpower to accomplish a complete remodification [of the state's laws] as quickly as possible." O.C.G.A., Foreword at ix-x. From five law publishers, the Commission selected The Michie Company to prepare and publish what would become the O.C.G.A. and entered into a contract. Id. at x.

The Commission itself developed the uniform numbering system and rules of style used in the new (1981) Code and adopted an arrangement into 53 Code titles. Id. at xi. Upon completion of the editorial process, a manuscript entitled the *Code of Georgia 1981 Legislative Edition* was prepared, presented to the General Assembly, and enacted at the 1981 extraordinary session of the General Assembly [Doc. No. 29-1, ¶ 19, admitted]. Annotations, indexes, editorial notes, and other materials have been added to that manuscript to produce the O.C.G.A., the first official Code to be published under authority of the State of Georgia since the Code of 1933 [Id.].

On October 3, 2006, the Commission issued a Request for Proposals, and

2

AO 72A
(Rev.8/8
2)

344

on December 27, 2006, the Commission entered a new Agreement for Publication ("Agreement") with Matthew Bender & Co. Inc. ("Lexis/Nexis") [Doc. No. 29-1, ¶ 20, admitted; Doc. No. 29-8]. The Agreement requires the official Code to include not only the statutory provisions, but also "annotations, captions, catchlines, headings, history lines, editorial notes, cross-references, indices, title and chapter analyses, research references, amendment notes, Code Commission notes, and other material related to or included in such Code at the direction of the Commission" [Doc. No. 29-8, p. 2]. Each O.C.G.A. volume and supplement therefore contains statutory text and non-statutory annotation text, including judicial decision summaries, editor's notes, research references, notes on law review articles, summaries of the opinions of the Attorney General of Georgia, indexes, and title, chapter, article, part, and subpart captions, which are all prepared by Lexis/Nexis under the requirements of the Agreement [Doc. No. 17, ¶¶ 1-3, 9, 18, and 26].

The Agreement provides that the Commission, not its hired publisher, has "the ultimate right of editorial control" both over all material contained in the O.C.G.A. and over what material is selected to become part of the O.C.G.A. [Doc. No. 29-8, p. 2]. The Agreement requires Lexis/Nexis to follow the Commission's

3

AO 72A
(Rev.8/8
2)

detailed publication manual, which "reflect[s] those specific content, style and publishing standards of the Code as adopted, approved or amended from time to time by the Commission or its staff pursuant to Code Section 28-9-3 of the Official Code of Georgia Annotated" [Id.]. Additionally, the Agreement requires that Lexis/Nexis summarize "all published opinions of the Georgia Supreme Court and the Court of Appeals of Georgia, and all published opinions of the United States Supreme Court and other federal courts that arose in Georgia and construed Georgia general statutes, whether such decisions favor plaintiffs, defendants, or the prosecution" [Id., p. 4]. The Agreement similarly provides that research references and legislative history are included in the O.C.G.A. [Id., pp. 5-6].

The Agreement requires that Lexis/Nexis provide Georgia's statutes in an un-annotated form on a website that the public can access for free using the Internet [Doc. No. 29-8, pp. 12-13; Doc. No. 17, ¶¶ 73-75]. The free public website contains only the statutory text and numbering of the O.C.G.A. [Doc. No. 17, ¶¶ 73, 75]. The Agreement requires Lexis/Nexis to track usage of the un-annotated Code and to report annually to the Commission the amount of usage and the effect of subscriptions to the Code in print and on CD-ROM [Doc. No. 29-8, p. 13]. The Agreement requires Lexis/Nexis to provide appropriate copyright

4

AO 72A
(Rev.8/8
2)

notice on both the free public website and the online O.C.G.A. available as part of the Lexis/Nexis for-profit online services and to notify visitors that any reproduction of the O.C.G.A. other than the statutory text and numbering is prohibited [Doc. No. 29-8, p. 13].

In Georgia, Lexis/Nexis has the exclusive right to publish and sell the O.C.G.A. as a printed publication, on CD-ROM and in an online version, and Lexis/Nexis receives income from its sales of the O.C.G.A. [Doc. No. 17, ¶¶ 84-85]. The Commission, however, only receives royalties from the licensing fee for the CD-ROM and online versions of the O.C.G.A. [Doc. No. 29-1, ¶ 37, admitted]. In fiscal year 2014, the Commission received $85,747.91 in licensing fee royalties [Id., ¶ 38, admitted].

To make the O.C.G.A., including the annotations, available on the Internet, Public Resource purchased all 186 printed volumes and supplements of the O.C.G.A., scanned them all, and then posted those copies on its website: https://law.resource.org [Doc. No. 17, ¶¶ 34-36]. Public Resource also distributed copies of the entirety of the O.C.G.A. contained on USB thumb drives to the Speaker of the House, Georgia House of Representatives, Mr. Wayne Allen, Legislative Counsel, Office of Legislative Counsel, Georgia General Assembly,

5

AO 72A
(Rev.8/8
2)

and other members of the State of Georgia legislature [Id., ¶¶ 63-64]. Public Resource actively encourages all citizens to copy, use, and disseminate the O.C.G.A. volumes and to create works containing them [Doc. No. 29-1, ¶ 74, admitted].

This action was filed on July 21, 2015 [Doc. No. 1]. On October 8, 2015, Plaintiffs filed an Amended Complaint with claims for direct and indirect copyright infringement [Doc. No. 11]. Plaintiffs seek injunctive relief and removal of any infringing materials from the Internet [Id.]. Defendant filed a Counterclaim which seeks a judgment of non-infringement [Doc. No. 16].

After the Commission commenced this action, Public Resource purchased and copied the 2015 volumes and supplements of the O.C.G.A. and posted them on its website [Id., ¶ 46]. In addition, Public Resource posted the copies on the Internet archive website, www.archive.org [Id., ¶¶ 50-52, 54-56].

## II.    Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . .

6

AO 72A
(Rev.8/8
2)

court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But the court is bound only to draw those inferences that are reasonable.

7

AO 72A
(Rev.8/8
2)

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## III.    Analysis

Defendant has filed a Motion for Summary Judgment [Doc. No. 29]. Plaintiffs have filed a Motion for Partial Summary Judgment [Doc. No. 30] because Plaintiffs do not request judgment as to the 2015 works, which at the time of briefing were yet to be registered.  In support of its motion, Defendant contends that the Court should grant summary judgment for two reasons: (1) the annotations to the O.C.G.A. are not copyrightable due to the unusual circumstances in Georgia in which the O.C.G.A., the only official Code of Georgia, includes the annotations; and (2) even if the annotations are copyrightable, Defendant's use

8

AO 72A
(Rev.8/8
2)

350

constitutes a non-infringing fair use of the copyrighted work.

### A.    Copyrightability of the O.C.G.A.

In order to establish a case of direct copyright infringement, Plaintiffs must demonstrate that: (1) they own a valid copyright in the allegedly infringing works, and (2) that Defendant copied the protected elements of the works. Peter Letterese & Assocs. v. World Inst. of Scientology Enters., Int'l, 533 F.3d 1287, 1300 (11th Cir. 2008) (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)).  The parties have stipulated that, outside of the works published in 2015, each of the O.C.G.A. works is the subject of a copyright registration [Doc. No. 17, ¶ 17].  A certificate of copyright registration made within five years after first publication of the work constitutes "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1233 (11th Cir. 2010); 17 U.S.C. § 410(c).  Production of these registrations shifts the burden to Defendant to establish that the registered works are not copyrightable.  Latimer, 601 F.3d at 1233.

The Copyright Act extends protection to copyright owners "in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise

9

AO 72A
(Rev.8/8
2)

communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). The Supreme Court instructs that the amount of originality required to extend copyright protection to a work is exceedingly low, that only a "modicum of creativity" is needed, and that copyright protection will be provided to the work "no matter how crude, humble or obvious it might be." Feist, 499 U.S. at 345-46.

The Copyright Act itself specifically lists "annotations" in the works entitled to copyright protection. 17 U.S.C. § 101. A long line of cases recognizes copyright protection for annotated cases and statutes. See, e.g., W.H. Anderson Co. v. Baldwin Law Pub. Co., 27 F.2d 82 (6th Cir. 1928); Lawrence v. Dana, 15 F. Cas. 26 (C.C.D. Mass. 1869). Moreover, the United States Copyright Office's own treatise expressly recognizes the protectability of annotations. U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES §§ 313.6(C)(2), 717.1 (3d ed. 2014) (stating also that "[a] legal publication that analyzes, annotates, summarizes, or comments upon a legislative enactment, a judicial decision, an executive order, an administrative regulation, or other edicts of government may be registered as a non-dramatic literary work"). In fact, the Copyright Office has a long history of registering annotated statutes, such as Copyright Reg. AA000020419 for Vernon's Annotated Statutes of the State of

10

AO 72A
(Rev.8/8
2)

Texas and Copyright Reg. TX0008001813 for Annotated Statutes of New Mexico 2015 Advance Code Service. Defendant admits that annotations in an unofficial Code would be copyrightable [Doc. No. 17-4, p. 2].

Here, Defendant argues that these annotations to the O.C.G.A. are not copyrightable, but the Court disagrees. The Court acknowledges that this is an unusual case because most official codes are not annotated and most annotated codes are not official. The annotations here are nonetheless entitled to copyright protection. The Court finds that Callaghan v. Myers, 128 U.S. 617 (1888), in which the Court found annotations in a legal reporter were copyrightable by the publisher, is instructive. Defendant itself has admitted that annotations in an unofficial reporter would be copyrightable, and the Court finds that the Agreement does not transform copyrightable material into non-copyrightable material.

Furthermore, a transformation of an annotation into one uncopyrightable unit with the statutory text would be in direct contradiction to current Georgia law. The U.S. Copyright Office has stated: "As a matter of longstanding public policy, the U.S. Copyright Office will not register a government edict that has been issued by any state." Compendium of U.S. Copyright Office Practices § 313.6(C)(2) (3d ed. 2014). However, the Copyright Compendium makes clear that the Office may

11

AO 72A
(Rev.8/8
2)

register annotations that summarize or comment upon legal materials unless the annotations have the force of law. Only those government documents having the force of law are uncopyrightable. Id.

The entire O.C.G.A. is not enacted into law by the Georgia legislature and does not have the force of law. The Georgia General Assembly has passed not just one but three different statutes to make clear that the O.C.G.A. contains both law and commentary. O.C.G.A. § 1-1-1 distinguishes the statutory and non-statutory commentary portions of the O.C.G.A.:

> The statutory portion of the codification of Georgia laws prepared by the Code Revision Commission and the Michie Company pursuant to a contract entered into on June 19, 1978, is enacted and shall have the effect of statutes enacted by the General Assembly of Georgia. The statutory portion of such codification shall be merged with annotations, captions, catchlines, history lines, editorial notes, cross-references, indices, title and chapter analyses, and other materials pursuant to the contract and shall be published by authority of the state pursuant to such contract and when so published shall be known and may be cited as the "Official Code of Georgia Annotated."

O.C.G.A. § 1-1-7 first enacted as a session law in 1982 further states:

> Unless otherwise provided in this Code, the descriptive headings or catchlines immediately preceding or within the text of the individual Code sections of this Code, except the Code section numbers included in the headings or catchlines immediately preceding the text of the Code sections, and title and chapter analyses do not constitute part of the law and shall in no manner limit or expand the

12

AO 72A
(Rev.8/8
2)

354

construction of any Code section. All historical citations, title and chapter analyses, and notes set out in this Code are given for the purpose of convenient reference and do not constitute part of the law.

Finally, the State of Georgia sessions laws include the following:

Annotations; editorial notes; Code Revision Commission notes; research references; notes on law review articles; opinions of the Attorney General of Georgia; indexes; analyses; title, chapter, article, part, and subpart captions or headings, except as otherwise provided in the Code; catchlines of the Code sections or portions thereof, except as otherwise provided in the Code; and rules and regulations of state agencies, departments, boards, commissions, or other entities which are contained in the Official Code of Georgia Annotated are not enacted as statutes by the provisions of this Act.

2014 Ga. Laws 866, 2015 Ga. Laws 5, § 54.

Finally, Defendant has argued that the merger doctrine applies here and bars copyrightability. Under the merger doctrine, "expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." BUC Int'l Corp. v. Int'l Yacht Council Ltd., 489 F.3d 1129, 1142 (11th Cir. 2007) (internal quotation marks omitted). Such is not the case here. The mere fact that the judicial summaries in the O.C.G.A. are distinctly different from corresponding annotations in West's Code Annotated belies the applicability of the merger doctrine. There is no question that there are a multitude of ways to write a

13

AO 72A
(Rev.8/8
2)

paragraph summarizing a judicial decision, and further, a multitude of ways to compile the different annotations throughout the O.C.G.A. Therefore, the Court finds that the merger doctrine is inapplicable here.

For the reasons discussed above, the Court finds that the annotations of the O.C.G.A. are copyrightable.

### B.    Fair Use

Since the Court has found that the annotations of the O.C.G.A. are entitled to copyright protection, the Court will now address Defendant's arguments regarding fair use. A claim of fair use is an affirmative defense with the burden of proof on the putative infringer. See Harper & Row, Publishers v. Nation Enters., 471 U.S. 539, 562 (1985); Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1280 (11th Cir. 2014). In determining whether application of the fair use doctrine is appropriate, the Copyright Act mandates the review of four factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. These four

14

AO 72A
(Rev.8/8
2)

statutory factors are not to be treated in isolation from one another. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994). Rather, "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." Id. at 578.

### i.    Purpose and character of the use

The first factor that the Court must consider is the purpose and character of Defendant's use of the copyrighted work. The Court must consider multiple factors, including (1) the extent to which the use is "transformative" rather than merely a superseding use of the original work, and (2) whether the use is for a nonprofit educational purpose, as opposed to a commercial purpose. Peter Letterese & Assocs. v. World Inst. of Scientology Enters., 533 F.3d 1287, 1309 (11th Cir. 2008). The Eleventh Circuit instructs:

> A transformative work is one that adds something new, with a further purpose or different character, altering the first work with new expression, meaning or message. On the other hand, a work that is not transformative, and that merely supersedes the objects of the original creation, is less likely to be entitled to the defense of fair use because of the greater likelihood that it will supplant the market for the copyrighted work, fulfilling demand for the original.

Id. at 1310 (internal citations and quotation marks omitted).

Defendant does not transform the annotations. It does not add, edit, modify,

15

AO 72A
(Rev.8/8
2)

comment on, criticize, or create any analysis or notes of its own. Defendant's justification in support of its verbatim copying and free distribution without authorization is that it purports to provide wider distribution of the annotations. Courts have routinely rejected arguments that this is transformative use. See, e.g., Author's Guild, Inc. v. HathiTrust, 755 F.3d 87, 101 (2d Cir. 2014) ("[T]he district court concluded that the 'use of digital copies to facilitate access for print-disabled persons is a transformative' use. This is a misapprehension; providing expanded access to the print disabled is not 'transformative'") (citation omitted)); Seltzer v. Green Day, Inc., 725 F.3d 1170, 1177 (9th Cir. 2013) ("In the typical 'non-transformative' case, the use is one which makes no alteration to the expressive content or message of the original work." (emphasis omitted)). Defendant's verbatim copying and posting of the annotations is expressly designed to supplant the O.C.G.A. as already distributed and made available online by Lexis/Nexis, which is not transformative.

The Court must also consider whether Defendant's use is for a nonprofit educational purpose, as opposed to a commercial purpose. That Defendant is a nonprofit does not end the inquiry pursuant to § 107(1). The Supreme Court has explained that "[t]he crux of the profit/nonprofit distinction is not whether the sole

16

AO 72A
(Rev.8/8
2)

358

motive of the use is monetary gain but whether the user stands to profit from

exploitation of the copyrighted material without paying the customary price."

Harper & Row, 471 U.S. at 562.  Courts in several cases have found that

educational use of copyrighted works by a nonprofit entity (or an individual

associated with such an entity) was commercial even though the secondary user

was not selling the items in question; "profit" may take the form of an indirect

economic benefit or a non-monetary, professional benefit. See, e.g., Soc'y of Holy

Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 61 (1st Cir. 2012)

(finding that the first factor weighed against fair use where an archbishop used

copyrighted translations of a religious text on his website; although the use was

educational, the archbishop profited from the use, in part, in the form of enhanced

professional reputation; Worldwide Church of God v. Phila. Church of God, Inc.,

227 F.3d 1110, 1118 (9th Cir. 2000) (finding the first factor weighed against fair

use where a religious organization distributed copies of a copyrighted book for use

in its religious observance; the use was nontransformative, and although the use

was educational, the organization profited indirectly by using the work to attract

new members who would tithe ten percent of their income); Weissmann v.

Freeman, 868 F.2d 1313, 1324 (2d Cir. 1989) (finding that the first factor weighed

17

AO 72A
(Rev.8/8
2)

against fair use where a professor claimed an assistant's paper as his own work and copied it for use in his class, under the professor's name, because the professor profited from the use by enhancing his professional reputation and gaining a valuable authorship credit).

In this case, Defendant's business involves copying and providing what it deems to be "primary legal materials" on the Internet. Defendant is paid in the form of grants and contributions to further its practice of copying and distributing copyrighted materials. Defendant has also published documents that teach others how to take similar actions with respect to government documents. Therefore, the Court finds that Defendant "profits" by the attention, recognition, and contributions it receives in association with its copying and distributing the copyrighted O.C.G.A. annotations, and its use was neither nonprofit nor educational.

### ii.    Nature of the copyrighted work

The second factor that the Court must consider is the nature of the copyrighted work. The selection, writing, editing, statutory commentary, and creativity of the annotations requires skill and analysis in reviewing a wealth of materials and drafting original materials to inform and educate users about courts

18

AO 72A
(Rev.8/8
2)

and agencies applying the Georgia code and their citation in third party materials. The creation of the annotations requires a tremendous amount of work from a team of editors. These efforts confirm that the annotations are original works entitled to broad copyright protection.

The fact that the annotations contain fact and not fiction does not end the inquiry for fair use purposes. Indeed, the Eleventh Circuit admonished the district court in <u>Patton</u> for exactly this approach:

> Here, the District Court held that "because all of the excerpts are informational and educational in nature and none are fictional, fair use factor two weights in favor of Defendants. <u>Cambridge Univ. Press</u>, 863 F.Supp.2d at 1242. We disagree. . . . Accordingly, we find that the District Court erred in holding that the second factor favored fair use in every instance. Where the excerpts of Plaintiffs' works contained evaluative, analytical, or subjectively descriptive material that surpasses the bare facts necessary to communicate information, or derives from the author's experiences or opinions, the District Court should have held that the second factor was neutral, or even weighed against fair use in cases of excerpts that were dominated by such material.

<u>Patton</u>, 769 F.3d 1269-1270. The annotations in this case contain exactly the evaluative, analytical, or subjectively descriptive analysis and guidance that the Eleventh Circuit addressed in <u>Patton</u>. Thus, the second factor is, at best, neutral as between these parties.

19

AO 72A
(Rev.8/8
2)

### iii.    Amount and substantiality of the portion used

The third factor that the Court must consider is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). A court must ask whether the defendant has "helped [itself] overmuch to the copyrighted work in light of the purpose and character of the use." Peter Letterese, 533 F.3d at 1314 (quoting Campbell, 510 U.S. at 587). This factor recognizes that the more of a copyrighted work that is taken in quantity and quality, the less likely the use is to be fair. See Harper & Row, 471 U.S. at 565 (holding that the third factor disfavored fair use because the defendant copied a qualitatively substantial portion of the original work, even though the defendants copied only approximately 300 words out of the 200,000 words in the plaintiffs' work). Indeed, where a defendant "uses virtually all of a copyrighted work, the fair use defense drifts even further out of its reach." Pac. & S. Co. v. Duncan, 744 F.2d 1490, 1497 (11th Cir. 1984). In this case, Defendant has misappropriated every single word of every annotation using a bulk industrial electronic scanner.

### iv.    Effect on the potential market

The fourth factor that the Court must consider is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).

20

AO 72A
(Rev.8/8
2)

The "central question" is whether, assuming that everyone engaged in the defendant's conduct, the use "would cause substantial economic harm such that allowing [the conduct] would frustrate the purposes of copyright by materially impairing [the] incentive to publish the work." Patton, 769 F.3d at 1276. The Supreme Court has expressly stated that this factor forms the most central inquiry of the fair use doctrine. Harper & Row, 471 U.S. at 566 (stating "[t]his factor is undoubtedly the single most important element of fair use").

Plaintiffs have established the markets for the O.C.G.A. works: printed publications, CD-ROM, and subscription services. When considering Defendant's actions being performed by everyone, it is inevitable that Plaintiffs' markets would be substantially adversely impacted. A judicial decree that Defendant's wholesale copying of the copyrighted annotations constitutes a fair use would hinder the economic viability of creating and maintaining the O.C.G.A. because people would be less likely to pay for annotations when they are available for free online.

Additionally, Lexis/Nexis's sole revenue to recoup the costs of preparation of the annotations is through hard copy sales and licensing online access to the O.C.G.A. as permitted by the Agreement. Because Defendant has copied every

21

AO 72A
(Rev.8/8
2)

word of the annotations verbatim and posted them free of charge, Defendant's misappropriation destroys Lexis/Nexis's ability to recover these costs. See Patton, 769 F.3d at 1275 ("Because Defendants' use is nontransformative and fulfills the educational purposes that Plaintiffs, at least in part, market their works for, the threat of market substitution here is great and thus the fourth factor looms large in the overall fair use analysis."). The revenues from such licensing reinforce the value of the O.C.G.A. and the damage that would be inflicted if the entire O.C.G.A. were made available for free.

>        **v.    Conclusion**

The Court has weighed all of the Campbell factors and finds that at least three of the four factors weigh in favor of Plaintiffs and against Defendant. As a result, the Court concludes that Defendant has not met its burden of proving fair use, and Plaintiffs are entitled to partial summary judgment.

**IV.    Conclusion**

Defendant's Motion for Summary Judgment [Doc. No. 29] is DENIED. Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 30] is GRANTED. The parties are ORDERED to confer and to submit to the Court, within 14 days, a proposed briefing schedule to address the injunctive relief to which Plaintiffs are

<div align="center">22</div>

AO 72A
(Rev.8/8
2)

<div align="center">364</div>

entitled as a result of the foregoing decision.

   **SO ORDERED**, this _23 ʳᵈ_ day of March, 2017.

                                    **RICHARD W. STORY**
                                    United States District Judge

23

AO 72A
(Rev.8/8
2)

365

# TAB 45

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION on behalf of and for the benefit of THE GENERAL ASSEMBLY OF GEORGIA, and THE STATE OF GEORGIA,<br><br>        Plaintiff,<br><br>        v.<br><br>PUBLIC.RESOURCE.ORG, INC.<br><br>        Defendant. | CIVIL ACTION NO.<br><br>1:15-CV-2594-RWS |

## JOINT MOTION FOR ENTRY OF
## <u>PROPOSED PERMANENT INJUNCTION ORDER</u>

Plaintiff and Counterclaim-Defendant the Code Revision Commission, on behalf of and for the benefit of the General Assembly of Georgia, and the State of Georgia ("Commission"), and Defendant and Counterclaim-Plaintiff Public.Resource.Org, Inc. ("Public Resource") jointly move for the Court to enter the below Proposed Permanent Injunction Order following this Court's Order on March 23, 2017 (Dkt. No. 44) granting Commission's Motion for Partial Summary Judgment.  On March 23, 2017, upon learning of the Court's Order, Public Resource took down all versions of the O.C.G.A. from its website and any other website within its possession, custody, or control.  Public Resource has also

1

366

removed all fundraising solicitations for its use of the O.C.G.A. from its website and any other website within its possession, custody, or control and from its web server.

The Parties submit this Joint Motion in lieu of a proposed briefing schedule to address the injunctive relief to which Commission is entitled.

Respectfully submitted, this 6th day of April, 2017.

/s/Anthony B. Askew

Anthony B. Askew (G.A. Bar: 025300)
Lisa C. Pavento (G.A. Bar: 246698)
Warren Thomas (G.A. Bar: 164714)
Meunier Carlin & Curfman LLC
999 Peachtree Street, NE, Suite 1300
Atlanta, Georgia 30309
Phone: 404-645-7700
Fax: 404-645-7707
taskew@mcciplaw.com
lpavento@mcciplaw.com
wthomas@mcciplaw.com

/s/Elizabeth H. Rader (*w/express permission*)

Elizabeth H. Rader (*pro hac vice*)
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Telephone: 202-239-3008
Fax: (202) 239-3333
elizabeth.rader@alston.com

Jason D. Rosenberg
Georgia Bar No. 510855
Sarah Parker LaFantano
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone 404-881-7461
Fax (404) 253-8811
jason.rosenberg@alston.com
sarah.lafantano@alston.com

*Counsel for the Plaintiff, Code Revision Commission on behalf of and for the benefit of the General Assembly of Georgia, and the State of Georgia*

*Counsel for the Defendant, Public.Resource.Org*

2

367

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that, pursuant to L.R. 5.1C and 7.1D of the Northern District of Georgia, the foregoing JOINT MOTION FOR ENTRY OF PROPOSED PERMANENT INJUNCTION ORDER complies with the font and point selections approved by the Court in L.R. 5.1C. The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

/s/Anthony B. Askew
Anthony B. Askew (G.A. Bar: 025300)
Meunier Carlin & Curfman LLC
999 Peachtree Street NE, Suite 1300
Atlanta, Georgia 30309
Telephone: 404-645-7700
Email: taskew@mcciplaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 6, 2017, I electronically filed the foregoing JOINT

MOTION FOR ENTRY OF PROPOSED PERMANENT INJUCTION

ORDER with the Clerk of Court using the CM/ECF system, which constitutes

service of the filed document on all counsel of record in this proceeding under LR

5.1(A)(3), N.D. Ga.


By:    /s/Anthony B. Askew_____
       Anthony B. Askew (G.A. Bar: 025300)

4

369

# TAB 45-1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CODE REVISION COMMISSION on
behalf of and for the benefit of THE
GENERAL ASSEMBLY OF
GEORGIA, and THE STATE OF
GEORGIA,

        Plaintiff,

        v.

PUBLIC.RESOURCE.ORG, INC.

        Defendant.

CIVIL ACTION NO.

1:15-CV-2594-RWS

## [PROPOSED] PERMANENT INJUNCTION ORDER

The Court, having entered an Order on March 23, 2017 granting Plaintiff's

Motion for Partial Summary Judgment, with respect to Plaintiff's works that were

registered with the United States Copyright Office at the time of briefing, hereby

issues the following injunctive relief:

Defendant is permanently enjoined from all unauthorized use, including

through reproduction, display, distribution, or creation of derivative works, of the

Official Code of Georgia Annotated (O.C.G.A.).  Defendant is FURTHER

ORDERED to remove all versions of the O.C.G.A. from its website and any other

website within its possession, custody, or control within seven days, wherein

"remove" means deletion from the website and wherein merely making the

1

370

O.C.G.A. versions inaccessible does not amount to a removal of said versions.

Defendant may continue to use, in relation to its court submissions, excerpts from

versions for the O.C.G.A. that were filed by either party as exhibits to, or quoted

in, documents filed with the Court through the ECF system and presently available

on the PACER system, and which are part of the record in this case,.  Defendant is

FURTHER ORDERED to remove all fundraising solicitations for the Defendant's

unauthorized use, including through reproduction, display, distribution, or creation

of derivative works, of the O.C.G.A. from its website and any other website within

its possession, custody, or control within seven days.

IT IS SO ORDERED, this _____ day of _____, 2017.

_____

UNITED STATES DISTRICT JUDGE

NORTHERN DISTRICT OF GEORGIA

2

371

# TAB 52

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

CODE REVISION COMMISSION and
STATE OF GEORGIA ,

            Plaintiffs,

v.

PUBLIC.RESOURCE.ORG, INC.,

            Defendant.

CIVIL ACTION FILE

NO. 1:15-CV-2594-RWS

**J U D G M E N T**

This action having come before the court, Honorable  Richard W. Story, United States District Judge, for consideration of the plaintiffs' motion for partial summary judgment and the court having granted said motion, and granted the parties' joint motion for permanent injunction, it is,

Ordered and Adjudged that this action be and the same hereby is **dismissed**.

Dated at Atlanta, Georgia, this 7th day of April, 2017.

JAMES N. HATTEN
CLERK OF COURT

By:   s/*Barbara D. Boyle*
          Deputy Clerk

Filed and Entered:
April 7, 2017
in the Clerk's Office
 James N. Hatten
Clerk of Court

By: B. D. Boyle
      Deputy Clerk

372

# TAB CS

## **CERTIFICATE OF SERVICE**

I CERTIFY that on May 24, 2017, I electronically filed the foregoing APPELLANTS' APPENDIX with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter.

<div style="margin-left: 40%;">
/s/ Sarah P. LaFantano
Sarah P. LaFantano
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Sarah.lafantano@alston.com

*Counsel for Appellant*
</div>