No. 17-11589-HH

IN THE

# United States Court of Appeals for the Eleventh Circuit

CODE REVISION COMMISSION, ET AL.,

*Plaintiffs/Appellees,*

*v.*

PUBLIC.RESOURCE.ORG, INC.

*Defendant/Appellant.*

On Appeal from the U.S. District Court for Northern District of Georgia,

## BRIEF OF NEXT-GENERATION LEGAL RESEARCH PLATFORMS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT/APPELLANT

Phillip R. Malone
Jeffrey T. Pearlman
Erica Sollazzo*
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: 650-725-6369
Fax: 650-723-4426
*LR 46-11 Eligible Law Student

*Attorneys for Amici Curiae*

*Public.Resource.Org., Inc. v. Code Revision Commission et al.*    No. 17-11589-HH

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* state that they have no parent corporation and that no publicly held corporation holds 10% or more of their stock.

The following list of interested persons is provided pursuant to 11th Circuit Rule 26.1-1.

1. Arredondo, Pablo (Vice President of Legal Research, Casetext)

2. Carver, Brian (Cofounder & Member, Board of Directors, Free Law Project)

3. Casetext

4. Free Law Project

5. Gurari, Itai (Cofounder & CEO, Judicata)

6. Hulce, Megan (Certified Law Student, Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic)

7. Judicata

8. Kraft, Seamus (Executive Director, Cofounder & President of the Board, The OpenGov Foundation)

9. Lissner, Michael (Executive Director & CTO, Free Law Project)

10. Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic

*Public.Resource.Org., Inc. v. Code Revision Commission et al.*   No. 17-11589-HH

11. Malone, Phillip (Director of the Stanford Law School Juelsgaard

    Intellectual Property and Innovation Clinic and Counsel of Record for

    *Amici*)

12. The OpenGov Foundation

13. Pearlman, Jef (Clinical Supervising Attorney and Lecturer in Law in the

    Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic

    and Counsel for *Amici*)

14. Ravel

15. Reed, Nik (Cofounder & COO, Ravel)

16. Safdie, Laura (COO & General Counsel, Casetext)

17. Sollazzo, Erica (Certified Law Student, Stanford Law School Juelsgaard

    Intellectual Property and Innovation Clinic)

18. Story, Richard (U.S. District Judge below)

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................C-1

TABLE OF AUTHORITIES .................................................................. ii

INTEREST OF *AMICI CURIAE* ...........................................................1

STATEMENT OF ISSUES ....................................................................3

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT .....................................................................................5

I.    The Official Code of Georgia Annotated Is Part of the Law of Georgia and
      Is Not Copyrightable.................................................................5

      A.    The agreement between LexisNexis and Georgia's Code Revision
            Commission gives the state control over the entire statutory code,
            including its annotations.................................................5

      B.    The state's own characterization of the O.C.G.A. as authoritative
            confirms that it is the only official law of Georgia. ...............7

II.   Both the Public at Large and Legal Research Innovators Must Have Full
      Access to the Official Law. ........................................................8

      A.    Copyright in state statutes chills innovation and restrains valuable
            competition in the market for legal research tools and services. ..........9

      B.    The uncertainty surrounding the copyrightability of state statutes has
            hindered *amici's* development of groundbreaking legal research tools
            that would benefit judges, attorneys, and the public...........................11

III.  Public Resource's Scanning and Posting of the O.C.G.A. Is Fair Use. ........21

      A.    The district court failed to consider and properly credit the
            transformative aspects of Public Resource's activities. ....................22

      B.    The district court erred when it considered only the amount taken and
            failed to acknowledge that the amount was reasonable in relation to
            Public Resource's purpose. .............................................24

CONCLUSION....................................................................................29

CERTIFICATE OF COMPLIANCE.......................................................30

CERTIFICATE OF SERVICE ...............................................................31

i

# TABLE OF AUTHORITIES

## Cases

*Authors Guild v. Google, Inc.,*
    804 F.3d 202 (2d Cir. 2015) .......................................................................... 22, 26

*Authors Guild, Inc. v. Hathitrust,*
    755 F.3d 87 (2d Cir. 2014) ....................................................................................26

*Banks v. Manchester,*
    128 U.S. 244 (1888) ................................................................................................5

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
    448 F.3d 605 (2d Cir. 2006) ..................................................................................26

*Bruzzone v. Miller Brewing Co.,*
    No. C-78-2055, 1979 WL 1070 (N.D. Cal. May 25, 1979) .................................27

*Cambridge Univ. Press v. Patton,*
    769 F.3d 1232 (11th Cir. 2014) .............................................................................25

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994) ....................................................................... 22, 25, 26, 29

*Hustler Magazine Inc. v. Moral Majority Inc.,*
    796 F.2d 1148 (9th Cir. 1986) ...............................................................................27

*Katz v. Google Inc.,*
    802 F.3d 1178 (11th Cir. 2015) .................................................................... 25, 26

*Kelly v. Arriba Soft Corp.,*
    336 F.3d 811 (9th Cir. 2003) .................................................................................26

*Núñez v. Caribbean Int'l News Corp.,*
    235 F.3d 18 (1st Cir. 2000) ...................................................................................26

*O'Neal Constr. Co. v. Lexington Developers, Inc.,*
    240 S.E.2d 856 (Ga. 1977) ......................................................................................8

*Online Policy Grp. v. Diebold, Inc.,*
    337 F. Supp. 2d 1195 (N.D. Cal. 2004) ................................................................24

*Perdue v. Baker*,
586 S.E.2d 606 (Ga. 2003) ....................................................................8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007)..............................................................26

*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*,
533 F.3d 1287 (11th Cir. 2008)............................................................22

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ............................................................................25

*Westview Cemetery, Inc. v. Blanchard*,
216 S.E.2d 776 (Ga. 1975) ....................................................................8

*Wheaton v. Peters*,
33 U.S. 591 (1834) ................................................................................5

*Williams & Wilkins Co. v. United States*,
420 U.S. 376 (1975) ............................................................................27

*Williams & Wilkins Co. v. United States*,
487 F.2d 1345 (Ct. Cl. 1973)...............................................................27

**Statutes**

17 U.S.C. § 107 ........................................................................... 22, 25

Ga. Code Ann. § 1-1-1 .................................................................. 7, 10

**Other Authorities**

Beth Ford, *Open Wide the Gates of Legal Access*, 93 Or. L. Rev. 539 (2014).......10

*CARA Legal Research Software Wins 2017 AALL New Product Award*,
American Association of Law Libraries (May 9, 2017),
https://www.aallnet.org/hc/NewsCallout/AALL-Recognizes-Casetexts-
CARA-for-2017-New-Product-Award.pdf ...........................................18

Carolyn Elefant, *Part II: Casetext Is Three-Dimensional Research—Watch How
a Real Lawyer Uses It*, MyShingle (May 16, 2017), http://myshingle.com/
2017/05/articles/web-tech/part-ii-casetext-three-dimensional-research-watch-
real-lawyer-uses...................................................................................18

Casetext, https://casetext.com (last visited May 24, 2017) .....................................16

*Fenwick Launches Casetext's AI Litigation Research Tool*, Fenwick & West
    LLP (Feb. 9, 2017), https://www.fenwick.com/media/pages/fenwick-
    launches-casetexts-ai-litigation-research-tool.aspx...............................................18

Free Law Project, https://free.law (last visited May 24, 2017) ...............................19

*Harry Locklin v. City of Lafayette*, Judicata, https://www.judicata.com/demo/
    color (last visited May 24, 2017)...........................................................................15

Judge Kevin Burke, *An Exciting Opportunity for Judges to Get Good, Solid
    Research*, American Judges Association (May 16, 2017),
    http://blog.amjudges.org/?p=5968..........................................................................17

Judicata, https://www.judicata.com (last visited May 24, 2017)..............................15

Letter from Carl Malamud, President & Founder, Public.Resource.Org, to Larry
    A. Schemmel, Special Assistant Att'y Gen., State of Miss. (Oct. 11,
    2013),  https:// www.documentcloud.org/documents/804618-ms-gov-
    20131011.html.........................................................................................................11

Letter from Larry A. Schemmel, Special Assistant Att'y Gen., State of Miss., to
    Carl Malamud, President & Founder, Public.Resource.Org (Apr. 21, 2017),
    https://law.resource.org/pub/us/code/ms/ms.gov.20170421.pdf.............................11

*Ravel Law Wins 2016 AALL New Product Award*, American Association of
    Law Libraries (May 6, 2016), https://www.aallnet.org/hc/NewsCallout/
    2016news/Ravel-Law-Wins-2016-AALL-New-Product-Award.pdf. .................13

Ravel, http://ravellaw.com (last visited May 24, 2017)............................................12

Robert Ambrogi, *Upsetting the Applecart of Legal Research*, Above the Law
    (May 15, 2017, 6:15 PM), http://abovethelaw.com/2017/05/upsetting-the-
    applecart-of-legal-research/?rf=1 .......................................................................3, 9

The OpenGov Foundation, https://opengovfoundation.org (last visited May 24,
    2017)........................................................................................................................20

## INTEREST OF *AMICI CURIAE*

*Amici* are nonprofit and for-profit creators and developers of next-generation legal research platforms that provide innovative tools and services for the legal community and the public.[1] These tools serve the public interest by dramatically transforming the ways in which the public, courts, law firms, and lawyers access, understand, and utilize the law.[2]

*Amicus* Ravel is a platform that empowers attorneys to go beyond conventional research using artificial intelligence and visualization. Ravel provides many innovative features: case law maps; language technology that identifies key passages in cases; and Judge, Court, Motion, and Law Firm Analytics. Ravel's effectiveness depends on having access to comprehensive, authoritative, and up-to-date primary legal information—especially statutes and case law.

*Amicus* Judicata "maps the legal genome" and provides research and analytic tools to turn unstructured case law into structured and easily digestible data. Judicata's color-mapping research tool fundamentally transforms how people interact with the law: it increases reading comprehension and speed, illuminates the

---

[1] No counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici*, their members, and their counsel, made monetary contribution to the preparation or submission of this brief.

[2] *Amici* wish to thank Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic Certified Law Student Megan Hulce for her substantial assistance in drafting this brief.

connections among cases, and makes the law more accessible to both lawyers and nonlawyers.

*Amicus* Casetext is a legal technology company that provides information and research services to litigators, leveraging artificial intelligence and the expertise of the legal community to rebalance the scales of justice. Its CARA software automates legal research tasks by using artificial intelligence and machine-learning technologies to analyze litigation documents and algorithmically query the law, using the Casetext research database of federal and state law.

*Amicus* Free Law Project is a nonprofit organization seeking to create a more just legal system. To accomplish that goal, Free Law Project provides free, public, and permanent access to primary legal materials on the Internet for educational, charitable, and scientific purposes. Its work empowers citizens to understand the laws that govern them by creating an open ecosystem for legal materials and research. Free Law Project also supports academic research by developing, implementing, and providing public access to technologies useful for research.

*Amicus* OpenGov Foundation produces cutting-edge civic software used by elected officials and citizens in governments across the United States. The Foundation seeks to ensure that laws are current, accessible, and adaptable. Everything the Foundation creates is free and open source, allowing the public to use, contribute to, and benefit from its work. Its software, coalition-building

activities, and events are designed to change the culture of government and boost collaboration between governments and communities.

## STATEMENT OF ISSUES

Whether an official statutory code, including annotations, created as a work for hire for a state under the direct supervision of state officers can be protected by copyright.

Whether the distribution of an official statutory code, including annotations, in order to further criticism, analysis, and practice of the law and encourage public engagement with the law is a fair use.

## SUMMARY OF ARGUMENT

After years of dominance by a handful of entrenched incumbents, technology has enabled a "golden age of legal research innovation." Robert Ambrogi, *Upsetting the Applecart of Legal Research*, Above the Law (May 15, 2017, 6:15 PM), http://abovethelaw.com/2017/05/upsetting-the-applecart-of-legal-research/?rf=1. *Amici* are creators of such technology. Innovators like *amici* and others have created tools that empower all in the legal field: judges, large law firms, small practitioners, and individual citizens. Not only do *amici* work toward the goal of leveling the field to increase access to justice, but they also seek to improve the overall quality of legal advocacy. However, uncertainty over the copyright of state statutes hangs as a cloud over *amici's* development of these tools and has either slowed down or altogether

3

prevented their ability to expand their coverage of statutory law to jurisdictions like Georgia. No *amicus* has access to all state statutes, and many have been forced to expand slowly and with caution to ensure that their inclusion of state statutes does not implicate concerns over erroneous assertions of copyright over official statutory material.

Georgia not only requires citizens to follow its laws, but it also purports to possess total control over the O.C.G.A.'s distribution and the manner in which the public may access the O.C.G.A.—thus forbidding appellant Public Resource and entities like *amici* from using and sharing the text with others except in the place and form determined by the state. This restriction of access to and transformative uses of the official law harms innovation in the legal research space and, worse, withholds meaningful access to the law from the public at large and from users of *amici*'s innovative and transformative services.

If Georgia's position prevails, it could provide only print access to the O.C.G.A., take the O.C.G.A. offline entirely, charge any fees it wishes for access, or distribute the O.C.G.A. only to those who agree to onerous terms and conditions. Georgia already refuses to license the O.C.G.A. to anyone other than LexisNexis. When it comes to something as fundamental as the law itself, the public and legal innovators like *amici* must be permitted to freely use, transform, and distribute the

law to the public in novel and innovative ways, not only in the very limited manner

dictated by the state.

## ARGUMENT

### I.    The Official Code of Georgia Annotated Is Part of the Law of Georgia and Is Not Copyrightable

The O.C.G.A., including its annotations, is Georgia's official statement of the

law and is thus not copyrightable. In contracting with a third-party publisher,

Georgia attempts to circumvent the well-established principle that edicts of

government may not be copyrighted. *See Banks v. Manchester*, 128 U.S. 244, 253

(1888); *Wheaton v. Peters*, 33 U.S. 591, 668 (1834). This novel arrangement,

however, does not change the fact that the annotations are an integral, inseparable

part of the official law of Georgia.

### A.    *The agreement between LexisNexis and Georgia's Code Revision Commission gives the state control over the entire statutory code, including its annotations.*

The contractual relationship between LexisNexis and Georgia demonstrates

that the annotations are effectively the work of Georgia and its Code Revision

Commission, an arm of the state.[3] Under the Commission's agreement with

LexisNexis, the entire O.C.G.A. is deemed a work for hire, making the Commission

---

[3] The Commission was created by Georgia's General Assembly in 1977 and assists the state legislature in publishing the O.C.G.A. Def.'s Mot. Summ. J. ¶¶ 12-13. The Commission is composed of the Lieutenant Governor, four state senators, the Speaker of the House, four state representatives, and four members appointed by the Georgia State Bar. *Id.* ¶ 16.

the official "author" for copyright purposes. Def.'s Mot. Summ. J. Exh. F, § 6.1(a), at 21 (Doc. No. 29). Several provisions in this agreement enumerate the detailed standards LexisNexis must satisfy while performing its work. For example, LexisNexis must publish the O.C.G.A. in conformity with the "specific content, style, and publishing standards" of the Commission's *Publication Manual for the Official Code of Georgia Annotated. Id.* § 1.1(f), at 2.

The Commission also closely supervises the preparation of the O.C.G.A. The agreement specifies that the Commission retains the "ultimate right of editorial control over all material contained in the Code." *Id.* § 1.1(e), at 2. If any disagreement were to arise between the Commission and LexisNexis about what material to include, "the decision of the Commission [would] control." *Id.* Indeed, the "final decision as to [the] contents of each volume" belongs to the Commission. *Id.* § 3(a), at 16.

The Commission exercises the same level of control over the annotations to the Code. The agreement not only makes the form of the annotations subject to the Commission's ultimate control, *see id.* § 1.6(a), at 3-4, but it also dictates the content of those annotations, *see id.* § 1.6(b), at 4 ("The Publisher's editors shall take from the cases constructions concerning constitutionality, purpose, intent, and meaning of words and phrases as well as illustrations as to what a particular provision applies and to what a particular provision does not apply."). The annotations are thus

6

prepared under the state's supervision and must be approved by the state, imbuing them with official character. That the Commission did not actually write the annotations does not detract from their official status. LexisNexis is akin to a law clerk working under the supervision of a judge: Once the judge has approved and issued an opinion drafted by her clerk, it is no less official because it did not originate with the judge's pen.

### B. The state's own characterization of the O.C.G.A. as authoritative confirms that it is the only official law of Georgia.

Georgia has also indicated, in a variety of settings, that the O.C.G.A. is the only official law of the state. When the O.C.G.A. was published in 1981, the State Deputy Legislative Counsel in charge of the Code Revision Division stated: "The important point to remember is that the Official Code of Georgia Annotated will be the official publication of the general laws of this state . . . . [I]t is this Code that will be cited in state publications." Def.'s Mot. Summ. J. Exh. E, at 5. The *User's Guide to the Official Code of Georgia, Annotated*, published by the Legislative Counsel, instructs attorneys to cite to the O.C.G.A. instead of unofficial codes. Def.'s Mot. Summ. J. ¶¶ 40-41. The O.C.G.A. itself contains a case summary with the heading "Official Code publication controls over unofficial compilation." Ga. Code Ann. § 1-1-1, note (Judicial Decisions). This summary warns attorneys who cite unofficial publications that they do so "at their peril." *Id.* (quoting a vacated Northern District of Georgia case).

The state judiciary has recognized the official character of the O.C.G.A. annotations. Several Georgia courts have relied on the annotations as authoritative sources of legislative history when conducting statutory interpretation. *See, e.g.*, *Perdue v. Baker*, 586 S.E.2d 606, 608 n.7 (Ga. 2003); *O'Neal Constr. Co. v. Lexington Developers, Inc.*, 240 S.E.2d 856, 857 (Ga. 1977); *Westview Cemetery, Inc. v. Blanchard*, 216 S.E.2d 776, 781 (Ga. 1975) (Hill, J., dissenting). In *O'Neal Construction*, for instance, a Georgia Supreme Court judge cited to the "editorial comment" to O.C.G.A. § 22-403(b) as evidence of a statute's purpose. 240 S.E.2d at 857.

The Commission's agreement with LexisNexis, Georgia's own pronouncements, and the Georgia judiciary all acknowledge—and even emphasize—the official character of the O.C.G.A. and its accompanying annotations. This official character distinguishes the O.C.G.A. from other annotated codes prepared independently and at arms-length by private publishers. Because the O.C.G.A. annotations constitute the official, state-sanctioned interpretation of Georgia law, they are not copyrightable.

## II.   Both the Public at Large and Legal Research Innovators Must Have Full Access to the Official Law.

After years of dominance by a few giants, technology has enabled significant innovation in legal research, prompting some to label this "the golden age of legal research innovation." Robert Ambrogi, *Upsetting the Applecart of Legal Research*,

Above the Law (May 15, 2017, 6:15 PM), http://abovethelaw.com/2017/05/
upsetting-the-applecart-of-legal-research/?rf=1. Innovators like *amici* have created
tools that empower all in the legal field: judges, large law firms, small practitioners,
and citizens. Not only do *amici* work toward the goal of leveling the field to increase
access to justice, but they also seek to raise the entire field to improve the quality of
legal advocacy. However, uncertainty over the copyright of state statutes hangs as a
cloud over *amici's* development of these tools and has either slowed down or
altogether prevented their ability to expand into jurisdictions like Georgia. No
*amicus* has access to all state statutes, and many have been forced to expand slowly
and with caution to ensure that their inclusion of state statutes does not implicate
dubious assertions of copyright and to avoid burdensome lawsuits.

### A.    *Copyright in state statutes chills innovation and restrains valuable competition in the market for legal research tools and services.*

Withholding access to the official law of a state chills this innovation and
interferes with what is otherwise a newly invigorated competition in the legal
research market. For example, one research tool, Fastcase, partnered with the State
Bar of Georgia to provide its service to all registered Georgia attorneys. Def.'s Mot.
Summ. J. ¶ 60 (Doc. No. 29). Fastcase sought to provide these attorneys with the
official Code because "it is the version of these edicts of government promulgated
by the State of Georgia." *Id.* ¶ 64. Georgia, however, refused to license the O.C.G.A.
to Fastcase "at any price"—despite Fastcase's connection to the State Bar and its

admirable efforts to ensure that all Georgia attorneys can access the law on a sophisticated platform regardless of financial resources. *Id.* ¶ 62.

Fastcase is thus relegated to providing the attorneys of Georgia with an unofficial version of the law, which attorneys must cite "at their peril." Ga. Code Ann. § 1-1-1, note (Judicial Decisions) (quoting a vacated Northern District of Georgia case). By restricting access to the official law of the state, Georgia has limited what would be valuable competition in the legal research market and prevented emerging products and services from competing with LexisNexis in the quality of research tools.

A decision upholding the copyrightability of the O.C.G.A. in this case could further reduce competition in this market by leading other states to limit access to their official statutes. Such fears are not hypothetical. Mississippi has an arrangement with LexisNexis similar to Georgia's, and Public Resource published the Mississippi Code of 1972 Annotated to provide access to the official law of Mississippi. Mississippi demanded that Public Resource remove the material, but Public Resource declined due to a belief that "the Official Code . . . falls squarely in the category of the law, which all citizens have the right to read, know, and speak." Beth Ford, *Open Wide the Gates of Legal Access*, 93 Or. L. Rev. 539, 555 (2014) (quoting Letter from Carl Malamud, President & Founder, Public.Resource.Org, to

Larry A. Schemmel, Special Assistant Att'y Gen., State of Miss. 1 (Oct. 11, 2013), https:// www.documentcloud.org/documents/804618-ms-gov-20131011.html).

Within one month of the district court's decision in this case, Mississippi sent Public Resource a letter renewing its demands that Public Resource take down the official code. In the letter, the Attorney General specifically cited the district court's decision as the authority for the demand. Letter from Larry A. Schemmel, Special Assistant Att'y Gen., State of Miss., to Carl Malamud, President & Founder, Public.Resource.Org 1 (Apr. 21, 2017), https://law.resource.org/pub/us/code/ms/ ms.gov.20170421.pdf. If the decision below in this case stands, more states may attempt to restrict access to the official laws of their jurisdiction.

     **B.**    *The uncertainty surrounding the copyrightability of state statutes has hindered* amici's *development of groundbreaking legal research tools that would benefit judges, attorneys, and the public.*

The innovative tools and services being developed by *amici* and other legal startups and providers serve the public interest by dramatically transforming the ways in which the public, courts, law firms, and lawyers access, understand, and utilize the law. These tools seek to radically improve the quality of legal research and representation with the ultimate goal of increasing access to justice. However, their progress has been hindered by the uncertainty surrounding the copyrightability of state statutes. No *amicus* has access to all state statutes, and none have the bandwidth to invest the resources needed to examine and, if necessary, challenge,

the copyright status of each state's official code. These problems have delayed public access to these innovative tools that aim to increase the overall efficiency and fairness of the law and have restrained the competition these tools would provide to the current incumbents.

### 1.    Ravel

*Amicus* Ravel is a platform that empowers people to do conventional legal research quickly and efficiently but also to go beyond conventional methods using artificial intelligence and visualization. *See* Ravel, http://ravellaw.com (last visited May 24, 2017). Ravel was designed to provide innovative new features to help answer difficult legal research questions. These features include, for example, case law maps (shown in the image below) that illuminate the citation relationships among cases to quickly identify important precedents and "needles in the haystack." Ravel's language technology identifies key passages in cases based on citations from other cases and collects all interpretations of those passages.



Ravel's Judge, Court, and Motion Analytics tools provide litigators with statistics about how often judges and courts grant roughly one hundred different motions, as well as the cases, courts, and language that judges commonly cite and use in their opinions. The American Association of Law Libraries honored Judge Analytics with the 2016 New Product Award, which recognizes products that "improve access to legal information, the legal research process, or procedures for the technical processing of library materials." *Ravel Law Wins 2016 AALL New Product Award*, American Association of Law Libraries (May 6, 2016), https://www.aallnet.org/hc/NewsCallout/2016news/Ravel-Law-Wins-2016-AALL-New-Product-Award.pdf.

As a research and analytics platform, Ravel's effectiveness depends on having access to the official and complete text of all primary legal information, especially

statutes and case law. Without such information, users could not responsibly rely on the results they find using Ravel or any other legal research or information product. The availability (or lack thereof) of primary legal information has a direct and substantial impact on legal technology innovation. Based on Ravel's experience with technology development and legal information, in order for primary legal information to be "available" in a way that supports innovation, the information must be comprehensive, authoritative, and up-to-date in a machine-readable format with a vendor-neutral citation format. The information must also be free and not subject to copyright or licensing restrictions.

The ability to use state statutes is of direct concern to Ravel. Ravel uses what is currently a limited amount of statutory information in a variety of ways, including search result improvement and in machine-learning algorithms that identify case law topics. Ravel's ability to develop innovative tools for, and using, statutes is hindered by the limited access to statutes at the federal and state levels. In Ravel's experience, jurisdictions that limit the availability of statutes through various means—including assertions of copyright—are impeding new legal search providers like Ravel from developing innovative new tools that can help legal professionals and members of the public.

2.    Judicata

*Amicus* Judicata is a legal technology company that describes its work as "mapping the legal genome." *See* Judicata, https://www.judicata.com (last visited May 24, 2017). It provides research and analytic tools that turn unstructured case law into structured and easily digestible data. For example, Judicata offers an innovative color-mapping research tool that transforms the way people interact with case law. If a reader enables this tool, each case citation within a case will be highlighted in a different color depending on its treatment within the case. *See Harry Locklin v. City of Lafayette*, Judicata, https://www.judicata.com/demo/color (last visited May 24, 2017). This tool, shown in the image below, fundamentally transforms how people interact with the law: it increases reading comprehension and speed, illuminates the connections among cases, and makes the law more accessible to both lawyers and nonlawyers.



Judicata attributes its existence in part to the work performed by Public Resource. To develop its technology, Judicata relied on the legal corpus Public Resource made available online in late 2007. Without these basic legal "building blocks," Judicata could not have built or refined its most innovative tools. Having open access to the law has also enabled Judicata to pursue unexpected research paths and make serendipitous discoveries that will ultimately benefit the legal profession. Judicata could not, for instance, have predicted that it would develop a color-mapping tool when the company was founded.

Judicata's legal research services currently include only California state law, but it plans to expand to other jurisdictions soon. The uncertainty engendered by a state asserting copyright in its official statutory code would inhibit the ability of Judicata or other search providers to expand into coverage of numerous state statutes. Judicata might find itself forced to defer adding coverage of a jurisdiction so long as concerns about copyrightability existed.

### 3. Casetext

*Amicus* Casetext is a legal technology company that provides innovative information and research services to litigators, leveraging artificial intelligence and the expertise of the legal community. *See* Casetext, https://casetext.com (last visited May 24, 2017). Casetext has a dual mission: (1) improve the quality of legal research by making it easier to find the best answer to legal questions and (2) reduce the

16

expense of legal research and, thus, the expense of legal representation. Beyond serving some of the world's largest law firms, Casetext provides free access to the public, and more than one million people take advantage of this opportunity each month. Casetext not only alleviates the cost of basic research for attorneys but also creates access for the pro se and indigent.

Casetext's award-winning software, CARA, automates key legal research tasks by employing artificial intelligence and machine-learning technologies to analyze litigation documents. It then uses that information to algorithmically query the law. This novel form of search allows litigators to find, in seconds, highly relevant authority that many hours of traditional research can miss. CARA builds on the Casetext research database, which gives users access to a library of federal and state law, annotated by expert analysis from leading attorneys and law firms. To function most effectively, CARA depends on having full access to the official, current legal corpus in a structured fashion.

Legal research tools like CARA benefit the entire legal ecosystem, including judges, legal librarians, large firms, solo practitioners, and clients. The American Judges Association noted that CARA "can help judges and their clerks quickly find important case law that the parties may have overlooked." Judge Kevin Burke, *An Exciting Opportunity for Judges to Get Good, Solid Research*, American Judges Association (May 16, 2017), http://blog.amjudges.org/?p=5968. When naming

17

CARA the 2017 New Product Award winner, the American Association of Law Libraries praised CARA for "empower[ing] legal information professionals and their employers with efficient, comprehensive results." *CARA Legal Research Software Wins 2017 AALL New Product Award*, American Association of Law Libraries (May 9, 2017), https://www.aallnet.org/hc/NewsCallout/AALL-Recognizes-Casetexts-CARA-for-2017-New-Product-Award.pdf.

Large law firms like Fenwick & West and Quinn Emanuel have announced their partnership with Casetext as a sign of their commitment to legal innovation. *See, e.g.*, *Fenwick Launches Casetext's AI Litigation Research Tool*, Fenwick & West LLP (Feb. 9, 2017), https://www.fenwick.com/media/pages/fenwick-launches-casetexts-ai-litigation-research-tool.aspx. Solo practitioners have also lauded Casetext and CARA for the much-needed innovation and competition they bring to legal research: "Casetext brings to mind a term that I never thought I would associate with legal research (or most legal tech for that matter): imagination. With technology, . . . who knows where legal research will go next?" Carolyn Elefant, *Part II: Casetext Is Three-Dimensional Research—Watch How a Real Lawyer Uses It*, MyShingle (May 16, 2017), http://myshingle.com/2017/05/articles/web-tech/part-ii-casetext-three-dimensional-research-watch-real-lawyer-uses.

Despite the success of Casetext's innovative tools, the current uncertainty around open access to and use of legal data has created high barriers to entry in the

legal research services market. Having to ask whether official legal materials that appear—and that should be—free and open to the public are subject to possible copyright claims cannot help but chill innovation.

###### 4.    Free Law Project

*Amicus* Free Law Project is a nonprofit that provides free, public, and permanent access to primary legal materials on the Internet for educational, charitable, and scientific purposes for the benefit of the public. *See* Free Law Project, https://free.law (last visited May 24, 2017). Its work empowers citizens to understand the laws that govern them by creating an open ecosystem for legal materials and research. Free Law Project also supports academic research on related technologies, corpora, and legal systems by developing, implementing, and providing public access to technologies useful for scholarly research.

To provide these services, Free Law Project relies on the availability of government documents, unencumbered by copyright. It seeks to collect and freely distribute online all U.S. court opinions, both state and federal, and historical and current. Free Law Project collects current opinions through the Juriscraper project, and it distributes the opinions online through the CourtListener project.

Free Law Project's current services would be improved by open access to state statutes. For instance, scholars might seek to conduct research about how statutes have changed over time. Lawyers and judges also need to know how the text of a

19

statute appeared at the time particular cases were decided. Old versions of statutes have been lost to time as new print volumes replaced the old, which were not preserved. Free Law Project has many ways to serve the public interest through access to state statutes, but uncertainty surrounding potential assertions of copyright over statutes—exemplified by the copyright claims in this case—stands in the way of these goals.

5.    The OpenGov Foundation

*Amicus* OpenGov Foundation produces cutting-edge civic software used by elected officials and citizens in governments across the United States. *See* The OpenGov Foundation, https://opengovfoundation.org (last visited May 24, 2017). The Foundation seeks to ensure that laws are current, accessible, and adaptable. Everything it creates is free and open source, allowing the public to use, contribute to, and benefit from its work. Its software, coalition-building activities, and events are designed to change the culture of government and boost collaboration and openness in governments and communities.

The OpenGov Foundation achieves this goal through projects like Madison and America Decoded. Madison is a platform for lawmakers to share proposed legislation with their citizens, who can easily access the law as it is being written, leave comments, annotate specific content, and interact with other civic-minded participants. State Decoded software provides jurisdictions with a user-friendly

platform for their citizens to access local, state, and federal legal codes. Implemented in places like Virginia and San Francisco, the searchable platform is organized by article and section and features scroll-over definitions that translate legal jargon into common English. While The OpenGov Foundation continues to develop these and many other tools, the uncertainty surrounding the copyrightability of state and local statutes presents a roadblock for these projects and has delayed the building of a bridge between citizens and government.

## III.    Public Resource's Scanning and Posting of the O.C.G.A. Is Fair Use.

The revolutionary tools and services described above, and many others like them, fundamentally transform how the public, courts, and lawyers access, search, read, and utilize the laws by which we are all bound. Those laws should not be subject to copyright. But even if the particular set of laws at issue in this case were found to be copyrightable, the highly transformative nature of the services enabled by full and open access to the law—like the access provided by Public Resource— demonstrates that the district court erred in holding that distribution of the O.C.G.A. is not a fair use under 17 U.S.C. § 107.

The lower court's analysis of each of the four fair use factors was flawed. *Amici* focus here on two elements of particular importance to the products and services they create: the transformative nature of Public Resource's scanning and posting of the O.C.G.A. and the need for Public Resource to use the entire work in

order to achieve its transformative purposes. The innovative tools and services that Public Resource enables, and that *amici* create, empower citizens, attorneys, and judges to interact with the law in unprecedented ways, but those efforts require the law in its entirety to create platforms for thorough and accurate research.

A.    *The district court failed to consider and properly credit the transformative aspects of Public Resource's activities.*

The district court erred when it summarily declared that Public Resource was merely copying "verbatim" in order to "supplant the O.C.G.A." Summ. J. Order 16 (Doc. No. 44). The court failed to consider that Public Resource's work is of a "different character." *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1310 (11th Cir. 2008). When courts evaluate the first factor, "the purpose and character of the use," 17 U.S.C. § 107(1), they must consider "whether the work merely supersedes the objects of the original or instead adds something new, with a further purpose or different character." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). For example, the Second Circuit had "no difficulty" finding that Google's copying of entire copyrighted books for use in Google Books was transformative because it "permit[ted] searchers to identify and locate the books in which words or phrases of interest to them appeared." *Authors Guild v. Google, Inc.,* 804 F.3d 202, 217 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 1658 (2016).

22

Just as Google digitized books so that its state-of-the-art technology could provide more information about those texts, Public Resource empowers citizens, lawyers, and innovative research tools and services to interact with the law in unprecedented ways. *Amici* have created platforms fundamentally different from those currently dominating the legal market and help users read legal documents and conduct research in a manner that increases understanding, efficiency, and thoroughness. Public Resource's work provided the foundation on which some *amici* built their platforms and on which others, some yet to be launched, will similarly innovate going forward. These new platforms simply could not exist—and could not provide the robust, transformative services to users that they do—if they were not able to access and use official legal data.

The district court erroneously compared the effect of Public Resource's activities to merely creating access for print-disabled people. In fact, some *amici* utilized the open access to the full corpus that Public Resource provides, unencumbered by technical limitations and restrictive terms of use or other contractual barriers, to create ways of interacting with the law that have a wholly different purpose and character than traditional reading of and searching through the law. The technological advances *amici* and other platforms are achieving for the benefit of users and the public based on open legal data could not demonstrate this transformation more clearly: algorithmically querying the law to reveal connections

and patterns; employing artificial intelligence and machine-learning technologies to analyze language, legal concepts, and litigation statistics; using language technology to identify and interpret key passages in cases based on citations from other cases; and much more. The possibilities unleashed by the open access that Public Resource provides allows for completely different understandings and uses of legal documents than would be possible through LexisNexis or Westlaw.

Moreover, the open access to the law enabled by Public Resource's scanning and posting, and the innovative uses of the law they enable, are powerfully in the public interest. Fair use favors purposes that are "in the public interest" over uses that merely seek to profit from another's work. *See Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004).

Given the significantly different ways users interact with the law on these platforms and the fundamental role that open, unrestricted access to the text of the law enabled by Public Resource plays in those interactions, the district court erred by describing Public Resource's purpose as merely seeking to "provide wider distribution of the annotations." Summ. J. Order 16 (Doc. No. 44).

> B.  *The district court erred when it considered only the amount taken and failed to acknowledge that the amount was reasonable in relation to Public Resource's purpose.*

The Supreme Court has articulated a clear standard for the third fair use factor. In *Campbell*, the Supreme Court held that courts should consider "whether 'the

amount and substantiality of the portion used in relation to the copyrighted work as a whole,' are *reasonable in relation to the purpose of the copying*." *Campbell*, 510 U.S. at 586-87 (emphasis added) (quoting 17 U.S.C. § 107(3)). The Eleventh Circuit has acknowledged that the Supreme Court "recognized that 'the extent of permissible copying varies with the purpose and character of the use.'" *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1272 (11th Cir. 2014) (quoting *Campbell*, 510 U.S. at 586-87) (holding that the district court erred in setting a rigid benchmark of the amount of copying for the third factor and should perform this analysis on a case-by-case basis).

When applying this standard, both the Supreme Court and the Eleventh Circuit have found that copying an entire work can be a fair use. In its landmark *Sony* decision, the Supreme Court found that recording entire movies and television episodes for time-shifting purposes was a fair use. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-50 (1984) (explaining that "the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use" when used for time-shifting (citation omitted)). The Eleventh Circuit recently held that a district court did not err in granting summary judgment to a defendant because every reasonable factfinder would conclude that the inclusion of a photo, in its entirety, in blog posts constituted fair use. *Katz v. Google Inc.*, 802 F.3d 1178 (11th Cir. 2015). The court found that "to copy any less of the image

'would have made the picture useless to [the] story.'" *Id.* at 1184 (quoting *Núñez v. Caribbean Int'l News Corp.,* 235 F.3d 18, 24 (1st Cir. 2000)). In each of these decisions, the purpose of the use was the crucial factor, not simply the amount used.

Many courts have found the use of an entire work to be fair when the use was reasonably necessary for the intended purpose. For example, the Second Circuit found that Google's copying of entire books for its search function was not only "reasonably appropriate" but also "literally necessary to achieve that purpose." *Authors Guild*, 804 F.3d at 221 (holding that Google's copying was a fair use); *see also Authors Guild, Inc. v. Hathitrust*, 755 F.3d 87 (2d Cir. 2014) (stating that the "crux" of the third factor is whether "no more was taken than necessary" and holding that digitization of entire copyrighted works to permit full-text searching was fair use (quoting *Campbell*, 510 U.S. at 589)); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) (finding that Google was likely to succeed in its fair use defense for use of entire images as thumbnails in search results); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) (holding that the use of copyrighted images in a book was a fair use); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (holding that Arriba's reproduction of Kelly's images for use as thumbnails in Arriba's search engine was a fair use); *Núñez*, 235 F.3d 18 (holding that a newspaper's use of an entire image was a fair use); *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148 (9th Cir. 1986) (holding that the district

court did not err in determining that the defendant's use of the plaintiff's entire parody advertisement constituted fair use); *Bruzzone v. Miller Brewing Co.*, No. C-78-2055, 1979 WL 1070 (N.D. Cal. May 25, 1979) (finding that the plaintiff's use of photoboards in market research and advertisement testing was a fair use despite plaintiff's copying of entire commercials).

One court has found that copying a written work in its entirety can be a fair use when the copying is in the public interest. In *Williams & Wilkins Co.*, a publisher of medical journals and books sued the National Institute of Health (NIH) and the National Library of Medicine (NLM) in response to their practice of sending photocopies of articles to medical researchers upon request. *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1345-48 (Ct. Cl. 1973), *aff'd*, 420 U.S. 376 (1975). The court noted that the NIH and NLM were nonprofits "devoted solely to the advancement and dissemination of medical knowledge" and that the recipients of the copies were medical researchers who needed the scientific studies for their research. *Id.* at 1354. The court considered the alternatives available to the researchers and, finding them inadequate, expressed concern that "medical science would be seriously hurt if such library photocopying were stopped." *Id.* at 1356. The court concluded that the distribution of entire copies of written works was a fair use, and the Supreme Court affirmed the decision by an equally divided court. 420 U.S. 376 (1975).

Like the libraries in *Williams & Wilkins*, Public Resource and others devoted to access to and analysis of the law need to copy the law in its entirety. Citizens who research the laws that govern them must know that the law they are inspecting is complete. For instance, a responsible citizen might check the Georgia statutory code before a hunting trip to ensure that his plans, including specific game and hunting methods, are lawful. That citizen needs access to the complete statutory code so that if he does not find anything on point, he can reasonably conclude that Georgia does not regulate that game or method of hunting.

Lawyers have an even greater professional obligation to ensure that their research is thorough and accurate before giving advice to a client. Because they cannot provide a thorough answer without knowing that they have checked, to the best of their ability, all the statutes, regulations, and cases that might apply to their client's situation, attorneys will not be able to use any version of the code that has not been reviewed and searched in its entirety. Similarly, none of the *amici* or other legal innovators creating new tools for legal analysis and search could contemplate relying on legal materials that were not full and complete, not to mention "official."

Because Public Resource copied the full statutory code to serve the practice of and public engagement with the law, which requires the entire O.C.G.A, Public Resource did not take more than was necessary to achieve its goal. The district court therefore erred by looking only at the absolute amount of copying and failing to

28

consider that "the quantity and value of the materials used [were] reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the district court.

Dated: May 24, 2017                  Respectfully submitted,

                              _____/s/Phillip R. Malone/_____
                              Phillip R. Malone
                              Juelsgaard Intellectual Property and
                                 Innovation Clinic
                              Mills Legal Clinic at Stanford Law School
                              559 Nathan Abbott Way
                              Stanford, CA 94305
                              Telephone: 650-725-6369
                              Fax: 650-723-4426

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B), 28.1(e)(2), and 29(d). The brief contains 6,369 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

Dated: May 24, 2017

_____/s/Phillip R. Malone/_____
Phillip R. Malone
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2017, I caused the foregoing Brief of Next-Generation Legal Research Platforms as *Amici Curiae* in Support of Defendant/ Appellant to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

Dated: May 24, 2017

_____/s/Phillip R. Malone/_____
Phillip R. Malone
Counsel for *Amici Curiae*