No. 17-11589

<span style="font-variant:small-caps">In the</span>

# United States Court of Appeals for the Eleventh Circuit

---

CODE REVISION COMMISSION, <span style="font-variant:small-caps">for the benefit of and on behalf of</span> THE GENERAL ASSEMBLY OF GEORGIA, <span style="font-variant:small-caps">and</span> THE STATE OF GEORGIA,

*Plaintiffs–Counter Defendants–Appellees,*

v.

PUBLIC.RESOURCE.ORG, <span style="font-variant:small-caps">Inc.</span>,

*Defendant–Counter Claimant–Appellant.*

---

<span style="font-variant:small-caps">Appeal from the United States District Court for the Northern District of Georgia</span>

---

**BRIEF OF PUBLIC KNOWLEDGE, THE AMERICAN LIBRARY ASSOCIATION, THE ASSOCIATION OF RESEARCH LIBRARIES, THE ASSOCIATION OF COLLEGE AND RESEARCH LIBRARIES, THE ORGANIZATION FOR TRANSFORMATIVE WORKS, THE INSTITUTE OF INTELLECTUAL PROPERTY AND SOCIAL JUSTICE, AND FORTY-ONE LIBRARIANS AND PROFESSORS OF LAW AS *AMICI CURIAE* IN SUPPORT OF PUBLIC.RESOURCE.ORG, INC.**

---

<span style="font-variant:small-caps">Charles Duan</span>
*Counsel of Record*
<span style="font-variant:small-caps">Public Knowledge</span>
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
cduan@publicknowledge.org

*Counsel for Amici Curiae*

No. 17-11589

CODE REVISION COMMISSION V. PUBLIC.RESOURCE.ORG

### CERTIFICATE OF INTERESTED PERSONS
### AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the parties state that they have no parent corporation or no publicly held corporation that holds 10% or more of their stock.

The following listing is provided pursuant to 11th Circuit Rule 26.1-1.

Acton, Anne M.

Adelman, Beth

American Library Association

Anzalone, Filippa Marullo

Association of College and Research Libraries

Association of Research Libraries

Butler, Brandon C.

Carrier, Michael A.

Chisolm, Tuneen

Clifford, Ralph D.

Courtney, Kyle K.

Danner, Richard A.

Duan, Charles

Emerson, Amy A.

Ford, Roger Allan

Fortney, Katie

Frye, Brian L.

Ghosh, Shubha

Hansen, David R.

Heald, Paul Justin

Hirsh, Kenneth J.

Institute of Intellectual Property and Social Justice

Joergensen, John

Johnson, Eric E.

Keele, Benjamin J.

Kennedy, Jocelyn

Klinefelter, Anne

Lantagne, Stacey M.

Lee, Sarah Hooke

Leiter, Richard

Liebesman, Yvette Joy

Love, Brian J.

Macklin, Lisa A.

Mayer, John

Mtima, Lateef L.

Organization for Transformative Works

Public Knowledge

Seipp, David J.

Selby, Courtney

Silbey, Jessica

Smith, Kevin L.

Sorkin, David E.

Street, Leslie

Tushnet, Rebecca

Wheeler, Ronald E.

Williams, Beth

Zimmerman, Katie

Zittrain, Jonathan L.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . C-1

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . ii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I. The Official Georgia Code, Including Annotations, Is Not Subject to Copyright Protection . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A. The Annotations Are the Legislature's Interpretations of the Statutes, and Therefore Are Not Copyrightable . . . . . . . . . . . 7

    B. The District Court Erroneously Assumed That Government Works Without Binding Force of Law Are Copyrightable . . . . . . 10

    C. Using Copyright to Block Dissemination of Official Statutory Codes Injures Interests of Libraries, Archivists, and the Public . . . 12

II. The District Court's Erroneous Fair Use Analysis Undermines the Doctrine's Most Fundamental Protections for Non-Commercial Acts . . 16

    A. Under the Fair Use Doctrine, a Use Is for Nonprofit Purposes If the Primary Purpose of the Use Is to Advance the Public Good . . . 17

    B. The District Court's Incorrect Reasoning on Commercial Purposes Harms the Law and Every Nonprofit Organization . . . . . . 20

III. The "Free" Online Version of the Georgia Code Is Not a Substitute for Full Availability of the Official Code . . . . . . . . . . . . . . . . 24

    A. The Online Version Is Not Free Because It Requires Users to Consent to Collection of Sensitive and Private Personal Information . . 24

    B. The Online Version Arguably Excludes Numerous Constituencies, Including Lawyers and Children . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

APPENDIX A: LexisNexis Privacy Policy . . . . . . . . . . . . . . . . 31

APPENDIX B: List of Individual Signatories . . . . . . . . . . . . . . . 37

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . 42

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . 43

Case: 17-11589    Date Filed: 05/23/2017    Page: 6 of 53

## TABLE OF AUTHORITIES

Authorities upon which this brief primarily relies are indicated with asterisks in the margin.

### CASES

*Banks & Bros. v. West Publishing Co.*,
    27 F. 50 (C.C.D. Minn. 1886) . . . . . . . . . . . . . . . . . . . . . . 8–9

\* *Banks v. Manchester*,
    128 U.S. 244 (1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8–12

*Building Officials & Code Administrators v. Code Technology, Inc.*,
    628 F.2d 730 (1st Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . 8

\* *Callaghan v. Myers*,
    128 U.S. 617 (1888) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11–12

\* *Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 22

*Echols v. Thomas*,
    458 S.E.2d 100 (Ga. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 13

\* *Harper & Row, Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

*Howell v. Miller*,
    91 F. 129 (6th Cir. 1898) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Marx v. General Revenue Corp.*,
    133 S. Ct. 1166 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Maxtone-Graham v. Burtchaell*,
    803 F.2d 1253 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . 19, 21

*Meeropol v. Nizer*,
    560 F.2d 1061 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . 19

*Nash v. Lathrop*,
    142 Mass. 29 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*O'Neal Construction Co. v. Lexington Developers, Inc.,*
  240 Ga. 376 (1977) . . . . . . . . . . . . . . . . . . . . . . 14

*Perdue v. Baker,*
  586 S.E.2d 606 (Ga. 2003) . . . . . . . . . . . . . . . . . 14

\* *Rosemont Enterprises, Inc. v. Random House, Inc.,*
  366 F.2d 303 (2d Cir. 1966) . . . . . . . . . . . . . . 17–18, 20

*Sikes v. State,*
  485 S.E.2d 206 (Ga. 1997) . . . . . . . . . . . . . . . . 13

*Society of the Holy Transfiguration Monastery, Inc. v. Gregory,*
  689 F.3d 29 (1st Cir. 2012) . . . . . . . . . . . . . . . . 22

\* *Sony Corp. of America v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) . . . . . . . . . . . . . . . . . . . . 22

*Time Inc. v. Bernard Geis Associates,*
  293 F. Supp. 130 (S.D.N.Y. 1968) . . . . . . . . . . . . 19

*United States v. Great Northern Railway,*
  287 U.S. 144 (1932) . . . . . . . . . . . . . . . . . . . . 13

*United States v. Steiger,*
  318 F.3d 1039 (11th Cir. 2003) . . . . . . . . . . . . . . 25

*Veeck v. Southern Building Code Congress International, Inc.,*
  293 F.3d 791 (5th Cir. 2002) . . . . . . . . . . . . . . 8, 24

*Wainwright Securities Inc. v. Wall Street Transcript Corp.,*
  558 F.2d 91 (2d Cir. 1977) . . . . . . . . . . . . . . . . 19

*Weissmann v. Freeman,*
  868 F.2d 1313 (2d Cir. 1989) . . . . . . . . . . . . . . . 22

*Westview Cemetery, Inc. v. Blanchard,*
  234 Ga. 540 (1975) . . . . . . . . . . . . . . . . . . . . 14

*Wheaton v. Peters,*
  33 U.S. 591 (1834) . . . . . . . . . . . . . . . . . . . . . 8

*(iii)*

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 22

*Yates v. United States*,
  135 S. Ct. 1074 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . 21

## Statutes

17 U.S.C. § 107  . . . . . . . . . . . . . . . . . . . . . . . . . . . .16−17, 21

    —— § 107(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    —— § 201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Children's Online Privacy Protection Act of 1998,
  15 U.S.C. §§ 6501−6505 . . . . . . . . . . . . . . . . . . . . . 28

    —— § 6502(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . 28

## Other Sources

Jonathan H. Adler, *Post-Decision Revisions of Supreme Court Opinions*, Wash. Post (May 25, 2014), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/25/post-decision-revisions-of-supreme-court-opinions/  . . . . . . . . . . . . . . . . . . . 15

A.J. Blechner, *Improving Usability of Legal Research Databases for Users with Print Disabilities*, 34 Legal Reference Services Q. 138 (2015)  . . . . . . . 29

Daniel F. Goldstein & Matthias Niska, *Why Digital Accessibility Matters to the Legal Profession: A Conversation with a Young Blind Attorney*, Law Prac. Today (ABA Law Practice Div.), June 2013, http://www.americanbar.org/content/newsletter/publications/law_practice_today_home/lpt-archives/june13/why-digital-accessibility-matters-to-the-legal-profession.html  . . . . . . . . . . . . . . . . . 29

Wendy J. Gordon, *Fair Use as Market Failure*, 82 Colum. L. Rev. 1600 (1982)  . . 19

Henry B. Hansmann, *The Role of Nonprofit Enterprise*, 89 Yale L.J. 835 (1980)  . . 23

Richard J. Lazarus, *The (Non)Finality of Supreme Court Opinions*, 128 Harv. L. Rev. 540 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15–16

Adam Liptak, *Final Word on U.S. Law Isn't: Supreme Court Keeps Editing*, N.Y. Times, May 27, 2014, at A1, https://www.nytimes.com/2014/05/25/us/final-word-on-us-law-isnt-supreme-court-keeps-editing.html . . 15

Adam Liptak, *Supreme Court Plans to Highlight Revisions in Its Opinions*, N.Y. Times, Oct. 6, 2015, at A12, https://www.nytimes.com/2015/10/06/us/politics/supreme-court-to-highlight-revisions-in-its-opinions.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Office of Gen. Counsel, Ala. State Bar, Formal Op. 2010-02 (2010) . . . . . . . 27

Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*, 57 UCLA L. Rev. 1701 (2010) . . . . . . . . . . . . . 25

William F. Patry & Shira Perlmutter, *Fair Use Misconstrued: Profit, Presumptions, and Parody*, 11 Cardozo Arts & Ent. L.J. 667 (1993) . . . . . . . 19, 21

Annette Boyd Pitts, Fla. Law Related Educ. Ass'n, *No Animals at School* (Nov. 28, 2012), http://www.justiceteaching.org/resource_material/No%20Animals%20on%20Campus%20(4).pdf . . . . . . . . . . . . . . . . . 28

Prof'l Ethics Comm., Fla. Bar, Formal Op. 12-3 (2013) . . . . . . . . . . . . . . 27

Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Natasha Singer, *With Little Data, Study Identifies the "Anonymous"*, N.Y. Times, Feb. 2, 2015, at B5, *available at* https://bits.blogs.nytimes.com/2015/01/29/with-a-few-bits-of-data-researchers-identify-anonymous-people/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Kaveh Waddell, *Your Browsing History Alone Can Give Away Your Identity*, The Atlantic (Feb. 6, 2017), https://www.theatlantic.com/technology/archive/2017/02/browsing-history-identity/515763/ . . . . . . . . . . . 26

Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195 (1983) . . . . . . . . . . . 13

Case: 17-11589    Document: 51    Date Filed: 05/23/2017    Page: 10 of 53

Mark Walsh, *Supreme Court Justices Regularly Seek to Change the Errors of Their Ways*, A.B.A. J. (Aug. 1, 2014), http://www.abajournal.com/magazine/article/justices_regularly_seek_to_change_the_errors_of_their_ways/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Case: 17-11589 Document: 51 Date Filed: 05/23/2017 Page: 11 of 53

## INTEREST OF *AMICI CURIAE*

*Amici curiae*[1] are 6 nonprofit organizations and 41 librarians and professors of law, who share an interest in public accessibility of law, accountability of government, and copyright law that accommodates these important public concerns. Individual signatories are identified in Appendix B.

Public Knowledge is a nonprofit organization dedicated to preserving an open Internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding and protecting the rights of consumers to use innovative technology lawfully. As part of this mission, Public Knowledge advocates on behalf of the public interest for a balanced copyright system, particularly with respect to new, emerging technologies.

The American Library Association is a nonprofit professional organization of more than 60,000 librarians dedicated to providing and improving library services and promoting the public interest in a free and open information society. The Association of College and Research Libraries, the largest division of the ALA, is a professional association of academic and research librarians. The Association of Research Libraries is a nonprofit organization of 125 research libraries in North

---

[1] This brief is being tendered with a motion for leave to file this brief. Pursuant to Rule 29(c)(5), no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of the brief. No person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief.

America, including university, public, government and national libraries. Collectively, these associations represent over 100,000 libraries in the United States employing over 350,000 librarians and other personnel.

The Organization for Transformative Works is a 501(c)(3) nonprofit organization established in 2007 and dedicated to protecting and preserving noncommercial fanworks: works created by fans based on existing works, including popular television shows, books, and movies. The OTW's nonprofit website hosting transformative noncommercial works, the Archive of Our Own, has over 1.1 million registered users and receives an average of over 150 million page views per week.

The Institute of Intellectual Property and Social Justice is a 510(c)(3) nonprofit organization founded in 2002 to address the social justice implications of intellectual property law and practice. IIPSJ's work includes, among other things, scholarly examination of intellectual property law from the social justice perspective, and advocacy for social-justice aware interpretation, application, and revision of intellectual property law.

## STATEMENT OF ISSUES

Whether a statutory code, which was commissioned, supervised, and granted official status by the state legislature, may be subject to an exclusive federal copyright preventing others from redistributing that official statutory code.

Whether, assuming that said official statutory code may be copyrighted, the act of redistributing the official code is permissible as a fair use under federal copyright law.

Case: 17-11589 Document: 51 Date Filed: 05/23/2017 Page: 14 of 53

## SUMMARY OF ARGUMENT

This appeal presents a question of exceptional importance to the democratic values of this nation: Whether a state's private copyright interest may overcome the public's right of access to the laws and official interpretations thereof. Proper resolution of the appeal requires careful consideration of the public interest in access to the law.

The General Assembly of Georgia, through its appointed agency the Code Revision Commission, produces the Official Code of Georgia Annotated and claims copyright in the compilation, asserting that redistributing the official code is an infringement. The state's argument, if successful, would set a remarkable precedent: that a government may use the full weight of private copyright law to impede citizens' efforts to share, distribute, analyze, or even read the law that governs them. That precedent would cut against the widely accepted premise that unfettered access to the law is a prerequisite to self-governance.

The public interest applied to the present case leads to three main conclusions, all of which require reversal of the district court.

1. Because the annotations to the Official Georgia Code[2] are pronouncements of the Georgia legislature, they are official interpretations of the law that cannot be copyrighted. Case law holds that lawmakers' official interpretations

---

[2]References to the "Official Georgia Code," the "official code," or the like are to the Official Code of Georgia Annotated.

Case: 17-11589 Document: 51 Date Filed: 05/23/2017 Page: 15 of 53

of the law cannot be copyrighted. Here, the Georgia legislature is the author of the annotations, rendering those annotations official interpretations of the law in which no copyright may inhere.

Furthermore, the annotations should not be copyrightable as a matter of policy. Access to official interpretations of the law underlies important public activities that are necessary to effective self-government. These include making statutory construction arguments before courts, in which one might use official annotations to bolster a legislative history argument, and monitoring elected officials' changes to interpretations of the law.

2. The district court also erred in its application of fair use, and in particular the distinction between commercial and nonprofit uses. Courts applying this distinction universally look to the primary purpose of a use in determining whether it is for profit or not. By contrast, the district court appeared to assume that even a scintilla of benefit from use of a copyrighted work, even an intangible reputation benefit, renders the use commercial and for profit. That assumption dangerously eviscerates the value of the fair use distinction to the detriment of every nonprofit organization, and it should be disapproved.

3. The attempts by the Georgia legislature and others to promote an unofficial website as a sufficient equivalent for the Official Georgia Code must fail. The proffered website does not offer "free" access to the Georgia laws because

Case: 17-11589   Document: 51   Date Filed: 05/23/2017   Page: 16 of 53

it requires users to give up wide-ranging privacy rights and enables the website operator, the private company LexisNexis, to sell off highly sensitive personal data about users viewing the Georgia code. Furthermore, many groups of people are potentially unable to use the website, due to unacceptable contractual terms and poor design of the website.

Certainly this "free" website option could be improved in the noted respects. But the larger point is that the basic right of the citizenry to learn the law and official interpretations thereof cannot be satisfied by the mere largesse of a private company, revocable at will. Private law such as copyright should place no barrier in the path of public access to the law; otherwise the very notion that "we the people" are the source of government power would be thrown into question. These principles, foundational to this nation, mandate reversal of the district court.

Case: 17-11589    Date Filed: 05/23/2017    Page: 17 of 53

## ARGUMENT

### I. The Official Georgia Code, Including Annotations, Is Not Subject to Copyright Protection

No party argues, and the district court did not hold, that the statutory text in the Official Georgia Code may be copyrighted. Instead, the sole question is whether the annotations to the official code may be copyrighted.

However, no copyright may inhere in the annotations to the code either. The annotations are the authorial work of the Georgia state legislature, and as such are official interpretations of the law. This renders the annotations uncopyrightable for at least two reasons. First, case law makes clear that the prohibition on copyright in the words of the law extends to a prohibition on copyright in official interpretations of the law. Second, access to the text of official interpretations of the law has as much public importance as access to the text of the law itself, and so copyright as a policy matter should be permitted in neither.

### A. The Annotations Are the Legislature's Interpretations of the Statutes, and Therefore Are Not Copyrightable

The annotations to the Official Georgia Code are not copyrightable based on a simple syllogism. First: lawmakers' interpretations of the law are official interpretations and are not copyrightable. Second: the annotations here are the Georgia legislature's interpretations of the law. Therefore, the annotations are official interpretations not protectable by copyright.

7

1.    Interpretations of the law authored by lawmakers are official interpretations not subject to copyright protection.  In *Banks v. Manchester*, the official reporter of cases for the State of Ohio brought a copyright suit against another publisher who duplicated and republished two Ohio cases.  *See* 128 U.S. 244, 247–49 (1888).  The Court affirmed the dismissal of the suit based on the "judicial consensus . . . that no copyright could . . . be secured in the products of the labor done by judicial officers in the discharge of their judicial duties." *Id.* at 253 (citing *Wheaton v. Peters*, 33 U.S. 591, 668 (1834)).

Similarly, the Massachusetts Supreme Judicial Court explained that the public ought to have "free access" to those official decisions that "construe and declare the meaning of statutes." *Nash v. Lathrop*, 142 Mass. 29, 35 (1886).  And *Banks & Bros. v. West Publishing Co.*, another widely cited case, observed that the principles favoring free accessibility to statutory texts were "also true as to judicial opinions, which, though not laws, are official interpretations of law." 27 F. 50, 57 (C.C.D. Minn. 1886).

Unprotectability of lawmakers' interpretations comports as well with the policy behind the case law, namely "the very important and practical policy that citizens must have free access to the laws which govern them." *Bldg. Officials & Code Adm'rs v. Code Tech., Inc.*, 628 F.2d 730, 734 (1st Cir. 1980); *see also Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 799 (5th Cir. 2002) (right to "free access

to the laws" flows from "metaphorical concept of citizen authorship"). "Each citizen is a ruler,—a law-maker,—and as such has the right of access to the laws he joins in making and to any official interpretation thereof." *Banks & Bros.*, 27 F. at 57. Withholding lawmakers' interpretations of the law from any segment of the public precludes that segment from enjoying a meeting of the minds with their chosen government representatives, and thus precludes that segment of people from participating in self-governance.

Where a non-lawmaker third party contributes independent "intellectual labor" to a government work, the third party may be permitted to hold a copyright to that independent contribution. *See Callaghan v. Myers*, 128 U.S. 617, 647 (1888); *Howell v. Miller*, 91 F. 129, 138 (6th Cir. 1898). But a lawmaker, officially interpreting the law, cannot use copyright to bar others from repeating that official interpretation.

2.  Georgia lawmakers are the authors of the annotations to the Official Georgia Code, and so those annotations are lawmakers' official interpretations of Georgia law, not copyrightable under *Banks* and its progeny. The contract between the Code Revision Commission and the private publisher of the official code proves that the Georgia legislature is the author of the annotations. The entirety of the code, including annotations, is a "work made for hire" on behalf of the state. Def.'s Mot. Summ. J., Doc. No. 29, Exh. F, § 6.1(a), at 21. And the

9

Case: 17-11589   Document: 51   Date Filed: 05/23/2017   Page: 20 of 53

contract specifies that the commission, not the publisher, had the "ultimate right of editorial control over all material," *id.* § 1.1(d), at 2, and further specifies in six pages of detail, the precise contents of the annotations, tables, and indices, *see id.* §§ 1.4–.14, at 3–8.

While the publisher may have held the physical pen, it was not the "author" of the annotations either under copyright law or in the conventional sense of one who contributes independent creativity. *See* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author."). That means that the annotations are law-makers' official interpretations of the law, akin to the headnotes and statements of cases in *Banks*, which were authored by judges.

Because the annotations to the Official Georgia Code are official interpretations of the law, they may not be copyrighted. The district court's holding to the contrary should be reversed.

## B.  The District Court Erroneously Assumed That Government Works Without Binding Force of Law Are Copyrightable

The district court disregarded the official nature of the annotations, instead reasoning that "[o]nly those government documents having the force of law are uncopyrightable." Summ. J. Order, Doc. No. 44, at 12. This reasoning is wrong

for two reasons: First, as a matter of logic it proves too much; and second, it is contrary to case law.

The assumption that only legally binding government documents are not copyrightable is logically inconsistent with the well-settled view that judicial opinions may not be copyrighted. Numerous parts of judicial opinions are non-binding: dicta, statements of facts, concurrences, and dissents, for example. No case appears to hold that only the binding parts of a judicial opinion are free to the public, while the rest may be the subject of private ownership.

On the contrary, *Banks* remarked that "the statement of the case and the syllabus or head note" are not copyrightable because they were authored by a judge. 128 U.S. at 252. The Supreme Court specifically called out portions of judicial opinions without force of law. This goes to show that the holding in *Banks*, that "the authentic exposition and interpretation of the law" is "free for publication to all," applied to texts both with and without force of law. 128 U.S. at 253–54 (citing *Nash*, 142 Mass. at 35).

The district court's sole authority on this point, *Callaghan*, also fails to support the proposition that annotations without binding force of law are copyrightable. That case permitted copyright in headnotes and statements of cases authored by a law reporter, distinguishing judge-authored headnotes and statements held copyrightable in *Banks*. *See Callaghan*, 128 U.S. at 647. The distinc-

tion fully turned on the reporter's status: Although the reporter of decisions in *Callaghan* was a government official, he was not a lawmaker like a judge. *See* 128 U.S. at 646–47. Thus, the "ground of public policy" that barred copyright in judge-authored headnotes did not apply to reporter-authored headnotes. *Id.* at 647.

Both *Callaghan* and *Banks* thus confirm that, when determining whether a government work is copyrightable, the relevant consideration is not whether that work carries force of law. Rather, the key is whether the work is authored by an official lawmaker.

### C. USING COPYRIGHT TO BLOCK DISSEMINATION OF OFFICIAL STATUTORY CODES INJURES INTERESTS OF LIBRARIES, ARCHIVISTS, AND THE PUBLIC

Freedom of access to official interpretations of laws is equally important to access to the laws themselves, because official interpretations serve important purposes that advance the public interest in self-governance. Insofar as the question of copyrightability of laws "is one of public policy," *Banks*, 128 U.S. at 253, the reasons why the public requires access to official interpretations are of vital importance to this case.

**Arguing for Statutory Constructions.** Unrestricted access to official annotations to the Georgia Code is critical to the public, because the annotations

are akin to legislative history and thus are important for making statutory construction arguments before courts.

Legislative history is unquestionably significant in statutory construction. The Georgia Supreme Court has explained that "in attempting to ascertain legislative intent of a doubtful statute, a court may look to . . . its legislative history." *Sikes v. State*, 485 S.E.2d 206, 209 (Ga. 1997); *accord Echols v. Thomas*, 458 S.E.2d 100, 101 (Ga. 1995); *see also United States v. Great N. Ry.*, 287 U.S. 144, 154 (1932); Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 197 (1983) (noting the Supreme Court applied legislative history to every statutory construction in that Term).

Even Justice Scalia, noted skeptic of legislative history, still admonishes lawyers: "Since most judges use legislative history, . . . you must use legislative history as well." Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 49 (2008).

The annotations in the Official Georgia Code are of no less importance than committee reports and floor debates. The state legislature is the author of the annotations, and it exercises complete control over the content. *See supra* p. 9. As a result, one would expect the official annotations to be highly persuasive authority when arguing over statutory construction.

And, indeed, Georgia judges have cited to official statutory commentary in interpreting statutes. In *Perdue v. Baker*, the Georgia Supreme Court relied on an editor's note to the Official Georgia Code to construe a voting redistricting plan. *See* 586 S.E.2d 606, 608 & n.7 (Ga. 2003). In *O'Neal Construction Co. v. Lexington Developers, Inc.*, that court quoted an "editorial comment following the statute" to determine the statutory rules for service of process. 240 Ga. 376, 377–78 (1977); *see also Westview Cemetery, Inc. v. Blanchard*, 234 Ga. 540, 548 (1975) (Hill, J., dissenting) (noting "Editorial Notes to the Annotated Code").

Lack of access to the annotations of the Official Georgia Code thus hinders citizens' ability to interpret the law, to predict how courts will apply it, and to argue statutory construction before courts. These effects militate against copyright in lawmaker-authored annotations, which can enable that lack of access.

**Government Oversight.** Essential to self-governance is the people's ability to oversee the acts of their government representatives. In particular, if government officials change their interpretations of the law, the public has a strong interest in keeping track of these changes. Copyright can interfere with this oversight activity and thus can interfere with the task of self-governance.

Recent experience with Supreme Court opinions is instructive. In 2014, a study in the Harvard Law Review revealed that the "Justices have revised their opinions in significant, including highly substantive, ways prior to their final

14

Case: 17-11589   Document: 51   Date Filed: 06/23/2017   Page: 25 of 53

and official publication." Richard J. Lazarus, *The (Non)Finality of Supreme Court Opinions*, 128 Harv. L. Rev. 540, 544 (2014). Even more surprising, the alterations to the supreme law of the land were often made opaquely: "the Court has done little to make clear what changes have been made in individual cases" and indeed "deliberately makes discovery difficult." *Id.* at 546.

Reaction to the study reveals how strongly the public values transparency when government officials change their interpretations of the laws. The study was front-page national news,[3] and commentators were "shocked" by the revelations.[4] The Supreme Court itself reacted swiftly in response to implement procedures for disclosing revisions.[5]

The citizens of Georgia would similarly have an interest in knowing whether Georgia lawmakers change their interpretation of a law via a change to the official code annotations—especially if, like the Supreme Court, the Georgia legislature made the change silently and without notice.

---

[3]*See, e.g.,* Adam Liptak, *Final Word on U.S. Law Isn't: Supreme Court Keeps Editing*, N.Y. Times, May 27, 2014, at A1, *available online*; Jonathan H. Adler, *Post-Decision Revisions of Supreme Court Opinions*, Wash. Post (May 25, 2014), *available online*. Locations of authorities available online are shown in the Table of Authorities.

[4]Mark Walsh, *Supreme Court Justices Regularly Seek to Change the Errors of Their Ways*, A.B.A. J. (Aug. 1, 2014), *available online*.

[5]Adam Liptak, *Supreme Court Plans to Highlight Revisions in Its Opinions*, N.Y. Times, Oct. 6, 2015, at A12, *available online*.

Monitoring those changes requires the ability to copy and transcribe the annotations to the official code, free of concerns for copyright. The Harvard study relied on "electronic scanning and comparison software programs" to discover undisclosed Supreme Court opinion revisions, and noted that absent these "technological advances," revisions to opinions would have been "wholly invisible as a practical matter." *Id.* at 588–89, 607. And yet, electronic scanning and processing are precisely what the State of Georgia seeks to prevent in this very case. Permitting copyright in official interpretations of law can thus interfere with the public's ability to oversee government.

\*     \*     \*

Self-governance depends on all people having access to the official interpretations of governing law. A state should not be able to use private copyright law to interfere with this important public project.

## II. The District Court's Erroneous Fair Use Analysis Undermines the Doctrine's Most Fundamental Protections for Non-Commercial Acts

The district court further erred in holding that dissemination of the Official Code of Georgia Annotated was not a fair use under 17 U.S.C. § 107. While the analysis of each of the four fair use factors was questionable for a variety of reasons, *amici* focus on one error of especial importance to them: the application of the first fair use factor relating to "the purpose and character of the use."

16

## A. UNDER THE FAIR USE DOCTRINE, A USE IS FOR NONPROFIT PURPOSES IF THE PRIMARY PURPOSE OF THE USE IS TO ADVANCE THE PUBLIC GOOD

1.  The first fair use factor comprises in part a determination of whether a use of a copyrighted work is "of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Correctly interpreted, that provision directs courts to look to whether the primary purpose of the allegedly infringing act is to achieve private commercial gain or to promote the public good.

The statutory language suggests this interpretation. Twice it recites "purposes" of the use as the touchstone of fair use. *Id.*; *see also* § 107 (use "for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright").

Cases applying the commercial/nonprofit distinction also look to the primary purpose of the use. In *Rosemont Enterprises, Inc. v. Random House, Inc.*, the Second Circuit found that a biography's use of portions of copyrighted magazine articles was fair use. *See* 366 F.2d 303, 306 (2d Cir. 1966). In rejecting the contention that commercial book sales could not be fair use, the appellate court focused on the overarching "public benefit in encouraging the development of historical and biographical works and their public distribution." *Id.* at 307. "Whether an author or publisher reaps economic benefits from the sale" of an allegedly infringing work, the court explained, "has no bearing on whether a public benefit may be derived

from such a work." *Id.* Since the value of the biography lay primarily in its expansion of public knowledge (in this case, about the enigmatic Howard Hughes) rather than mere commercial profit, the Second Circuit held the biography's use of copyrighted material to be a fair use. *See id.* at 309.

The Supreme Court reached much the same conclusion in *Campbell v. Acuff-Rose Music, Inc.*, which concerned a parody of a popular song. *See* 510 U.S. 569, 594 (1994). Although the parody was produced and sold for commercial profit, the Court refused to give "virtually dispositive weight to the commercial nature of the parody." *Id.* at 584. Instead, the Court looked to the primary purpose of the work at issue, finding that the parody "reasonably could be perceived as commenting on the original or criticizing it, to some degree," such that the first factor favored fair use. 510 U.S. at 583.

*Harper & Row, Publishers, Inc. v. Nation Enterprises* also applied a primary purpose analysis to find a commercial nature to a magazine's act of "scooping" a soon-to-be-published memoir. *See* 471 U.S. 539, 543 (1985). In analyzing whether the use was commercial or nonprofit, the Supreme Court found that it "cannot ignore [the magazine]'s stated purpose of scooping" the memoir. *Id.* at 562. It further found that the magazine had "the *intended purpose* of supplanting the copyright holder's commercially valuable right." *Id.* As in *Campbell*, the Court focused specifically on the "stated" and "intended" purpose of the use.

Other courts agree that the correct test of the commercial/nonprofit distinction is whether the primary purpose of the use is to advance the public interest; that is, whether the copied works "were used *primarily* for scholarly, historical reasons, or *predominantly* for commercial exploitation." *Meeropol v. Nizer*, 560 F.2d 1061, 1069 (2d Cir. 1977) (emphasis added); *see also Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) (relying on "public interest in having the fullest information available on the murder of President Kennedy" to find fair use in copying entire frames of Zapruder film); *Wainwright Sec. Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977) ("The fair use doctrine offers a means of balancing . . . the public's interest in dissemination of information affecting areas of universal concern, such as art, science, and industry."); *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1262 (2d Cir. 1986) (finding fair use favored when "the educational elements of [an allegedly infringing book] far outweigh the commercial aspects of the book").

Scholars also conclude that in determining whether a use is nonprofit, courts should focus "on the degree of social benefit fostered by that type of use." William F. Patry & Shira Perlmutter, *Fair Use Misconstrued: Profit, Presumptions, and Parody*, 11 Cardozo Arts & Ent. L.J. 667, 681 (1993); *see also* Wendy J. Gordon, *Fair Use as Market Failure*, 82 Colum. L. Rev. 1600, 1630 (1982) (fair use findings should be more likely where the allegedly infringing uses have "external benefits").

Case: 17-11589    Document: 51    Date Filed: 05/23/2017    Page: 30 of 53

2.    Applying this primary-purpose test to the present case, the district court certainly erred in holding that Public Resource's acts were not for nonprofit educational purposes. Public Resource's professed reason for disseminating the Official Georgia Code was the organization's belief that "the Rule of Law would be strengthened by the wider availability on the Internet of primary legal materials, the raw materials of our democracy," and a desire "to promote public education and public safety, equal justice for all, a better informed citizenry, more efficient markets, and the Rule of Law." Doc. No. 29, at 3.

These objectives are public-minded goals akin to that in *Rosemont* of educating the public through a biography, and to that in *Campbell* of providing criticism and commentary (in Public Resource's case, on the Georgia legislature's tight leash on public access to the laws of the state). They are reason to find Public Resource's acts to be noncommercial under the first fair use factor, or at a minimum to raise a triable issue of fact, precluding summary judgment.

## B.    The District Court's Incorrect Reasoning on Commercial Purposes Harms the Law and Every Nonprofit Organization

Rather than looking to the primary purpose of the use, the district court asserted that if an entity making use of a copyrighted work received any benefit at all from that use, even "an indirect benefit or a non-monetary, professional

benefit," then the use was for-profit and commercial. *See* Doc. No. 44, at 17. This assumption was wrong and should be disapproved here.

The district court's assumption effectively renders all uses to be commercial. No enterprise, nonprofit or otherwise, would undertake any effort without anticipating some tangible or intangible benefit. *See Maxtone-Graham*, 803 F.2d at 1262; Patry & Perlmutter, *supra*, at 680–81. Academic scholarship, a classic "nonprofit educational purpose," often results in intangible benefits such as tenure or prestige. It is difficult to imagine what activity would be "nonprofit" under the district court's definition; it would seem that one would have to inflict self-harm to qualify.

This illogic is jurisprudentially relevant, because the district court's reading renders at least two aspects of § 107 superfluous, a result disfavored under canons of statutory construction. *See, e.g., Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1178 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme"); *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (plurality op.); *id.* at 1089 (Alito, J., concurring). First, there would be no need for the first factor to distinguish between commercial and nonprofit educational uses, since all reasonable uses would be commercial. Second, the district court's construction would "swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news

21

reporting, comment, criticism, teaching, scholarship, and research, since these activities 'are generally conducted for profit in this country.' Congress could not have intended such a rule." *Campbell*, 510 U.S. at 584 (quoting *Harper & Row*, 471 U.S. at 592 (Brennan, J., dissenting)).

Case law also rejects the notion that a scintilla of benefit renders a use commercial. In *Sony Corp. of America v. Universal City Studios, Inc.*, the Supreme Court held that it was a fair use to employ a VCR to record television shows for later viewing. *See* 464 U.S. 417, 455 (1984). Certainly VCR owners receive a valuable benefit from watching shows at the times they desire, and according to the district court this would render their uses profitable and thus commercial. Doc. No. 44, at 17. But *Sony* emphatically and repeatedly stated that personal time-shifting of television shows "must be characterized as a noncommercial, nonprofit activity." 464 U.S. at 449; *see also id.* at 425, 442, 450 n.33.[6]

The district court's error stemmed from an incorrect assumption that a "non-profit" is an entity that makes no profit. *See* Doc. No. 44, at 18 ("Defendant 'profits'" and therefore "its use was neither nonprofit nor educational"). On the con-

---

[6] The cases cited by the district court actually support the primary purpose test laid out above, not the any-indirect-profit test that the district court applied. *See Harper & Row*, 471 U.S. at 562; *Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012) (archbishop's infringing website postings intended to attract recognition); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (same); *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989) (professor who plagiarized work intended primarily to gain credit, not to disseminate knowledge).

trary, every nonprofit "profits" in the district court's broad sense of earning some benefit in return for its works. A public radio station solicits listener donations, a symphony orchestra sells tickets, and a hospital receives insurance payouts. *See* Henry B. Hansmann, *The Role of Nonprofit Enterprise*, 89 Yale L.J. 835, 838 (1980). The key differentiator between nonprofits and others is the use to which profits may be put: A for-profit firm may distribute profits to owners or shareholders, but a nonprofit must dedicate its profits to furtherance of the public good through advancement of its organizational mission. *See id.* at 838–39.

This understanding of nonprofits, as those who must rededicate their earnings to the public, confirms the primary-purpose interpretation of "nonprofit educational purposes." It also reveals the grave danger in letting the district court's construction stand. Nonprofit organizations regularly rely on fair use in advocacy, debate, and educating the public. A fair use doctrine that discourages nonprofit organizations from gaining even reputational benefits from their acts of public service would undermine incentives for such organizations to engage in intellectual discourse and to strive toward the public good.

Accordingly, the district court erred in holding the redistribution of the Official Georgia Code to be a commercial act under the first fair use factor. That holding should be reversed.

Case: 17-11589    Date Filed: 05/23/2017    Page: 34 of 53

## III.  The "Free" Online Version of the Georgia Code Is Not a Substitute for Full Availability of the Official Code

Though the district court did not rely on it, the Code Revision Commission repeatedly cited the existence of a free online website containing the text of Georgia statutes (but not the official annotations) as reason to justify the state's assertion of copyright over the Official Georgia Code.  *See, e.g.,* Pl.'s Mot. Partial Summ. J., Doc. No. 30, at 7, 21.  The existence of that website is merely at the pleasure of the commission and its contractual publisher LexisNexis, and as such cannot justify the use of private copyright exclusivity to limit the public right of access to the law. *See Veeck*, 293 F.3d at 799.

But even taking the commission's argument at face value, the unofficial website is no substitute for the Official Georgia Code.  First, the website is not actually "free":  Accessing the site requires users to pay in the form of valuable and sensitive private information.  Second, the website arguably impedes certain constituencies, among them businesses, attorneys, children, and the visually impaired, from using the website.

## A.  The Online Version Is Not Free Because It Requires Users to Consent to Collection of Sensitive and Private Personal Information

Prior to viewing the Georgia code on LexisNexis's website, one must consent to collection and sale of personal, private, and sensitive information.  Private

Case: 17-11589  Document: 51  Date Filed: 05/23/2017  Page: 35 of 53

browsing data is a valuable asset that many users are loath to give up. The website thus does not offer access to the Georgia code "free of charge," Compl., Doc. No. 1, ¶ 14, at 8, because users must pay for access in the form of lost privacy.

The privacy policy of the LexisNexis website is provided in Appendix A. That policy states that LexisNexis will collect information that uniquely identifies a user viewing the code, such as the user's IP address, "unique device identifier," and even "the region, city or town" where the user is located. LexisNexis "automatically collects" this information, regardless of the user's choice or permission. *Infra* p. 32.

This information is highly sensitive and often sufficient to identify the exact identity of individuals viewing the Georgia code. IP addresses uniquely identify households. *See United States v. Steiger*, 318 F.3d 1039, 1042 (11th Cir. 2003). Modern "big data" analytics can reveal even more personal information about users, and companies already use these techniques for marketing in surprising and invasive ways. *See* Natasha Singer, *With Little Data, Study Identifies the "Anonymous"*, N.Y. Times, Feb. 2, 2015, at B5, *available online*; Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*, 57 UCLA L. Rev. 1701 (2010).

Also collected are the pages (i.e., code sections) the user viewed, the times and durations of visits, and the search queries the user entered. A user's browsing

pattern in general can be incredibly revealing of that user's sensitive personal facts. *See* Kaveh Waddell, *Your Browsing History Alone Can Give Away Your Identity*, The Atlantic (Feb. 6, 2017), *available online*.

And a user's pattern of browsing statutes can be especially revealing. A person researching Title 19, Chapters 5–6 of the Georgia code is likely contemplating a divorce. A reader of Title 37, Chapter 7, Article 1 may be a drug addict looking for help. And it takes little imagination to guess who might run a search of "crime w/20 sex! AND (alcohol OR drunk!) w/10 consent!" within the code.

Potential divorcees, drug addicts, and rape victims likely do not want their personal circumstances broadcast to others. But LexisNexis's privacy policy obligates these people to share their secrets as quid pro quo for learning the law.

And the privacy violations do not stop at the company borders. According to the privacy policy, LexisNexis may share users' private information with "affiliates and with sponsors, joint venture partners and other non-affiliated third parties"—essentially anyone. *See infra* p. 34.

A website that requires users to disclose highly sensitive data, which the website may use or sell at will, is not a "free" website. The online Georgia code is no substitute for actual unrestricted access to the law.

## B.  The Online Version Arguably Excludes Numerous Constituencies, Including Lawyers and Children

The Georgia code website also potentially prevents or discourages numerous people from using the website. Several such groups are described below.

**Businesses and Attorneys.** The LexisNexis Terms of Service specify that the website content "is for your personal use only and not for commercial exploitation." Stip. Facts, Doc. No. 17, Exh. I, § 2.1, at 2. On its face, this bars businesses or their agents from viewing the Georgia code online. The website later presents more permissive terms of use, but only after user has already agreed to the more restrictive Terms of Service. *See id.* ¶ 88; *id.* Exh. K, § 1.1. At a minimum, then, diligent business owners and employees would find it risky to use the Georgia code website.

Attorneys face a further challenge when using LexisNexis to read the Georgia code: They may be in violation of their duties of confidentiality. Attorney ethics committees, including the Alabama and Florida bars[7] within this Circuit, permit an attorney to access an online service provider only when the attorney can "reasonably ensure that the provider will abide by a confidentiality agreement." Office of Gen. Counsel, Ala. State Bar, Formal Op. 2010-02, at 16 (2010); *accord* Prof'l Ethics Comm., Fla. Bar, Formal Op. 12-3 (2013). LexisNexis's Terms of Service, however, offer no guarantee of confidentiality. *See* Doc. No. 17, Exh. I,

---

[7] The Georgia bar appears not to have yet opined on the matter.

§ 3, at 2 (" . . . nor is anything submitted to this Web Site treated as confidential."). Since an attorney's pattern of searching and browsing a statutory code can reveal client confidences, *see supra* p. 26, there is a serious question of whether an attorney may use the online Georgia code under LexisNexis's Terms of Service.[8]

**Children.** Because LexisNexis collects information from users, the company is subject to the Children's Online Privacy Protection Act of 1998, which disallows collection of information on children under 13 without parental consent. *See* 15 U.S.C. § 6502(a)(1). LexisNexis currently attempts to avoid applicability of that law by reciting that it is unaware of children using its services. *See infra* p. 35. But if LexisNexis does gain actual knowledge of underage children using the Georgia code website, say if a child emails customer support in the course of a school project,[9] then the company may be required to block the child from the service to avoid applicability of the law. The ability of children under 13 to view the Georgia code website is thus questionable.

**People with Disabilities.** The LexisNexis website is difficult for the visually impaired to use. One review of the main LexisNexis service website attempted five basic legal research tasks using a screen reader, to evaluate the website's

---

[8]Law firms likely avoid this problem by negotiating individualized agreements with LexisNexis, presumably with better confidentiality terms.

[9]Elementary school children do indeed sometimes read the law, for class projects for example. *See, e.g.,* Annette Boyd Pitts, Fla. Law Related Educ. Ass'n, *No Animals at School* (Nov. 28, 2012), *available online* (elementary school lesson plan involving reading Florida statutes).

accessibility. A.J. Blechner, *Improving Usability of Legal Research Databases for Users with Print Disabilities*, 34 Legal Reference Services Q. 138, 148 (2015). The study awarded the site its lowest ranking, "Challenging to Use," on four of the tasks; the fifth was deemed "Usable with Some Challenges." *Id.* at 166 tbl.1. It concluded that LexisNexis had "room for improvement" in accessibility for visually impaired people. *Id.* at 165; *see also* Daniel F. Goldstein & Matthias Niska, *Why Digital Accessibility Matters to the Legal Profession: A Conversation with a Young Blind Attorney*, Law Prac. Today (ABA Law Practice Div.), June 2013, *available online.*

That at least these groups of people cannot use the online Georgia code without concern points to the danger of relying on a corporate promise to fulfill fundamental public rights: The private corporation has little or no incentive to enable the entire population to enjoy the full extent of those rights. The federal judiciary exists to ensure that important individual rights, including the right to access the law and official interpretations of the law, are enforceable guarantees and not illusory promises.

This case presents an important conflict between the private interest of copyright and the public right to know, learn, share, and apply the law. The choice is clear from centuries of case law and experience: The public right must prevail.

Case: 17-11589    Date Filed: 05/23/2017    Page: 40 of 53

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the district court.

Respectfully submitted,

Dated: May 23, 2017

*s/ Charles Duan*
CHARLES DUAN
    *Counsel of Record*
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
cduan@publicknowledge.org

*Counsel for Amici Curiae*

Case: 17-11589 Document: 51 Date Filed: 05/23/2017 Page: 41 of 53

# APPENDIX A
## LexisNexis Privacy Policy

To the extent necessary, I declare under 28 U.S.C. § 1746 under penalty of perjury that the following is a true and correct copy of the text I obtained online on May 12, 2017 from the URL https://www.lexisnexis.com/en-us/terms/privacy-policy.page, which I accessed by clicking the link labeled "Privacy Policy" on the online version of the Georgia code, at https://www.lexisnexis.com/hottopics/gacode/.

Executed on May 23, 2017 in Washington, D.C.

*s/ Charles Duan*

Charles Duan
*Counsel for Amici Curiae*

## Privacy Policy

1. About This Privacy Policy
2. Collection of Information
3. Use of Your Information
4. Disclosure of Your Information
5. Children's Privacy
6. Your Choices and Communications Preferences
7. Access to and Accuracy of Your Information
8. Data Security
9. Cross-Border Transfer
10. Changes
11. Contact

Case: 17-11589 Document: 51 Date Filed: 05/23/2017 Page: 42 of 53

## 1. About This Privacy Policy

This privacy policy explains how the personal information collected when you use the websites, mobile applications and other services that post a link to this privacy policy (each, a "Service") will be used by the LexisNexis company that owns or administers the Service. This privacy policy may be supplemented by additional privacy terms or notices set forth on certain areas of the Service.

## 2. Collection of Information

The Service collects information from you in two ways: directly from your input and automatically from your use.

### 2.1 Information you provide

The types of personal information that the Service collects directly from you depends on how you interact with the Service and may include:

- Contact details, such as your name, email address, postal address and phone number;
- Usernames and passwords;
- Payment information, such as a credit or debit card number;
- Educational and professional background;
- Comments, feedback and other information you submit to the Service; and
- Interests and communication preferences.

### 2.2 Information Collected Automatically

The Service also automatically collects, through its servers and the use of cookies and similar technologies, information that tells us how you use the Service and may include:

- Internet Protocol ("IP") address used to connect your computer to the Internet;
- Computer, device and connection information, such as browser type and version, operating system, mobile platform and unique device identifier ("UDID") and other technical identifiers;
- Uniform Resource Locator ("URL") click stream data, including date and time stamp, referring and exit URLs, search terms you used and pages you visited or searched for on the Service; and
- For location-aware Services, the region, city or town where your device is located in order to provide you with more relevant content for where you are in the world.

We may use and disclose information that does not reveal your identity or permit direct association with any specific individual, such as browser and device information, anonymous usage data and aggregated information, for any purpose, except where we are restricted by law. If we combine non-personal information with personal information, the combined information will be treated as personal information for as long as it remains combined.

You can control cookies through your browser's settings and other tools. However, if you block certain cookies, you may not be able to register, login, or access certain parts or make full use of the Service.

## 3. Use of Your Information

We may use your personal information to:

- Process and fulfill a transaction or order;
- Provide technical, product and other support and to help keep the Service working, safe and secure;
- Respond to your requests, inquiries, comments and concerns;
- Provide, evaluate and improve the Service, its advertisements and promotional campaigns and our other products and services and to develop new products, services and benefits;
- Offer you customized content and individualized personalization of the Service to make it more relevant to your interests and needs;
- Notify you about changes or updates to the Service and our other products and services;
- Provide you with special offers and other information about the Service as well as other products, events and services of ours, our affiliates, and non-affiliated third parties;
- Invite you to participate in surveys, sweepstakes, competitions and similar promotions;
- Identify usage trends and for data analysis, including for purposes of research, audit, reporting and paying royalties and license fees to third-party providers, such as authors and other copyright holders and content distributors, and determining the effectiveness of our promotional campaigns, or in other ways to which you have expressly agreed in a customer agreement; and
- Comply with our legal obligations, resolve disputes, and enforce our agreements.

Case: 17-11589 Document: 51 Date Filed: 05/23/2017 Page: 44 of 53

We may also match or combine the personal information that you provide with information that we obtain from other sources or that is already in our records, whether collected online or offline or by predecessor or affiliated group companies, for the purposes described above.

## 4. Disclosure of Your Information

We may share your personal information with:

- Our affiliates, trading names and divisions within the LexisNexis group of companies worldwide (for a list, visit //www.lexisnexis.com/offices) and certain RELX Group companies that provide technology, customer service and other shared services functions; and
- Our service providers, suppliers, agents and representatives, including but not limited to, editors, payment processors, customer support, email service providers, IT service providers, mailing houses and shipping agents;

to process the information for us based on our instructions and in compliance with this privacy policy and any other appropriate confidentiality and security measures.

We also may share your personal information with our affiliates and with sponsors, joint venture partners and other non-affiliated third parties, including entities for which we are acting as an agent, licensee, application host or publisher, that wish to send you information about their products and services that may be of interest to you, as determined by your choices and communications preferences.

If you access the Service through an institution-sponsored subscription, your personal information and certain usage data gathered through the Service may be shared with your institution for the purposes of usage analysis, subscription management and compliance, cost attribution and departmental budgeting.

If you access an application on the Service through a license agreement with the application's service provider, certain of your personal information will be shared with the service provider so that it can provide you the application, subject to the terms of the service provider's license agreement and privacy policy.

We also may disclose your personal information:

- To (i) respond to or comply with any law, regulation, subpoena, court order or other legal obligation; (ii) detect, investigate and help prevent security threats, fraud or other malicious activity; (iii) enforce and protect our rights and properties; or (iv) protect the rights, property or safety of our users, employees and others; and

- If LexisNexis, the Service or a related asset or line of business is acquired by, transferred to or merged with another company.

The Service may let you post and share personal information, comments, materials and other content. Any information you post or disclose publicly may be collected and used by others, may be indexable by search engines, and might not be able to be removed. Please be careful when disclosing personal information in these public areas.

## 5. Children's Privacy

We do not knowingly collect information from children under the age of 13 or target the Service to children under 13.

## 6. Your Choices and Communications Preferences

You can manage your communications preferences when you register with the Service, by updating your account preferences, by using the "opt-out" or unsubscribe mechanism or other means provided within the communications that you receive, or by contacting us. We reserve the right to notify you of changes or updates to the Service whenever necessary.

## 7. Access to and Accuracy of Your Information

The Service may allow registered users to directly access the account information they provided and make corrections or updates to that information upon login at any time. The accuracy of such information is solely the responsibility of the user.

You may also request access to and correction of other personal information about you that you have directly provided to us through the Service. To protect your privacy and security, we may require you to verify your identity.

If you request to deactivate your account or delete your personal information, we will endeavor to fulfill your request in accordance with our policies but some personal information may persist in backup copies for a certain period of time and may be retained as necessary for legitimate business purposes or to comply with our legal obligations.

Access to personal information that LexisNexis may gather from public records and other sources is subject to applicable laws and our consumer choice policies.

Case: 17-11589 Document: 51 Date Filed: 05/23/2017 Page: 46 of 53

## 8. Data Security

We use a variety of administrative, physical and technical security measures intended to safeguard your personal information.

## 9. Cross-Border Transfer

Your personal information may be transferred to, accessed from and stored in servers and facilities located outside the country where you live as may be necessary for the purposes described in this privacy policy. When we transfer your personal information internationally, we take steps intended to ensure that the information continues to receive appropriate protections.

Certain U.S. entities within the LexisNexis group of companies have certified certain of their services to the EU-U.S. Privacy Shield Framework as set forth by the U.S. Department of Commerce. Please view these entities' Privacy Shield Notice here. To learn more about the Privacy Shield program, and to view these entities' certification, please visit www.privacyshield.gov.

These entities also continue to adhere to the privacy principles of the U.S.-Swiss Safe Harbor framework. To learn more about the Safe Harbor program, and to view these entities' certification, please visit https://safeharbor.export.gov/swisslist.aspx.

## 10. Changes

We may change this privacy policy from time to time. Any changes will be posted on this page with an updated revision date.

## 11. Contact

If you have any questions, comments or requests regarding this privacy policy or our processing of your information, please contact:

>       Privacy Information Manager
>       LexisNexis
>       P.O. Box 933
>       Dayton, Ohio 45401
>       USA
>       Telephone (US toll free): 1-800-831-2578
>       Email: privacy.information.mgr@lexisnexis.com

Last updated: September 16, 2016
Copyright © 2016 LexisNexis

Case: 17-11589   Document: 51   Date Filed: 06/26/2017   Page: 47 of 53

# APPENDIX B
## LIST OF INDIVIDUAL SIGNATORIES

The following individuals join this brief in their personal capacities. Institutional affiliations are listed for identification purposes only.


Anne M. Acton

*Professor of Law and Director of the Law Library, New England Law*

Beth Adelman

*Director, Charles B. Sears Law Library and Vice Dean for Legal Information Services, University at Buffalo School of Law*

Filippa Marullo Anzalone

*Professor of Law and Associate Dean for Library and Technology Services, Boston College Law School*

Brandon C. Butler

*Director of Information Policy, University of Virginia Library*

Michael A. Carrier

*Distinguished Professor, Rutgers Law School*

Tuneen Chisolm

*Assistant Professor, Norman Adrian Wiggins School of Law, Campbell University*

Ralph D. Clifford

*Professor of Law, University of Massachusetts School of Law*

Kyle K. Courtney

> *Copyright Advisor, Harvard University*

Richard A. Danner

> *Rufty Research Professor of Law and Senior Associate Dean for Information*
>
> *Services, Duke University School of Law*

Amy A. Emerson

> *Director, Legal Research Clinic and Adjunct Clinical Professor of Law,*
>
> *Cornell University Law School*

Roger Allan Ford

> *Associate Professor of Law, University of New Hampshire School of Law*

Katie Fortney

> *Copyright Policy and Education Officer,*
>
> *California Digital Library, University of California*

Brian L. Frye

> *Spears-Gilbert Associate Professor of Law,*
>
> *University of Kentucky College of Law*

Shubha Ghosh

> *Crandall Melvin Professor of Law, Syracuse University College of Law*

David R. Hansen

> *Director of Copyright and Scholarly Communication,*
>
> *Duke University Libraries*

Paul Justin Heald

>  *Richard W. and Marie L. Corman Research Professor,*
>
>  *University of Illinois College of Law*

Kenneth J. Hirsh

>  *Director of the Law Library and Professor of Practice,*
>
>  *University of Cincinnati College of Law*

John Joergensen

>  *Senior Associate Dean for Information Services and Professor of Law,*
>
>  *Rutgers University Law School*

Eric E. Johnson

>  *Associate Professor of Law, University of North Dakota School of Law*

Benjamin J. Keele

>  *Research and Instructional Services Librarian,*
>
>  *Robert H. McKinney School of Law, Indiana University*

Jocelyn Kennedy

>  *Executive Director, Harvard Law School Library*

Anne Klinefelter

>  *Director of the Law Library and Associate Professor of Law,*
>
>  *University of North Carolina School of Law*

Stacey M. Lantagne

>  *Assistant Professor of Law, University of Mississippi School of Law*

Case: 17-11589    Document: 51    Date Filed: 05/23/2017    Page: 50 of 53

Sarah Hooke Lee

    *Associate Dean and Director of Information and Research Services,*

    *Northeastern University School of Law*

Richard Leiter

    *Director of the Schmid Law Library and Professor of Law,*

    *University of Nebraska College of Law*

Yvette Joy Liebesman

    *Professor of Law, Saint Louis University School of Law*

Brian J. Love

    *Assistant Professor, Santa Clara University School of Law*

Lisa A. Macklin

    *Director, Scholarly Communications Office, Emory University*

John Mayer

    *Executive Director, Center for Computer-Assisted Legal Instruction*

Lateef L. Mtima

    *Professor of Law, Howard University School of Law*

David J. Seipp

    *Professor of Law and Law Alumni Scholar, Boston University School of Law*

Courtney Selby

    *Associate Dean for Information Services, Director of the Law Library, and As-*

    *sociate Professor of Law,*

    *Maurice A. Deane School of Law at Hofstra University*

Jessica Silbey

*Professor of Law, Northeastern University School of Law*

Kevin L. Smith

*Dean of Libraries and Adjunct Professor of Law, University of Kansas*

David E. Sorkin

*Associate Professor of Law, John Marshall Law School*

Leslie Street

*Assistant Director for Public Services and Clinical Assistant Professor of Law, University of North Carolina School of Law*

Rebecca Tushnet

*Professor of Law, Georgetown University Law Center*

Ronald E. Wheeler

*Associate Professor of Law and Legal Research, Boston University School of Law*

Beth Williams

*Director of the Robert Crown Law Library and Senior Lecturer in Law, Stanford Law School*

Katie Zimmerman

*Scholarly Communications and Licensing Librarian, Massachusetts Institute of Technology Libraries*

Jonathan L. Zittrain

*George Bemis Professor of International Law, Harvard Law School*

Case: 17-11589    Date Filed: 05/23/2017    Page: 52 of 53

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B), 28.1(e)(2), and 29(d). The document contains **6,498** words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).


Dated: May 23, 2017          *s/ Charles Duan*
                             Charles Duan
                             *Counsel for Amici Curiae*

Case: 17-11589  Document: 51  Date Filed: 05/23/2017  Page: 53 of 53

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2017, I caused the foregoing **Brief of Public Knowledge, the American Library Association, the Association of Research Libraries, the Association of College and Research Libraries, the Organization for Transformative Works, the Institute of Intellectual Property and Social Justice, and Forty-One Librarians and Professors of Law as *Amici Curiae* in Support of Public.Resource.Org, Inc.** to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

Dated: May 23, 2017      *s/ Charles Duan*
                                     Charles Duan
                                     *Counsel for Amici Curiae*