Case No. 17-11589

# United States Court of Appeals

*for the*

# Eleventh Circuit

CODE REVISION COMMISSION on behalf of and for the benefit of THE GENERAL ASSEMBLY OF GEORGIA, and THE STATE OF GEORGIA

*Plaintiff-Appellee*,

v.

PUBLIC.RESOURCE.ORG, INC.

*Defendant-Appellant*.

*Appeal from the United States District Court*
*for the Northern District of Georgia, Atlanta Division*
*Case No. 1:09-CV-02594-RWS*

## APPELLEE'S SUPPLEMENTAL APPENDIX VOLUME II

ANTHONY B. ASKEW
LISA C. PAVENTO
WARREN J. THOMAS
Meunier Carlin & Curfman LLC
999 Peachtree Street NE, Suite 1300
Atlanta, Georgia 30309
Telephone:  (404) 645-7700

*Counsel for Appellee-Plaintiff*                    July 7, 2017

# APPELLEE'S SUPPLEMENTAL APPENDIX VOLUME II

## <u>INDEX</u>

| DOCKET/<br>TAB # | <u>DESCRIPTION</u> |
|---|---|
| 33 | Defendant's Memorandum Of Law In Opposition To The Commission's Motion For Partial Summary Judgment |
| 33-1 | Defendant's Response To Plaintiff's Statement Of Undisputed Material Facts |
| 34-1 | Exhibit 1 to Plaintiff's Memorandum Of Law In Opposition To Defendant's Motion For Summary Judgment – Plaintiff's Additional statement Of Undisputed Material Facts |
| 41-1 | Defendant's Response To Plaintiff's Supplemental Statement Of Undisputed Material Facts |
| 46 | Permanent Injunction Order |
| 48 | Defendant's Supplemental Statement In Support Of Joint Motion For Entry Of Proposed Permanent Injunction Order |
| 49 | Notice of Appeal |
| 58-4 | Exhibit 4 to Plaintiff's Memorandum In Support Of Plaintiff's Detailed Request For An Award Of Attorney's Fees And Other Costs - May 1, 2014 Letter From Carl Malamud to Secretary of State, Delaware |
| 58-5 | Exhibit 5 to Plaintiff's Memorandum In Support Of Plaintiff's Detailed Request For An Award Of Attorney's Fees And Other Costs – July 15, 2013 Letter From Carl Malamud to Idaho Secretary of State et al. |

| DOCKET/ TAB # | **DESCRIPTION** |
|---|---|
| 58-6 | Exhibit 6 to Plaintiff's Memorandum In Support Of Plaintiff's Detailed Request For An Award Of Attorney's Fees And Other Costs – October 11, 2013 Letter From Carl Malamud to Larry Schemmel, Attorney General, Mississippi |
| 58-7 | Exhibit 7 to Plaintiff's Memorandum In Support Of Plaintiff's Detailed Request For An Award Of Attorney's Fees And Other Costs – April 15, 2008 Letter From Carl Malamud to Dexter Johnson, State of Oregon |
| 58-8 | Exhibit 8 to Plaintiff's Memorandum In Support Of Plaintiff's Detailed Request For An Award Of Attorney's Fees And Other Costs – May 16, 2008 Letter From Karl Olson to Dexter Johnson, State of Oregon |

# DKT 33

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | **CIVIL ACTION** |
| v. | ) ) ) | **FILE NO.   1:15-CV-2594-RWS** |
| PUBLIC.RESOURCE.ORG, INC., | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT PUBLIC.RESOURCE.ORG, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO THE COMMISSION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................................1

II.  SUMMARY OF FACTS AND ARGUMENTS .....................................................2

III. LEGAL ARGUMENTS ........................................................................................4

      A.     The Commission's argument that the statutory text in the O.C.G.A. can be treated differently from the annotations that make it the only official Code of Georgia must fail. ............................................................................................4

      B.     The O.C.G.A.'s selections and arrangements lack sufficient originality for copyright to the extent they are mechanical, routine collections of facts or simply follow the previous publisher's format. ...................................................8

      C.     To the extent any portion of the O.C.G.A. is copyrightable, Public Resource's scanning and posting the O.C.G.A. is a fair use. ..............................12

            i.     The purpose of Public Resource's non-commercial use, to make Georgia's only official Code accessible to the public, favors fair use. ...........................................................................................................12

            ii.    The nature of the copyrighted work favors fair use. ................................14

            iii.   Public Resource used no more than necessary to serve the purpose of making the official Code more available to citizens of Georgia and the general public. ............................................................................14

            iv.   The record contains no evidence of harm to the copyright holder or the value of the O.C.G.A. ....................................................................16

IV.  CONCLUSION ....................................................................................................21

LEGAL02/36379790v4

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bellsouth Advert. & Publ'g Corp. v. Donnelly Info. Publ'g, Inc.*,
    999 F.2d 1436 (11th Cir. 1993) (en banc) ............................................................10

*Callaghan v. Myers*,
    128 U.S. 617 (1888) .......................................................................................6, 7

*Cambridge Univ. Press v. Patton*,
    769 F.3d 1232 (11th Cir. 2014)...............................................................passim

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ...........................................................................................16

*Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) .............................................................................................9

*Golan v. Holder*,
    132 S. Ct. 873 (2012) ........................................................................................12

*Matthew Bender & Co., Inc. v. West Pub. Co.*,
    158 F.3d 674 (2d. Cir 1998) .............................................................................8, 9

*Wheaton v. Peters*,
    33 U.S. 591 (1834)..........................................................................................5, 6

LEGAL02/36433166v3

## I. __INTRODUCTION__

The Commission asks the Court to decide whether a state can own a copyright in the original and creative annotations of its uncopyrightable state's laws. But that is not the issue the Court needs to decide to rule on the Commission's motion. The facts of this case are unique, and the critical issue is much more narrow and fact-specific. This Court need only decide whether the State of Georgia, having long ago decided that its only official Code should include certain indexes, tables and other factual annotations, should be able to use copyright law to enjoin anyone except its for-profit agent from distributing that official Code. The answer must be no. First, the whole O.C.G.A. is one work that is not subject to copyright because it is Georgia's law. Second, even if the mundane annotations enjoyed a thin copyright, given the undisputed facts and circumstances in this specific case, Public Resource's purchasing, scanning and distributing the O.C.G.A. free to make it more available and more useful to inform the public would constitute a fair use. Notably, even considering the submissions of proposed Amicus Lexis/Nexis, three years after Public Resource first scanned and posted the O.C.G.A. there is no evidence—only conjecture—that Public Resource's actions could materially impair the marketability of printed volumes of

LEGAL02/36379790v4

the O.C.G.A., CD-ROMs, or subscriptions to Lexis/Nexis's online legal research services.

## II. SUMMARY OF FACTS AND ARGUMENTS

When Carl Malamud started Public.Resource.Org, Inc. ("Public Resource"), he believed the Rule of Law would be strengthened by the wider availability on the Internet of primary legal materials, the raw materials of our democracy.  Malamud Decl., Defendants Statement of Undisputed Material Facts ("DSUMF") Ex. A at ¶¶ 1, 14-15, 19.  In order to promote public education and public safety, equal justice for all, a better informed citizenry, more efficient markets, and the Rule of Law, Public Resource has undertaken to make edicts of government, including the O.C.G.A., available on a noncommercial basis.  *Id.* at ¶ 45.

The State of Georgia enacts and promulgates its laws through its legislature. *Id.* at ¶ 44.  The Code Revision Commission assists the legislature in publishing the laws it enacts in the O.C.G.A.  *Id.* at ¶ 82.  Most of the commissioners are Georgia's elected officials and the Commission's work is supervised by elected legislators.  Ex. D, Ga. Code Ann., Foreword at ix-x.  In 2006, the Commission entered into an agreement for publication with Matthew Bender & Co., Inc. ("Lexis/Nexis").  Ex. F at 1.  The Commission, however, retained oversight and ultimate control over publishing the O.C.G.A.  *Id.* at 3.  The agreement specifies

- 2 -

the Commission's and Lexis/Nexis's respective roles in codifying, publishing, and maintaining the O.C.G.A.  It also specifies what the annotations Lexis/Nexis prepares, under the Commission's direct supervision, must contain.  *Id.* at 2, 4-5. In return, the State gives Lexis/Nexis exclusive rights to publish the printed O.C.G.A., sell it on CD-ROMs, and provide paid subscribers access to it online. Stip. at ¶¶ 84-85.  This exclusivity produces the absurd result that Fastcase, which partners with the State Bar of Georgia to provide its legal research service free to the Bar's 42,000 members, can only provide those lawyers with an "unofficial compilation" of the Code of Georgia, with titles and catchlines written by Fastcase. Declaration of Edward Walters ("Walters Decl."), Ex. L at ¶¶ 8-13).

The publishing agreement also requires that Lexis/Nexis provide Georgia's statutes, stripped of their annotations, on a website that the public can access for free, if they first agree to accept Lexis/Nexis's terms of use.  DSUMF Ex. F at 11-12; Stip. at ¶ 73-75, 86-87; Dkt. 17-10; Dkt. 17-9.  At least one citizen of Georgia found the requirement to accept those terms of use distasteful, particularly a provision requiring users to agree to jurisdiction in a New York court and provisions prohibiting reuse (such as posting) of the laws on the site even by public and non-profit users.  Johnson Decl., DSUMF Ex. K at ¶ 10.  The Lexis/Nexis

website also suffers from technical limitations that make it difficult for users to locate and read the laws of Georgia.  *Id.* at ¶¶ 11-18.

In addition to these shortcomings, there are other good reasons why Georgia's citizens, and others wishing to know and understand Georgia's laws, might not find the Lexis/Nexis website as useful as the printed O.C.G.A. or another website that provides functionality different from Lexis/Nexis's website. While the Lexis/Nexis free website displays the statutory text and numbering, without the annotations the statutory text simply is not the one official Code of Georgia.

### III.  <u>LEGAL ARGUMENTS</u>

**A.    The Commission's argument that the statutory text in the O.C.G.A. can be treated differently from the annotations that make it the only official Code of Georgia must fail.**

The Commission misconstrues Public Resource's position as asserting that annotations in the O.C.G.A., standing alone, are laws.  Pl.'s Mem. at 16-18. Instead, Public Resource argues that the O.C.G.A. is a single edict of government with one author, Georgia's General Assembly, acting through the Commission. Deft's Mem. at 8-11.  This case is unusual because most official codes are not annotated and most annotated codes are not official.  The cases in which courts have analyzed annotations and found them eligible for a copyright addressed

annotations private companies created for themselves, not annotations that a State commissioned and approved for its only official Code. As set out in Public Resource's opening brief and DSUMF, the State, particularly acting through its general assembly, decided that the only official Code of Georgia should be annotated. Deft's Mem. at 3-4; DSUMF at ¶¶ 13-22, 24-29. To create that annotated official Code, a committee recommended that the laborious editorial process of publishing the O.C.G.A. should be outsourced to an appropriate publisher of legal materials and the General Assembly agreed. *Id.* at ¶¶ 13-15. This would be a different case if Lexis/Nexis decided to create and publish its own unofficial, Code of Georgia, Annotated. The ship has sailed, however, and the State cannot change the O.C.G.A's nature to make its state-mandated annotations "unofficial" by passing session laws saying they are not enacted as statutes. Public Resource has never contended that legislative enactment of statutes is the sole reason the O.C.G.A. is in the public domain as an edict of government. Nor does Public Resource ask the Court to strike down as unconstitutional those session laws, which Georgia passed in the two sessions between first asserting copyright against Public Resource and filing this action. The law involved in *Wheaton v. Peters* was judicial opinions, not statutes, and it is settled that such opinions are not subject to copyright.

The Commission's reference to the reported decision of *Wheaton v. Peters* (Pl.'s Mem. at 17) is misleading.  In that case, the parties were private publishers of Supreme Court reports.  The remark that compilations "may be of great utility, but they are not the law" was speaking of compilations of judicial opinions—reporters.  And, moreover, the language quoted in the Commission's brief and presented as the Supreme Court's is actually in the argument of one of the defendants' attorneys, not the Court's opinion, which begins at page 654.  The Supreme Court decided that Wheaton might have exclusive rights to publish his reports under an act of Congress but remanded for a jury trial to determine whether Wheaton had complied with requisite publication of his compliance with the statute in a newspaper and delivery of a copy to the secretary of state.  *Wheaton v. Peters*, 33 U.S. 591, 667-68 (1834); *see also Callaghan v. Myers*, 128 U.S. 617, 648 (1888) (summarizing).

The Commission relies on *Callaghan* for its proposition that the official nature of the O.C.G.A. does not "transform the annotations into the law to make those annotations uncopyrightable."  Pl.'s Mem. at 17.  This—and especially the replacement of original language in the passage quoted with an ellipses—is misleading.  There is no official code of Illinois, annotated or otherwise.  The supplemental materials the Supreme Court found copyrightable by the Court

- 6 -

Reporter, not by Illinois, were headnotes, syllabi of each opinion, lists of the judges composing the court, names of counsel and sometimes their arguments and an index, arranged alphabetically, consisting substantially of a reproduction of the headnotes. *Id.*, 128 U.S. at 633. The State of Illinois did not try what Georgia does here—to commission annotations for the State's only official publication of the statutory law and then assert copyright to limit the public's access to them. "[T]here was no legislation of the state of Illinois which forbade the obtaining of a copyright by [the reporter], or which directed that the proprietary right which would exist in him should pass to the state of Illinois, or that the copyright should be taken out for or in the name of the state, as the assignee of such proprietary right." *Id.* at 647. The Court therefore applied the "general proposition that the reporter of a volume of law reports can obtain a copyright for it as an author, and that such copyright will copy the parts of the book of which he is the author, although he has no exclusive right in the judicial opinions published…" *Id.* at 649 (collecting authority).

Indeed, Public Resource does not argue that the annotations are *transformed* from copyrightable to public domain works when they join the statutory text in the O.C.G.A.'s volumes. Rather, the annotations are born in the public domain. Lexis/Nexis's editors' numerous selections, coordination and arrangements carry

LEGAL02/36433166v3

out the General Assembly's and the Commission's deliberate instructions that
Georgia's only official Code shall contain titles, catchlines, indexes, research
references and the other annotations at issue.  Nor does Public Resource claim that
the word *official*, alone, can render any official document uncopyrightable.  Here,
the undisputed facts, concerning how the O.C.G.A. came to contain the annotations
it does, support holding that the O.C.G.A. is an edict of government and therefore
not copyrightable.

### B. The O.C.G.A.'s selections and arrangements lack sufficient originality for copyright to the extent they are mechanical, routine collections of facts or simply follow the previous publisher's format.

As discussed in Public Resource's memorandum in support of its motion, (at
11-13), copyright does not protect expression in a compilation when the selection
or arrangement is conventional or dictated by practical considerations.  *Matthew
Bender & Co., Inc. v. West Pub. Co.*, 158 F.3d 674, 681-82 (2d. Cir 1998).  Both
the Commission and Lexis/Nexis argue that because some annotated codes meet
the originality requirement for registration and copyright protection, the
O.C.G.A.'s annotations do too.  Pl. Mem. at 13; Lexis/Nexis Mem. at 16.  The
Court should see through this fallacy.  A district court's reasoning that "courts
have consistently held that telephone directories are copyrightable" instead of

- 8 -

analyzing the selection and arrangement in the directory at issue was the error the Supreme Court reversed in the *Feist* case.  *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344 (1991) (describing district court's decision).  Instead, section 101 of the copyright act "instructs courts that, in determining whether a fact-based work is an original work of authorship, they should focus on the manner in which the collected facts have been selected, coordinated, and arranged."  *Id.* at 358.

The Commission and Lexis/Nexis unsurprisingly focus on the annotations that are summaries of opinions.  They point to differences between summaries of the same case in the O.C.G.A. and West's competing annotated code as evidence that the summaries are creative.  But this ignores the similarities that flow from the court's decision that some evidence supported the ALJ's calculation of a claimant's weekly wage and award of workers' compensation benefits based on the claimant's testimony.  These are facts and, as one court put it, a publisher's overall choice of which procedural facts to include in a case report does not demonstrate the requisite originality or creativity because "names of the parties, the deciding court, and the dates of argument and decision are elementary items, and their inclusion is a function of their importance, not West's judgment."  *Matthew Bender*, 158 F.3d at 683.

More importantly, the Commission does not only assert copyright in the summaries; it asserts copyright in numerous different parts of the O.C.G.A. such as "catchlines of code sections; names of titles, Chapters, Articles, Parts, and Subparts, history lines; editors' notes; Code Commission notes; annotations; research references; cross-references; indexes; and other such materials." DSUMF Ex. H.  Catchlines are "descriptive headings …to denote the contents of a Code section.  DSUMF Ex. F, § 1.4.  Names of titles, chapters, articles, parts, and subparts are similar.  Descriptive headings consisting of a few words have been held to lack the requisite originality for copyright protection.  *Bellsouth Advert. & Publ'g Corp. v. Donnelly Info. Publ'g, Inc.*, 999 F.2d 1436, 1442 (11th Cir. 1993) (en banc).  The *Bellsouth* court concluded that headings like "Attorneys" or "Banks" represented such obvious labels for the matter appearing under them as to lack the requisite originality for copyright and that any expressive act in choosing headings for categories would merge with the idea of listing such entities as a class of businesses in a directory.  *Id.* at 1444.  History lines show where a new Code section appeared in prior official codes to trace that Code section back to its origin. DSUMF Ex. E p. 104.  The Code citations are facts and thus not protected elements.  Likewise, research references, cross-references and indexes, labor intensive as they may be, are facts that are discovered by Lexis/Nexis's editors, not

- 10 -

creative expression.   None of these parts of the O.C.G.A. are protectable by copyright.

The Commission's claim that Lexis/Nexis's selection and arrangement in the annotations is original should fail for another reason:  the rules for selection and arrangement were largely developed by the Commission and its staff as part of the recodification process that began in 1978.  DSUMF Ex. E at 102.  At that time, the Commission adopted the three unit numbering system combining title, chapter and section numbers separated by a dash, which was already used in a number of other state codes.  *Id.* at 102 and n.4.  At that time, the Commission and editors at the Michie Company decided that case summary annotations would contain direct quotations from the reported decisions, where possible, the full name of the case, the full Georgia Reports, Georgia Appeals Reports, and Southeastern Reporter citations and the year of decision.  *Id.* at 104.  Case annotations will generally be arranged by subject matter, with cases involving the constitutionality of the statute appearing first.  *Id.* at 105-106.  When Lexis/Nexis was awarded the current contract— almost thirty years later—it agreed to "maintain the organization and arrangement of the current Code in all supplements and replacement volumes published under [the] Agreement."  DSUMF at ¶¶ 24, 26; Ex. F at § 1.4.  The same agreement spells out how to choose cases and compile case summary annotations

and what research references, cross-references and indexes the O.C.G.A. must include.  DSUMF ¶¶ 27-29.  Therefore, the overall selection and arrangement of the annotations did not originate with Lexis/Nexis.  For all these reasons, the O.C.G.A.'s annotations are not sufficiently original or creative to be protected by copyright.

**C.     To the extent any portion of the O.C.G.A. is copyrightable, Public Resource's scanning and posting the O.C.G.A. is a fair use.**

> ***i.     The purpose of Public Resource's non-commercial use, to make Georgia's only official Code accessible to the public, favors fair use.***

The Eleventh Circuit has stated that applying the fair use doctrine in a way that promotes the dissemination of knowledge, not simply its creation, is consistent with the goals of copyright.  *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1282 (11th Cir. 2014) (citing *Golan v. Holder*, 132 S. Ct. 873, 888 (2012)).  The Commission argues that Public Resource's use of the O.C.G.A. was not educational or transformative because it deliberately copied Georgia's Code to provoke this suit.  Pl. Mem. at 19-20.  Public Resource was not simply goading Georgia and other states to make a point, but posted the O.C.G.A, the only official Code of Georgia, for the benefit of citizens.  Malamud Decl., ¶¶ 45-47.  While its

Proclamation of Promulgation has a lighthearted, even cheeky tone, Public

Resource tried every possible avenue to communicate with the Commission so it

might work together with Public Resource to exploit the Internet's potential to

make the O.C.G.A. more readily useable by the public.  For example, within days

of receiving the Commission's cease-and-desist letter, Carl Malamud wrote back a

reasoned defense of Public Resource's actions, concluding "I would be more than

happy to come to Georgia to discuss this matter with you."  Stip. Ex. D, Dkt. 17-4.

But the Commission has never once agreed to such a dialogue.  Fastcase also tried

to obtain a license to make the O.C.G.A. available online to its bar association

subscribers, but the Commission would not talk with them either.  Walters Decl.,

¶¶ 8-13.

     The Commission and Lexis/Nexis defend Lexis/Nexis's free statutory code

website and argue that the public has plenty of access to the statutory code and the

O.C.G.A.  But whether the Lexis/Nexis free site is problematic is immaterial;

fundamentally, this case is about others' rights to build other websites that speak

the official Code of Georgia.  Even assuming Georgia's websites and libraries

provide some public access to the statutory code and the O.C.G.A., Public

Resource's posting the O.C.G.A. online still *increases* public access to the one

- 13 -

official Code of Georgia, consistent with copyright's goal to spread knowledge in addition to providing incentives to create works.

.

### ii. The nature of the copyrighted work favors fair use.

As discussed in Public Resource's memorandum in support of its own motion for summary judgment, the O.C.G.A. is primarily a compilation of facts, and therefore the scope of fair use is greater than it would be for a more creative work.  Deft's Mem. at 18-19.  The Commission asserts that the statutes are facts but the annotations are opinions—without any explanation of why the Court should consider them opinions.  As discussed in section III B above, catchlines, history lines, editor's notes, research references, cross-references and indexes are nothing but factual.  Case annotations include summaries of opinions, but that does not make *them* opinions.  Additionally, the Court could properly consider that the O.C.G.A. is the only official Code of Georgia as bearing on the second fair use factor and weighing in favor of fair use.

### iii. Public Resource used no more than necessary to serve the purpose of making the official Code more available to citizens of Georgia and the general public.

Public Resource purchased, scanned, posted and distributed the entire O.C.G.A. because posting the statutory text would not serve the same purpose of making the only official Code of Georgia more available and useful to the public. Scholarship, analysis and other public engagement would be undermined without free access to the complete official Code, which includes annotations by design. Judges, lawyers and citizens treat the annotations as authoritative and rely on them to interpret the Code.  Therefore, Public Resource posts as much of the O.C.G.A. as is necessary to fulfill its purpose.

The Commission offers no analysis of factor three beyond observing that excessive verbatim copying weighs against fair use.  It fails to acknowledge the authorities explaining that verbatim copying of a work is sometimes necessary to serve a fair use purpose.  See Deft's Mem. at 14-15; 19-20.  Nor does it explain why the Court should find Public Resource's use of the whole O.C.G.A. excessive. Amicus Lexis/Nexis tries a little harder but essentially argues that generally use of an entire work may not constitute a fair use, so Public Resource's nonprofit, public interest use of the O.C.G.A., including its annotations, is not either.  The Eleventh Circuit, however, has expressly stated that a court abdicates its duty to analyze the third factor for each instance of alleged infringement by applying a blanket rule or benchmark.  *Cambridge* at 769 F.3d at 1271-72.  That court noted that "fair use

- 15 -

analysis must be performed on a case-by-case/work-by-work basis." *Id.* at 1272,

citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584-85 (1994).  The

*Cambridge* court invoked the Supreme Court's instruction to avoid "hard

evidentiary presumption[s]" and "eschew a rigid, bright-line approach to fair use."

*Id.* quoting *Campbell*.  For the same reason, the district court properly considered

whether the individual instances of alleged infringement were excessive in relation

to the defendants' pedagogical purpose. *Id.* at 1275.  Here, Public Resource's

educational and public interest purpose required using the whole O.C.G.A. and the

Court can find that this factor does not weigh against fair use.


> ### iv.    *The record contains no evidence of harm to the copyright holder or the value of the O.C.G.A.*

The Commission's two-paragraph discussion of factor four is far too

conclusory to support a finding that this factor weighs against fair use.  Instead of

describing the market for the O.C.G.A. and pointing to any scintilla of evidence of

likelihood of harm to it, the Commission and Lexis/Nexis essentially ask the Court

to apply a presumption of market harm from Public Resource's scanning, posting

and distributing the O.C.G.A.  But there is no precedent for such a presumption

and the law of fair use forbids it.  The Commission cites and quotes the *Cambridge*

decision, but then essentially ignores what *Cambridge* teaches about how to

identify the relevant market and analyze evidence relating to potential harm.  That case teaches that, in a sense, the copyright grant's terms include a transaction cost: an implied license to the public for fair use of the work.  *Cambridge*, 769 F.3d at 1257.  To determine the scope of fair use, courts should imagine a hypothetical perfect market for the work in question and then ask how much of that market fair users can capture without removing the copyright holder's incentive to propagate the work.  *Id.* at 1258.  Ideally, the copyright holder will sell the work to buyers who can pay the market rate and tolerate secondary uses which do not undermine the market for the work.

Here, the market for the O.C.G.A. is unusual, to say the least.  The Commission sets the price Lexis/Nexis can charge buyers and keeps it low.  DSUMF Ex. F at 19, 40; Howerton Decl., ¶ 6.  The agreement treats Lexis/Nexis's online service and CD-ROM product differently than the printed, bound volumes.  DSUMF Ex. F at 23-25.  West Publishing charges five times as much for its competing Code of Georgia, annotated and presumably gets it—even though it is an unofficial compilation and not State of Georgia-approved.  Howerton Decl. at ¶ 9.  Lexis/Nexis must provide the Commission the electronic database version of the O.C.G.A.  DSUMF Ex. F at 12.  Lexis/Nexis cannot charge defined State Government Subscribers, who might otherwise

purchase the printed, bound volumes, for subscriptions to the C.D.-ROM.  *Id.* at

13.  And it gets more complicated.  State Government Subscribers can also copy,

print and sell, as books, the parts of the O.C.G.A. that relate to their own

department or agency.  *Id.*  The agreement describes the market for the CD-ROM

product as "the courts, government agencies, law libraries, law firms, members of

the Georgia Bar, legal assistants and other potential subscribers."  *Id.* at 37.  The

Court can logically conclude, therefore, that neither the Commission nor

Lexis/Nexis considered Georgia citizens outside of the legal community an

important enough market to list in the agreement, much less such individuals who

reside outside of Georgia.  When Fastcase sought to purchase a license to provide

the O.C.G.A. online as part of its online legal research service, however, it was

told no such license would be granted at any price.  Walters Decl. at ¶ 8-13.

Lexis/Nexis's printed O.C.G.A. also has qualities not achieved via online access or

thumb drive content.  The agreement requires specified paper and binding

materials and sewing in a specified way "to produce a volume as strong as that

commonly known as 'Library Editions.'"  DSUMF Ex. F at 16.  If these qualities

are important to the State, it follows that they are important to some potential

purchasers like courts, law libraries, and law firms and that these purchasers will

not consider scans or downloads of scans a competing substitute for the printed,

bound O.C.G.A.  Finally, Lexis/Nexis's cost to publish O.C.G.A. rises every year,

making the printed publication "a struggle" every year.  DSUMF Ex. I.

Lexis/Nexis blames the Commission's refusal to let it raise the price of the printed

O.C.G.A. for its struggles.  *Id.*

Because of the publishing agreement's unusual nature, the State does not

receive revenue from royalties on the sale of printed, bound volumes of the

O.C.G.A. in the first place.  Ex. O at 14.  If any sales of books are lost, Lexis/Nexis

is deprived of revenues, but it is not the copyright holder.  Assuming this were

true, it is not harm to the market for the O.C.G.A.  It is a different kind of harm not

relevant to a fair use analysis.

*Cambridge* teaches that the scope of fair use in a given case is an *evidentiary*

question.  769 F.3d at 1258.  Where the publishers offered no evidence showing

that they lost any book sales in or after 2009, the district court did not err in finding

that the defendants' use did not affect the plaintiffs' actual or potential sale of

books.  *Id.* at 1276.  The court also considered whether the defendants' use

damaged the market for licenses for digital excerpts.  Where a license was

available for digital excerpts, the district court properly weighed the fourth factor

against fair use.  Where there was no evidence that a license for digital use of a

given work was available in the market, however, the district court properly

LEGAL02/36433166v3

weighed the fourth factor in favor of fair use.  *Id.* at 1279.  Although the alleged

infringer has the overall burden to show lack of substantial damages to the market,

the court reasoned that the publishers could reasonably be expected to have

evidence of a market for digital licenses.  *Id.*  It was reasonable, therefore, to place

the burden of going forward with such evidence on them and, where no such

evidence was offered, to presume that no market for digital permissions for a given

work existed.  Here, neither the Commission nor Lexis/Nexis can point to any

evidence of lost sales—print, online subscription, or CD-ROM—in the three years

since Public Resource scanned, posted and distributed the O.C.G.A.  Nor can it

show that Public Resource could have obtained a license to use the O.C.G.A. on its

website as it does.  The Commission rejected Fastcase's offer to do just that.

Importantly, the agreement between the Commission and Lexis/Nexis requires

Lexis to track use of the statutory code on its free site and report "the effect, if any,

on subscriptions to the Code in print and on CD-ROM."  DSUMF Ex. F at 12.  But

neither the Commission nor Lexis/Nexis has not offered any such report.

Finally, as set forth in Public Resource's memorandum in support of its

motion for summary judgment (at 22-24), in many cases a citizen's ability to

consult the O.C.G.A. on its website for free would not displace a purchase from

Lexis/Nexis.  As the Commission observes, people can read the entire O.C.G.A.

for free if they have access to a state or county library, state university or county law enforcement office within the State of Georgia.  The Commission and Lexis/Nexis do not contend that a citizen's use at those Georgia facilities supplants the normal market.  Just like a library, Public Resource purchased the O.C.G.A. sets that it scanned and posted.  If *exactly* what Public Resource did was widespread, Lexis/Nexis would sell more books, not fewer.  For all these reasons, the Court can properly find that Public Resource's use has had no effect on actual or potential sales of the O.C.G.A. Therefore, the fourth factor is neutral or favors fair use.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant summary judgment in favor of Public Resource on its counterclaim and both the Commission's claims.

LEGAL02/36433166v3

Respectfully submitted this 7th day of June, 2016.


By:  /s/ *Elizabeth H. Rader*
Jason D. Rosenberg
Georgia Bar No. 510855
jason.rosenberg@alston.com
Sarah P. LaFantano
Georgia Bar No. 734610
sarah.lafantano@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424
Telephone 404-881-7461
Fax (404) 253-8861

Elizabeth H. Rader
*Admitted pro hac vice*
elizabeth.rader@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Telephone:  202-239-3008
Fax: (202) 239-3333

*Attorneys for Defendant*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA, | ) ) ) ) ) ) | **CIVIL ACTION**<br><br>**FILE NO.   1:15-CV-2594-RWS** |
| Plaintiff, | ) | |
| v. | ) ) | |
| PUBLIC.RESOURCE.ORG, INC., | ) | |
| Defendant. | | |

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to L.R. 5.1C and 7.1D of the Northern District of Georgia, the foregoing **Defendant Public.Resource.Org, Inc.'s Memorandum of Law In Opposition to the Commission's Motion for Partial Summary Judgment** complies with the font and point selections approved by the Court in L.R. 5.1C. The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

*/s/ Sarah P. LaFantano*
Sarah Parker LaFantano
Georgia Bar No. 734610

- 1 -

| CODE REVISION COMMISSION on | ) | |
| Behalf of and For the Benefit of the | ) | |
| GENERAL ASSEMBLY OF | ) | **CIVIL ACTION** |
| GEORGIA and the STATE OF | ) | |
| GEORGIA, | ) | **FILE NO.   1:15-CV-2594-RWS** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| PUBLIC.RESOURCE.ORG, INC., | ) | |
| | | |
| Defendant. | | |

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Defendant Public.Resource.Org, Inc.'s**

**Memorandum of Law In Opposition to the Commission's Motion for Partial**

**Summary Judgment** was electronically filed with Clerk of Court using the

CM/ECF system which will automatically send notification of such filing to all

attorneys of record.


*/s/ Sarah P. LaFantano*
Sarah P. LaFantano
Georgia Bar No. 734610

# DKT 33-1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA, | ) ) ) ) ) | **CIVIL ACTION**<br><br>**FILE NO.   1:15-CV-2594-RWS** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PUBLIC.RESOURCE.ORG, INC., | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant Public.Resource.Org, Inc. hereby responds to Plaintiff's enumerated Statement of Undisputed Material Facts (Dkt. 30-2):

1.     *Each Official Code of Georgia Annotated ("OCGA") volume and supplement in Exhibit A to the Stipulation of Facts ("Exhibit A") contains statutory text and non-statutory annotation text. Dkt. 17 ¶1.*

**RESPONSE**:

Admitted.

2.     *The 2014 and 2015 State of Georgia session laws each state in part:*

*Annotations; editorial notes; Code Revision Commission notes; research references; notes on law review articles; opinions of the*

> *Attorney General of Georgia; indexes; analyses; title, chapter, article, part, and subpart captions or headings, except as otherwise provided in the Code; catchlines of Code sections or portions thereof, except as otherwise provided in the Code; and rules and regulations of state agencies, departments, boards, commissions, or other entities which are contained in the Official Code of Georgia Annotated are not enacted as statutes by the provisions of this Act.*

*2014 Ga. Laws 866, § 54; 2015 Ga. Laws 5, § 54. Dkt. 17 ¶ 2.*

**RESPONSE**:

Admitted.

3.    *The non-statutory annotation text of each OCGA volume and supplement in Exhibit A includes summaries of judicial decisions. Dkt. 17 ¶ 3.*

**RESPONSE**:

Admitted.

4.    *The summaries of judicial decisions in the non-statutory annotations of each OCGA volume and supplement in Exhibit A are prepared by Matthew Bender and Company, a member of the LexisNexis Group, a division of Reed Elsevier Properties, Inc. ("LexisNexis") under contract for the State of Georgia, and are finalized under the direct supervision of and subject to the approval of the Code Revision Commission. Dkt. 17 ¶ 4.*

**RESPONSE:**

Admitted.

5.     *The judicial decisions summarized in the judicial decision summaries in each OCGA volume and supplement in Exhibit A have been selected by LexisNexis to be summarized for inclusion in the OCGA, under the direct supervision and subject to the approval of the Code Revision Commission. Dkt. 17 ¶ 5.*

**RESPONSE:**

Admitted.

6.     *The content of the summaries of judicial decisions in each OCGA volume and supplement in Exhibit A has been selected for inclusion in the OCGA. Dkt. 17 ¶ 6.*

**RESPONSE:**

Admitted.

7.     *The summaries of judicial decisions in each OCGA volume and supplement in Exhibit A have been coordinated with an OCGA statute (statutory text). Dkt. 17 ¶ 7.*

**RESPONSE:**

Admitted.

8.     *The summaries of judicial decisions in each OCGA volume and supplement in Exhibit A are arranged under the heading "Judicial Decisions" prior to or following an OCGA statute (statutory text). Dkt. 17 ¶ 8.*

**RESPONSE:**

Admitted.

9.     *The summaries of judicial decisions are selected, coordinated and arranged in each OCGA. volume and supplement listed in Exhibit A. Dkt. 17 ¶ 9.*

**RESPONSE:**

Admitted.

10.     *The non-statutory annotation text of each OCGA volume and supplement in Exhibit A includes editor's notes. Dkt. 17 ¶ 10.*

**RESPONSE:**

Admitted.

11.     *Editor's notes in each OCGA volume and supplement in Exhibit A are prepared by LexisNexis under contract for the State of Georgia, and under the direct supervision and subject to the approval of the Code Revision Commission. Dkt. 17 ¶ 11.*

**RESPONSE:**

Admitted.

12.    *The editor's notes in each OCGA volume and supplement in Exhibit A have been coordinated with an OCGA statute (statutory text). Dkt. 17 ¶ 12.*

**RESPONSE:**

Admitted.

13.    *The editor's notes in each OCGA volume and supplement in Exhibit A are arranged after the heading "Editor's notes" prior to or following an OCGA statute (statutory text). Dkt. 17 ¶ 13.*

**RESPONSE:**

Admitted.

14.    *The editor's notes are coordinated and arranged in each OCGA volume and supplement listed in Exhibit A. Dkt. 17 ¶ 14.*

**RESPONSE:**

Admitted.

15.    *Each OCGA volume and supplement in Exhibit A is the subject of a U.S. Copyright Registration as shown in Exhibit A. Dkt. 17 ¶ 17; Dkt. 17-1.*

**RESPONSE:**

Admitted.

16.    *The non-statutory annotation text of each OCGA volume and supplement listed in Exhibit A includes summaries of opinions of the Attorney General of Georgia. Dkt. 17 ¶ 18.*

**RESPONSE:**

Admitted.

17.     *The summaries of opinions of the Attorney General of Georgia in the non-statutory annotations of each OCGA volume and supplement listed in Exhibit A are prepared by LexisNexis under contract for the State of Georgia, and under the direct supervision of and subject to the approval of the Code Revision Commission. Dkt. 17 ¶ 19.*

**RESPONSE:**

Admitted.

18.     *The opinions of the attorney general of Georgia referenced in each OCGA volume and supplement listed in Exhibit A have been selected for inclusion in the OCGA. Dkt. 17 ¶ 20.*

**RESPONSE:**

Admitted.

19.     *The opinions of the Attorney General of Georgia referenced in the opinion of the attorney general summaries are selected in each OCGA volume and supplement listed in Exhibit A. Dkt. 17 ¶ 21.*

**RESPONSE:**

Admitted.

20.     *The content of the summaries of opinions of the Attorney General of Georgia in each OCGA volume and supplement listed in Exhibit A has been selected for inclusion in the OCGA. Dkt. 17 ¶ 22.*

**RESPONSE:**

Admitted

21.     *The summaries of opinions of the Attorney General of Georgia in each OCGA volume and supplement listed in Exhibit A have been coordinated with an OCGA statute (statutory text). Dkt. 17 ¶ 23.*

**RESPONSE:**

Admitted.

22.     *The summaries of opinions of the Attorney General of Georgia in each OCGA volume and supplement listed in Exhibit A are arranged under the heading "Opinions of the Attorney General" prior to or following an OCGA statute (statutory text). Dkt. 17 ¶ 24.*

**RESPONSE:**

Admitted.

23.     *The summaries of the opinions of the Attorney General of Georgia are selected, coordinated and arranged in each OCGA volume and supplement listed in Exhibit A. Dkt. 17 ¶ 25.*

**RESPONSE:**

Admitted.

24.    *The non-statutory text of each OCGA volume and supplement listed in Exhibit A includes summaries of research references. Dkt. 17 ¶ 26.*

**RESPONSE:**

Admitted.

25.    *The summaries of research references in the non-statutory annotations of each OCGA volume and supplement in Exhibit A are prepared by LexisNexis under contract for the State of Georgia, and under the direct supervision and subject to the approval of the Code Revision Commission. Dkt. 17 ¶ 27.*

**RESPONSE:**

Admitted.

26.    *The research references referenced in each OCGA volume and supplement in Exhibit A have been selected for inclusion in the OCGA. Dkt. 17 ¶ 28.*

**RESPONSE:**

Admitted.

27.    *The research references are selected in each OCGA volume and supplement listed in Exhibit A. Dkt. 17 ¶ 29.*

**RESPONSE:**

Admitted.

28.     *The content of the summaries of the research references in each OCGA volume and supplement listed in Exhibit A has been selected for inclusion in the OCGA. Dkt. 17 ¶ 30.*

**RESPONSE:**

Admitted.

29.     *The summaries of research references in each OCGA volume and supplement listed in Exhibit A have been coordinated with an OCGA statute (statutory text). Dkt. 17 ¶ 31.*

**RESPONSE:**

Admitted.

30.     *The summaries of research references in each OCGA volume and supplement listed in Exhibit A are arranged under the heading "Research References" prior to or following an OCGA statute (statutory text). Dkt. 17 ¶ 32.*

**RESPONSE:**

Admitted.

31.    *The summaries of research references are selected, coordinated and arranged in each OCGA volume and supplement listed in Exhibit A. Dkt. 17 ¶ 33.*

**RESPONSE:**

Admitted.

32.    *Public Resource purchased from LexisNexis and copied the entirety of 186 volumes and supplements of the OCGA, including front and back covers, which 186 volumes include the volumes and supplements of the OCGA listed in Exhibit A. Dkt. 17 ¶ 34.*

**RESPONSE:**

Admitted.

33.    *Public Resource posted on its website https//law.resource.org the copies it made of the OCGA including the volumes and supplements of the OCGA listed in Exhibit A. Dkt. 17 ¶ 36.*

**RESPONSE:**

Admitted.

34.    *Public Resource has facilitated, enabled, encouraged and induced others to view, download, print, copy and distribute each OCGA volume and supplement listed in Exhibit A without limitation or compensation to the State of Georgia. Dkt. 17 ¶ 38.*

**RESPONSE:**

Admitted.

35.     *Public Resource created works containing each OCGA volume and supplement listed in Exhibit A. Dkt. 17 ¶ 39.*

**RESPONSE:**

Admitted.

36.     *The annotations to each OCGA volume and supplement listed in Exhibit A include summaries of cases that relate to the OCGA, summaries of Opinions of the Attorney General of Georgia and summaries of research references related to the OCGA. Dkt. 17 ¶ 40.*

**RESPONSE:**

Admitted.

37.     *Public Resource actively encourages all citizens to copy, use, and disseminate to others in Georgia and elsewhere and to create works containing the OCGA volumes and supplements listed in Exhibit A. Dkt. 17 ¶ 41.*

**RESPONSE:**

Admitted.

38.     *The Commission does not assert copyright in the OCGA statutory text itself because the laws of Georgia are and should be free to the public. Dkt. 17 ¶ 45.*

**RESPONSE:**

Admitted.

39.     *Subsequent to July 22, 2015 and with full knowledge of the Commission's Complaint (Dkt. No. 1), Public Resource copied the entirety of the volumes and supplements of the 2015 OCGA shown in Exhibit A and distributed those copies via posting them on its website https://law.resource.org. Dkt. 17 ¶ 46.*

**RESPONSE:**

Admitted.

40.     *Public Resource's posting of the entirety of the 114 volumes and supplements of the OCGA listed in Exhibit A on its website https://law.resource.org was for the purpose of facilitating, enabling, encouraging and inducing others to view, download, print, copy and distribute those volumes and supplements of the OCGA. Dkt. 17 ¶ 48.*

**RESPONSE:**

Admitted.

41.     *Public Resource's posting of the entirety of the 114 volumes and*

*supplements of the OCGA listed in Exhibit A on its website*

*https://law.resource.org resulted in the copying (downloading) of those volumes*

*and supplements from that website by members of the public. Dkt. 17 ¶ 49.*

**RESPONSE:**

Admitted.

42.     *Public Resource posted on a website, www.archive.org, copies of the*

*entirety of the volumes and supplements of the OCGA listed in Exhibit A. Dkt. 17 ¶*

*50.*

**RESPONSE:**

Admitted.

43.     *Subsequent to July 22, 2015 and with full knowledge of the*

*Commission's Complaint (Dkt. No. 1), Public Resource copied the entirety of the*

*volumes and supplements of the 2015 OCGA listed in Exhibit A and posted them*

*on the website www.archive.org. Dkt. 17 ¶ 52.*

**RESPONSE:**

Admitted.

44.     *Public Resource's posting of the entirety of the volumes/supplements*

*of the OCGA on the website www.archive.org, including those*

*volumes/supplements listed in Exhibit A, was for the purpose of facilitating,*

*enabling, encouraging and inducing others to view, download, print, copy and*

*distribute those volumes and supplements of the OCGA. Dkt. 17 ¶ 54.*

**RESPONSE:**

Admitted.

45.     *Public Resource's posting of the entirety of volumes and*

*supplements of the OCGA on the website www.archive.org, resulted in the*

*copying (downloading) of those volumes/supplements of the OCGA from the*

*website by members of the public as listed in Exhibit A. Dkt. 17 ¶ 55.*

**RESPONSE:**

Admitted.

46.     *Public Resource distributed USB thumb drives containing scanned*

*copies of the OCGA to members of the State of Georgia Legislature. Dkt. 17 ¶ 63.*

**RESPONSE:**

Admitted.

47.     *Public Resource distributed copies of the entirety of 90 volumes and*

*supplements of the OCGA to at least eight institutions in and around the state of*

*Georgia, Honorable David Ralston, Speaker of the House, Georgia House of*

*Representatives and Mr. Wayne Allen, Legislative Counsel, Office of Legislative*

*Counsel, Georgia General Assembly, including those shown in Exhibit A, by*

*placing those copies on USB thumb drives and mailing them. Dkt. 17 ¶ 64.*

**RESPONSE:**

Admitted.

48.     *Public Resource's distribution of the entirety of 90 volumes and supplements of the OCGA to at least eight institutions in and around the state of Georgia, including those volumes and supplements shown in Exhibit A, was for the purpose of facilitating, enabling, encouraging and inducing others to view, download, print, copy and distribute those volumes and supplements of the OCGA. Dkt. 17 ¶ 65.*

**RESPONSE:**

Admitted.

49.     *The Commission has not authorized Public Resource to copy, distribute or make derivative works of any entire volume or supplement of the OCGA, including those shown in Exhibit A, and upon receiving cease and desist letters from the Commission, Public Resource refused to remove any and all copies of the OCGA that it had posted on any website. Dkt. 17 ¶ 66.*

**RESPONSE:**

Admitted.

50.     *The statutory text and numbering of the OCGA is accessible by the public through the Georgia General Assembly website at www.legis.ga.gov and the*

*Georgia Senate website at* www.senate.ga.gov *by clicking on the "Georgia Code"*

*link on each of those websites which will direct the user to the LexisNexis website*

*operated for the State of Georgia. Dkt. 17 ¶ 73.*

**RESPONSE:**

Admitted.

51.    *The "Georgia Code" links on the websites* www.legis.ga.gov *and*

www.senate.ga.gov *link to the LexisNexis website*

http://www.lexisnexis.com/hottopics/gacode/Default.asp *("LexisNexis GA Code*

*website"), which is operated for the State of Georgia, and the LexisNexis GA Code*

*website contains the statutory text and numbering of the OCGA. Dkt. 17 ¶ 74.*

**RESPONSE:**

Admitted.

52.    *There is no fee to access the statutory text and numbering of the*

*OCGA through the LexisNexis GA Code website. Dkt. 17 ¶ 75.*

**RESPONSE:**

Admitted.

53.    *The statutory text and numbering of the OCGA can be electronically*

*copied and/or printed from the LexisNexis GA Code website. Dkt. 17 at ¶ 76.*

**RESPONSE:**

Admitted.

54.    *The statutory text of the OCGA is searchable by term on the*

*LexisNexis GA Code website. Dkt. 17 ¶ 77.*

**RESPONSE:**

Admitted.

55.    *Public Resource operates the websites public.resource.org,*

*law.resource.org, house.resource.org, bulk.resource.org and others. Dkt.*

*17 ¶ 79.*

**RESPONSE:**

Admitted.

56.    *At least one copy of each OCGA volume and supplement that Public*

*Resource posted on its https//law.resource.org website is in an electronic format*

*that displays an image of the printed publication as copied by Public Resource,*

*which image allows for electronic page turning of the printed publication. Exhibit*

*B to the Stipulation of Facts (Dkt. 17-2) is a true and correct copy of the front*

*cover of one such image. Dkt. 17 ¶ 37.*

**RESPONSE:**

Admitted.

57.    *The preface in each OCGA volume and supplement in Exhibit A of the*

*Stipulation of Facts (Dkt. 17-1) is prepared under contract by LexisNexis for the*

17

*State of Georgia and under the direct supervision and subject to the approval of*

*the Code Revision Commission. Dkt. 17 ¶ 15.*

**RESPONSE:**

Admitted.

58.    *Public.Resource.Org has argued:*

*The distinction between 'the statutory text itself' and additional materials perhaps would have some bearing if the publication in question were the independent commercial endeavor of a publication firm. If such firm were to copy the state statutes and compile that information with additional analyses and summaries and were to do so as a strictly commercial endeavor, we understand and respect that this material would be their private property.*

*Dkt. No. 17-4, p. 2.*

**RESPONSE:**

Public Resource admits that its founder, Carl Malamud, made these

statements in a July 30, 2013 letter to Honorable Joshua McKoon, Honorable

David Ralston, and Honorable David Shafer.

59.    *The Official Code of Georgia Annotated is a compilation of the Georgia*

*statutes and other non-statutory materials, or annotations, which has been published*

*yearly since 1982. Exhibit 1, Declaration of Elizabeth P. Howerton ¶ 3.*

**RESPONSE:**

Admitted.

18

60.    *The annotations in the OCGA provide analyses and other information that allow for a better or easier understanding of a relevant statute. The annotations included in the OCGA are original and creative summaries of judicial decisions, editor's notes, summaries of opinions of the Attorney General of Georgia, and compilations thereof. Ex. 1 ¶¶ 3, 4.*

**RESPONSE:**

Public Resource admits that the annotations in the OCGA provide for a better or easier understanding of a relevant statute.   Public Resource objects to the statement that the annotations are original and creative, as this calls for a legal conclusion.  Public Resource denies that the annotations are original and creative.

61.    *The OCGA is published by Matthew Bender and Company, Inc., a member of the LexisNexis Group ("LexisNexis"), a division of Reed Elsevier Properties, Inc. under a work for hire agreement with the State of Georgia. Ex. 1 ¶ 5.*

**RESPONSE:**

Public Resource admits that the OCGA is published by Matthew Bender and Company, Inc., a member of the LexisNexis Group ("LexisNexis"), a division of Reed Elsevier Properties, Inc. under the Publication Agreement.   *See* Ex. F to Defendant's Memorandum in Support of Its Motion for Summary Judgment, Dkt. 29-8.  Public Resource objects to the statement that the Publication Agreement is a

work for hire agreement, as defined in 17 U.S.C. § 101, as that calls for a legal conclusion.  Public Resource denies that the Publication Agreement is a work-for-hire agreement, as defined in 17 U.S.C. § 101.

62.  *When entering the contract with LexisNexis, the ability of the state to keep the price of the OCGA low for the benefit of the citizens of Georgia was an important consideration. Ex. 1 ¶ 6.*

**RESPONSE:**

Admitted.

63.  *West's Code of Georgia Annotated is another compilation of the Georgia statutes and annotations thereof that is published by West Publishing. Ex. 1 ¶ 7.*

**RESPONSE:**

Admitted.

64.  *The OCGA contains the official, or State of Georgia-approved, codified statutory text (OCGA. 1-1-1), whereas the statutory text in West's Code of Georgia Annotated is not approved by the State. Ex. 1 ¶ 8.*

**RESPONSE:**

Admitted.

65.  *The current price of a complete OCGA set is $404.00 as compared to $2,570.00 for a complete set of West's Code of Georgia Annotated. Ex. 1 ¶ 9.*

**RESPONSE:**

Admitted.

66.    *The entire OCGA, including the annotations, is available for viewing on compact disc at over 60 state- and county-operated facilities such as state and county libraries, state universities, and county law enforcement offices within the State of Georgia. Ex. 1 ¶ 10.*

**RESPONSE:**

Admitted.

67.    *The    Georgia    General    Assembly    has    websites    at http://www.legis.ga.gov,    http://www.house.ga.gov,    and    http://www.senate.ga.gov that provide live broadcasts of both legislative houses, links to the Georgia Code, and the ability to search pending legislation, obtain contact information for legislators, and obtain state budget documents. Ex. 1 ¶ 11.*

**RESPONSE:**

Admitted.

68.    *The Georgia Code was accessed almost 79 million times between 2007 and 2015 via the website that is linked to the Georgia General Assembly websites. Ex. 1 ¶ 12.*

**RESPONSE:**

Admitted.

69.     *In 1994, the Board of Regents of the University System of Georgia and the University of Georgia created GALILEO, the first state wide digital library. Ex. 1 ¶ 13.*

**RESPONSE:**
Admitted.

70.     *GALILEO can be found at http://dlg.galileo.usg.edu. Ex. 1 ¶ 13.*

**RESPONSE:**

Admitted.

71.     *GALILEO provides access to the Georgia Laws, which is a publication of Georgia laws (both codified and uncodified) as enacted by the Georgia Legislature. Ex. 1 ¶ 14.*

**RESPONSE:**

Admitted.

72.     *In 1996, the Georgia Government Publications database (GGP) was created as GALILEO's first digital conversion initiative of publications released by agencies of Georgia's executive branch. Ex. 1 ¶ 15.*

**RESPONSE:**

Admitted.

73.    *Georgia law (OCGA. 20-5-2) requires Georgia state agencies to submit publications to GALILEO that they produce for the public. Ex. 1 ¶ 16.*

**RESPONSE:**

Admitted.

74.    *The GGP database consists of over 70,000 documents produced by Georgia state agencies. Ex. 1 ¶ 17.*

**RESPONSE:**

Admitted.

75.    *Prior to the State of Georgia filing a lawsuit against Public Resource, Public Resource copied and distributed hundreds of annotated state code volumes of several states, including Georgia, Mississippi and Idaho, and then informed each state of its actions. Ex. 1 ¶ 18.*

**RESPONSE:**

Admitted.

76.    *Under the Publication Agreement between the State of Georgia and LexisNexis, the annotations in the OCGA remain the property of the State of Georgia and LexisNexis obtains copyright registrations therefore. Exhibit 2, Agreement for Publication, § 6.1.*

**RESPONSE:**

Admitted.

77.    *LexisNexis is granted the exclusive right to publish and sell the OCGA according to the prices set in the publication contract, with any price increases at the sole discretion of the Commission. Ex. 2 §§ 5, 8.*

**RESPONSE:**

Admitted.

78.    *LexisNexis created the summaries of judicial decisions in the OCGA works using a lengthy process of selection, analysis and summarization. Exhibit 3, Declaration of Anders X. Ganten ¶¶ 3-15.*

**RESPONSE:**

Public Resource admits that LexisNexis selects and summarizes the judicial decision in the OCGA using the detailed criteria set down in the Publication Agreement and Publication Manual.  Exhibits F and G to Defendant's Motion for Summary Judgment.  Dkt. 29-8; 29-9.

79.    *LexisNexis identified and read each potentially relevant judicial decision, determined how the case relates to a statute, and then determined the type of annotation that should be created. Ex. 3 ¶¶ 4, 5.*

**RESPONSE:**

Public Resource objects to this statement as immaterial to the issues presented in Plaintiff's Motion for Partial Summary Judgment, as the copyrightability of a work does not depend upon the "sweat of the brow" of its creator.  Public Resource admits that LexisNexis selects and summarizes the judicial decisions in the OCGA using the detailed criteria set down in the Publication Agreement and Publication Manual.  Exhibits F and G to Defendant's Motion for Summary Judgment.  Dkt. 29-8; 29-9.

80.  *For those cases of significance, LexisNexis created an original several line summary of the case that distills the case's relevant holding relating to the statute. Ex. 3 ¶¶ 7, 8.*

**RESPONSE:**

Public Resource admits that LexisNexis created a several line summary of the case that distills the case's relevant holding relating to the statute.  Public Resource objects to the statement that such a summary is original, as this calls for a legal conclusion.  Public Resource denies that any such summary is original.

81.  *The OCGA annotation of the judicial decision Cho Carwash Property, LLC. v. Everett (326 Ga. App. 6 (2014)) published in the 2014 edition of the OCGA. as associated with Georgia statute § 34-9-260 is as follows:*

*Average weekly wage calculated correctly. – Award of workers' compensation benefits was upheld because there was some evidence to support the administrative law judge's calculation of the claimant's average weekly wage under OCGA. § 34-9-260(3) based on the claimant's testimony that the claimant was supposed to work from the car wash's opening until its close. Cho Carwash Property, LLC. v. Everett, 326 Ga. App. 6, 755 S.E.2d 823 (2014).*

*Ex. 3 ¶¶ 9, 13.*

**RESPONSE:**

Admitted.

82.     *Each of the OCGA Works further contains original and creative compilations of summaries of judicial decisions, editor's notes, summaries of opinions of the Attorney General of Georgia, summaries of research references, and compilations of these compilations. Ex. 3 ¶ 5.*

**RESPONSE:**

Public Resource admits that the OCGA contains compilations of summaries of judicial decisions, editor's notes, summaries of opinions of the Attorney General of Georgia, summaries of research references, and compilations of these compilations.  Public Resource objects to the statement that these compilations are original and creative, as that statement calls for a legal conclusion.  Public Resource denies that these compilations are original and creative.

83.     *Each judicial decision summary, editor's note, and summary of an opinion of the Attorney General of Georgia was first selected for inclusion in the OCGA by LexisNexis and then coordinated with a particular statute. Ex. 3 ¶ 3.*

**RESPONSE:**

Admitted.

84.     *When multiple summaries or editor's notes were coordinated with a single code section, each was arranged in a particular order. Ex. 3 ¶ 4.*

**RESPONSE:**

Admitted.

85.     *The correspondence shown in Exhibit C to the Stipulation of Facts (Dkt. 17-3) is a true and exact copy of a letter written by Mr. Malamud and sent to David Ralston and Wayne Allen on May 30, 2013. Dkt. 17 ¶ 67.*

**RESPONSE:**

Admitted.

86.     *The correspondence shown in Exhibit D to the Stipulation of Facts (Dkt. 17-4) is a true and exact copy of a letter written by Mr. Malamud and sent to Joshua McKoon, David Ralston and David Shafter on July 30, 2013. Dkt. 17 ¶ 68.*

**RESPONSE:**

Admitted.

87.     *The correspondence shown in Exhibit E to the Stipulation of Facts (Dkt. 17-5) is a true and exact copy of a letter written by Joshua McKoon and sent to Mr. Malamud on July 25, 2013. Dkt. 17 ¶ 69.*

**RESPONSE:**

Admitted.

88.     *The correspondence shown in Exhibit F to the Stipulation of Facts (Dkt. 17-6) is a true and exact copy of a letter written by Joshua McKoon and sent to Mr. Malamud on August 15, 2013. Dkt. 17 ¶ 70.*

**RESPONSE:**

Admitted.

89.     *The correspondence shown in Exhibit G to the Stipulation of Facts (Dkt. 17-7) is a true and exact copy of a letter written by Joshua McKoon and sent to Mr. Malamud on April 2, 2014. Dkt. 17 ¶ 71.*

**RESPONSE:**

Admitted.

90.     *To access the statutory text and numbering in the OCGA via the website link found on the State of Georgia website, www.legis.ga.gov, one must accept the terms and conditions of use generally applicable to the LexisNexis websites ("LexisNexis Website Use Terms and Conditions"). A true and correct*

*copy of the LexisNexis Website Use Terms and Conditions is attached to the*

*Stipulation of Facts as Exhibit I (Dkt. 17-9). The access page that allows users to*

*access the online publication by accepting the LexisNexis Website Use Terms and*

*Conditions explicitly states that the LexisNexis Website Use Terms and Conditions*

*do not apply to the OCGA statutory text and numbering. A true and correct copy*

*of this access page is attached to the Stipulation of Facts as Exhibit J (Dkt. 17-6).*

*Dkt. 17 ¶ 86.*

**RESPONSE:**

Admitted.

Respectfully submitted this 7th day of June, 2016.

By: /s/ Elizabeth H. Rader

Jason D. Rosenberg
Georgia Bar No. 510855
jason.rosenberg@alston.com
Sarah P. LaFantano
Georgia Bar No. 734610
sarah.lafantano@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424
Telephone 404-881-7461
Fax (404) 253-8861

Elizabeth H. Rader
*Admitted pro hac vice*
elizabeth.rader@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Telephone:  202-239-3008
Fax: (202) 239-3333

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CODE REVISION COMMISSION on                )
Behalf of and For the Benefit of the       )
GENERAL ASSEMBLY OF                        )   **CIVIL ACTION**
GEORGIA and the STATE OF                   )
GEORGIA,                                   )   **FILE NO.   1:15-CV-2594-RWS**
                                           )
                    Plaintiff,             )
v.                                         )
                                           )
PUBLIC.RESOURCE.ORG, INC.,                 )
                                           )
                    Defendant.
_____

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Defendant's Response to Plaintiff's**

**Statement of Undisputed Material Facts** was electronically filed with Clerk of

Court using the CM/ECF system which will automatically send notification of such

filing to all attorneys of record.


                              */s/ Sarah P. LaFantano*
                              Sarah Parker LaFantano
                              Georgia Bar No. 734610

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA, | ) ) ) ) ) ) | **CIVIL ACTION**<br><br>**FILE NO.   1:15-CV-2594-RWS** |
| Plaintiff, | ) | |
| v. | ) ) | |
| PUBLIC.RESOURCE.ORG, INC., | ) | |
| Defendant. | | |

**CERTIFICATE OF COMPLIANCE**

I hereby certify that, pursuant to L.R. 5.1C and 7.1D of the Northern

District of Georgia, the foregoing **Defendant's Response to Plaintiff's**

**Statement of Undisputed Material Facts** complies with the font and point

selections approved by the Court in L.R. 5.1C. The foregoing pleading was

prepared on a computer using 14-point Times New Roman font.

*/s/ Sarah P. LaFantano*
Sarah Parker LaFantano
Georgia Bar No. 734610

# DKT 34-1

# EXHIBIT 1



# 10
# RULES
# FOR
# RADICALS



## CARL MALAMUD

PRO-000564



I have not failed, I've just found 10,000 ways that won't work.

THOMAS EDISON

PRO-000565

# 10 RULES FOR RADICALS

PRO-000566

An address to the WWW2010 Conference
Raleigh, North Carolina, April 30, 2010
*http://public.resource.org/rules/*

CC-Zero, No Rights Reserved.
*http://creativecommons.org/publicdomain/zero/1.0/*

PRO-000567

# 10 RULES FOR RADICALS

.

**CARL MALAMUD**

PRO-000568

PRO-000569

## 10 Rules for Radicals

1    Thank you for your kind invitation to speak before you today on this occasion of the 19th International World Wide Web Conference. I would particularly like to thank Paul Jones, a man whose sites have hosted poets and presidents and who has given a home on the Internet to the people of Linux and the people of Tibet. Tim O'Reilly says you should put more into the ecosystem than you take out, and there is no better example of this than Paul Jones and his decades of public service to the Internet.

2    Before I turn to the subject of my talk, I feel I can give you a little context about how to judge these words by telling you about the first time I saw the World Wide Web in action. I was visiting Geneva in 1991 because I was interested in CERN's role as a hub for the growing net, using X.25 to gateway to the Soviet Union and Eastern Europe.

3    While I was visiting CERN, the head of networking, Brian Carpenter, said I should go see one of the researchers who was doing some interesting work. I went into a dark room and a young man sat behind his spiffy brand-new NeXT workstation and he showed me his research project, a derivative of SGML with a little bit of local area networking thrown in.

4    I politely watched Tim Berners-Lee give me a demo of his so-called World Wide Web, but I was skeptical. It looked nice, of course, but then anything looked nice on the NeXT workstation, a high-priced hunk of hardware created by a bunch of Apple refugees. Tim showed me how with a click you could pull up a file on another computer, but I wasn't sure this was something that would ever catch

### 7 TALES OF BUREAUCRACY

on, certainly not on a global level. I distinctly remember
thinking to myself "this won't scale."

5      Having presented to you my credentials as a pundit, I
would like to talk to you today about some bureaucracies
I've had occasion to encounter, and some lessons I have
learned about how citizens—citizens with no official
portfolio or status—"mere" citizens if you will—how
citizens can change the way government works.

6      I hope these tales are more than mere war stories, I
hope to leave you today with some rules for radicals, 10
rules to apply to governing institutions as we attempt to
change their behavior.

## — Bureaucracy № 1 —

7      We begin in ancient times, a time so long ago that the term
broadband referred to ISDN lines which would operate at a
massive 64,000 bits per second, the speed of a leased line
—but magically switched on and off on-demand using the
ISDN "intelligent network."

8      This time—the late 1980s and the early 1990s—was a
time when the idea of a hyperlink was still considered the
mad delusion of a wild-eyed prophet named Theodor
Nelson, hence my skepticism about TimBL's research
project.

9      In those days, there were two kinds of networks. There
was the so-called Internet, and there were respectable
networks. The respectable networks were being defined
by international institutions such as the International
Organization for Standardization and the International
Telecommunication Union.

## 10 Rules for Radicals

10      These institutions were based in Geneva and their work product was meant for grownups, grownups of sufficient means that the cost of a few thousand dollars to buy standards documents was considered not only eminently reasonable, but absolutely necessary to the functioning of our standards-making organizations. These grownups worked for telephone companies like AT&T and their PTT peers around the world, and for a few industrial concerns like IBM and Siemens.

11      Asking the International Organization for Standardization—asking ISO to give away technical standards would be as silly as asking the restaurant to give away the Entrecôte and the Beaujolais. In this world of many fine lunches and dinners, there was no free lunch.

12      In those days, I couldn't afford the Entrecôte and certainly not the Beaujolais. I was a hack, a hack in the traditional sense of the word making my living as a writer, a hack with a strong interest in the Internet, a network based on open standards, a network with no kings, a network built on the then-radical notion that standards should be based on decision by rough consensus and rule by working code.

13      While this loose-knit band of anarchists that were defining an Internet based on open standards were free to ignore most of the nonsense coming out of the "standards professionals" and their "Open Systems Interconnection" effort—there was one thing we couldn't ignore and that was the telephone network on which we built our unreliable, best-effort datagram service.

7 TALES OF BUREAUCRACY

14      This telephone network was defined by the
International Telecommunication Union, the ITU, in the
1988 edition of a document called the Blue Book, a 19,000
page compendium that contained the standards for things
like how modems worked, how to compress audio, and the
operation of Signaling System Number 7. Anybody
defining Internet standards that interfaced effectively with
the underlying telephone network needed the Blue Book.

15      But, I couldn't afford the Blue Book—it cost 2,500 Swiss
Francs—and since I was making my living as a columnist
for trade press publications such as Communications
Week, since I couldn't write about what the Blue Book
contained, I instead wrote a lot of columns about how I
couldn't afford the Blue Book and why it should be free.

16      At the time, the Secretary-General of the ITU was a big
Finn named Pekka Tarjanne, a job he got as a reward after
a career in Finnish politics followed by 12 years as head of
the Finnish PTT. Tarjanne had hired a lawyer named
Anthony Rutkowski as his counsellor, and that was
probably a mistake as Tony Rutkowski was in reality a
double-agent, an Internet sympathizer who even used
email.

17      In 1991, the ITU was not exactly a technically
progressive organization. They had lots of rotary-dial
telephones of course, because their founding treaty
specified they got free phone calls from all the PTTs, a fact
they were inordinately proud of and never ceased to point
out.

18      But there was no email and only a single fax machine
for the entire 17-story building, and this telefacsimile

## 10 RULES FOR RADICALS

device was carefully secured in a deputy secretary-
general's office and required a special form with many
signatures before a document was considered fax-worthy.

19     Tony Rutkowski read my columns flaming about the ITU
and he got me a meeting with Dr. Tarjanne. I flew to
Geneva and soon found myself in the rather spectacular
Secretary-General's suite on the top floor of the ITU tower.

20     After a few pleasantries about Finland—Reindeer,
saunas—we got down to business. I stated my case: the
Blue Book ought to be available for free on the Internet.

21     Dr. Tarjanne smiled the smile of a patient father and
told me that in his ideal world, the Blue Book and indeed
the Entrecôte and maybe even the Beaujolais would all be
free, but this was of course impossible, as much as we both
might share this dream of an ideal world.

22     You see, it really wasn't about the money, Tarjanne
explained, there was a technical obstacle. The Blue Book
was being produced on an ancient mainframe using an
ancient program, a program so old that they had lost the
source code and nobody was quite sure exactly how it
worked.

23     They were developing a new typesetting system, but
that was several years away, and for now they were stuck
with only one output device, and that was their printing
press.

24     Dr. Tarjanne was sure I could see, while he'd love to
give me the source to the Blue Book, it wouldn't do me any
good, even his own expert technical staff didn't know quite
how this black box worked.

PRO-000574

7 TALES OF BUREAUCRACY

25       I suggested that perhaps we could try an experiment—
and this is my first rule for radicals: call everything you do
an experiment—and the experiment I proposed was that
perhaps the ITU could furnish a set of tapes for the Blue
Book and the Internet would try its hand at reverse-
engineering the system. If we succeeded, we'd give the
ITU back their Blue Book in some coherent ultra-modern
format like TROFF.

26       Since Dr. Tarjanne knew the Internet had only a few
users, none of them serious people of means who buy
standards, he'd be able to shut up the critics by saying he
had cooperated, but the Internet had not been up to the
task.

27       He said we could have a set of tapes.

28       I went to Boulder, Colorado and enlisted the help of
Mike Schwartz, a professor of computer science and the
creator of the original search engine, netfind. After a few
false starts, we managed to mount the tapes and read the
raw data into a series of octal dumps hundreds of pages
long, which we spread on the floor next to a printed copy
of the Blue Book.

29       By comparing the octal dump to the final form, we were
able to confirm that the Secretary-General was correct—
this system was a total mess—but after a lot of head-
scratching and a few surprises, we managed to turn their
system into TROFF and then into NROFFed ASCII and
PostScript, posted the tarballs on an FTP server, and sent a
note to the IETF list.

30       The next day, the National Science Foundation called,
complaining that the Blue Book release was using up all

PRO-000575

## 10 Rules for Radicals

the bandwidth on the international backbones. The cross-Atlantic line was still just an E1, running at 2 megabits per second and costing the NSF $60,000 per month, and we were using all the bits.

31      I reassured the government program managers that this was a temporary phenomenon, and soon we had saturated our market with files spreading out to 500 hosts in 27 countries.

32      Then, word started to trickle back to Geneva that maybe the Internet was a bit bigger than previously thought, and soon after that a telefacsimile arrived from an ITU official, who explained that he had been instructed by the Secretary-General to convey to me a message, and that message was that our experiment was now over. The Secretary-General was insisting that we remove the Blue Book from our server. Oh, and while we were at it, remove all copies of the Blue Book from the rest of the Internet, within 20 days.

33      I conveyed my kind regards to the Secretary-General, and explained that while of course I would comply with respect to my own server, that vis-a-vis the rest of the world, there was not much that could be done as the proverbial cat had escaped from the proverbial bag.

This is thus my second rule for radicals, and that is when the authorities finally fire that starting gun—and do something like send you tapes—run as fast as you can, so when they get that queasy feeling in their stomach and have second thoughts, it is too late to stop.

34      Tarjanne the Finn was my first real bureaucrat, but the Blue Book underscored for me the importance of open

<u>7 TALES OF BUREAUCRACY</u>

standards, that if code is law then it must surely follow that
law is code—and if that is the case, then the only way that
makes sense to release this code has to be open source.

## — Bureaucracy № 2 —

35    For the rest of my story today, I turn from Geneva back to
the United States.

36        In 1993, I had graduated from print to the wonderful
world of multimedia, which meant mostly 8-bit GIF files.
The blinky tag had not even been invented yet.

37        Most of us running network ops were using FTP, email,
and perhaps gopher and Archie. With those tools, I was
running an Internet radio station called Internet Talk
Radio. The flagship program was Geek of the Week, which
most people retrieved by launching an overnight FTP job
and then—assuming the sound card was properly installed
—listened to the sound file on their workstations.

38        Not everybody had FTP, and one listener used the MCI
Mail FTP gateway, which broke the 30-megabyte sound
files up into several hundred mail messages. When all the
messages arrived, he reassembled them and curled up to
his workstation for his episode of Geek of the Week.

39        We did a lot of "the future is here" Internet demos in
those days, and after giving one in Congress, I was called
aside by the staff of Congressman Edward Markey, and
they showed me a letter from a Nader's Raider named
Jamie Love, saying that the Securities and Exchange
Commission database of public filings of corporations—
known as EDGAR for the Electronic Data Gathering and

PRO-000577

## 10 RULES FOR RADICALS

Retrieval System—that this EDGAR database should be available on the Internet for free.

40      These EDGAR filings were used by stock brokers, economists, and analysts, and a $300 million/year industry had sprung up retailing these documents. When I was a doctoral student in economics, I learned that sometimes you could write to the corporation and ask them to send you their annual report by U.S. Mail, but often I ended up forking over $30 a document to some information retailer to read these filings electronically.

41      To feed this $300 million/year industry, the SEC had set up a $30 million deal with Mead Data Corporation. The theory was that these filings were indigestible raw data, so Mead would act as the information wholesaler and add "value" to the documents—and they would sell to information retailers, who would add even more "value" to the documents—and finally these documents would reach the information consumer, presumably professionals on Wall Street who knew how to read these highly technical filings full of, you know, numbers and stuff.

42      A very brave bureaucrat at the National Science Foundation, Dr. Steve Wolff, arranged for my nonprofit radio station to get a few hundred thousand dollars, enough so we could buy a feed of the EDGAR data. Eric Schmidt, then the CTO at Sun Microsystems, pitched in a box with four SPARC-2 processors. UUNET offered free transit, Cisco threw in a router, and MFS Datanet provided a 10 megabit fiber link to the Internet Exchange known as MAE East.

7 TALES OF BUREAUCRACY

43      That 10-megabit link was fast enough that when the
new Clinton administration took office, they asked to
borrow it. Turns out the new tenants over at the White
House were having trouble getting their routers cleared by
the Secret Service and they wanted to do a "we know what
the Internet" is event with the President, so ARPA helped
us run an infra-red link from the roof of the National Press
Building down to the White House lawn to get them hooked
up.

44      About ninety days after the NSF grant came through,
the server was up and running and raw EDGAR data was
on the net. Remember rule 2, when the starter's pistol gets
fired, run as fast as you can.

45      We ran the service for a year and a half, starting with
FTP for tarballs, then Gopher for docs, then an HTTP
server, then finally a WAIS database. By mid-1995, there
were 50,000 people a day using the service.

46      Some of those people were financial fat cats on Wall
Street, but there were also students, journalists,
government employees, senior citizen investment clubs,
and others that were of insufficient means to afford $30
documents.

47      And this brings us to rule number 3, which is that
eyeballs rule. Build up a user base, and you have much
more leverage than if you're just blowing smoke.

48      Perhaps we should have used our "first-mover
advantage" to—as they said in the .com days—"monetize
the eyeballs." But, I didn't want to be the face of the SEC, I
wanted the SEC to do their job, which was to make the

## 10 RULES FOR RADICALS

EDGAR database available to the public, on the Internet, for free, and in an at least moderately clueful manner.

49    So I pulled the plug.

50    A sign appeared on the web server saying "this service will terminate in 60 days. Click here for more information."

51    When you clicked, you got a page with source code, usage stats, cost figures, and configurations to run the system, and a series of "click here" links if you felt that termination of the system would somehow inconvenience you.

52    The first "click here" link was "click here to send mail to Newt Gingrich," the hip young Speaker of the House. The next was "click here to send mail to Al Gore," the hip young Vice President. They both had email accounts and were very proud of them.

53    The third "click here" link was "click here to send mail to the Chairman of the SEC." Chairman Arthur Levitt, a grand old man of finance, didn't have an email address, so we created one for him. A couple of days later, the 17,000 messages he received were printed and delivered to the SEC front desk.

54    Coincidentally, the SEC had scheduled an EDGAR Industry Day meeting, which we weren't invited to, so we crashed it. After some theatrics, one of the Commissioners came up and asked some simple questions, like how much it would cost to run the service and who the users were.

55    The Commissioner evidently briefed the Chairman, because that evening Chairman Levitt called the Associated Press and the Wall Street Journal and said the SEC was going to offer this EDGAR database on the

7 T<small>ALES OF</small> B<small>UREAUCRACY</small>

Internet. The filings weren't a product, they were the glue
that make our financial markets work efficiently by
requiring corporations to disclose information to the
public.

56   The next day, the chief of staff called up and said that
while he fully supported his Chairman, there was one hitch
and that was that there was no way they could buy a
computer in 60 days and besides, their Internet line had
been installed but didn't seem to be working. Could we
extend the deadline? I said the deadline was firm.

57   The chief of staff ended up signing a loaner agreement,
we put some Sun boxes in the back of a station wagon,
drove down to SEC headquarters and helped them
configure their Cisco router and T1 line.

58   They were up and running by the deadline. The
computer staff ended up tickled pink they were running
the U.S. government's busiest web server and getting tons
of fan mail from their adoring public.

59   Rule 4 is that when you achieve your objective, don't be
afraid to turn on a dime and be nice. You can bang the
table and be a total pain in the ass, but there comes a time
to be helpful, courteous, and friendly.

— Bureaucracy № 3 —

60   For the next bureaucracy, let's fast-forward this Wayback
Machine to late 2006 and early 2007—when Google
bought YouTube for $1.65 billion, when C-SPAN started
allowing you to use their video of congress on your blog,
the year Netflix started streaming videos—the year "you"

## 10 RULES FOR RADICALS

were named Time Man of the Year. This is when video came to the Internet.

61    Well, not all the Internet.

62    Back in Washington, D.C. was an agency called the National Technical Information Service, NTIS, a government profit center tasked with, among other things, being the official retailer of videos from all across the government.

63    A look at the NTIS web site showed thousands of videos from 54 different federal agencies. There was all sorts of useful stuff—none of it viewable on the Internet—like training materials for volunteer firefighters from the U.S. Fire Academy.

64    But the prices! Ooh la la! Talk about champagne wishes and caviar dreams! An Ellis Island documentary—"Island of Hope, Island of Tears"—cost $55 for a 29-minute VHS tape.

65    "The Time of Apollo" from NASA?  $50 for 28 minutes.

66    I forked over $336, ordered some tapes, and posted them to YouTube and the Internet Archive. "John F. Kennedy: Years of Lightening," from the U.S. Information Agency. "Firefighter Safety and Survival" from the U.S. Fire Academy, and "Day of the Killer Tornados" from FEMA.

67    The nice thing about the U.S. government is pretty much anything they produce is called a "Work of the Government" and that means, at the federal level, it is public domain. There are a couple of exceptions and grey areas, but the basic rule is no copyright.

PRO-000582

## 7 TALES OF BUREAUCRACY

68      Simple enough: buy video from the government and
upload it. Nobody can stop you. Simple that is, except for
the cost.

69      But what if we spread the pain out? What if other people
bought some of these tapes and donated them to the
public domain?  For $29.95 a month, I signed up for EBay's
ProStores, one of those anybody-can-build-a-store e-
commerce solutions, and built a front-end proxy on top of
the NTIS store. The deal was we'd take your money, order
the tape, upload it to the Internet Archive and YouTube,
and you'd get a tax deduction.

70      In a fit of marketing, we festooned the site with slogans:
"Be the last person to buy this fine video" and "Buy from
us and you get nothing but everybody gets something."

71      And, my favorite: "Made by the government—buy in
confidence knowing the source."

72      OK, so it was a little cheeky and perhaps even a bit
silly. But, the whole business model was silly. With no
intellectual property protection on the content—all of it
works of the government, all already paid for by taxpayer
dollars—if we had enough money we'd simply buy one
copy of each video and we'd be done with it. They'd be out
of business.

73      The store was snazzy, but there were more "lookie loos"
than buyers. In fact, we got only one order for $106, and
that order was actually a mistake—the guy thought we
were going to send him a DVD.

74      One day I lost my patience and sent a rather
intemperate fax to the director of the NTIS. A letter is
probably not the appropriate characterization for this

PRO-000583

## 10 RULES FOR RADICALS

communique and maybe flame would be more accurate. I
basically accused the entire of agency of falling down on
the job.

75      So imagine my surprise the next day when my phone
rang and the voice on the other end said "Mr. Malamud,
this is Ellen Herbst. I'm director of the National Technical
Information Service."

76      Oh-oh, I thought, here it comes.

77      Well, Ms. Herbst turned out to be perfectly reasonable.
She wanted the video out there, but by law they were
required to recover their costs and by the time you added
up the people to run the service and factored in the almost
nonexistent sales, well, it cost $70 to sell you a videotape.

78      If they had to recover their costs, what if we didn't cost
them anything?

79      "Can you just loan us your videotapes?" I asked the
Director. "You know, send us the tapes, we make a copy, we
send them back to you? We can even pay the postage!"

80      A long pause. "Yes, I suppose we could do that."

81      And thus was born FedFlix, where government loans us
tapes which we digitize and send back to them, with a DVD
included for each videotape.

82      Rule 5 is pretty simple. Keep asking—keep rephrasing
the question until they can say yes.

83      In November 2007, a couple months after that phone
call—lightening fast by government standards—we signed
a joint venture agreement in which every month NTIS
would send 20 tapes.

84      We ran that program for a year and put a couple
hundred tapes on-line. At the end of the year, we renewed

PRO-000584

7 TALES OF BUREAUCRACY

the agreement and upped the quantity to 100 tapes a month, and they started sending Betacam masters.

85        For about $10,000, we've built up a nice little studio that does professional-quality encoding of the Betacam masters, producing 8-megabit H.264 MP4 files We don't do anything fancy like color correcting or normalizing the sound, but for the content we have that just doesn't seem necessary.

86        FedFlix really isn't a funded project, it is something to fill in gaps in the day. Instead of writing to a Facebook wall, I choose to rip. I put an egg timer on top of the Betacam deck, and pop in a tape and set the timer. When it goes off, I put in another tape.

87        After a few weeks, there will be a nice collection of files, I put together a packing list with the metadata, then use a big old hairy RegEx to turn the packing list into a bunch of curl calls that use the Internet Archive S3 interface and Python scripts that use the YouTube API.

88        Perhaps the most subversive thing we do with this video is put the masters on our server for FTP and rsync. The hardest part of making a film or a news piece today is clearing the rights in that absurd thicket of copyright-obsessed stock footage libraries. With our multi-terabyte public domain stock footage library, you don't have to ask, and there are never any late charges in the public domain.

89        It sometimes amazes me what video gets popular. A World War II film called "Principles of Refrigeration" has received 78,000 views. Turns out there isn't any good HVAC material on the net. The biggest hit on YouTube is a

10 RULES FOR RADICALS

bulldozer safety film called "Stay Calm and Stay in the Cab!" which has over a half-million views.

## — Bureaucracy № 4 —

90   One of the big challenges facing government is the deluge of paper, videotape, and other legacy formats. For agencies in the information business, such as the Library of Congress, the National Archives, and many others, the dual challenges of dealing with legacy formats and how to face a digital future have been overwhelming. In many cases, the agencies have turned to what they call public-private partnerships, so-called "no cost to the government" deals that have proven to be especially troublesome.

91   An example of such a no cost to the government deal was one cut by the Government Accountability Office, an arm of Congress, which has the definitive library of federal legislative history—folders for each public law that contain all the hearings, bills, and reports that led up to each statute.

92   GAO entered into a deal with Thomson West where the government shipped off all those federal legislative histories to the vendor, which scanned them and then sent the paper back.

93   Not that different than the FedFlix program, but with an important twist. Thomson West didn't send the GAO back digital copies of their data. Instead, Thomson West gave GAO a couple of logins for their staff to use the digitized material, but for everybody else, including government

PRO-000586

7 TALES OF BUREAUCRACY

folks—including congressmen—everybody else has to
pay to access the U.S. federal legislative histories.

94     The deal wasn't really no cost to the government since
it took a huge amount of effort to pack these 60 million
pages of paper up and send them to the vendor. The
vendor got a sweetheart deal: an exclusive lock on a vitally
important government database. The government got
snookered.

95     For my next bureaucracy, I want to talk about one of
those public-private partnerships, this one being a deal
that the National Archives cut with Amazon. In December
of 2009, I got a call from Congress asking if I could testify
as part of the inaugural hearing for the new Archivist,
David Ferriero.

96     As part of the research, I looked at the deal the
Archives had cut with Amazon. This was part of Amazon's
new DVD print-on-demand service, and what they had
done was digitize about 1,800 government videos which
they were making available for about $10 per DVD.

97     I've got nothing against Amazon selling DVDs, even
DVDs of public domain video. But, if you went to the
government site, there was only a 2-minute preview of
each video, in a Microsoft proprietary format, and a
320x240 picture. Next to the 2-minute preview was a
government statement saying you could buy this video
from "our partner" Amazon.Com.

98     Rick Prelinger—creator of the Prelinger Library and the
real pioneer in rescuing government video—had FOIA'd
the contract behind this arrangement, and it looked like
that while the National Archives got a DVD of their video

PRO-000587

## 10 RULES FOR RADICALS

back, they agreed not to post it on-line for 5 years. There was a weird arrangement where the government got some kind of royalty from Amazon, but the royalty was after they deducted "ingestion fees" for scanning the videos. The government was paying for the digitization, but wasn't allowed to use the material.

99      I asked the Chief of Staff of the National Archives how much these royalties they were getting were, and it turned out to be—in 2 years of operation of this partnership—a total of $3,273.66.

100      This seemed nuts. So, I forked over $251 and bought 20 DVDs from Amazon and posted them in all the usual places. Some great stuff, like footage of Richard Nixon in the White House, explaining why he was innocent of any wrongdoing.

101      Then, I wrote to Cory Doctorow at Boing Boing and he posted a note telling all the happy mutants that if they watched Richard Nixon on YouTube, they could help save the public domain because we were counting all the views to show members of Congress that people really care about this stuff.

102      "Watch Richard Nixon, help save the public domain."

103      The next day, I sent another $461 to Amazon and ordered another 28 videos, and that led to another Boing Boing post, "Watch the Bob Hope Christmas Special and Help Save the Public Domain."

104      By the time I testified before Congress on December 16, we were able to show more online views for these 48 videos than the total unit sales from the Amazon program over two years. The message was pretty clear: the Amazon

7 Tales of Bureaucracy

deal had not brought the government any revenue and it had come at a substantial cost of public access.

105     We had our point as far as Congress was concerned, but when I went home I kept looking at those 1,800 videos and wondered if there was some way to liberate them without forking over $18,000 to Amazon. I was musing about this on Twitter and somebody at-replied back and asked if I had considered an Amazon wish list—the way you let other people buy stuff for you for your Bar Mitzvah, birthday, baby shower, or wedding?

106     Whoa, I thought, what a nice hack!

107     So, 153 of the most impressive titles went on an Amazon Wish List and Boing Boing issued a new post suggesting that if people had an extra $10.95, perhaps they could buy a Christmas gift for the public domain? (Tax deductible, no less!)

108     That list sold out in a matter of days, and the day before Christmas, my Amazon sent to me, 43 boxes of DVDs. I spent the holidays ripping the discs, finding metadata, and uploading files.

109     It was great. Footage of the Hindenburg blowing up, James Cagney narrating a cold war film called "the Wall," the Cambodian Royal Ballet, old CIA propaganda films, Disney war films, early space footage, and the Roswell Area 51 investigation.

110     When you criticize a government agency to their congressional oversight committee, you're probably going to get a response. So here is rule 6 for radicals, which is when you get the microphone, make sure you make your point clearly and succinctly.

## 10 Rules for Radicals

111  Pretty soon, I got a call from the National Archives to discuss the "Amazon situation." When I said that this video was totally unavailable to the public, I had misspoke— anybody could go to the National Archives in College Park, Maryland and watch any of those 1,800 DVDs onsite. They'd also let you make a copy of a DVD, and they'd even furnish the blanks to make those copies—up to 6 copies per visit.

112  And, they had more than the 1,800 DVDs in question, they had over 3,000 DVDs onsite.

113  "You mean," I asked, "if I went out there often enough, I could copy all 3,000 of the DVDs and post them?"

114  "Absolutely. You bet, go for it."

115  Well, at 10 minutes per DVD, that's 30,000 minutes—500 hours—more time than I could spend in College Park, but a perfect opportunity for crowd-sourcing and thus was born the International Amateur Scanning League.

116  I wrote to the National Archives chief of staff to give a courtesy heads-up that I was going to draft a bunch of volunteers to go out to College Park and systematically copy all their DVDs. Imagine my surprise when she wrote back and said David Ferriero thought this was such a great idea that he'd like to come to the initial meeting of volunteers and personally teach them how to rip DVDs.

117  Next thing we knew, we were in a meeting room at the Sunlight Foundation in the middle of a major blizzard, and the Archivist of the United States was teaching us how to rip video. We printed a bunch of red, white, and blue FedFlix return envelopes for people to send the DVDs as they finished, and created Public Domain Merit Badges for

volunteers who reached certain milestones. If you copy 5
DVDs you get a John F. Kennedy Public Domain Merit
Badge, at 25 discs you get the Bob Hope, and for 50 you get
the Duke Ellington.

## — Bureaucracy № 5 —

118    Video is really just a hobby for me, something I do in my
spare time. I run a 501(c)(3) nonprofit and we get our
money in the form of grants from foundations such as the
Omidyar Network and corporations such as Google and
Justia. We also get contributions from private foundations
such as the Elbaz, Kapor, and O'Reilly foundations.

119    Foundations aren't going to give you much money if
your mission statement is "we upload government
videotapes to YouTube."

120    My day job, as it were, the stuff we're paid to do in the
form of grants and contributions, is to help change our
legal system by making the law more freely available.

121    You'll remember that with government video, at the
federal level, there is no copyright in works of
government. This principle that there is no copyright is
even more sacred for a protected core—the law. The
principle that we're a nation of laws not a nation of men
means that we write down the rules that citizens must
obey. How can we be a nation of laws if those rules are not
open source?

122    Despite this principle, access to legal materials in the
United States is a $10 billion per year business. Often,
government will erect barriers to access as a way of
extracting rent from the public.

## 10 Rules for Radicals

123    This is particularly true for a database run by the Administrative Office of the U.S. Courts, a database called PACER, which stands for Public Access to Court Electronic Records. PACER contains 500 million pages of the proceedings of the U.S. district courts, including the dockets, briefs, motions, and opinions of every U.S. federal case.

124    The courts charge 8 cents per page and require a valid credit card to access PACER. A prisoner or other citizen can petition a judge for free access. But, petitioning a federal judge isn't exactly a low barrier to entry.

125    This is a big business for the courts: they drag in $120 million a year in revenue. The courts even charge the executive branch of the federal government millions a year to access filings!

126    To poke a few fingers in the eyes of the Administrative Office, we put up a recycling site, which let people upload their PDF documents from PACER—where we'd recycle them into the public domain.

127    Since PACER is a half-billion-page database, it was really kind of a bluff, a vehicle for an FAQ that tried to expose the finances behind PACER. But one of the things in the FAQ caught the attention of a couple of volunteers.

128    You see, the Courts, under strong congressional pressure to do something about public access, had just launched a trial program, putting one terminal in each of 17 libraries around the country. In the FAQ for the PACER recycling site, I encouraged volunteers to join the so-called Thumb Drive Corps and download docs from the

PRO-000592

7 TALES OF BUREAUCRACY

public access libraries and upload them to the PACER recycling site.

129    Aaron Swartz, whom many of you may know as the editor of the RSS spec and a prolific contributor to the Internet, called up and said he'd like to join the Thumb Drive Corps. I told him to be careful, knowing he was technically astute and inclined to script things pretty, um, aggressively. I warned him to make sure he didn't violate any of the guidelines the courts had set: if they said don't download too many docs, don't download too many docs.

130    A few weeks later I got email saying he had some data, could he maybe get an account to upload his docs directly?  Sure, no problem, we let him SSH in, and data started to come in, and come in, and come in, and soon there were 760 gigabytes of PACER docs, about 20 million pages.

131    Aaron evidently had super-sized his Thumb Drive, but he's a bright guy, so we weren't totally surprised.

Then, the stream abruptly stopped and I got email from Aaron saying we needed to talk. Right away.

132    The Administrative Office had evidently finally looked at their usage logs after two months—and then abruptly cancelled the public access program overnight, saying a security breach had occurred. The Superintendent of Documents at the Government Printing Office gave a speech and said that not only had a security breach occurred, the FBI had been called in to investigate.

133    Aaron and I talked again, and after grilling him, I was still convinced we had done nothing wrong. There were no signs or appropriate use statements saying this was

PRO-000593

10 RULES FOR RADICALS

intended for casual use only. I'll grant you that 20 million
pages had perhaps exceeded the expectations of the
people running the pilot public access project, but
surprising a bureaucrat isn't illegal.

134     From previous experience putting Court of Appeals
decisions on-line, I was pretty sure this PACER data was
going to be a mess. Rather than release the data on the net,
I started an audit looking for privacy violations.

135     For the next two months, a series of scripts ran that
looked for personal identifiers. Any files with a hit were
manually examined. Many of them were false positives,
such as government contract numbers.

136     But, there were also a whole bunch of files that did have
problems, and for each of those I looked around for things
the regex didn't catch and ended up finding even more
Social Security numbers, and other illegal data like the
names of minors and bank account numbers.

137     There was the obvious stuff, like the IRS suing a citizen
and forgetting to redact their Social Security number on
tax returns filed as evidence. Or, redacting the number by
placing a black rectangle on top of the text or turning the
color of the text to white.

138     There was also some really heart-wrenching stuff, like a
list of 350 patients of a doctor who was being sued for
malpractice. For each patient, the supporting document
listed their home address, birth date, Social Security
number, and a list of all their medical problems. Or the list
of the members of labor unions involved in pension
disputes, with their personal identifying information, home
address, and earnings history.

PRO-000594

## 7 TALES OF BUREAUCRACY

139      After completing that analysis, we sent a formal audit over to the Administrative Office of the Courts with a carbon copy to the judge who chairs the Judicial Conference Rules Committee. In addition to a printed list, they got a DVD that let them compare the redacted to the un-redacted version of 2,000 offending documents.

140      You'd think this was pretty shocking evidence, but the Administrative Office of the Courts ignored the preliminary audit, then ignored the final audit, then continued to ignore us. Finally, over the Christmas holidays in 2008, letters went to the Chief Judges of 30 district courts.

141      On the top of those letters—in big red type—were the words "Third and Final Notice." The letters said we had sent a preliminary audit to the Administrative Office and a final audit to the Administrative Office, and of course, these letters said, it goes without saying that the Administrative Office had promptly notified the judges of these very serious problems, since of course they didn't want to be breaking the law.

142      Needless to say, the judges hadn't heard about this situation, and you have to swallow real hard before you send Chief Judges of U.S. District Courts letters saying "Third and Final Notice," but you know what ... judges are reasonable people. They got these letters, their clerks checked them out, and we started getting letters back saying in effect "you're right, thanks, we'll take steps."

143      As a result of those audits, the Senate sent a strongly worded letter to the Administrative Office asking them why they weren't obeying the law. The judge who chairs the

10 RULES FOR RADICALS

Rules Committee wrote back to the Senate saying that
while they had privacy rules in place, they were obviously
not going far enough and they would change their rules.
And, a few months later, they changed their rules.

144       Here is my seventh rule for radicals, which is to get
standing. One can criticize government all one wants, and
they'll often ignore you. But, if there is something clearly
wrong and against the law and you can document that
malfeasance and wrongdoing, they have to talk to you. If
you have standing, you can insist.

## — Bureaucracy № 6 —

145   There is a related rule, and that is rule 8, which is to try to
get the bureaucrats to threaten you. Remember how the
law has a special place when it comes to copyright? While
a state government might be able to assert copyright over
some things, the Supreme Court has repeatedly ruled that
nobody can copyright the law. This means no copyright on
court opinions, but it also means no copyright on state
statutes.

146       So, you can imagine our surprise when the Oregon
Legislative Counsel, the lawyers for the legislature of
Oregon, sent a takedown notice to Public.Resource.Org
and to Justia, a company that has been instrumental in
putting free law on-line. The state said that by making
tarballs of the 2007 Oregon Revised Statutes available for
anonymous FTP, we had violated their copyright.

147       Why would the Oregon legislature insist on copyright?
Money!  They sold a print edition and they made money on

PRO-000596

7 TALES OF BUREAUCRACY

that print edition. We were threatening their revenue stream.

148     Now, to be totally fair, the policy in question had been put in place in the mid 1940s and nobody had ever questioned that policy. The takedown notice was the action of a bureaucrat just doing what they'd been doing for 70 years.

149     Once you have a takedown notice, particularly from a body as eminent as the lawyer for the Oregon legislature, you are in legal peril. You have a right to think they're going to sue you, because that's what the takedown notice says.

150     If you're in legal peril, you can go to a judge and ask for what's called declaratory relief, asking the court to rule on the issue. So, we hired a lawyer and put together a draft declaratory relief request and posted it on the net.

151     The thing about a state sending you a takedown notice for putting the law on the Internet is that this is not one of the subtle legal issues that you have to carefully explain to people. Everybody gets this—you can walk into any bar and explain what's going on and everybody will instantly get the issue and say "that's really stupid."

152     And that's my rule 9 for radicals—look for over-reaching, something that is clearly nuts. Not being able to publish state statutes certainly qualified on that count.

153     A few days after we threatened to sue, we got a notice saying the Oregon Legislature had scheduled hearings on this issue and would we be prepared to testify? Of course! If they were willing to talk, we certainly were.

PRO-000597

## 10 Rules for Radicals

154    We testified, as did some Oregon citizens. The lawyer for the legislature gave his testimony, and I was impressed by how well informed and willing to look at the issues everybody was.

155    After a lot of questions, the Legislative Counsel Committee, which was chaired by the President of the Senate and the Speaker of the House, voted unanimously to waive any assertions of copyright. It was democracy in action, and way quicker than a law suit.

156    To prove the point about why this was so important to do, a few months later, a second-year law student at Lewis & Clark took the statutes and created OregonLaws.Org, a dramatically better version of the Oregon statutes featuring a great UI, valid HTML, permaURLs, an iPhone app, tag clouds, a twitter feed, and loads of other bells and whistles.

157    When a state asserts copyright over legal materials, it is important to remember that while this is partly about democracy and justice, it is also about innovation. By requiring a license as a precondition to access primary legal materials, we create a barrier to innovation.

## — Bureaucracy № 7 —

158    I'd like to end this tale with a bureaucracy that is a bit amorphous, a little hard to visualize and thus an exceedingly difficult target and that bureaucracy is all the lawyers in the United States of America. When it comes to bureaucracies, the bar truly is the borg.

159    The principle that access to the law must be unfettered is a basic foundation of our system of justice. The U.S.

PRO-000598

<u>7 TALES OF BUREAUCRACY</u>

constitution says that "equal protection under the law" may
not be denied. Equal protection means that your basic
rights cannot be arbitrarily denied because you are poor,
are of a certain religion or race, or because somebody
disagrees with your political views.

160    A poll tax, which preconditions access to the polls on
access to money, is wrong because it denies equal
protection under the law. I put it to you that just as a poll
tax is wrong, preconditioning access to primary legal
materials on having a credit card is just as wrong, and it
violates our rights to equal protection under the law.

161    Turning primary legal materials from public property
into private parcels violates more than equal protection, it
makes due process under the law impossible, when rich
lawyers can do more research than poor lawyers.

162    By poor lawyers, I mean public interest lawyers and
solo practitioners. I also mean government lawyers in
places like the Department of Justice, who, believe it or
not, get memos telling them to please stop doing so much
research because the department is over budget.

163    Going back to the 1824 decision in Wheaton v. Peters,
one of the landmark cases of the great Marshall Court, the
Supreme Court, has been clear, over and over again, that
there is no copyright over primary legal materials, be they
court opinions or administrative regulations or state
statutes or OSHA regulations or even building codes
drafted by third parties but duly enacted as the law of the
land.

164    Despite this clear public policy, states and
municipalities have erected a thicket of copyright

## 10 Rules for Radicals

restrictions, pay walls, and click-through contracts around the raw materials of our democracy.

165    How do you change something so basic, so fundamental as access to the law?

166    This year, people involved in the free law movement have been gathering together under the banner of the Law.Gov initiative, an effort to try and convince policy makers from water districts to the President and Chief Justice that access to primary legal materials matters.

167    Our strategy to get this basic principle—that access to primary legal materials must be unfettered and reliable, must be available in bulk, and cannot be subject to pay walls or copyright restrictions—has started with a national conversation, a series of working groups and workshops held in many of the top law schools in the country.

168    We are in the middle of this process right now, in fact have just completed our workshop at Duke Law School's Center for the Public Domain, a workshop that featured not only well known legal scholars, but had the active participation of the Archivist of the United States and Andrew McLaughlin, who is Deputy Chief Technology Officer in the Executive Office of the President.

169    We will be completing this process of workshops and working groups in June, and will issue a set of recommendations to government officials. The Ninth Circuit of the Court of Appeals has granted us time to brief the judges, the U.S. Senate has asked for a copy of the report, and I've been very impressed at the number of top administration officials, members of Congress, and Chief

PRO-000600

7 TALES OF BUREAUCRACY

Judges in the Judicial Conference who have taken a keen
interest in these proceedings.

## — 10 Rules for Radicals —

170   In this talk, I've tried to present to you some rules for
radicals, some techniques that I use in my work, but
techniques that perhaps might be useful in your own
efforts to change how institutions function. We've covered
nine of those rules so far. Let me recap.

171         Rule 1: Call everything an experiment.

172         Rule 2: When the starting gun goes off, run really fast.
As a small player, the elephant can step on you, but you
can outrun the elephant.

173         Rule 3: Eyeballs rule. If a million people use your
service, and on the Internet you can do that, you've got a
lot more credibility than if you're just issuing position
papers and flaming the man.

174         Rule 4: When the time comes, be nice.

175         Rule 5: Keep asking until they say yes. Gordon Bell, the
inventor of the VAX, once said that you should keep your
vision, but modify your plan.

176         Rule 6: When you get the microphone, get to the point.
Be clear about what you want.

177         Rule 7: Get standing. Have some skin in the game, some
reason you're at the table.

178         Rule 8: Get them to threaten you.

179         Rule 9: Look for overreaching, things that are just
blatantly, obviously wrong or silly.

180         And finally, rule 10, which is don't be afraid to fail. It
took Thomas Edison 10,000 times before he got the

PRO-000601

10 RULES FOR RADICALS

lightbulb right, and when he was asked about those
failures, he said "I have not failed, I've just found 10,000
ways that won't work."

181       Fail. Fail often. And don't forget, you can question
authority.

182       Thank you very much.

PRO-000602

# DKT 41-1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA, | ) ) ) ) ) ) | **CIVIL ACTION**<br><br>**FILE NO.   1:15-CV-2594-RWS** |
| Plaintiff, | ) | |
| v. | ) ) | |
| PUBLIC.RESOURCE.ORG, INC., | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant Public.Resource.Org, Inc. hereby responds to Plaintiff Code

Revision Commission's enumerated Supplemental Statement of Additional

Undisputed Material Facts (Dkt. 34-5):

1. *PR is paid in the form of grants and contributions. Ex. 1,*

*PRO000591.*

**RESPONSE**:

Admitted.

2. *PR publishes "10 Rules for Radicals" that describes its copying and distribution of documents and teaches others how to take actions similar to PR's. Ex. 1, PRO000571-PRO000602.*

**RESPONSE**:

Admitted.

3.      *PR discusses in "10 Rules for Radicals" its copying and distribution of Oregon's Revised Statutes, and Rule 9 specifically relates to PR's experience in this regard. Ex. 1, PRO000596- PRO000598.*

**RESPONSE**:

Admitted.

4.      *The annotation of the judicial decision Cho Carwash Property, LLC. v. Everett (326 Ga. App. 6 (2014)) in West's Georgia Code Annotated associated with Georgia statute § 34-9-260 is as follows:*

> *Some evidence supported ALJ's calculation that workers' compensation claimant worked 38 hours per week when he was injured during training and thus that claimant's average weekly wage was $323, although claimant had worked only three days before being injured, and although employer testified that claimant would have been placed on part-time schedule once training had been completed; evidence indicated that lube technicians, such as claimant, worked four days per week, employer's business was open ten hours per day for six days of the week, claimant was supposed to work from time that business opened until it closed, and employees took 30-minute lunch.*

*Ga. Code Ann. § 34-9-260 ann. (West 2016).*

**RESPONSE:**

Admitted.

5.      *Although at least some of the O.C.G.A. volumes and supplements purchased by Public Resource were available for purchase on compact disc (CD), Public Resource purchased these volumes and supplements in paper form. Stip. ¶ 35.*

**RESPONSE:**

Admitted.

6.      *LexisNexis publishes and sells the O.C.G.A. as a printed publication, on CD-ROM, and in an on-line version. Stip. ¶ 84.*

**RESPONSE:**

Admitted.

7.      *LexisNexis receives income from its sales of the O.C.G.A. Stip. ¶ 85.*

**RESPONSE:**

Admitted.

8.      *The annotation of the judicial decision Piedmont Newnan Hosp., Inc. v. Barbour, 333 Ga. App. 620 (2015,), in the O.C.G.A. associated with Georgia statute § 24-4-401 is as follows:*

> *In a medical malpractice case, the trial court did not abuse its discretion in allowing the jurors to touch plaintiff's hand to determine for themselves if there was a detectable difference in the temperature of each hand and which of the parties' experts was correct as to whether plaintiff suffered from Complex Regional Pain Syndrome because the jurors could utilize all their senses, not just hearing and eyesight, in*

*determining factual disputes put to them; the evidence was relevant; and the trial court was not essentially allowing the jurors to make a medical diagnosis as the touching of plaintiff's arm allowed the jurors to determine whether the left arm was cooler than the right arm, and which expert was more credible.*

*O.C.G.A. § 24-4-401 ann. (2015).*

**RESPONSE:**

Admitted.

9.    *The annotation of the judicial decision Piedmont Newnan Hosp., Inc.*

*v. Barbour, 333 Ga. App. 620 (2015), in West's Georgia Code Annotated*

*associated with Georgia statute § 24-4-401 is as follows:*

> *Evidence of difference in temperature between patient's two hands was relevant to experts' contested diagnosis of whether patient suffered from complex regional pain syndrome (CRPS), in medical malpractice action against hospital in which patient alleged that hospital failed to ensure intravenous (IV) needle was correctly installed and properly functioning prior to heart stress test, thus causing infiltration of nuclear tracer material in his arm and development of CRPS.*

*Ga. Code Ann. § 24-4-401 ann. (West 2016).*

**RESPONSE:**

Admitted.

10.    *PR created, uploaded to its website at*

*https://law.resource.org, and distributes, an XML-encoded version of the*

*O.C.G.A. Ex. 2, PRO000633– PRO000635, PRO000654.*

**RESPONSE:**

Admitted.

*11.      PR's XML-encoded version of Title 1 of the O.C.G.A. is*

*available at*

*https://law.resource.org/pub/us/code/ga/georgia.xml.2014/TITLE%201.%*

*20GENERAL%20PROVISIONS.xml. Ex. 2, PRO000634. Exhibit 3 is a*

*true and accurate reproduction of the XML-encoded version of this file.*

*Ex. 3.*

**RESPONSE:**

Admitted.

*12.      PR's XML-encoded version of O.C.G.A. Title 1 does not include any*

*annotations. For example, O.C.G.A. § 1-1-1 contains an annotation of the*

*judicial decision Georgia ex rel. Gen Assy'y v. Harrison Co., 548 F. Supp. 110*

*(N.D. Ga. 1982), while PR's XML-encoded version of that statute includes no*

*annotations other than the revision history. Ex 3, at 1.*

**RESPONSE:**

Admitted.

Respectfully submitted this 5th day of July, 2016.

By: /s/ Elizabeth H. Rader
     Jason D. Rosenberg
     Georgia Bar No. 510855
     jason.rosenberg@alston.com
     Sarah P. LaFantano
     Georgia Bar No. 734610
     sarah.lafantano@alston.com
     ALSTON & BIRD LLP
     One Atlantic Center
     1201 West Peachtree Street
     Atlanta, GA  30309-3424
     Telephone 404-881-7461
     Fax (404) 253-8861

     Elizabeth H. Rader
     *Admitted pro hac vice*
     elizabeth.rader@alston.com
     ALSTON & BIRD LLP
     950 F Street, NW
     Washington, DC 20004
     Telephone:  202-239-3008
     Fax: (202) 239-3333

     *Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA, | ) ) ) ) ) ) | **CIVIL ACTION** **FILE NO.   1:15-CV-2594-RWS** |
| Plaintiff, | ) | |
| v. | ) ) | |
| PUBLIC.RESOURCE.ORG, INC., | ) | |
| Defendant. | | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **Defendant's Response to Plaintiff's Supplemental Statement of Undisputed Material Facts** was electronically filed with Clerk of Court using the CM/ECF system which will automatically send notification of such filing to all attorneys of record.

*/s/ Sarah P. LaFantano*
Sarah Parker LaFantano
Georgia Bar No. 734610

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA, | ) ) ) ) ) | **CIVIL ACTION** **FILE NO.   1:15-CV-2594-RWS** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PUBLIC.RESOURCE.ORG, INC., | ) | |
| Defendant. | | |

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to L.R. 5.1C and 7.1D of the Northern

District of Georgia, the foregoing **Defendant's Response to Plaintiff's**

**Supplemental Statement of Undisputed Material Facts** complies with the font

and point selections approved by the Court in L.R. 5.1C. The foregoing pleading

was prepared on a computer using 14-point Times New Roman font.

*/s/ Sarah P. LaFantano*
Sarah Parker LaFantano
Georgia Bar No. 734610

# DKT 46

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION on behalf of and for the benefit of THE GENERAL ASSEMBLY OF GEORGIA, and THE STATE OF GEORGIA, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:15-CV-2594-RWS |
| PUBLIC.RESOURCE.ORG, INC. | |
| Defendant. | |

## [~~PROPOSED~~] PERMANENT INJUNCTION ORDER

The Court, having entered an Order on March 23, 2017 granting Plaintiff's

Motion for Partial Summary Judgment, with respect to Plaintiff's works that were

registered with the United States Copyright Office at the time of briefing, hereby

issues the following injunctive relief:

Defendant is permanently enjoined from all unauthorized use, including

through reproduction, display, distribution, or creation of derivative works, of the

Official Code of Georgia Annotated (O.C.G.A.). Defendant is FURTHER

ORDERED to remove all versions of the O.C.G.A. from its website and any other

website within its possession, custody, or control within seven days, wherein

"remove" means deletion from the website and wherein merely making the

1

O.C.G.A. versions inaccessible does not amount to a removal of said versions. Defendant may continue to use, in relation to its court submissions, excerpts from versions for the O.C.G.A. that were filed by either party as exhibits to, or quoted in, documents filed with the Court through the ECF system and presently available on the PACER system, and which are part of the record in this case,. Defendant is FURTHER ORDERED to remove all fundraising solicitations for the Defendant's unauthorized use, including through reproduction, display, distribution, or creation of derivative works, of the O.C.G.A. from its website and any other website within its possession, custody, or control within seven days. *The Clerk shall close the case.*

IT IS SO ORDERED, this *7th* day of *April*, 2017.


UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF GEORGIA

2

# DKT 48

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| CODE REVISION COMMISSION on behalf of and for the benefit of THE GENERAL ASSEMBLY OF GEORGIA, and THE STATE OF GEORGIA, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:15-CV-2594-RWS |
| PUBLIC.RESOURCE.ORG, INC. | |
| Defendant. | |

**PUBLIC RESOURCE.ORG'S SUPPLEMENTAL STATEMENT IN SUPPORT OF JOINT MOTION FOR ENTRY OF PROPOSED PERMANENT INJUNCTION ORDER**

Defendant and Counterclaim-Plaintiff Public.Resource.Org, Inc. ("Public Resource") files this supplemental statement to clarify that its joinder in the Motion for Permanent Injunction Order (Dkt. 45) is not intended to waive, and expressly does not waive, its right to appeal the Court's March 23, 2017 Order to the United States Court of Appeals for the Eleventh Circuit and seek reversal of the order and judgment against it.

On March 23, 2017, upon learning of the Court's Order granting the Commission's motion for partial summary judgment, to comply with the order,

Public Resource took down all versions of the O.C.G.A. from its website and every other website within its possession, custody, or control.  Public Resource also removed all fundraising solicitations for its use of the O.C.G.A. from its website and any other website within its possession, custody, or control and from its web server.  Public Resource joined in the Motion for Permanent Injunction Order to avoid the need for briefing to address the injunctive relief issue and thus preserve the Parties' and Court's resources.

Respectfully submitted, this 7th day of April, 2017.

_____

Elizabeth H. Rader (*pro hac vice*)
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Telephone: 202-239-3008
Fax: (202) 239-3333
elizabeth.rader@alston.com

Jason D. Rosenberg
Georgia Bar No. 510855
Sarah Parker LaFantano
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone 404-881-7461
Fax (404) 253-8861
jason.rosenberg@alston.com

2

Saran.Lafantano@alston.com

*Counsel for the Defendant,*
*Public.Resource.Org*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CODE REVISION COMMISSION on
behalf of and for the benefit of THE
GENERAL ASSEMBLY OF
GEORGIA, and THE STATE OF
GEORGIA,

　　　　　　Plaintiff,

　　　v.

PUBLIC.RESOURCE.ORG, INC.

　　　　　　Defendant.

CIVIL ACTION NO.

1:15-CV-2594-RWS

## <u>CERTIFICATE OF SERVICE</u>

　　　I hereby certify that I have filed the foregoing **Supplemental Statement In Support of Joint Motion for Entry of Proposed Permanent Injunction of Defendant Public.Resource.Org, Inc.** electronically with the Clerk of Court, using the CM/ECF system which will automatically send notification of such filing to all attorneys of record.

　　　　　　　　　　　　*/s/ Sarah P. LaFantano*
　　　　　　　　　　　　Sarah P. LaFantano
　　　　　　　　　　　　Georgia Bar No. 734610

# DKT 49

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION on behalf of and for the benefit of THE GENERAL ASSEMBLY OF GEORGIA, and THE STATE OF GEORGIA, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:15-CV-2594-RWS |
| PUBLIC.RESOURCE.ORG, INC. | |
| Defendant. | |

## **NOTICE OF APPEAL**

Notice is hereby given that Defendant and Counterclaim-Plaintiff

Public.Resource.Org, Inc. ("Public Resource") appeals to the United States Court

of Appeals for the Eleventh Circuit from the Final Judgment entered on April 7,

2017 (D.I. 46) and all other orders decided adversely to Defendants, including, but

not limited to, the Court's March 23, 2017 Order granting Plaintiff's Motion for

Partial Summary Judgment (D.I. 44).  Consistent with Rule 4(a) of the Federal

Rules of Appellate Procedure, this Notice of Appeal is being filed within 30 days

of the entry of the District Court's March 23, 2017.

1

Respectfully submitted, this 7th day of April, 2017.

/s/Elizabeth H. Rader

Elizabeth H. Rader (*pro hac vice*)
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Telephone: 202-239-3008
Fax: (202) 239-3333
elizabeth.rader@alston.com

Jason D. Rosenberg
Georgia Bar No. 510855
Sarah Parker LaFantano
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone 404-881-7461
Fax (404) 253-8861
jason.rosenberg@alston.com
Saran.Lafantano@alston.com

*Counsel for the Defendant,*
*Public.Resource.Org, Inc.*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION on behalf of and for the benefit of THE GENERAL ASSEMBLY OF GEORGIA, and THE STATE OF GEORGIA, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:15-CV-2594-RWS |
| PUBLIC.RESOURCE.ORG, INC. | |
| Defendant. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have filed the foregoing **Notice of Appeal of**

**Defendant Public.Resource.Org, Inc.** electronically with the Clerk of Court,

using the CM/ECF system which will automatically send notification of such filing

to all attorneys of record.

*/s/ Sarah P. LaFantano*
Sarah P. LaFantano
Georgia Bar No. 734610

3

# DKT 58-4

# EXHIBIT 4



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

**Open Source America's Operating System**

"It's Not Just A Good Idea—It's The Law!"

May 1, 2014

Honorable Jeffrey W. Bullock
Secretary of State
401 Federal Street
Dover, DE 19901

Via Certified Mail 9414 7118 9956 0424 6046 19

Dear Secretary Bullock:

I am writing in regards to Title 8 of the Delaware Code, and specifically in regards to 8 Del. Code §397, "Penalty for unauthorized publication of chapter," which reads:

> "Whoever prints or publishes this chapter without the authority of the Secretary of State of this State, shall be fined not more than $500 or imprisoned not more than 3 months, or both."

I mentioned this penalty in recent testimony before the House Judiciary Committee of the U.S. House of Representatives along with a series of similar provisions and takedown notices from Georgia, Idaho, and Mississippi. However, given the wonderful job that your office has done on the Internet with the Delaware Code, e-filing for corporations, and other modern services, I must confess that I thought that the provision was simply a typo or an artifact of the July 3, 1967 law (56 Del. Laws, c. 50) that you had not yet got around to removing.

It was thus somewhat of a shock after speaking to staff at the Legislative Council's office and to your own Chief of Community Relations that Delaware is indeed serious about enforcing these provisions and requiring anybody who wishes to copy Title 8 of the Delaware Code to first request and obtain permission.

Long-standing precedent of the United States Supreme Court holds that copyright claims cannot prevent citizens from reading and speaking the law. See Wheaton v. Peters, 33 U.S. 591 (1834); Banks v. Manchester, 128 U.S. 244 (1888). Chief Judge Edith H. Jones of the 5th Circuit expressed this principle clearly in her opinion in Veeck v. Southern Building Code Congress, which concerned a model building code incorporated in the law of two Texas towns:

> "Public ownership of the law means precisely that "the law" is in the "public domain" for whatever use the citizens choose to make of it. Citizens may

PRO-000651

*Honorable Jeffrey W. Bullock, Secretary of State, Page 2*

reproduce copies of the law for many purposes, not only to guide their actions but to influence future legislation, educate their neighborhood association, or simply to amuse." 293 F.3d 791 (5th Cir. 2002) (en banc).

The matter is so clear that the U.S. Copyright Office has incorporated it into the standard operating procedures:

"Edicts of government, such as judicial opinions, administrative rulings, legislative enactments, public ordinances, and similar official legal documents are not copyrightable for reasons of public policy. This applies to such works whether they are Federal, State, or local as well as to those of foreign governments." Compendium of Office Practices II, §206.01, U.S. Copyright Office (1984)

The problem with your assertion of control over Title 8 is not only that it is clearly against long-standing public policy in the United States, it is a significant brake on innovation. When some students at a major law school wanted to use these materials in coursework, §397 proved to be so scary that their professors insisted that they ask for permission first. Imagine what it would have been like if WestLaw had been forced to ask for and obtain permission from each of the states and each of the federal courts before being able to embark on their creation of the National Reporter System?

Assertions of control are a slippery slope and they are unfounded because in the United States the law belongs to the people. The rule of law requires that the law be promulgated freely, a principle deeply embedded in our constitutional provisions of freedom of speech, equal protection, and due process. We have accordingly made a copy of Title 8 without requesting prior authorization and made it available at the following location:

https://law.resource.org/pub/us/code/de/

It is our intention to continue to develop these materials, encouraging both for-profit and non-profit entities to work with the code to make it available as pamphlets, and in modern formats such as States Decoded. We have clearly labeled the material as public domain and we assert no rights. Nor should you.

In discussing this issue with staff at the Legislative Council's office, two concerns were raised in an attempt to justify the current policy. The first was that educational uses would be routinely approved once your office received a look at the intended use and that commercial or inappropriate uses were being looked for. Needless to say, there are significant free speech considerations in requiring a license before people are able to speak the law.

The second issue that was raised was a desire to insure the authenticity of the materials. Copyright is an inappropriate instrument for such a consideration, particularly given the clear statement of the courts that the law has no copyright. A better tool would be providing digital signatures at the source so anybody presented with a document that purports to contain the text of the law is able to reach your web site and verify the authenticity of the original documents you publish. This is the approach that, for example, the Government Printing Office uses to sign the Official Journals of the federal government.

PRO-000652

*Honorable Jeffrey W. Bullock, Secretary of State, Page 3*

In addition, if your site were to offer standard security services, such as a secure HTTP connection and modern services such as DNSSEC, people visiting your site would have additional assurances of the integrity of the materials they read.

In the meantime, we respectfully refuse to request permission for our publication activities and will not accept a license if one is proffered. I would be happy to travel to Delaware to discuss this matter with you. I believe if you consider the matter further and hear the views of the citizens of Delaware and those schooled in constitutional and copyright law, you will quickly come to the conclusion reached by other states, such as the State of Oregon, that have reversed similar unconstitutional prohibitions against access to their laws.

Sincerely yours,

 Digitally signed by Carl
Malamud
DN: cn=Carl Malamud,
o=Public.Resource.Org, ou,
email=carl@media.org,
c=US
Date: 2014.05.01 12:46:09
-07'00'

Carl Malamud


cc:   Attorney General Beau Biden
      Delaware Department of Justice
      Carvel State Building
      820 N. French Street
      Wilmington, DE 19801
      Via Certified Mail 9414 7118 9956 0424 9346 93

      Hon. Peter C. Schwartzkopf
      House Legislative Council Committee
      411 Legislative Avenue
      Dover, DE 19901
      Via Certified Mail 9414 7118 9956 0424 9132 78

      Hon. Patricia M. Blevins
      Senate Legislative Council Committee
      411 Legislative Avenue
      Dover, DE 19901
      Via Certified Mail 9414 7118 9956 0424 9105 50

PRO-000653

# DKT 58-5

# EXHIBIT 5



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

### Public Works for a Better Government

July 15, 2013

Hon. Ben Ysura
Secretary of State
State of Idaho
PO Box 83720
Boise ID 83720–0080

Hon. Brent Hill
President Pro Tempore of the Senate
Idaho State Legislature
1010 South 2nd East
Rexburg, Idaho 83440

Hon. Scott Bedke
Speaker of the House
Idaho State Legislature
P.O. Box 89
Oakley, ID 83346

Idaho Code Commission
P.O. Box 388
Boise, ID 83701

Dear Secretary Ysura, President Pro Tempore Hill, Speaker Bedke, and Members of the
Idaho Code Commission:

Public.Resource.Org is in receipt of the communication of July 12, 2013 from Mr.
Bradlee R. Frazer of Hawley Troxell Ennis & Hawley LLP concerning your notice under
17 U.S.C. § 512(c)(3), the Digital Millennium Copyright Act. Your notice claims
copyright infringement for the publication of the Idaho Code without having secured
from you first a "royalty–free copyright license ... to reproduce and display the native,
underlying statutory code content." In addition, your letter claims additional rights, for
which you apparently will not grant any license, for all text which falls outside of the
red boxes you drew on the Idaho Code, constituting what you describe as "analyses,
summaries and reference materials."

We respectfully decline to remove the Idaho Code and respectfully reject the distinction
between "native" code and additional materials, as both are integral part and parcel of
the only official Idaho Code, such material constituting the official laws of Idaho as
published by the state.

carl@media.org   1005 GRAVENSTEIN HIGHWAY NORTH, SEBASTOPOL, CALIFORNIA 95472 · PH: (707) 827-7290 · FX: (707) 829-0104

PURPORTED LICENSE REQUIREMENTS FOR THE IDAHO CODE, PAGE 2

It is a long-held tenet of American law that there is no copyright in the law. This is because the law belongs to the people and in our system of democracy we have the right to read, know, and speak the laws by which we choose to govern ourselves. Requiring a license before allowing citizens to speak the law would be a violation of deeply-held principles in our system that the laws apply equally to all.

This principle was strongly set out by the U.S. Supreme Court under Chief Justice John Marshall when they stated "the Court is unanimously of opinion that no reporter has or can have any copyright in the written opinions delivered by this Court, and that the judges thereof cannot confer on any reporter any such right." Wheaton v. Peters, 33 U.S. (8 Pet.) 591 (1834). The Supreme Court specifically extended that principle to state law, such as the Idaho Code, in Banks v. Manchester (128 U.S. 244, 1888) , where it stated that "the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or a statute."

This principle has become embedded clearly throughout our country. The Court of Appeals for the Sixth Circuit has stated that "any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book, whether such book be the property of the state or the property of an individual." Howell v. Miller, 91 F. 129, 137 (6th Cir. 1898) (Harlan, J.).

These strong precedents are reflected in the official policy statement of the U.S. Copyright Office:

> "Edicts of government, such as judicial opinions, administrative rulings, legislative enactments, public ordinances, and similar official legal documents are not copyrightable for reasons of public policy. This applies to such works whether they are Federal, State, or local as well as to those of foreign governments."

U.S. Copyright Office, Compendium II: Copyright Office Practices § 206.01 (1984)

The principle that there is no copyright in the law, and that no license is therefore needed, has been fundamental to the evolution of our legal system. West Law could never have built that magnificent edifice of American jurisprudence, the Federal Reporter, if each court had required a license to publish. If citizens are required to obtain a license before repeating the law, does that not strike at the very heart of our rights of free speech under the First Amendment? If ignorance of the law is no excuse, how can we restrict promulgation of those laws?

The distinction between "native" content ("the law") and additional materials perhaps would have some bearing if the publication in question were the independent commercial endeavor of a publication firm. If such a firm were to copy the state statutes and compile that information with additional analyses and summaries and were to do so as a strictly commercial endeavor, we understand and respect that this material would be their private property.

However, the publication in question is not by some independent endeavor, it is by the Idaho Code Commission and the document is clearly labeled as the official Idaho Code. Your vendor states in its marketing materials that this document is "the only official

PURPORTED LICENSE REQUIREMENTS FOR THE IDAHO CODE, PAGE 3

source" for Idaho law. The Idaho Code is a publication of the State and it is the definitive statement by the State of the law. Any lawyer would ignore this publication any of its components at his or her peril. Any citizen wishing to read the Official Idaho Code would have trouble distinguishing between the material you outlined in red and those materials outside the box. No matter how you slice that cheese, it all looks the same. The Official Idaho Code, every component of it, is the law.

A similar situation occurred in the great state of Oregon when we received a Cease and Desist notice on April 7, 2008 for publishing online the Oregon Revised Statutes. As with the present situation, lawyers for that state demanded licenses as a condition to publication and attempted to make a distinction between the law and the additional organization of that material by the Legislative Counsel of Oregon.

I am pleased to tell you that the State of Oregon decided that this was an issue that should be decided by the people of Oregon and their elected officials. The Speaker of the House and the Senate President called a hearing of the Legislative Counsel Committee, listened to citizens and to their own legislative counsel, kindly invited us to speak, and at the end of the day unanimously waived any assertion of copyright in the Oregon Revised Statutes.

Not only was copyright waived, something very special happened. With the restrictions on use of the Oregon Revised Statutes lifted, a law student at the Lewis & Clark Law School was able to take this material and develop a vastly better version of the Oregon Revised Statutes for the people of his state to use. Restricting use of the codes restricts innovation, making it harder to use the materials. Restrictions on the Idaho Code hurts democracy and the citizens of Idaho by making their laws less accessible.

In Oregon, the assertion of copyright dated back to the 1940s and the state had carried that policy forward. When the people of Oregon looked at the issue in the light of our modern era, the decision was very clear. Let us not forget that Section 73–210 of the Idaho Code, asserting copyright in the Idaho Code, was added in 1949 and this right was authorized and empowered in the Session Laws of 1947. Is it not time, in light of developments such as the Internet, to revisit those restrictions?

Our publication of the Idaho Code should be encouraged, not threatened. Our publication of the Idaho Code is the clean potato, not one that should be prosecuted by expensive law firms in federal courts. I would be more than happy to come to Idaho to discuss the matter with you, and would strongly encourage you to discuss the issue with the people of Idaho.

Sincerely yours,

Digitally signed by Carl Malamud
DN: cn=Carl Malamud, o=Public.Resource.Org, ou, email=carl@media.org, c=US
Date: 2013.07.15 10:24:46 -07'00'

Carl Malamud
Public.Resource.Org

# DKT 58-6

# EXHIBIT 6



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

## Open Source America's Operating System

"It's Not Just A Good Idea—It's The Law!"

October 11, 2013

Larry A. Schemmel
Special Assistant Attorney General
Office of the Attorney General
State of Mississippi
Post Office Box 1850
Jackson, Mississippi 39215-1850

Dear Mr. Schemmel:

I am in receipt of your letter of October 7 regarding your request that we "immediately remove the annotated version of the Mississippi Code of 1972 Annotated from any and all … website(s) and from all sites and all types of written and electronic media." We respectfully decline to comply with this request for the reasons stated herein.

First, let me thank you for thoughtful letter. I especially appreciate your support for the 8 Principles of Open Government Data, which I helped draft with 30 of my colleagues in 2007. If I may take the liberty of paraphrasing your letter, it seems like you are making two main points:

- You state that the State of Mississippi makes the unannotated version of the Code available and that this is complete, current, and <u>official</u>. (Emphasis in the original letter.)

- You state that the annotated version of the Code is also an "<u>official</u> version of the law of the State and includes the law itself <u>and</u> copyright-protected material." (Emphasis in the original letter.)

Let me begin by addressing the question of availability of the unannotated version of the Code via your vendor's web site. As you know, the 8 Principles of Government Data require that access to government data—particularly public domain data such as we both agree includes the unannotated Code—should be license-free and machine processable.

As you will see in Exhibit A, access to the site is initially blocked by a popup which requires the user to agree the Terms and Conditions. Those Terms and Conditions, which are attached in Exhibit B, consists of an extensive license agreement spanning 5 pages of exceedingly technical language in fine print.

Some of the highlights of the agreement include fairly draconian prohibitions against effective use, including a prohibitions against the ability to "copy, modify, reproduce, republish, distribute, display, or transmit for commercial, non-profit or public purposes all or any portion of this Web Site."

PRO-000755

The Attorney General of Mississippi, Page 2

The terms of use, in turn, refer to the Copyright Statement from your vendor, which states:

> No part of the materials including graphics or logos, available in this Web site may be copied, photocopied, reproduced, translated or reduced to any electronic medium or machine-readable form, in whole or in part, without specific permission (to request permission to use materials, continue to our Permission Request Form). Distribution for commercial purposes is prohibited.
> *Source: http://www.lexisnexis.com/terms/copyright.aspx*
> *Last Retrieved: October 10, 2013*

If the user has the courage to click through, they are presented with a navigational interface based on frames and an extensive amount of clicking by the user before they can reach the section they are looking for (See Exhibit C). Finally, the user is presented with a section of the Code, for example Exhibit D, shows § 1-1-8.

The user interface your vendor presents is full of links to various proprietary products, but there is a little print icon, which presents a semi-clean version of the text, as shown in Exhibit E. However, there is a huge flaw in the user interface, in that the URL that is presented does not allow a user to share what they are looking at with other users. If you mail the URL to a friend, you don't get the section of the Code, you get a screen from your vendor hawking proprietary products as shown in Exhibit F.

The lack of permanent URLs and a modern user interface are just the beginning of problems with this web site.

- As you can see from Exhibit G, the site is replete with HTML errors, errors which prevent the text from properly working on modern standards-based browsers (I have included only the first 10 pages of the 39 page error report).
- In addition, as shown in Exhibit H, the site is replete with CSS errors, as shown in Exhibit H, making the site work improperly in browsers (again, I have included only the first 10 pages of the 165 error report, which is a test of only one of several of the CSS files used).
- In addition, as shown in Exhibit I, the site does not meet the Section 508 accessibility requirements of the U.S. Rehabilitation Act, which makes information available to people with disabilities.
- Finally, as shown in Exhibit J, your vendor does not permit search engines to crawl their site, making the most common discovery method for users unavailable in the case of the Mississippi Code. People should be able to easily discover what the law is.

Perhaps the biggest issue is that the public access that is provided does not allow bulk access to the data. This means that other sites, which might provide better formatting or accessibility, are prohibited from providing this service by the terms of use. There is no requirement that the State or your vendor provide a good web site, but prohibiting others from doing so is a significant barrier to the rule of law and our rights to read, know, and speak the laws which we must all obey.

Let me turn briefly now to the issue of the Annotated Official Code. Exhibit K contains the marketing literature provided by your vendor. As you can see, any citizen and

The Attorney General of Mississippi, Page 3

certainly any lawyer would feel totally remiss in not using the the official annotated
version of the Code. The marketing literature stresses that:

**Be sure that the law you read is the law indeed**
Official isn't just a word. It's a process. The Mississippi Joint Legislative
Committee on Compilation, Revision and Publication of Legislation maintains
careful editorial control over the publication of the official code, from the
moment LexisNexis receives the acts to the final galley proofs of the finished
product. Their strict supervision ensures that the published code and its
supplements contain no errors in content, conform carefully to the numbering
scheme, and publish in a timely manner.

**Cite the code that's guaranteed to be right**
Because it's official, you can rely on LexisNexis' Mississippi Code of 1972
Annotated for the correct statement of the law ...

As you can see, it is very clear that the Code is the official statement of the law as
promulgated by the State. This is not some independent commercial endeavor, this is
an official process under the direction of the State.

I have attached as Exhibit L the same section earlier attached from Exhibit D, this one
being the annotated version. As you can see by comparing the two, the Annotated
Code includes important cross references, research references, and Editor's Notes. The
Editor's notes are not simply creative work, they are important materials. For example,
the note to § 1–1–11 is a reference to a statement adopted by the Joint Legislative
Committee on Compilation, Revision and Publication of Legislation. Statements such as
these are part and parcel of the law, statements of the codifiers that add important
information to the original statutes.

I appreciate the efforts you have taken to reach out to me and the informative nature
of your letter. It is clear you have given the matter careful consideration. However, we
believe that the Official Code as promulgated by the Joint Legislative Committee and
bearing the official authorship of the Committee falls squarely in the category of the
law, which all citizens have the right to read, know and speak.

We therefore respectfully decline to remove the materials. However, I would be more
than happy to discuss the matter including traveling to Mississippi to discuss the
technical points which I have raised with you and others.

Sincerely yours,



Digitally signed by Carl
Malamud
DN: cn=Carl Malamud,
o=Public.Resource.Org, ou,
email=carl@media.org,
c=US
Date: 2013.10.11 09:58:41
-07'00'

Carl Malamud

enc:      Trodart 5208 Self-Inking Rubber Stamp, Red Ink
          "IF A LAW ISN'T PUBLIC, IT ISN'T A LAW. JUSTICE STEPHEN BREYER"

PRO-000757

# DKT 58-7

# EXHIBIT 7



**PUBLIC.RESOURCE.ORG** ~ *A Nonprofit Corporation*

### Public Works Projects for the Internet

April 15, 2008

The Honorable Dexter A. Johnson
Legislative Counsel of the State of Oregon
Legislative Counsel Committee
The State of Oregon
Attn: Mr. Sean Brennan, Esq.

Re: The Legislative Counsel's Web Site

Dear Mr. Johnson:

I am writing in reference to your assertion in your April 7, 2008 letter to Mr. Tim
Stanley in which you stated "the entirety of the Oregon Revised Statutes is freely
available online at the Legislative Assembly's own website" as justification for requiring
Mr. Stanley and other groups to remove copies of Oregon Law from the Internet.

For your convenience, this letter and our other correspondence may be accessed at the
following location:

http://www.scribd.com/groups/view/7303-oregon-legislative-counsel

As you know, the general goal for public access to the public law of Oregon as stated
in 2005 ORS 173.763 is that the law "shall be made available to the public through the
largest nonproprietary, nonprofit cooperative public computer network. The
information shall be made available in one or more formats and by one or more means
in order to provide the general public in this state with the greatest feasible access."
Assertions of copyright are merely tools to aid in cost recovery and only to the extent
that the cost recovery is within the context of your public access obligations.

I am sorry to report that the Legislative Counsel Committee's own website does not
meet broadly accepted standards of functionality and validity.  The Oregon Revised
Statutes portion of your web site was submitted to Markup Validation Service, the
independent testing and certification arm of the W3C, the standards-making body for
the World Wide Web.  Unfortunately, the results show 503,482 HTML errors in the code
of the Oregon Revised Statutes.

In addition to not meeting the core basic requirements of the HTML standards, your
site is also noncompliant with Section 508 accessibility requirements, and do not make
use of Cascading Style Sheets (CSS), a commonly accepted "Best Practices" standard as
specified in REC-CSS1-19990111 et. seq.  Such blatant noncompliance with HTML and
other required standards mean that your web site may not display properly on some
computers and is likely to pose significant obstacles to those with handicaps or older
computers, such as those with low incomes.

PRO-000828

The Honorable Dexter A. Johnson, Page 2

In addition to these numerous blatant code violations, the Legislative Counsel web site is sorely lacking in basic functionality.  Open government data principles mandate that the goal of broad public access to public records can only be met if the data are available in bulk, and in a timely, accessible, and machine-processable fashion. Further, your HTML files are lacking required metadata such as keywords, author, description, and other information optimized for search engines.  Your site has a robots.txt file prohibiting access to your search engine interface by sites such as Google and you do not conform to the broadly accepted "sitemap" standards which make sites more visible to these search engines.

Your HTML files also do not have any internal markup to allow direct access to individual sections of the code, again a "best practices" standard followed by the vast majority of modern legal systems.  In addition, your HTML files do not contain either internal links to other ORS sections cited or external links to other laws and to court decisions.

With numerous code violations and a site that is an eyesore, this low-income hosting being provided the public does not further the rule of law.  As citizens, we are presumed to know the law, and the aims of broad dissemination can never be met with a single web site.  Aggressive pursuit of obstacles to redistribution run directly counter to the basic principles of the Internet and your statutory obligation to provide broad access.  Your policy objectives would be far better met by allowing the Internet and the legal information community to supplement your efforts and build new tools that make the Oregon Revised Statutes available in a much more comprehensive and systematic fashion.

Sincerely yours,


Carl Malamud
President & CEO
Public.Resource.Org, Inc.

PRO-000829

# DKT 58-8

# EXHIBIT 8

# LEVY, RAM & OLSON LLP

May 16, 2008

**VIA FACSIMILE – (503) 373-1043**
**AND MAIL**

Dexter Johnson
Legislative Counsel
State of Oregon
Legislative Counsel Committee
900 Court St. NE, S-101
Salem, Oregon 97301-4065

      Re:    Public License Agreement

      I am writing to follow up on my May 2, 2008 letter to you, to which I await a response.

      In light of the Legislative Counsel Committee's continued position that it has copyright ownership over certain features of the Oregon Revised Statutes, my clients have concluded it is in the public interest to resolve this dispute by means of a declaratory judgment action. The need for such an action could be obviated if the Committee disclaimed copyright ownership over the Oregon Revised Statutes, but the current posture of things – with the Committee having promulgated a "Public License" which my clients find unacceptable, and having stated only that Justia need not remove its copy of Oregon Revised Statutes "at this time" – leaves my clients in a state of unacceptable limbo.

      Accordingly, it is my clients' current intention – absent a disclaimer of copyright ownership as set forth above – to file a Complaint for Declaratory Relief on or before June 2, 2008. As a courtesy, the Committee can access a draft complaint at the following URL: http://resource.org/oregon.

      If you have any questions, please do not hesitate to give me a call.

                        Sincerely,

                        Karl Olson

KO:amw

cc:    Tim Stanley
       Carl Malamud

PRO-000833

1
Karl Olson (SBN 104760)
ko@lrolaw.com
2
LEVY, RAM & OLSON
639 Front Street, 4th Floor
3
San Francisco, CA 94111
Telephone: (415) 433-4949
4
Facsimile: (415) 433-7311
5
*Attorneys for Plaintiffs*
6

7

8
**IN THE UNITED STATES DISTRICT COURT**
9
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

11
PUBLIC.RESOURCE.ORG, JUSTIA INC.,

CASE NO.
12
            Plaintiffs,

**COMPLAINT FOR DECLARATORY**
13
    v.

**RELIEF RE NON-INFRINGEMENT OF**
**COPYRIGHT**
14
STATE OF OREGON LEGISLATIVE
COUNSEL COMMITTEE,
15
            Defendant.
16

17

18
        1.This is a civil action seeking declaratory relief. Defendant the Legislative Counsel
19
Committee of the State of Oregon (hereafter "the Committee") – in contrast to the vast majority
20
of states – has taken the position that it is the copyright owner of the Oregon Revised Statutes and
21
thus has a copyright interest in basic information about that state's laws. The Committee claims
22
that such basic information as the arrangement and subject-matter compilation of the Oregon
23
Revised Statutes, leadlines and numbering for each section, and tables and indexes can be
24
copyrighted. Plaintiffs – whose mission is to make the law widely available to people who are
25
expected to comply with it – take issue with the state's broad assertion of rights over such basic
26
information, and contend that the state cannot acquire copyright over the laws in the first
27
instance. This declaratory relief action seeks to resolve that dispute.
28

PRO-000834

**PARTIES**

2. Plaintiff Public.Resource.Org is a 501(c)(3) non-profit corporation headquartered in Sebastopol, California, which makes the text of laws available to the public over the Internet.

3. Plaintiff Justia, Inc. is a corporation headquartered in Mountain View, California which likewise makes available laws to the public over the Internet and otherwise.

4. Defendant the Legislative Counsel Committee of the State of Oregon, which is counsel to the Legislature of the State of Oregon, headquartered in Salem, Oregon, has claimed that it is the copyright owner of the Oregon Revised Statutes. The Committee is a financially self-sufficient agency which generates its own revenue and pays its own debts. This action does not seek an affirmative financial judgment paid out of the state treasury, although it does seek an award of attorneys' fees.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over this claim pursuant to the Copyright Act, 17 U.S.C. section 101 et seq., 28 U.S.C. sections 1331 and 1338, and the Declaratory Judgment Act, 28 U.S.C. section 2201.

6. Plaintiffs are informed, believe, and thereon allege that Defendant has sufficient contact with this district generally and, in particular, with the events herein alleged, including but not limited to its promulgation over the Internet of the Oregon Revised Statutes in a form available to millions of Californians, so as to subject it to both personal jurisdiction in this Court and to make this Court a proper venue pursuant to 28 U.S.C. section 1391. Defendant also sells to California residents and ships to California. Defendant maintains an Internet E-Commerce website at securepay.oregon.gov which sells to residents of all states including California and Plaintiffs are informed, believe and thereon allege that the securepay.oregon.gov e-commerce server used by Defendant is physically located in San Jose, California. Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California:   defendant sent "take down" notices to and affecting parties residing in the Northern District of California, and residents of the Northern District of California are alleged to have infringed copyright.

**FACTUAL ALLEGATIONS**

7. On April 7, 2008, the State of Oregon Legislative Counsel Committee (hereafter "Committee") wrote a "take-down notice" to plaintiff Justia, Inc. asking it to remove all copies of Oregon Revised Statutes from the Internet and claiming a copyright in (1) the arrangement and subject-matter compilation of Oregon statutory law, (2) prefatory and explanatory notes, (3) leadlines and numbering for each statutory section, and (4) the tables, index and annotations of those laws. A copy of the Committee's letter is attached hereto as Exhibit A. [link to document on scribd.]

8. On April 13, 2008, plaintiff Public.Resource.Org wrote the committee explaining that (1) there is a right to read public law which precludes the state's assertion of copyright, and (2) the state was asserting a copyright over non-copyrightable material. Carl Malamud, the president and CEO, stated that Public.Resource.Org had posted, but had currently restricted, both 2005 and 2007 copies of the Oregon Revised Statutes. Mr. Malamud pointed out that section 173.763(1)(a)(H) of the Oregon Revised Statutes spelled out a mandate of making available a number of items including bills, bill histories, and "all Oregon Laws enacted on and after September 9, 1995." A copy of his April 13 letter is attached as Exhibit B. [link to document on scribd]

9. Mr. Malamud followed up his April 13 letter with an April 15 letter explaining to the Committee that its own website "does not meet broadly accepted standards of functionality and validity." He pointed out that ORS section 173.763 mandates that the law "shall be made available to the public through the largest nonproprietary, nonprofit cooperative public computer network. The information shall be made available in one or more formats and by one or more means in order to provide the general public in this state with the greatest feasible access." A copy of his April 15 letter is attached hereto as Exhibit C.

10. The Committee replied to the April 13 and April 15 letters by promulgating, on or about April 29, a so-called "Public License" which would allow plaintiffs to post the Oregon Revised Statutes on the Internet only if they acknowledged that portions of the Oregon Revised Statutes "are protected by copyright and other applicable law to the extent stated in this license."

PRO-000836

1  The "Public License" stated, "Any copying, reproduction, download or other use of the ORS

2  Website Edition as provided on this website other than as authorized under this License or under

3  copyright law is prohibited." A copy of the "Public License" is attached hereto as Exhibit D. A

4  day later, the Committee wrote to Tim Stanley, the head of Justia, informing him that it would not

5  require him to remove content "at this time," but it did not back down from or renounce its claim

6  of copyright over portions of the Oregon Revised Statutes ("ORS"), nor did the Committee rule

7  out future legal action to remove the ORS from Justia's website. A copy of the state's April 30

8  letter is attached hereto as Exhibit E.

9      11.Plaintiffs' counsel wrote to the Committee on May 2, 2008 informing the Committee

10  that plaintiffs had reached an impasse with the Committee, and that plaintiffs intended to post the

11  entirety of the Oregon Revised Statutes, including the material the Committee had asserted a

12  copyright over, on June 2, 2008. A copy of the May 2 letter is attached hereto as Exhibit F.

13      12.It is generally recognized that the Oregon Revised Statutes are the definitive statement

14  of Oregon law as enacted by the elected representatives of the citizens of Oregon. The Wikipedia

15  entry for "Oregon Revised Statutes" says it is the "codified body of statutory law governing the

16  U.S. state of Oregon, as enacted by the Oregon Legislative Assembly." [Oregon Revised

17  Statutes, WikiPedia, http://en.wikipedia.org/wiki/Oregon_Revised_Statutes, last accessed May

18  13, 2008]. That the Oregon Revised Statutes is official is reinforced throughout the government.

19  (See, e.g., Oregon Department of Revenue which links to the Oregon Revised Statutes as

20  controlling law at http://www.oregon.gov/DOR/adminrules.shtml, last accessed May 13, 2008

21  and City of Medford, Oregon, which also links to the Oregon Revised Statutes at

22  http://www.ci.medford.or.us/Page.asp?NavID=1484, last accessed May 13, 2008.)

23              **COUNT I: DECLARATORY RELIEF OF NON-INFRINGEMENT**

24      13.Plaintiffs repeat and incorporate as though fully set forth herein each and every

25  allegations in paragraphs 1 through 12 above.

26      14.There is a real and actual controversy between plaintiffs and the State of Oregon

27  Legislative Counsel Committee regarding whether the Committee owns a copyright over portions

28  of the Oregon Revised Statutes ("ORS").

---

Case No. _____ -- COMPLAINT FOR DECLARATORY RELIEF RE NON-INFRINGEMENT OF
COPYRIGHT                                                                          4

PRO-000837

15.The Committee contends that it owns a copyright on the arrangement and subject-matter compilation of ORS, the prefatory and explanatory notes, the lead-lines and numbering for sections, and tables, indexes and annotations.

16.Plaintiffs contend that the Committee's assertion of copyright is precluded by the First Amendment to the United States Constitution, by Oregon law, by United States copyright law, and by such authorities as *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340 (1991) [alphabetical listings of names, accompanied by towns and telephone numbers, in telephone book white pages held not copyrightable] and *Matthew Bender & Co. v. West Publishing*, 158 F.3d 674, 676 (2d Cir. 1998) [alterations to judicial opinions, such as annotating to reflect subsequent procedural developments and choices on selection and arrangement, "can reasonably be viewed as obvious, typical, and lacking even minimal creativity"].  Plaintiffs also contend that the Oregon Revised Statutes are in the public domain and that any use they are making or propose to make of the ORS is a fair use pursuant to 17 U.S.C. section 107.  Indeed, the Committee itself in its April 7 letter (Exhibit A) conceded that the entirety of the Oregon Revised Statutes is freely available online at the Oregon Legislative Assembly's own website.

17.Since the ORS is used by the executive branch, legislative branch, courts and lawyers as a statement of the law (the Committee calls the printed version the "official legal text" on its website, www.leg.state.or.us/ors ), it has "enter[ed] the public domain and [is] not subject to the copyright holder's exclusive prerogatives." *Veeck v. Southern Building Code Congress Intl., Inc.*, 293 F.3d 791, 793.

18.Plaintiffs therefore request that the Court determine and adjudge that each and every one of the propositions stated in paragraphs 16 and 17 above states the law applicable to the facts stated in this action, and that plaintiffs have a right to post the Oregon Revised Statutes including the organizational scheme of the statutes, the numbers and leadlines, editorial notes, source notes and prefatory material, the index, the annotations, tables, and other material as to which the Committee claims copyright ownership.

PRO-000838

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for relief as follows:

1.     A declaratory judgment that the use they have made and propose to make of the Oregon Revised Statutes is not an infringement of copyright;

2.     Injunctive relief restraining Defendant, and its agents, servants, employees, successors and assigns, and all those in privity with it, from bringing any lawsuit or threat against plaintiffs for copyright infringement for their use of the Oregon Revised Statutes, including but not limited to plaintiffs' publication, distribution, display, licensing, arrangement, or the ability to host it online or link to it from any website;

3.     Attorney's fees pursuant to, *inter alia*, 17 U.S.C. section 505, on a private attorney general basis according to California Code of Civil Procedure section 1021.5, or otherwise as allowed by law;

4.     For plaintiffs' costs and disbursements; and

5.     For such other and further relief as the court may deem just and proper.

Dated:  May 16, 2008                                    LEVY, RAM & OLSON LLP


                                          By:     _____
                                                   Karl Olson
                                                   ko@lrolaw.com
                                                   LEVY, RAM & OLSON LLP
                                                   639 Front Street, 4th Floor
                                                   San Francisco, CA  94111
                                                   Telephone:  415-433-4949
                                                   Facsimile:  415-433-7311


                                                   *Attorneys for Plaintiffs*

PRO-000839

1  Exhibit C: PUBLIC LICENSE PROPOSED BY OREGON LEGISLATIVE COUNSEL

2  The ORS Website Edition (defined below) is provided on this website under

3  the terms of this public license ("License"). Portions of the Oregon Revised

4  Statutes are protected by copyright and other applicable law to the extent

5  stated in this license. Any copying, reproduction, download or other use of

6  the ORS Website Edition as provided on this website other than as authorized

7  under this License or under copyright law is prohibited.

8

9  By exercising any rights to the ORS Website Edition, You accept and agree to

10  be bound by the terms of this License. To the extent this License may be

11  considered to be a contract, the State of Oregon, acting by and through the

12  Legislative Counsel Committee ("Licensor"), grants You the rights contained

13  in this License in consideration of your acceptance of such terms and

14  conditions and your promise to abide by the limitations set forth in this

15  License.

16

17  Subject to the limitations described in this paragraph, the Oregon Revised

18  Statutes is copyrighted by the State of Oregon and, except as authorized

19  under this License, may not be reproduced or distributed by any means or in

20  any manner without the written permission of the Office of the Legislative

21  Counsel. This copyright extends solely to the organizational scheme of the

22  statutes, the numbers and Leadlines (defined below) that appear at the head

23  of each section, all Editorial Notes, Source Notes and Prefatory Material

24  (defined below), the Index (defined below), the Annotations (defined below),

25  all Tables (defined below) and any other material produced by the Office of

26  the Legislative Counsel as part of the compilation and production of the

27  Oregon Revised Statutes. The State of Oregon disclaims any copyright in the

28  text of the statutes as enacted by the Oregon Legislative Assembly. Any

Exhibit C: Public License Proposed by Oregon Legislative Counsel

person may refer or cite to any portion of the Oregon Revised Statutes in any work, including to any section number, and may quote from any copyrighted portion of the Oregon Revised Statutes to the extent consistent with fair use under Title 17 of the United States Code.

## 1. Definitions

As used in this License:

"Annotations" means the case law annotations to the Oregon Revised Statutes compiled and printed as the last volume of the Oregon Revised Statutes or as the Annotations Cumulative Supplement.

"Collective Work" means a work, such as a periodical issue, anthology, citation service, digest, encyclopedia or other collection, in which the entirety or portions of the ORS Website Edition, in unmodified form and exclusive of those parts of the ORS Website Edition over which Licensor does not claim copyright, are assembled into a collective whole, along with one or more other contributions constituting separate and independent works in themselves. A work that constitutes a Collective Work is not a Derivative Work for the purposes of this License.

"Commercial Advantage" means a use of the ORS Website Edition in which You charge or receive, directly or indirectly, any monetary compensation or thing of value for distributing copies of, displaying, performing or otherwise providing or granting access to the ORS Website Edition to any person. "Commercial Advantage" does not include monetary compensation or a thing of value You receive in connection with a display of advertising or related to

PRO-000841

Exhibit C: Public License Proposed by Oregon Legislative Counsel

an offer of services in the ordinary operation of a website You control, provided that the display or offer is not connected with or contingent on the distribution, display or performance of the ORS Website Edition on the website and provided that You state on the website that the State of Oregon does not evaluate, endorse, approve, warrant, support or have any liability or responsibility for, knowledge of or connection with the services offered or any advertising displayed.

"Derivative Work" means a work based upon the ORS Website Edition or upon the ORS Website Edition and other pre-existing works, such as a translation, abridgment, condensation, or any other form in which the ORS Website Edition may be recast, transformed or adapted, except that a work that constitutes a Collective Work is not a Derivative Work for the purposes of this License.

"Edition," including a use of the term "Edition" as part of the term "ORS Website Edition," means a compilation of the Oregon Revised Statutes prepared for use during a particular year or biennium as, more or less, the currently effective statute laws of the State of Oregon and that is so identified on a website maintained by the State of Oregon, in the text of the Oregon Revised Statutes or the ORS Website Edition or, in the printed version of the Oregon Revised Statutes, on the title page of each printed volume.

"Editorial Notes" means explanatory notes in the Oregon Revised Statutes that appear immediately before or after the text of a statutory section and explain some aspect of the wording, placement, status, effectiveness or application of the section.

PRO-000842

Exhibit C: Public License Proposed by Oregon Legislative Counsel

1   "Index" means the alphabetical list of subjects or topics, and statutory

2   section numbers that correspond to those subjects or topics, usually but not

3   always compiled into and printed as volumes 18 and 19 of the Oregon

4   Revised Statutes.

5

6   "Leadlines" means the brief summaries of the provisions of sections of the

7   Oregon Revised Statutes that appear in boldface immediately after the

8   numbers that identify sections of the Oregon Revised Statutes.

9

10  "Licensor" means the State of Oregon, acting by and through the state's

11  Legislative Counsel Committee.

12

13  "Oregon Revised Statutes" means an Edition of the official topically compiled

14  permanent and general statute laws of the State of Oregon, together with the

15  topical and hierarchical schemes, Annotations, cross-references, Editorial

16  Notes, Indexes, Leadlines, Prefatory Material, Source Notes, Tables and text of

17  the Oregon Constitution and the Oregon Rules of Civil Procedure, or any part

18  thereof, that the Legislative Counsel Committee compiles, produces or

19  publishes.

20

21  "ORS Website Edition" means the text of the current Edition of the Oregon

22  Revised Statutes that is posted on the same website on which this License

23  appears.

24

25  "Prefatory Material" means that part of the Oregon Revised Statutes that

26  appears at the beginning of volume 1 of the printed version of the Oregon

27  Revised Statutes, and such other text as may appear at the beginnings of

28  volumes or chapters of the Oregon Revised Statutes or in other places in the

Case No. _____ -- COMPLAINT FOR DECLARATORY RELIEF RE NON-INFRINGEMENT OF   10
COPYRIGHT

Exhibit C: Public License Proposed by Oregon Legislative Counsel

Oregon Revised Statutes, and that explains how the statutes are compiled and the history, use and constituent parts of the Oregon Revised Statutes, or that provides other information of a similar character or content.

"Source Notes" means the citations that appear in small print after a statutory section or number and that cite the year of enactment, amendment or repeal of the statutory section and the Oregon Laws chapter and section that enacted, amended or repealed the section.

"Tables" means the tables of data that are usually but not always compiled into and printed as volume 20 of the Oregon Revised Statutes and that contain historical material and such other tables as may appear elsewhere in the Oregon Revised Statutes, except for tables that appear in the text of the statutes as enacted by the Oregon Legislative Assembly.

"You" means an individual or entity exercising rights under this License that has not previously violated the terms of this License with respect to the ORS Website Edition, or that has received express permission from Licensor to exercise rights under this License despite a previous violation.

**2. Fair Use Rights**

Nothing in this License is intended to reduce, limit or restrict any rights arising from fair use, first sale or other limitations on the exclusive rights of the copyright owner under copyright law or other applicable laws.

**3. License Grant**

---

Case No. _____ -- COMPLAINT FOR DECLARATORY RELIEF RE NON-INFRINGEMENT OF COPYRIGHT                                    11

PRO-000844

Exhibit C: Public License Proposed by Oregon Legislative Counsel

Subject to the terms and conditions of this License, Licensor hereby grants You a worldwide, royalty-free, nonexclusive, perpetual license, for the duration of the applicable copyright in the ORS Website Edition that is specifically subject to this License, to exercise the following rights in the ORS Website Edition:

    a.    You may reproduce the ORS Website Edition, incorporate the ORS Website Edition into one or more Collective Works, and reproduce the ORS Website Edition as incorporated in the Collective Works; and

    b.    You may distribute copies of the ORS Website Edition, display or perform the ORS Website Edition publicly, and perform the ORS Website Edition publicly by means of a digital transmission, including as incorporated in Collective Works.

You may exercise these rights in all media and formats whether now known or hereafter devised. These rights include the right to make such modifications as are technically necessary to exercise the rights in other media and formats, but otherwise You have no rights to make Derivative Works. All rights not expressly granted by Licensor are hereby reserved.

**4. Restrictions**

The rights granted in section 3 of this License are expressly made subject to and limited by the following restrictions:

    (a)    With every copy of the ORS Website Edition that You distribute, publicly display, publicly perform or publicly digitally perform, You

must include a copy of this License or the Uniform Resource Identifier for the web page on which this License appears. You may not offer or impose any terms on the ORS Website Edition that restrict the terms of this License or the ability of a recipient of the ORS Website Edition to exercise the rights granted to that recipient under the terms of this License. You may not sublicense the ORS Website Edition. You must keep intact all notices that refer to this License and to the disclaimer of warranties. When You distribute, publicly display, publicly perform or publicly digitally perform the ORS Website Edition, You may not impose any technological measures on the ORS Website Edition that restrict the ability of a person that receives the ORS Website Edition from You to exercise the rights granted to that person under the terms of the License. This paragraph applies to the ORS Website Edition as incorporated in a Collective Work, but this does not require the Collective Work apart from the ORS Website Edition itself to be made subject to the terms of this License. If You create a Collective Work, upon notice from Licensor You must, to the extent practicable, remove from the Collective Work any credit required by paragraph (c) of this section, as requested.

(b)   You may not exercise any of the rights granted to You in section 3 of this License in any manner for Commercial Advantage. The exchange of the ORS Website Edition for other copyrighted works by means of digital file-sharing or otherwise shall not be considered to be for Commercial Advantage, provided there is no payment of any monetary compensation in connection with the exchange of copyrighted works.

PRO-000846

Exhibit C: Public License Proposed by Oregon Legislative Counsel

1

2      (c)     If You distribute, publicly display, publicly perform or publicly

3              digitally perform the ORS Website Edition or Collective Works, You

4              must, unless Licensor has given You notice to the contrary under

5              paragraph (a) of this section, keep intact all copyright notices for the

6              ORS Website Edition and provide, to the degree reasonable for the

7              medium or means You are using, the following notice:

8

9              Subject to the limitations described in this paragraph,

10             the Oregon Revised Statutes is copyrighted by the

11             State of Oregon and may not be reproduced or

12             distributed by any means or in any manner without

13             the written permission of the Office of the Legislative

14             Counsel. This copyright extends solely to the

15             organizational scheme of the statutes, the numbers

16             and leadlines that appear at the head of each

17             section, all editorial notes, source notes and prefatory

18             material, the index, the annotations, all tables and

19             any other material produced by the Office of the

20             Legislative Counsel as part of the compilation and

21             production of the Oregon Revised Statutes. The State

22             of Oregon disclaims any copyright in the text of the

23             statutes as enacted by the Oregon Legislative

24             Assembly. Any person may refer or cite to any portion

25             of the Oregon Revised Statutes in any work, including

26             to any section number, and may quote from any

27             copyrighted portion of the Oregon Revised Statutes to

28

Case No. _____ -- COMPLAINT FOR DECLARATORY RELIEF RE NON-INFRINGEMENT OF     14
COPYRIGHT

1    the extent consistent with fair use under Title 17 of

2    the United States Code.

3

4  (d)  You may use the notice required by paragraph (c) of this section only

5       for the purpose of attribution in the manner set out above. By

6       exercising rights under this License, You may not implicitly or

7       explicitly assert or imply that the State of Oregon, the Legislative

8       Counsel Committee or the Office of the Legislative Counsel sponsors

9       or endorses You or any use of the ORS Website Edition by You.

10

11  **5. Representations, Warranties and Disclaimer**

12

13  LICENSOR OFFERS THE ORS WEBSITE EDITION AS-IS AND ONLY TO THE

14  EXTENT OF ANY RIGHTS HELD IN THE LICENSED ORS WEBSITE EDITION BY

15  LICENSOR. LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY

16  KIND CONCERNING THE ORS WEBSITE EDITION, EXPRESS, IMPLIED,

17  STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, WARRANTIES

18  OF TITLE, MARKETABILITY, MERCHANTIBILITY, FITNESS FOR A PARTICULAR

19  PURPOSE, NONINFRINGEMENT, OR THE ABSENCE OF LATENT OR OTHER

20  DEFECTS, ACCURACY, OR THE PRESENCE OR ABSENCE OF ERRORS,

21  WHETHER OR NOT DISCOVERABLE. SOME JURISDICTIONS DO NOT ALLOW

22  THE EXCLUSION OF IMPLIED WARRANTIES, SO SUCH EXCLUSION MAY NOT

23  APPLY TO YOU.

24

25  UNDER ORS 171.285, THE ORS WEBSITE EDITION DOES NOT CONSTITUTE

26  THE OFFICIAL TEXT OF OREGON LAW AND IS NOT PRIMA FACIE EVIDENCE OF

27  THE LAW IN ANY COURT OR PROCEEDING. FOR THE OFFICIAL TEXT OF THE

28  OREGON REVISED STATUTES, YOU ARE ADVISED TO CONSULT THE PRINTED

PRO-000848

Exhibit C: Public License Proposed by Oregon Legislative Counsel

EDITION OF THE OREGON REVISED STATUTES THAT BEARS THE CERTIFICATE REQUIRED FROM THE OFFICE OF THE LEGISLATIVE COUNSEL OR THE REVISOR OF STATUTES UNDER ORS 171.285.

## 6. Limitation on Liability

EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE LAW, IN NO EVENT WILL LICENSOR BE LIABLE TO YOU ON ANY LEGAL THEORY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES OR DAMAGES OF ANY OTHER CHARACTER OR KIND ARISING OUT OF THIS LICENSE OR THE USE OF THE ORS WEBSITE EDITION, EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 7. Termination

This License and the rights granted hereunder will terminate automatically upon any breach by You of the terms of this License. Individuals or entities who have received Collective Works from You under this License, however, will not have the licenses terminated, provided the individuals or entities remain in full compliance with those licenses. Sections 1, 2, 5, 6, 7 and 8 of this License survive any termination of this License.

Licensor reserves the right to release the ORS Website Edition under different license terms or to stop distributing the ORS Website Edition at any time provided, however, that any such election does not withdraw this License (or any other license that has been, or is required to be, granted under the terms of this License), and this License will continue in full force and effect unless terminated as stated in this section.

PRO-000849

Exhibit C: Public License Proposed by Oregon Legislative Counsel

**8. Miscellaneous**

Each recipient of a distribution of the ORS Website Edition provided by You and each performance or public digital performance of the ORS Website Edition that is based on a distribution of the ORS Website Edition provided by You is subject to the same terms and conditions granted to You under this License. In providing a distribution of the ORS Website Edition to a recipient or in performing or publicly digitally performing the ORS Website Edition You may not modify or disclaim a term or condition of this License.

You agree that if any term or provision of this License is declared by a court of competent jurisdiction to be illegal or in conflict with any law, the validity of the remaining terms and provisions is not affected, and the remaining rights and obligations granted to You shall be construed and enforced as if this License did not contain the particular term or provision held to be invalid.

No term or provision of this License shall be deemed waived and no breach consented to unless such waiver or consent shall be in writing and signed by the party to be charged with such waiver or consent.

This License constitutes the entire agreement between Licensor and You with respect to the ORS Website Edition licensed here. There are no understandings, agreements or representations with respect to the ORS Website Edition not specified here. Licensor shall not be bound by any additional provisions that may appear in any communication from You. Except for any typographical or other nonsubstantive changes, this License

PRO-000850

Exhibit C: Public License Proposed by Oregon Legislative Counsel

1  may not be modified except by Licensor after 60 days' notice given on the

2  website on which the License appears.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. _____ -- COMPLAINT FOR DECLARATORY RELIEF RE NON-INFRINGEMENT OF   18
COPYRIGHT

PRO-000851

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this 7th day of July 2017, I have electronically filed the foregoing APPELLEE'S SUPPLEMENTAL APPENDIX VOLUME II with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record.

The undersigned hereby further certifies that on this 7th day of July 2017, two copies of the foregoing was shipped to the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit pursuant to FRAP 25(a)(2)(B).


*/s/Lisa C. Pavento*_____
Lisa C. Pavento
Georgia Bar No. 246698